**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF CONNECTICUT, and STATE OF VERMONT,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KEVIN K. McALEENAN, *in his official capacity as Acting Secretary of the United States Department of Homeland Security*; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; KENNETH T. CUCCINELLI II, *in his official capacity as Acting Director of United States Citizenship and Immigration Services*; and UNITED STATES OF AMERICA,<br><br>    Defendants. | **CIVIL ACTION NO.  19 Civ. 07777 (GBD)** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND STAY PENDING JUDICIAL REVIEW**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

ARGUMENT .......................................................................................................................... 5

  A.  Plaintiffs will suffer imminent and irreparable harm because of the Final Rule. ................ 6

    1.  The Final Rule deters Plaintiffs' residents from participating in important public programs. ........................................................................................................................... 7

    2.  The Final Rule will irreparably harm Plaintiffs' proprietary interests by slashing federal funding, imposing direct costs and harms onto Plaintiffs, and damaging Plaintiffs' economies. ....................................................................................................................... 9

    3.  The Final Rule will irreparably harm public health within Plaintiffs' jurisdictions. ..... 13

    4.  The Final Rule will cause Plaintiffs to expend significant resources to adjust state and local run public benefit programs. ..................................................................................... 14

  B.  Plaintiffs are likely to succeed on the merits of their claims under the Administrative Procedure Act. ...................................................................................................................... 18

    1.  The Final Rule exceeds DHS's statutory authority and is contrary to law. ................... 18

      a.  The Final Rule contravenes the long-standing meaning of the term "public charge" incorporated into the INA by Congress. ........................................................................... 19

      b.  Congress has repeatedly rejected efforts to expand the definition of public charge. . 24

      c.  The Final Rule conflicts with congressional enactments about immigrants' eligibility for public benefits. ......................................................................................................... 25

    2.  The Final Rule is arbitrary and capricious. ................................................................... 27

      a.  The Final Rule's changes to the meaning of "public charge" are arbitrary and capricious because Defendants fail to justify their abandonment of longstanding policy and practice. ....................................................................................................................... 27

      b.  The Rule's purported "totality of the circumstances" test is arbitrary because its factors bear no reasonable relationship to determining whether an individual is in fact likely to become a public charge. ...................................................................................... 30

      c.  The Final Rule is arbitrary and capricious because it fails to consider the federal government's obligations to accommodate and include individuals with disabilities and is contrary to Section 504 of the Rehabilitation Act. ........................................................... 33

      d.  The Rule is arbitrary and capricious because it fails to consider or quantify significant harms. ................................................................................................................................. 37

  C.  The public interest and balance of equities tip sharply in Plaintiffs' favor and the Court should preliminarily enjoin the Final Rule without geographic limitation. .............................. 39

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Int'l v. Commc'ns Comm'n*,
 885 F.3d 687 (D.C. Cir. 2018) ..................................................................................20, 23

*Am. Wild Horse Pres. Campaign v. Perdue*,
 873 F.3d 914 (D.C. Cir. 2017) ............................................................................................38

*Arizona v. United States*,
 567 U.S. 387 (2012) ...........................................................................................................40

*B.C. v. Mount Vernon Sch. Dist.*,
 837 F.3d 152 (2d Cir. 2016)................................................................................................34

*Batalla Vidal v. Nielsen*,
 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ..........................................................................12, 13

*Bauer v. DeVos*,
 325 F. Supp. 3d 74 (D.D.C. 2018) ...................................................................................6, 40

*Bob Jones Univ. v. United States*,
 461 U.S. 574 (1983) ...........................................................................................................24

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ...........................................................................................................40

*California v. Azar*,
 911 F.3d 558 (9th Cir. 2018) ...............................................................................................9

*Cape May Greene, Inc. v. Warren*,
 698 F.2d 179 (3d Cir. 1983) ...............................................................................................36

*Chamber of Commerce v. U.S. Dep't of Labor*,
 885 F.3d 360 (5th Cir. 2018) ..............................................................................................30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
 467 U.S. 837 (1984) ...........................................................................................................19

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971) ........................................................................................................6, 18

*City of Arlington v. FCC*,
 569 U.S. 290 (2013) ...........................................................................................................18

*Cuomo v. Clearing House Ass'n, L.L.C.*,
   557 U.S. 519 (2009) ............................................................................................ 25

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sciences*,
   804 F.3d 178 (2d Cir. 2015) ............................................................................. 34

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .............................................................................. 10, 33

*Doe v. Pfrommer*,
   148 F.3d 73 (2d Cir. 1998) ............................................................................... 34

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (N.D. Cal. 2014) ....................................................................... 39

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) ............................................................. 6

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ...................................................................................... 30

*Ex parte Mitchell*,
   256 F. 229 (N.D.N.Y. 1919) ............................................................................. 21

*FCC v. NextWave Pers. Commc'ns Inc.*,
   537 U.S. 293 (2003) .......................................................................................... 37

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .......................................................................................... 28

*Franco-Gonzalez v. Holder*,
   No. 10 Civ. 02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) .................... 35

*Gegiow v. Uhl*,
   239 U.S. 3 (1915) .............................................................................................. 21

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007) ................................................................................. 6

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ......................................................................... 40

*Home Care Ass'n of Am. v. Weil*,
   799 F.3d 1084 (D.C. Cir. 2015) ....................................................................... 28

*Howe v. United States*,
   247 F. 292 (2d Cir. 1917) ................................................................................. 21

*Humane Soc'y of U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ..................................................................................38

*In re Nw. Airlines Corp.*,
  483 F.3d 160 (2d Cir. 2007) ......................................................................................22

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ..................................................................................................25

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................................................39

*Levine v. Apker*,
  455 F.3d 71 (2d Cir. 2006) ........................................................................................23

*Los Angeles v. Kern*,
  462 F. Supp. 2d 1105 (C.D. Cal. 2006) ......................................................................9

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004) ................................................................................31

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
  676 F.3d 1094 (D.C. Cir. 2012) ................................................................................27

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) ..............................................................................................27

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ..................................................................................37

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ..........................................................................................6

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) ..................................................................................................22

*New York v. BB's Corner, Inc.*,
  No. 12 Civ. 1828, 2012 WL 2402624 (S.D.N.Y. June 25, 2012) ............................13

*New York v. Schweiker*,
  557 F. Supp. 354 (S.D.N.Y. 1983) ...........................................................................13

*Pub. Citizen, Inc. v. Mineta*,
  340 F.3d 39 (2d Cir. 2003) ........................................................................................30

*Richards v. Ashcroft*,
  400 F.3d 125 (2d Cir. 2005) ......................................................................................22

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ...................................................................................27

*Stewart v. Azar*,
   313 F. Supp. 3d 237 (D.D.C. 2018) ..........................................................38

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ...............................................................6, 40

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017)..............................................................................39

*U.S. ex rel. Mantler v. Comm'r of Immigration*,
   3 F.2d 234 (2d Cir. 1924)..........................................................................21

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014)..................................................................................19

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)..................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................6

## CONSTITUTION

U.S. Const.
   art. 1, § 8, cl. 4 .......................................................................................40

## FEDERAL STATUTES

5 U.S.C.
   § 702.............................................................................................................9
   § 705..................................................................................................6, 39, 40
   § 706..............................................................................................18, 27, 37

7 U.S.C.
   § 2017........................................................................................................27

8 U.S.C.
    § 1101 ........................................................................................................................2
    § 1182 ..............................................................................................2, 3, 5, 30, 31
    § 1183a .............................................................................................................3, 32
    § 1185 ........................................................................................................................2
    § 1201 ........................................................................................................................2
    § 1227 ........................................................................................................................2
    § 1255 ..................................................................................................................2, 26
    § 1522 ......................................................................................................................26
    §1612 .......................................................................................................................26
    §1613 .......................................................................................................................26

29 U.S.C.
    § 705 .......................................................................................................................35
    § 794 ..................................................................................................................34, 36

Agricultural Research, Extension, and Education Reform Act of 1998,
    Pub. L. No. 105-185, 112 Stat. 523 ......................................................................26

Farm Security and Rural Investment Act of 2002,
    Pub. L. No. 107-171, 116 Stat. 134 (2002)...........................................................26

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. 104-208, 104-208, 110 Stat. 3009-546 (1996)..........................................25

Immigration Act of 1882,
    ch. 376, 22 Stat. 214 (1882) ..................................................................................20

Immigration Act of 1903,
    ch. 1012 § 2, 32 Stat. 1213, 1214 (1903) ..............................................................21

Immigration Act of 1907,
    ch. 1134 § 2, 34 Stat. 898, 899 (1907) ..................................................................21

Immigration Act of 1910,
    ch. 128 § 1, 36 Stat. 263, 263 (1910) ....................................................................21

Immigration Act of 1917,
    ch. 29, 39 Stat. 874, 876 (1917) ............................................................................21

Personal Responsibiility and Work Opportunity Reconciliation Act,
    Pub. L. 104-193, 110 Stat. 2260 (1996) (codified at 8 U.S.C. § 1601) ............................26, 28

Rehabilitation Act of 1973,
    Pub. L. 93-112, 87 Stat. 394 (1973) (codified at 29 U.S.C. § 794) .............................36, 37, 38

**LEGISLATIVE MATERIALS**

13 Cong. Rec. 5108-10 (June 19, 1882) ......................................................20

142 Cong. Rec. S11612 (daily ed. Sept. 16, 1996) ....................................25

147 Cong. Rec. S13245-07 (Dec. 14, 2001) ...............................................27

H.R. Rep. 104-651 (1996) ............................................................................26

H.R. Rep. 104-651 (1996) ............................................................................26

S. Rep. 104-249 (1996) .................................................................................25

S. Rep. 113-40 (2013) ...................................................................................25

**FEDERAL RULES AND REGULATIONS**

6 C.F.R.
    § 15.30 ..........................................................................................34
    § 15.49 ..........................................................................................34

28 C.F.R.
    § 41.51 ..........................................................................................34

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,
    64 Fed. Reg. 28,689-93, 28689 (Mar. 26, 1999) ........................3, 8, 23, 29

*Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) ..................4, 32

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) .............. passim

*Final Rule: Adjustment of Status for Certain Aliens*, 54 Fed. Reg. 29,442 (July 12,
    1989) ............................................................................................................23

**ADMINISTRATIVE DECISIONS**

*In the Matter of C-*
    3 I. & N. Dec. 96 (BIA 1947) ...............................................................22

*In the Matter of H-*
    1 I. & N. Dec. 459 (BIA 1943) .............................................................22

*In the Matter of K-*
    3 I. & N. Dec. 613 (BIA 1949) .............................................................22

*In the Matter of R-*
    1 I. & N. Dec. 209 (BIA 1942) .............................................................21

*In the Matter of T-*
   3 I. & N. Dec. 641 (BIA 1949) ........................................................................22

*Matter of A-*
   19 I. & N. Dec. 867 (BIA 1988) ......................................................................22

*Matter of B-*
   3 I. & N. Dec. 323 (BIA 1948) ........................................................................21

*Matter of Martinez-Lopez*
   10 I. & N. Dec. 409 (BIA 1962) .................................................................22, 32

*Matter of V-*
   1 I. & N. Dec. 293 (BIA 1942) ........................................................................21

## MISCELLANEOUS AUTHORITIES

Dep't of Homeland Sec., *Table 1. Persons Obtaining Lawful Permanent Resident
   Status: Fiscal Years 1820 to 2016,* (Dec. 18, 2017),
   https://www.dhs.gov/immigration-statistics/yearbook/2016/table1 ..........................................4

Dep't of Justice, March 2003 Memorandum Opinion for the General Counsel of
   the Immigration and Naturalization Service at 2 (March 13, 2002),
   https://www.justice.gov/file/19086/download ..........................................................36

Immigration and Naturalization Serv., *2001 Statistical Yearbook of the
   Immigration and Naturalization Service* 258 (2003),
   https://www.hsdl.org/?view&did=444066..............................................................4

Merriam-Webster's Dictionary (Online Ed.) https://www.merriam-
   webster.com/dictionary/charge ...........................................................................20

Webster's Dictionary (1828 Ed.), https://perma.cc/R9NN-5HFK................................................20

Webster's Dictionary (1886 Ed.), https://perma.cc/LXX9-KF3K................................................20

## PRELIMINARY STATEMENT

Plaintiffs seek immediate provisional relief to enjoin Defendants from implementing, by unjustified and unsupported regulation, one of the most consequential changes to the federal immigration system in a generation.

For over one hundred years, immigrants seeking a better life in this country have been excluded on the ground that they may become a "public charge" only if they fell in a narrowly-defined category of individuals likely to become primarily dependent on the government for long-term subsistence.  This well-established meaning of "public charge" comports with more than a century of common law, decades of administrative practice by immigration judges, and repeated ratification by Congress.

A new regulation published by Defendants, scheduled to take effect on October 15, 2019, would upend this longstanding status quo.  *See* Final Rule, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pt. 103, 212, 213, 214, 245, 248) (Final Rule).  Unless enjoined, the Final Rule will irreparably harm Plaintiffs by deterring millions of noncitizens and their family members from accessing public benefits they are lawfully entitled to receive, causing tremendous economic, public health, and other harms. Defendants' effort to remake federal immigration law to suit their preferred policy objectives is illegal because it exceeds their congressional authorization, contravenes clearly-expressed congressional intent, and bears no reasonable relationship to determining whether an immigrant is in fact likely to become a public charge.  Indeed, the Final Rule arbitrarily ignores both the overwhelming evidence in the administrative record and the significant reliance interests of Plaintiffs and their residents.  The Final Rule transparently seeks to exclude working class

immigrants of color to the benefit of wealthier, whiter immigrants "coming from Europe."[1] The Court should enjoin Defendants' unlawful action.

## BACKGROUND

### The well-settled understanding of "public charge."

The Immigration and Nationality Act ("INA") provides that the federal government may determine whether a noncitizen applying either to enter or to reside permanently in the United States is likely to become a "public charge" and therefore inadmissible. 8 U.S.C. § 1182(a)(4)(A). Immigrants are assessed under the public charge framework when noncitizens who are legally present here—typically on employment or family-sponsored visas that permit long-term residence—seek to adjust their status to become legal permanent residents ("LPRs" or "green card holders"). *Id.* at § 1182(a); *id.* at § 1255(a). Individuals seeking entry into the United States through any type of visa are also subject to the public charge analysis.[2] *Id.* at § 1182(a). In evaluating whether an applicant is likely to become a public charge, the Department of Homeland Security ("DHS") is statutorily required to evaluate a range of factors in a totality-of-circumstances determination. *Id.* at § 1182(a)(4)(B).[3] Applicants presently in the United States who are found inadmissible are subject to removal (i.e., deportation). *Id.* at § 1227(a)(1).

"Public charge" is a term with a well-established common law meaning that Congress has adopted and maintained for more than 130 years and that, until this Final Rule, federal

---

[1] Zeke Miller and Ashley Thomas, *Trump Official: Statue of Liberty's Poem is about Europeans*, Associated Press (Aug. 14, 2019), https://www.apnews.com/290fe000b4584ddca46a6eb36a74a703.

[2] DHS may also undertake a public charge determination each time a noncitizen passes through a U.S. port of entry, 8 U.S.C. § 1185(d), and when LPRs enter the United States after a trip of more than six months out of the country, 8 U.S.C. § 1101(a)(13)(c).

[3] Defendant United States Customs and Immigration Services ("USCIS") is a component of DHS and has authority to make public charge determinations for adjustment of status applications. 8 U.S.C. § 1201(a). Prior to March 1, 2003, this function was performed by the Immigration and Naturalization Service ("INS"), under the purview of the United States Department of Justice ("DOJ"). After 2003, this authority was delegated to DHS.

immigration agencies have consistently applied.  Under that well-settled understanding, the term "public charge" means an individual who is or is likely to become primarily and permanently dependent on the government for subsistence.  The term does not refer to employable individuals who earn a modest living, or to individuals who receive temporary or moderate amounts of public benefits to supplement their income and promote upward mobility.[4]  See *infra* at 19-24. The federal government has confirmed this long-standing meaning of "public charge" multiple times, including in a 1999 Field Guidance that defined a "public charge" narrowly as "an alien who has become (for deportation purposes) or who is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense,"—a test that has become known as the "primarily dependent standard." *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689-93, 28689 (Mar. 26, 1999) ("1999 Field Guidance").

For decades, federal immigration officials have applied a totality-of-circumstances test that weighs five statutory factors to assess whether an individual is likely to become a public charge under this historical definition: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; (5) education and skills. 8 U.S.C. § 1182(a)(4)(B).  Officials may also consider an affidavit of support, which is a legally enforceable contract between the sponsor of the applicant and the federal government.  8 U.S.C. § 1182(a)(4)(B)(ii); 8 U.S.C. § 1183a(a)(1)(A).

For roughly a century, a public charge finding has been the exception, not the rule; between 1892 and 1980 (the last year for which data is publicly available) less than one percent

---

[4] The history of public charge and the key provisions of the INA are described more fully in Plaintiffs' Complaint, ¶¶ 24-36.

of immigrants were excluded on public charge grounds.[5]

**The challenged rulemaking.**

In October 2018, DHS issued the notice of proposed rulemaking, *Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) ("Proposed Rule"), which sought to redefine public charge and overhaul the totality-of-the-circumstances test by which DHS determines if an applicant is likely to become a public charge.[6]  The Proposed Rule faced intense criticism, drawing opposition from the "vast majority" of commenters.  84 Fed. Reg. at 41,297.

On August 14, 2019, DHS published the Final Rule in the Federal Register, which finalized, with minimal adjustments,[7] the proposed changes to the public charge definition and the totality-of-circumstances test.  *Id.* at 41,292.  Specifically, the Final Rule eliminates the primarily dependent standard; holds the use of non-cash, supplemental benefits like Medicaid, food stamps, and housing supplements against applicants; and replaces the totality-of-circumstances test with the weighted-factors analysis described below.  *Id.* at 41,294-95.

*Vastly expanded definition of public charge:* The Final Rule redefines "public charge" as any person who has received any amount of several "public benefit[s]" for more than 12 months in the aggregate within any 36-month period.  *Id.* at 41,501 (§ 212.21(a)).  The Final Rule defines "public benefit" to include, for the first time, not just substantial cash assistance and government-financed institutionalization—i.e., indicators of long-term government dependency—but also non-cash benefits such as Supplemental Nutrition Assistance Program

---

[5] *See* Dep't of Homeland Sec., *Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*, (Dec. 18, 2017), https://www.dhs.gov/immigration-statistics/yearbook/2016/table1; Immigration and Naturalization Serv., *2001 Statistical Yearbook of the Immigration and Naturalization Service* 258 (2003), https://www.hsdl.org/?view&did=444066.
[6] The Proposed Rule is described in more detail in Plaintiffs' Complaint, ¶¶ 103-09.
[7] For example, the Final Rule makes limited exceptions for pregnant women and children on Medicaid.  84 Fed. Reg. at 41,476.  Women and children would still be penalized, however, for enrolling in SNAP, and women would have to enroll and disenroll in Medicaid depending on their pregnancy status.

("SNAP"), Medicaid, and various forms of housing assistance. *Id.* at 41,501 (§ 212.21(b)) (enumerating covered public benefits). The Final Rule also provides that DHS will count each benefit separately in calculating the duration of use—even when multiple benefits are used concurrently in the same month. *Id.* That is, an individual who receives just four months of SNAP, Medicaid, and housing assistance together will be deemed to have received an overall 12 months of benefits, and thus be a "public charge" under the Final Rule. *Id.*

*Transformation of the totality-of-circumstances test:* To determine the likelihood that an applicant would become a public charge, the INA specifies that DHS take into account a range of factors, including, at a minimum, an immigrant's age, health, family status, assets, resources, financial status, education, and skills. *See* 8 U.S.C. § 1182(a)(4). DHS has historically interpreted the statute to require a "totality-of-circumstances" test in making such a determination. The Final Rule transforms this test by adding a host of factors to the analysis, including income of under $15,613 for an individual (an amount *above* the federal poverty guidelines ("FPG")), family size, English-language proficiency, application for a fee waiver for immigration benefits, and the mere application for enumerated benefits, even if such benefits are not actually received or used. *See* 84 Fed. Reg. at 41,502-04 (§ 212.22). The Final Rule assigns mandatory weights to many of these factors and counts each of them separately for purposes of determining the 12-month threshold, thus heavily tilting the scale to favor wealthy immigrants at the expense of the working poor and disabled. *Id.* at 41,397; *id.* at 41,502-04 (§ 212.22(b)).

The Final Rule is set to go into effect on October 15, 2019. *Id.* at 41,292.

## **ARGUMENT**

Plaintiffs are entitled to a preliminary injunction because they are likely to suffer irreparable harm absent preliminary relief; they are likely to succeed on the merits; the balance

of the equities tips in their favor; and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the alternative, this Court should "postpone the effective date" of the Final Rule pending judicial review, a provisional remedy that is expressly authorized by the Administrative Procedure Act ("APA"). 5 U.S.C. § 705. The standard for a stay under § 705 is the same as the standard for a preliminary injunction. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).

### A. **Plaintiffs will suffer imminent and irreparable harm because of the Final Rule.**

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). Plaintiffs need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred."[8] *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

Plaintiffs will suffer irreparable and imminent harm because the Final Rule will drive immigrants and their families in Plaintiffs' jurisdictions to forgo and disenroll from critical public assistance benefits, including both the benefits expressly covered by the Final Rule (the "enumerated benefits"), and also benefits that are beyond the express scope of the Final Rule. This predictable chilling effect—that DHS itself acknowledges—will result in imminent and irreparable harm by directly imposing substantial economic harms on Plaintiffs that cannot be

---

[8] Judicial review of agency action under the APA is ordinarily "based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). The Court may consider evidence outside the administrative record in determining whether Plaintiffs have established irreparable harm for purposes of this preliminary injunction motion. *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1106 (N.D. Cal. 2018).

remedied and by undermining Plaintiffs' efforts to safeguard public health.  In addition, even apart from this chilling effect, the Final Rule imposes immediate programmatic and administrative costs and burdens on Plaintiffs that they cannot recoup.

### 1. The Final Rule deters Plaintiffs' residents from participating in important public programs.

DHS admits that the Rule will chill participation in public benefits programs.  DHS acknowledges that the Rule will cause immigrants to disenroll from the enumerated benefit programs—including Medicaid, food stamps, and housing benefits—in order not to prejudice their chances of changing immigration status.  *See, e.g.*, 84 Fed. Reg. at 41,307.  And DHS recognizes that impact will not be confined only to noncitizens, but will be borne also by "U.S. citizens who are members of mixed status households." *Id.* at 41,300.

DHS also concedes that this effect will not be limited to the programs and individuals covered by the Rule, but will cause families to forego or disenroll from benefits that are "not directly regulated by this [R]ule." *Id.* at 41,463.  For example, the Rule will likely cause immigrants to forgo participation in the Special Supplemental Nutrition Program for Women, Infants and Children ("WIC"), which provides food supplements for pregnant women and children, even though WIC is not expressly covered by the Final Rule.  The same is true for the Children's Health Insurance Program ("CHIP"), which provides low-cost health insurance to children, and for other health programs administered by Plaintiffs, including those administered in accordance with the Affordable Care Act ("ACA").[9]  And while the Final Rule allows pregnant women and children to remain on Medicaid without collateral public charge

---

[9] Exhibit 2 to the Declaration of Elena Goldstein (hereinafter "Ex. __") (Banks Decl.) ¶ 7; Ex. 3 (Barbot Decl.) ¶ 8; Ex. 6 (Gifford Decl.) ¶ 25; Ex. 9 (Kallick Decl.) ¶¶ 18-29; Ex. 10 (Katz Decl.) ¶ 16; Ex. 11 (Ku Decl.) ¶¶ 28, 49; Ex. 8 (Maksym Decl.) ¶ 13; Ex. 17 (Visnauskas Decl.) ¶¶ 23-24; Ex. 19 (Zucker Decl.) ¶¶ 13, 14, 33, 41, 48, 71.

consequences, the confusion and fear surrounding this Rule will nonetheless drastically reduce these vulnerable populations' participation in these vital healthcare programs.[10]

Both common sense and historical experience confirm that these negative impacts are likely to occur. In the past, confusion regarding the immigration consequences of changes to public benefits laws resulted in widespread disenrollment from benefits programs—including among immigrants and family members whose eligibility remained unchanged.[11] The same predictable effect on enrollment will occur again if this Court allows the Rule to take effect.

In total, the Final Rule's chilling effect is likely to deter approximately 24 million noncitizens and their family members in the United States from accessing a variety of public benefits.[12] This includes approximately 2.1 million New Yorkers,[13] 200,000 Connecticut residents,[14] and 8,000 Vermont residents.[15] Specifically, the Final Rule will cause hundreds of thousands of Plaintiffs' residents to withdraw from Medicaid and other programs designed to ensure that families have access to preventative and primary care.[16] Likewise, hundreds of thousands of noncitizens in Plaintiffs' jurisdictions may cease receiving SNAP food stamp

---

[10] Ex. 3 (Barbot Decl.) ¶¶ 8, 12; Ex. 4 (David Decl.) ¶ 19; Ex. 6 (Gifford Decl.) ¶ 9; Ex. 9 (Kallick Decl.) ¶¶ 18-29; Ex. 10 (Katz Decl.) ¶ 11; Ex. 11 (Ku Decl.) ¶¶ 25-33, 46-55; Ex. 19 (Zucker Decl.) ¶ 7.

[11] *See* Ex. 5 (Fong Decl.) ¶¶ 7-8; Ex. 14 (Mostofi Decl.) ¶¶ 7-8; Ex. 9 (Kallick Decl.) ¶¶ 23-28; Ex. 11 (Ku Decl.) ¶¶ 30-32; Ex. 16 (Schanzenbach Decl.) ¶¶ 37-39; *see also* 1999 Field Guidance, *supra*, at 28,692.

[12] Ex. 9 (Kallick Decl.) ¶ 18.

[13] *Id.*

[14] *Id. See also* Ex. 6 (Gifford Decl.) ¶ 10.

[15] DHS, without any evidentiary support, asserts that only 2.5% of households with at least one foreign-born citizen will disenroll or forego benefits. 84 Fed. Reg. at 41,463. But in fact the Final Rule will deter a vastly larger population of immigrants and their citizen family members from utilizing both the enumerated public benefits set forth in the Rule and other public benefit programs that are critical to Plaintiffs' economies, *see infra* at 13-14, and to the health and well-being of Plaintiffs' residents. *See, e.g.,* Ex. 9 (Kallick Decl.) ¶¶ 16, 18-29; Ex. 16 (Schanzenbach Decl.) ¶¶ 5-9, 31-49.

[16] Ex. 6 (Gifford Decl.) ¶ 24; Ex. 8 (Maksym Decl.) ¶ 7; Ex. 9 (Kallick Decl.) ¶¶ 18-29 (summarizing evidence of chilling wide range of non-cash benefits); Ex. 10 (Katz Decl.) ¶ 17 (estimating that approximately 283,000 patients at NYC Health + Hospitals will be impacted); Ex. 11 (Ku Decl.) ¶¶ 30-32, 46-54 (summarizing chilling effect on Medicaid); Ex. 19 (Zucker Decl.) ¶ 14 (estimating that the Final Rule will disincentivize up to 2 million New Yorkers from applying for or continuing to receive health insurance).

benefits because of the Final Rule,[17] as well as thousands of citizen children,[18] and many will be discouraged from participating in affordable housing programs.[19]  These mass withdrawals will have grave impacts on Plaintiffs' proprietary interests and economies and will impair Plaintiffs' ability to safeguard public health in their jurisdictions.  And regardless of how many individuals ultimately cease participating in these benefits programs, the Rule will impose substantial administrative and programmatic expenses on Plaintiffs.

### 2. The Final Rule will irreparably harm Plaintiffs' proprietary interests by slashing federal funding, imposing direct costs and harms onto Plaintiffs, and damaging Plaintiffs' economies.

This widespread chilling to enrollment in benefits will cause irreparable injury to Plaintiffs' proprietary, sovereign, and public-health interests.  Such injury is irreparable where, as here, the party seeking relief will not be able to recover monetary damages to compensate for the impacts caused by an illegal rule.  *See* 5 U.S.C. § 702 (permitting relief "other than money damages"); *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018) (finding that states would suffer irreparable economic harm if HHS rules limiting insurance coverage were not enjoined); *Los Angeles v. Kern*, 462 F. Supp. 2d 1105, 1119 (C.D. Cal. 2006) (monetary harms were irreparable where government plaintiffs could not seek monetary damages).

*General impacts.*  First, if adopted, the Final Rule will cause Plaintiff States to suffer massive federal funding cuts due to decreased enrollment in the enumerated benefits.  Decreased

---

[17] Ex. 2 (Banks Decl.) ¶ 11; Ex. 6 (Gifford Decl.) ¶¶ 16, 18; Ex. 8 (Guinn Decl.) ¶¶ 22, 24, 26; Ex. 8 (Maksym Decl.) ¶ 31; Ex. 15 (Newton Decl.) ¶¶ 21-24.  The heightened food insecurity will be exacerbated by declines in WIC participation engendered by the Rule.  *See* Ex. 4 (David Decl.) ¶ 28; Ex. 15 (Newton Decl.) ¶¶ 21-24; Ex. 19 (Zucker Decl.) ¶ 33.

[18] Ex. 16 (Schanzenbach Decl.) ¶ 37; *see also* Ex. 2 (Banks Decl.) ¶ 11(e) (explaining that since 2017, 78,000 individuals in noncitizen households, including 44,000 citizen children, have left the caseload or decided not to enroll); *id.* ¶ 12; Ex. 8 (Maksym Decl.) ¶ 32; Ex. 16 (Newton Decl.) ¶¶ 17-18.

[19] Ex. 1 (Allen Decl.) ¶¶ 8, 46-53, 61; Ex. 2 (Banks Decl.) ¶ 11; Ex. 6 (Gifford Decl.) ¶¶ 16, 18; Ex. 8 (Guinn Decl.) ¶¶ 22, 24, 26; Ex. 13 (Mosquera-Bruno Decl.) ¶ 13; Ex. 17 (Visnauskas Decl.) ¶¶ 21-24; Ex. 18 (Williams Decl.) ¶ 15.

Medicaid and SNAP enrollment alone will collectively cost Plaintiff States more than $1.5 billion in direct federal funding.[20]  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (threatened loss of "federal funds" were a "sufficiently concrete and imminent injury").

Second, the Final Rule will dramatically increase costs to Plaintiffs of providing for the health and well-being of their communities when immigrants and their families forgo or disenroll from federal programs.  Non-cash supplemental benefit programs like Medicaid and SNAP satisfy important needs that do not go away if immigrants or their families refrain from using such programs.[21]  Healthcare programs help Plaintiffs' residents stay healthy, prevent dangerous and costly medical conditions (like diabetes, HIV, or heart disease), and provide treatment when needed so that individuals can return to work or school.[22]  SNAP ensures that modest- and low-income families can buy nutritious foods to maintain and improve their health and well-being.  And housing programs assist individuals in securing a safe and affordable place to live.[23]  These critical needs remain when the Final Rule causes millions of immigrants to forgo the benefits to which they are legally entitled.  Immigrants who live in Plaintiffs' jurisdictions will still get sick; children will still need to eat; and families will still need affordable housing so that they can continue to work and send their children to school.  As a practical matter, the Final Rule will shift the costs of serving these basic public policy goals on to Plaintiffs as immigrants drop out of the very benefit programs that Congress designed to address public health, nutrition, and housing.

*Healthcare.* The Final Rule will have direct financial consequences to Plaintiffs as administrators of insurance programs, and direct providers of healthcare.  Plaintiffs have made

---

[20] Ex. 9 (Kallick Decl.) ¶¶ 30-41 (describing value of lost benefits to states); *see also* Ex. 6 (Gifford Decl.) ¶ 12.
[21] *See* Ex. 11 (Ku Decl.) ¶¶ 55-62.
[22] *Id.*
[23] *See* Ex. 1 (Allen Decl.) ¶¶ 10-18, 35-44.

great strides in reducing the number of uninsured residents and improving public health through insurance programs like Medicaid, CHIP, and programs administered in accordance with the ACA.[24]  By deterring enrollment in such health insurance programs, the Final Rule will increase uncompensated care and reverse decades of progress in making healthcare more affordable and accessible.  And because individuals without health insurance tend to forgo preventative healthcare, wait longer to seek care, and eventually obtain urgent care from emergency departments, the care they eventually receive is far more costly.[25]  These harms will be exacerbated by decreased participation in WIC, which will increase costs associated with low birthweights, childbirth complications, and child obesity.[26]

Plaintiffs' healthcare systems, including hospitals that Plaintiffs operate, will shoulder these higher healthcare costs.  Plaintiffs' healthcare systems will still provide care for noncitizens and their families, but those patients will be sicker and more costly to treat.  And Plaintiffs and the healthcare institutions in their jurisdictions will provide more expensive care without receiving compensation from Medicaid or other healthcare programs.[27]  For example, because of the Final Rule and its chilling effects on patients, NYC Health + Hospitals expects to face a net financial loss of $121 to $187 million in the first year of the Final Rule's implementation.[28] Moreover, increasing the number of uninsured patients will weaken hospitals' financial footing, which may result in hospital closures.[29]  These harms to Plaintiffs' public health systems are irreparable.  *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018) (irreparable

---

[24] Ex. 6 (Gifford Decl.) ¶ 25; Ex. 8 (Maksym Decl.) ¶¶ 4-7; Ex. 19 (Zucker Decl.) ¶ 13.

[25] Ex. 6 (Gifford Decl.) ¶¶ 30, 34; Ex. 8 (Maksym Decl.) ¶ 6; Ex. 19 (Zucker Decl.) ¶¶ 17, 43.

[26] Ex. 19 (Zucker Decl.) ¶¶ 34-35.

[27] Ex. 11 (Ku Decl.) ¶¶ 63-73 (describing increase costs to state based on loss of Medicaid funding).

[28] Ex. 10 (Katz Decl.) ¶ 19; *see also* Ex. 19 Zucker Decl. ¶ 18 (noting that New York State already has inadequate funds to compensate for services provided to patients who cannot pay for the cost of their care and explaining that the Final Rule will exacerbate this problem).

[29] Ex. 6 (Gifford Decl.) ¶ 36; Ex. 11 (Ku Decl.) ¶ 68; Ex. 19 (Zucker Decl.) ¶ 19.

harm where residents' loss of health insurance would "impose tremendous burdens on the State Plaintiffs' public health systems").

*Housing.* The Final Rule will also shift to state and local governments the costs of providing safe and affordable housing benefits to working individuals and their families. State Plaintiffs will bear the costs of reduced participation in affordable housing programs and concomitant increase in emergency shelter use.[30]

*Decrease in economic productivity.* The Final Rule will decrease economic productivity in Plaintiffs' jurisdictions and lead to further economic harms to Plaintiffs, including more than $3.6 billion in economic ripple effects, 26,000 lost jobs, and $175 million in lost tax revenue within Plaintiffs' jurisdictions.[31] Benefits like Medicaid and SNAP stimulate Plaintiffs' economies through a direct economic multiplier effect; for example, for every dollar spent on SNAP, there is at least $1.60 in increased economic activity.[32] Accordingly, reduction in these benefits causes direct economic harm to Plaintiffs. These devastating economic effects of the Final Rule on Plaintiffs are irreparable. *See Batalla Vidal*, at 279 F. Supp. 3d at 434 (granting preliminary relief because policy would have "staggering adverse economic impacts" for state plaintiffs (internal quotation marks omitted)).

The Final Rule will also negatively impact Plaintiffs' workforce. Without preventative

---

[30] Ex. 13 (Mosquera-Bruno Decl.) ¶¶ 21-22; Ex. 17 (Visnauskas Decl.) ¶ 34. In 2016, it cost Connecticut an average of $33,360 per year to shelter a homeless person, as compared to an annual average of a little over $14,000 annually to rent a HUD-subsidy-eligible two-bedroom apartment at the average statewide HUD-determined fair market rent. Ex. 13 (Mosquera-Bruno Decl.) ¶ 23. In Vermont, the average cost for emergency housing from the state general assistance fund was $74 per night. Ex. 12 (Maksym Decl.) ¶ 46.

[31] Ex. 9 (Kallick Decl.) ¶¶ 42-56 (quantifying lost GDP, jobs, and tax revenue); Ex. 16 (Schanzenbach Decl.) ¶¶ 9, 41-43 (SNAP only); *see also* Ex. 6 (Gifford Decl.) ¶ 12. If disenrollment reaches 35 percent, Plaintiff States collectively stand to lose $2.7 billion in federal funding, $5.5 billion in ripple effects, and tens of thousands of jobs.

[32] *See* Ex. 16 (Schanzenbach Decl.) ¶¶ 11, 29, 42. In 2017, SNAP recipients spent over $6.1 billion in Plaintiffs' jurisdictions at approximately 25,200 authorized retailers. *See* Ex. 6 (Gifford Decl.) ¶ 21; Ex. 8 (Guinn Decl.) ¶ 16; Ex. 12 (Maksym Decl.) ¶ 25; *see also* Ex. 9 (Kallick Decl.) ¶ 45; Ex. 19 (Zucker Decl.) ¶ 36.

healthcare and public benefits, individuals are likely to spend more time suffering from preventable illnesses and missing work, reduces economic productivity and creates instability in Plaintiffs' workforces.[33]  *See Batalla Vidal*, 279 F. Supp. 3d at 434-35 (finding irreparable harm where "[e]mployers will suffer due to the inability to hire or retain" employees).

### 3. The Final Rule will irreparably harm public health within Plaintiffs' jurisdictions.

The Final Rule will cause irreparable harm to public health.  Plaintiffs, their agencies, and their institutions are constitutionally and statutorily obligated to provide for the health and well-being of all of their residents, including noncitizens.[34]  The Rule directly undermines Plaintiffs' efforts to promote health insurance and positive health outcomes and jeopardizes Plaintiffs' ability to combat the spread of disease.[35]  The Rule will also result in public health harms stemming from lack of access to adequate nutrition and housing.[36]  This "potential impact on public health" is "itself sufficient irreparable harm to support preliminary injunctive relief." *New York v. BB's Corner, Inc.,* No. 12 Civ. 1828, 2012 WL 2402624, at *3 n.3 (S.D.N.Y. June 25, 2012); *see also New York v. Schweiker*, 557 F. Supp. 354, 359 (S.D.N.Y. 1983) (adverse public health consequences of proposed regulation constituted irreparable harm to the state).

First, as noncitizens disenroll from or forgo enrollment in the health insurance, health programs, and food supplement programs that Plaintiffs administer, Plaintiffs' ability to safeguard public health will be significantly frustrated.  Health insurance provides access to primary and preventative healthcare, including screenings for diabetes, mental health conditions,

---

[33] Ex. 6 (Gifford Decl.) ¶ 32; Ex. 19 (Zucker Decl.) ¶ 26; Ex. 9 (Kallick Decl.) ¶¶ 48-50.
[34] *See, e.g.*, Ex. 8 (Guinn Decl.) ¶¶ 5-7, 10; Ex. 12 (Maksym Decl.) ¶¶ 14, 22; Ex. 13 (Mosquera-Bruno Decl.) ¶ 4; Ex. 19 (Zucker Decl.) ¶ 3.
[35] Ex. 11 (Ku Decl.) ¶¶ 55-62.
[36] Ex. 1 (Allen Decl.) ¶¶ 36-37, 43-44.

HIV, and cervical and breast cancer.[37]  Medicaid and CHIP in particular are associated with a reduction in avoidable conditions and hospitalizations, infant and child mortality, reduced risk of diabetes, obesity, and hospitalizations in adulthood.[38]  An increase in food insecurity will likewise cause long-term public health harms in Plaintiffs' jurisdictions.[39]

Moreover, the Final Rule jeopardizes Plaintiffs' ability to reduce the spread of communicable diseases.  Specifically, uninsured adults and children are more likely to skip immunizations and vaccinations, increasing the likelihood that communicable diseases will spread throughout Plaintiffs' jurisdictions.[40]  Additionally, the Final Rule will undermine Plaintiffs' progress towards ending the HIV/AIDS epidemic through programs linked to Medicaid.[41]

Finally, the Final Rule will cause housing instability and homelessness for Plaintiffs' residents, which will likewise have dire consequences on public health within Plaintiffs' jurisdictions.[42]

### 4.  The Final Rule will cause Plaintiffs to expend significant resources to adjust state and local run public benefit programs.

The Final Rule will impose significant programmatic and administrative burdens on Plaintiffs, their agencies, and institutions.  Plaintiffs administer the Medicaid, SNAP, and

---

[37] Ex. 3 (Barbot Decl.) ¶ 14; Ex. 6 (Gifford Decl.) ¶ 27; Ex. 11 (Ku Decl.) ¶¶ 55-63; Ex. 12 (Maksym Decl.) ¶ 6; Ex. 19 (Zucker Decl.) ¶¶ 39, 44.
[38] Ex. 3 (Barbot Decl.) ¶ 18; Ex. 11 (Ku Decl.) ¶ 55-57; Ex. 19 (Zucker Decl.) ¶ 39.
[39] Ex. 3 (Barbot Decl.) ¶ 34; Ex. 6 (Gifford Decl.) ¶¶ 19-20; *see also*  Ex. 8 (Guinn Decl.) ¶¶ 33-35; Ex. 10 (Katz Decl.) ¶ 12; Ex. 19 (Zucker Decl.) ¶ 52.
[40] Ex. 3 (Barbot Decl.) ¶¶ 24, 36, 37-38; Ex. 19 (Zucker Decl.) ¶¶ 22-24, 45.
[41] Ex. 3 (Barbot Decl.) ¶ 25; *see also* Ex. 19 (Zucker Decl.) ¶¶ 44-45.
[42] Ex. 1 (Allen Decl.) ¶¶ 36-37, 43-44; Ex. 13 (Mosquera-Bruno Decl.) ¶¶ 12, 13, 18, 21; Ex. 17 (Visnauskas Decl.) ¶¶ 25-32; Ex. 18 (Williams Decl.) ¶ 16.

housing programs targeted by the Rule.[43]  Plaintiffs also administer additional programs, such as WIC and CHIP, manage state-funded Medicaid programs, and administer insurance programs and marketplaces in compliance with the ACA, all of which will be impacted by the Final Rule.[44]  The Final Rule's negative effects on the administration of those programs thus falls directly on Plaintiffs.  For example, Plaintiffs will need to (1) change their systems for administering and enrolling individuals in public benefits programs, (2) revamp their recordkeeping infrastructures to respond to new requirements in the Rule, and (3) expend significant resources educating staff and residents about the implications of the Final Rule. These expenditures of time and resources—and concomitant diversion from other agency priorities—cannot be recovered.  Where, as here, Plaintiffs will be obligated to "take steps to mitigate the risk[s]" attendant to the Rule, Plaintiffs have shown irreparable harm. *Cty. of Santa Clara*, 250 F. Supp. 3d at 537.

*Overhaul of systems.* Plaintiffs have devoted substantial time and resources to create systems, policies, and procedures designed to streamline and manage benefit application processes.  The Final Rule will require Plaintiffs to change their systems, including by revising application forms and portals to inform residents of the implications of the Final Rule and allow them to choose which benefits to enroll in.[45]  For example, Connecticut estimates that it will spend millions of dollars to revise its integrated web-based applications.[46]  New York State expects to spend additional funds processing WIC applicants, costs which will directly reduce

---

[43] Ex. 2 (Banks Decl.) ¶ 3; Ex. 6 (Gifford Decl.) ¶ 4; Ex. 8 (Guinn Decl.) ¶ 4; Ex. 12 (Maksym Decl.) ¶¶ 4, 15, 23; Ex. 13 (Mosquera-Bruno Decl.) ¶¶ 5-8; Ex. 17 (Visnauskas Decl.) ¶ 11; Ex. 18 (Williams Decl.) ¶¶ 3-9; Ex. 19 (Zucker Decl.) ¶ 6.
[44] *See* Ex. 12 (Maksym Decl.) ¶¶ 4, 13; Ex. 6 (Gifford Decl.) ¶ 6; Ku Decl. ¶¶ 28, 49; Ex. 19 (Zucker Decl.) ¶¶ 4, 6.
[45] Ex. 2 (Banks Decl.) ¶¶ 25-28; Ex. 19 (Zucker Decl.) ¶¶ 56-60, 64-70.
[46] Ex. 6 (Gifford Decl.) ¶ 43.

funding for WIC's nutrition education classes, breastfeeding support, public health screenings, and other programs.[47]  Likewise, Plaintiff States will need to make substantial and costly changes to and investments in their online insurance marketplaces that rely on threshold determinations of Medicaid eligibility to determine eligibility for other insurance programs.[48]

*Recordkeeping obligations*. The Final Rule will require state and local agencies to track detailed information concerning immigrants' receipt of public benefits.  The Final Rule requires applicants to provide documentation relating to any benefits received, no matter how long ago or how brief the duration, which will require Plaintiffs to develop new processes and systems to provide this information.[49]  *See* 84 Fed. Reg. at 41,484.  Likewise, the Rule allows DHS to "request additional information from the benefit-granting agency" where it believes it has insufficient information to determine whether the "conditions of [public charge] bond have been breached."  *Id.* at 41,507 (§ 213.1(h)(3)).  Gathering, storing, and tracking this information will require Plaintiffs to expend additional resources or divert resources from other areas to comply.[50]

Moreover, if the Final Rule becomes effective, Plaintiffs anticipate that state agencies will have to expend resources processing enrollee "churn"—when participants disenroll and then re-enroll in state benefit programs.[51]  Such churn results in duplicative and expensive work for state agencies and may require agencies to develop new policies and procedures.[52]

*Programmatic expenses*. The agencies and institutions that administer and provide benefits and services implicated by the Final Rule have spent and will continue to spend irrevocable resources understanding, responding to, and preparing for this radical shift.  These

---

[47] Ex. 19 (Zucker Decl.) ¶¶ 64-70.
[48] Ex. 6 (Gifford Decl.) ¶¶ 46-47; Ex. 12 (Maksym Decl) ¶ 13; Ex. 19 (Zucker Decl.) ¶¶ 57-61.
[49] Ex. 2 (Banks Decl.) ¶¶ 25-28.
[50] Ex. 6 (Gifford Decl.) ¶ 39; Ex. 8 (Guinn Decl.) ¶ 37; Ex. 13 (Mosquera-Bruno) ¶ 24.
[51] Ex. 6 (Gifford Decl.) ¶ 40.
[52] *See id.*; Ex. 17 (Visnauskas Decl.) ¶ 40.

efforts include hundreds of staff hours analyzing the impact of these changes;[53] millions of dollars training staff members and preparing materials;[54] coordinating responses to the Rule among various agencies and entities within the jurisdiction;[55] and time responding to significant increases in concerns, calls, and walk-in inquiries with respect to public charge.[56]

The harms caused to Plaintiffs by the Final Rule are actual and imminent. Noncitizens will immediately begin dropping out of public benefit programs if the Final Rule were to take effect to avoid having the receipt of nominal amounts of such benefits count against them in a public charge inquiry.[57] Indeed, because the Final Rule makes the receipt of multiple benefits in a single month count as *multiple months* of benefits in the public charge inquiry, noncitizens will quickly disenroll from all of the enumerated programs and many other programs that they fear might count against them. And the harms to Plaintiffs will immediately follow from such rapid and widespread disenrollment: noncitizens newly without healthcare coverage will get sick and need treatment; families that can no longer afford their homes will need a place to live; residents will stop generating business through the use of SNAP benefits; and Plaintiffs will be forced to alter their established processes for administering public benefits.

These concerns are far from speculative. Indeed, the fear sown by Defendants' transformation of immigration policy has already begun to have such adverse effects; some immigrants and their families began to disenroll from public benefits following early publicity about the Proposed Rule.[58]

---

[53] *See, e.g.*, Ex. 10 (Katz Decl.) ¶ 24; Ex. 7 (Gonzalez-Murphy Decl.) ¶ 20.
[54] *See, e.g.*, Ex. 10 (Katz Decl.) ¶ 20; Ex. 13 (Mosquera-Bruno Decl.) ¶ 24; Ex. 19 (Zucker Decl.) ¶¶ 61-62.
[55] *See, e.g.*, Ex. 7 (Gonzalez-Murphy Decl.) ¶¶ 17-21, 23-27; Ex. 14. (Mostofi Decl.) ¶¶ 16-21.
[56] *See, e.g.*, Ex. 6 (Gifford Decl.) ¶ 41; Ex. 7 (Gonzalez-MurphyDecl.) ¶¶ 20-21; Ex. 10 (Katz Decl.) ¶¶ 25-26; Ex. 13 (Mosquera-Bruno Decl.) ¶ 23.
[57] Ex. 9 (Kallick Decl.) ¶ 28; *see also* Ex. 8 (Guinn Decl.) ¶ 26; Ex. 11 (Ku Decl.) ¶ 30; Ex. 16 (Schanzenbach Decl.) ¶ 39 n. 54.
[58] Ex. 2 (Banks Decl.) ¶ 11; Ex. 3 (Barbot Decl.) ¶¶ 12, 24; Ex. 4 (David Decl.) ¶¶ 20-26; Ex. 5 (Fong Decl.) ¶¶ 10-

**B.  Plaintiffs are likely to succeed on the merits of their claims under the Administrative Procedure Act.**

The APA provides that courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; that is "not in accordance with law"; or that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §§ 706(2)(A), (C). The APA requires this Court to conduct "plenary review of the Secretary's decision." *Overton Park*, 401 U.S. at 420.  The Final Rule runs afoul of the APA in numerous respects. First, DHS exceeded its authority under the INA and acted contrary to law by radically departing from the well-settled basic meaning of the term "public charge"—in contravention of history, common law interpretation, and statutory boundaries—to reach hardworking immigrants who use supplemental, non-cash benefits as a stepping stone to upward mobility.  The Final Rule is likewise arbitrary and capricious because, among other defects, DHS relied on irrational assumptions about the long-term dependency of immigrants who receive federal benefits, failed to justify its overhaul of public charge law, and failed to consider important aspects of the problem, including how the Final Rule conflicts with Section 504 of the Rehabilitation Act.

**1.   The Final Rule exceeds DHS's statutory authority and is contrary to law.**

The Final Rule violates the APA because it is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and contrary to law, *id.* § 706(2)(A).  In determining whether agency action exceeds statutory authority, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do."  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).  Where the applicable statutes are clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

---

19; Ex. 7 (Gonzalez-Murphy Decl.) ¶ 15; Ex. 10 (Katz Decl.) ¶¶ 11-15; Ex. 14 (Mostofi Decl.) ¶¶ 11-14; Ex. 15 (Newton Decl.) ¶¶ 15, 21, 27, 31; Ex. 19 (Zucker Decl.) ¶ 33.

intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984). And where a statute admits of some ambiguity, an agency is still prohibited from relying on an unreasonable interpretation of that statute. *Id.* at 844.

Here, DHS's unprecedented expansion of the meaning of "public charge" contravenes the unambiguous and well-established meaning of that term that Congress incorporated into the INA; even if the term is ambiguous, Defendants' proposed interpretation stretches beyond any reasonable interpretation of the statute. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[A]gencies must operate within the bounds of reasonable interpretation. . . And reasonable statutory interpretation must account for both the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" (internal quotation marks omitted)). At bottom, DHS seeks to enact by regulatory fiat a statutory scheme that Congress chose not to enact—a full-scale realignment of our federal immigration system to exclude hard-working immigrants and their families. The Final Rule's transformation of the narrow public charge exception into a *de facto* rule against admissibility for immigrants of relatively modest means cannot be reconciled with the text of the INA, the history and common-law meaning of public charge, or the contexts in which Congress passed and amended the public charge framework and public benefits programs.

　　　　a. *The Final Rule contravenes the long-standing meaning of the term "public charge" incorporated into the INA by Congress.*

"Public charge" is not an open-ended term that DHS is entitled to alter at its discretion. For over a century, the term "public charge" in immigration law has been understood to mean individuals who are unable or unlikely to work and who are thus primarily dependent on the government for subsistence in the long term. This well-established meaning derives from over a century of common-law interpretation that Congress borrowed when it chose to codify a "public

charge" analysis in the INA in 1952.  And in the 70 years since the INA's enactment, Congress, federal immigration authorities, and courts have continued to recognize that those who receive supplemental, non-cash benefits like subsidized healthcare, food stamps, and housing assistance are not public charges.  Defendants' wholesale expansion of public charge to encompass working immigrants who receive nominal amounts of supplemental benefits conflicts with Congress's meaning—stretching the scope of public charge beyond recognition—and thus exceeds their authority. *ACA Int'l v. Commc'ns Comm'n*, 885 F.3d 687, 698 (D.C. Cir. 2018) ("even if the [statute] does not foreclose the [the agency's] interpretation, the interpretation [can] fall[ ] outside the bounds of reasonableness" under *Chevron* (internal quotation marks omitted)).

The term "public charge" has an established scope dating back to early immigration statutes and judicial and agency interpretations of those statutes.  In 1882, Congress passed the first federal immigration statute, which rendered excludable "convicts, lunatics, idiots, and any person unable to take care of himself without becoming a public charge."  Immigration Act of 1882, ch. 376, 22 Stat. 214, 47th Cong. (1882).  Based on early state immigration laws, *see* Compl. ¶ 26, and consistent with the plain meaning of the term "charge," [59] the 1882 statute sought to prevent long-term residence in the United States of those "who ultimately become *life-long dependents* on our public charities."  13 Cong. Rec. 5108-10 (June 19, 1882) (statement of Rep. Van Voorhis) (emphasis added).  Far from excluding as public charges immigrants who received temporary assistance, the same law authorized immigration officials to provide "support and relief" to immigrants who may "need public aid" after their arrival, Immigration Act of 1882 at §§ 1, 2.  Congress passed additional immigration bills between 1891 and 1917, all of which

---

[59] Webster's Dictionary defined "charge" as a "person or thing committed to another[']s custody, care or management; a trust."  *Charge*, Webster's Dictionary (1828 Online Ed.), https://perma.cc/R9NN-5HFK; Charge, *Webster's Dictionary* (1886 Ed.), https://perma.cc/LXX9-KF3K.

retained substantially the same public charge provision.[60]

Court decisions confirmed this specific and narrow meaning of the term "public charge."
For example, in 1915, the Supreme Court held that the public charge exclusion applied to only
those individuals who had "permanent personal objections" and not to those who, for reasons
outside of their control, could not work temporarily.  *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915).
Within the Second Circuit, courts consistently interpreted the statutory term "public charge" to
encompass those likely to be residents of almshouses, and thus almost completely supported by
government aid over the long term.  *See Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917)
("We are convinced that Congress meant the act to exclude persons who were likely to become
occupants of almshouses for want of means with which to support themselves in the future.");
*U.S. ex rel. Mantler v. Comm'r of Immigration*, 3 F.2d 234, 235 (2d Cir. 1924) (same); *Ex parte
Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) (same).  The Board of Immigration Appeals
("BIA")[61] likewise repeatedly affirmed that the term "public charge" in early immigration
statutes did not refer to immigrants who were willing and able to work.[62]

Against this backdrop of statutory history and judicial interpretation, Congress enacted

---

[60] *See* Immigration Act of 1903, ch. 1012, 32 Stat. 1213, 1214 (1903); Immigration Act of 1907, ch. 1134, § 2, 34
Stat. 898, 899 (1907); amended by Act of Mar. 26, 1910, ch. 128, § 1, 36 Stat. 263, 263 (1910); Immigration Act of
1917, ch. 29, 39 Stat. 874, 876 (1917).

[61] The BIA is a department within DOJ that is the highest administrative body for interpreting and applying
immigration laws.  The BIA has nationwide jurisdiction to hear appeals from certain decisions rendered by
immigration judges and by district directors of DHS.

[62] *See Matter of B-*, 3 I. & N. Dec. 323, 324-25 (BIA 1948) ("public charge" did not include employable noncitizens
who availed themselves of  general public-benefits programs; "The acceptance by an alien of services provided by a
State or by a subdivision of a State to its residents, services for which no specific charge is made, does not in and of
itself make the alien a public charge . . ."); *In the Matter of R-*, 1 I. & N. Dec. 209, 210 (BIA 1942) (reversing
finding that immigrant was likely to become a public charge because he had only $78 at time of arrival to U.S.
where "[n]othing in the record indicates that he was not able to work"); *Matter of V-*, 1 I. & N. Dec. 293, 295-96
(BIA 1942) (finding that an immigrant who "can obtain employment and owns his own home" is not likely to
become a public charge even where immigrant was not currently employed); *In the Matter of H-*, 1 I. & N. Dec. 459,
459 (BIA 1943) (overturned public charge finding for an appellant who was "steadily employed"); *In the Matter of
C-*, 3 I. & N. Dec. 96, 97 (BIA 1947) ("no likelihood" that an immigrant "able and willing to work" will become a
public charge); *In the Matter of K-*, 3 I. & N. Dec. 613, 614 (BIA 1949); *In the Matter of T-*, 3 I. & N. Dec. 641, 644
(BIA 1949) (a woman "quite capable of earning her own livelihood" and a boy with training in tailoring are not
inadmissible as likely to become public charges).

the INA in 1952 and gave no indication that it intended to alter this well-developed meaning of public charge. *See In re Nw. Airlines Corp.,* 483 F.3d 160, 169 (2d Cir. 2007) ("We . . . assume that Congress passed each subsequent law with full knowledge of the existing legal landscape" (citing *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990)). The statute thus incorporated the established definition, as "when a federal statute uses, but does not define, a term of art that carries an established common law meaning, [courts] will give that term its common law definition" absent clear Congressional intent to the contrary. *Richards v. Ashcroft*, 400 F.3d 125, 128 (2d Cir. 2005); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325 (1992).

In the decades since the passage of the INA, the BIA has repeatedly confirmed that Congress adopted the established meaning of public charge as individuals who are primarily and permanently dependent on the government. *See*, *e.g.*, *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962) ("[T]he statute requires more than a showing of a possibility that the alien will require public support."); *Matter of A-,* 19 I. & N. Dec. 867, 870 (BIA 1988) (temporary unemployment did not convert applicant into a public charge). Accordingly, between 1892 and 1980, immigration authorities excluded less than one percent of immigrants each year as likely to become a public charge.[63]

Federal agencies have likewise affirmed the continuing narrow meaning of public charge as those primarily dependent on the government for cash assistance or on long-term institutionalization. In 1999, after welfare reforms led immigrants and their families to withdraw from non-cash benefits programs for which they remained eligible, INS issued guidance that formally codified this primarily dependent standard and specifically concluded that that "non-cash benefits (other than institutionalization for long-term care) are by their nature supplemental

---

[63] *See supra* n. 5.

and do not, alone or in combination, provide sufficient resources to support an individual or family."  64 Fed. Reg. 28,686-88, 28,689.  In so doing, INS consulted "extensively" with agencies charged with administering public benefits programs.  *Id.* at 28,692.  And DOJ has also recognized that "public charge" means primarily dependent, adopting the same standard in the deportation context and acknowledging that this meaning of public charge "ha[d] been part of U.S. immigration law for more than 100 years."  U.S. Dep't of Justice, Public Charge Fact Sheet, 2009 WL 3453730 (Oct. 29, 2009).  *See also U.S. Dep't of Justice, Final Rule: Adjustment of Status for Certain Aliens*, 54 Fed. Reg. 29,442-01, 29,444 (July 12, 1989) (DOJ rule confirming that an applicant may not be deemed a public charge if he has "has a consistent employment history which shows the ability to support himself" even if the applicant earns "below the poverty level").

The Final Rule's extraordinary expansion of the meaning of public charge contravenes the term's unambiguously limited scope and stretches far beyond the bounds of reasonable interpretation.  The Rule targets immigrants who use even minimal amounts of public benefits to maintain and continue to improve their circumstances, even those who have steady jobs and are on the path to being entirely self-sufficient.  These hardworking immigrants are not remotely the type of individuals whom Congress intended to include as public charges.  *See ACA Int'l*, 885 F.3d at 698 (agency's expansive reading of a term "originally aimed to deal with hundreds of thousands . . . into one constraining hundreds of millions" was "outside the bounds of reasonableness").  Moreover, through the use of various weighted factors and other mechanisms, the Rule uses the two-word phrase "public charge" to create an immigration system that is stacked against applicants who are working class, disabled, or non-white, while favoring wealthy, white immigrants.  *See infra* at 30-33. *See Levine v. Apker*, 455 F.3d 71, 85 (2d Cir.

2006) (under the APA, an agency "is not empowered to implement selectively the instructions given by [Congress], by picking and choosing those factors that it deems most compelling").  It is simply not plausible that Congress intended DHS to make such major decisions about the basic functioning of our immigration system through the narrow public charge framework.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Indeed, Defendants' reimagining of the scope of public charge would reach approximately one-third of the population if applied to U.S. citizens.[64]  Such an expansive reading impermissibly and unreasonably stretches the term "public charge" beyond its narrow common law and common sense meaning.

> b.  *Congress has repeatedly rejected efforts to expand the definition of public charge.*

The Final Rule's dramatic expansion of the public charge definition would impose by fiat a controversial change that Congress has rejected on multiple occasions and make an end-run around the legislative process.  Congress's deliberate decision to preserve the definition as-is constrains DHS's ability to make those same changes administratively.  *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983) ("In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced [to the prevailing agency interpretation].").

In 1996, Congress considered the Immigration Control and Financial Responsibility Act ("ICFRA"), which would have expanded "public charge" to encompass immigrants living in the United States who received almost any public benefit, including SNAP and Medicaid.  ICFRA sought to achieve precisely the same goals that the Final Rule does: deeming immigrants using non-cash benefits "public charges."  S. Rep. 104-249, at 2 (1996).  Opponents, who successfully

---

[64] *See* Ex. 9 (Kallick Decl.) ¶¶ 57-59; Ex. 24 (Comment letter on Proposed Rule ("Ltr.") submitted by Legal Aid Society ("LAS")) 1.

defeated the bill, explained that "the definition of public charge goes too far in including a vast array of programs none of us think of as welfare." *Id*. at 64 (statement of Sen. Leahy).  During debates over the Illegal Immigration Reform and Immigrant Responsibility Act, some members of Congress again tried and failed to expand the public charge definition to include use of non-cash public benefits.  *See* 142 Cong. Rec. S11612, at S11712 (daily ed. Sept. 16, 1996); *see also* Pub. L. 104-208, 104-208, 110 Stat. 3009-546 (1996).  In 2013, Congress thwarted yet another effort to expand the public charge definition in the INA's admissibility provision.  The proposed bill would have rendered immigrants living in the United States inadmissible as public charges if they qualified for programs like Medicaid, SNAP, and CHIP, but was ultimately rejected because of its "strict benefit restrictions and requirements."  S. Rep. 113-40, at 42 (2013).

In light of this history, the Final Rule's redefinition of public charge to include use of benefits programs that "no one thinks of as welfare" is a transparent attempt to circumvent Congressional will through rulemaking and exceeds DHS's statutory authority.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded . . . .").  An agency may not do through administrative action "what Congress declined to do."  *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 533 (2009).  Here, DHS seeks to do exactly that.

> c.  *The Final Rule conflicts with congressional enactments about*
>      *immigrants' eligibility for public benefits.*

The Final Rule's radical transformation of the meaning of "public charge" to cover certain non-cash benefits also conflicts with Congress's judgment in extending those benefits to lawful immigrants.  This conflict is most stark in the Final Rule's attempts to invoke the Welfare Reform Act as support for DHS's re-interpretation of the term.  DHS cites the Act for Congress's

recognition of the importance of "self-sufficiency" and the desire to avoid having "the availability of public benefits . . . constitute an incentive for immigration to the United States." Pub. L. 104-193, 110 Stat. 2260 (1996) (codified at 8 U.S.C. § 1601); *see*, *e.g.*, 84 Fed. Reg. at 41,306.  But DHS ignores that Congress fully addressed these concerns through the Welfare Reform Act itself by limiting the eligibility criteria for noncitizens to obtain certain public benefits.  *See* H.R. Rep. 104-651, at 4, 6 (1996).[65]  DHS unlawfully disregards Congress's policy choice by treating the receipt of these tailored benefits, which the Welfare Reform Act expressly authorizes, as indication of *lack* of self-sufficiency—precisely the opposite of Congress's judgment.  *See* H.R. Rep. 104-651, at 3 (1996) (the Welfare Reform Act "converts welfare into a helping hand, rather than a handout, by limiting lifetime welfare benefits").[66]  Tellingly, the same Congress that enacted the Welfare Reform Act also rejected attempts to amend the INA's public charge provision to reach noncitizens who receive non-cash public benefits (including benefits pursuant to the Welfare Reform Act).  *See supra* at 24-25.

Subsequent congressional enactments, which protected immigrants' access to food stamps, further undermine Defendants' expansive redefinition of public charge.[67]  DHS's draconian interpretation of public charge would frustrate the purpose of other statutory schemes

---

[65] Specifically, the Welfare Reform Act provided that only those immigrants who are considered "qualified" may obtain most federal means-tested public benefits.  And most immigrants become "qualified" for benefits eligibility five years after their date of entry.  8 U.S.C. §§ 1612, 1613.  Congress thus determined that immigrants who remain in the United States for five years without receipt of public benefits have demonstrated adequate self-sufficiency to obtain benefits that help recipients maintain and improve their employment, education, and health.

[66] The term appears only in the INA provisions that concern refugee assistance programs.  *See* 8 U.S.C. § 1522(a)(1)(A).

[67] *See* Agricultural Research, Extension, and Education Reform Act of 1998, Pub. L. No. 105-185, 112 Stat. 523 (restoring food stamp eligibility for certain immigrants who resided in the United States when the Welfare Reform Act was enacted); the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (restoring eligibility for food stamps to children and certain immigrants with disabilities regardless of how long they have been in the country); *see also* 7 U.S.C. § 2017(b) (prohibiting the federal government from counting the receipt of nutritional supplements against any beneficiary).

that Congress designed to promote stability and self-sufficiency over the long term.[68]  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102 (1983) (statutes must be construed to that the interpretation of one statute does not frustrate the goals of another).

### 2.  The Final Rule is arbitrary and capricious.

Plaintiffs are also likely to prevail on their claim that the Final Rule is arbitrary and capricious.  Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  The APA requires an agency to engage in "reasoned decisionmaking" that rests on a "logical and rational" "consideration of the relevant factors."  *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015).  The Final Rule lacks rational justification and arbitrarily targets certain populations, namely, non-white, working class, and disabled immigrants.  Furthermore, despite acknowledging that the Final Rule will lead to destructive public health and economic consequences in immigrant communities, DHS arbitrarily fails to address or quantify these predictable harms.

> a.  *The Final Rule's changes to the meaning of "public charge" are arbitrary and capricious because Defendants fail to justify their abandonment of longstanding policy and practice.*

Defendants' Final Rule represents a dramatic departure from the longstanding meaning and application of public charge.  Where, as here, agency action sharply deviates from past practice, the APA requires agencies to "reasonably explain and justify" such deviation.  *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1097 (D.C. Cir. 2012).  This requirement is heightened where the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when prior policy has engendered serious reliance interests that must

---

[68] *See* 147 Cong. Rec. S13245-07, S13269-70 (Dec. 14, 2001) (Statement of Sen. Graham) (stating, in support of the 2002 Farm Bill, "I am also acutely aware of the role the Food Stamp Program plays in helping families leave welfare for work. . . A provision of the 1996 law also cut off food stamps to legal immigrants.  This was unnecessary to achieve the goals of the law, since over 90 percent of legal immigrants are working.")

be taken into account," as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

Defendants proffer no reasonable basis to radically alter a framework for evaluating "public charge" that has been consistently applied for more than a century.  While Defendants assert that the Final Rule will "better ensure" that immigrants are "self-sufficient," 84 Fed. Reg. 41,295, and "minimize the incentive" of noncitizens to immigrate or adjust status "due to the availability of public benefits," *id.* at 41,305, the Rule offers no evidence or reasoned basis to conclude that the current public charge framework failed to satisfy these same objectives.  For example, the Rule fails to marshal any evidence to suggest that immigrants are seeking to adjust their status because of the availability of non-cash benefits, particularly in light of Congress's prior actions to limit the availability of such public benefits through the Welfare Reform Act and its progeny.  *See supra* at 25-26; 84 Fed. Reg. at 41,312-13.  *Cf. Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1095 (D.C. Cir. 2015) (agency change of policy justified based on evidence of the "dramatic transformation" of underlying industry).  Nor do Defendants provide any evidence to support the irrational assumptions that hardworking immigrants who have modest incomes, disabilities, larger families, or less English proficiency become long-term dependents on the federal or state governments.

Moreover, the Final Rule's changes to the meaning of "public charge" rely on irrational assumptions about the long-term dependency of immigrants who receive public benefits.  This assumption is contrary to the evidence before DHS, the nature of the non-cash benefit programs that Congress implemented, and Defendants' prior factual understanding of those programs.  For example, the Final Rule's stacking scheme, which counts each month of benefit use separately

(such that six months of SNAP and six months of Medicaid count as 12 months of benefits use), would render government assistance during *short-term* hardship the basis for a public charge determination.  The new definition would thus reach families falling on temporary hard times who, by taking advantage of the benefits that Congress intends them to receive, seek to regain stability and upward mobility.  84 Fed. Reg. at 41,314.

Far from suggesting an absence of self-reliance, the enumerated benefits *promote* self-sufficiency and employment—as Congress and federal agencies have long recognized.  Indeed, INS determined in 1999, after extensive consultation with relevant benefits-granting agencies, that non-cash "benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient."  64 Fed. Reg. at 28,692.  The expert opinion of these agencies concluded that receipt of non-cash benefits not only was irrelevant to the public charge analysis, but also helped communities maintain self-sufficiency and avoid future dependence.  *Id.  See also* 84 Fed. Reg. at 41,352, 41,365, 41,367, 41,211(summarizing numerous comments describing how the enumerated benefits promote self-sufficiency).

Indeed, even now "DHS does not dispute" the positive effects of the enumerated medical, food stamp, and housing benefits for immigrants' "long-term self-sufficiency."  84 Fed. Reg. at 41,353.  *See also id.* at 41,352 (conceding that such benefits aim to promote self-sufficiency "in the short- and, eventually long-term"); *id.* at 41,314 (recognizing that the benefits at issue  "serve the public interest, and help people become productive members of society").  But DHS irrationally dismisses these concerns as irrelevant.  *See id.* at 41,347 ("In short, and as relevant here, the fact that an alien might rely on public benefits to *become* self-sufficient in the future has

no bearing on whether such alien currently is self-sufficient or currently is or is not a public charge.") (emphasis in original).

In cutting off access to these benefits, which Congress designed to help working individuals and specifically extended to certain noncitizens, *see supra* at 24-26, the Rule irrationally undermines the very values of self-sufficiency that it purports to promote. *See Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003) (arbitrary and capricious for agency to adopt a rule that was "plainly inferior" for accomplishing goals of regulatory scheme).

DHS's lack of reasoned explanation is particularly egregious given that the Final Rule's radical departure from long-established policy will upend strong reliance interests. As detailed above, Plaintiffs have plainly engendered serious reliance interests in the current public charge framework, and the Final Rule will require Plaintiffs to bear substantial administrative and regulatory costs. *See supra* at 14-17; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Likewise, these changes implicate the strong reliance interests of Plaintiffs' immigrant residents, who may rely on those benefits. DHS acted arbitrarily in disregarding these strong reliance interests of Plaintiffs and the populations they serve. *E.g.*, *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 387 (5th Cir. 2018) (vacating agency rule as arbitrary where it "transform[ed]" the "market . . . and . . . regulate[d] in a new way the thousands of people and organizations working in that market").

> b. *The Rule's purported "totality of the circumstances" test is arbitrary because its factors bear no reasonable relationship to determining whether an individual is in fact likely to become a public charge.*

The INA sets forth a list of factors, including age, health, family status, assets, resources, and financial status, and education and skills, to be taken into account in ascertaining whether an immigrant is likely to become a public charge. 8 U.S.C. § 1182(a)(4)(B)(i). While the INA

permits DHS to consider other factors, *see id.*, those factors must at a minimum bear a reasonable relationship to the public charge analysis.  *See, e.g., State Farm*, 463 U.S. at 52 (agency action must be "logical and rational").

By contrast, the Final Rule lists numerous factors that bear no reasonable relationship to a finding of public charge.  First, the Rule irrationally disfavors lower income immigrants regardless of whether they have *any* indicia of reliance—much less dependence—on the federal government.  For example, the Rule takes as a "heavily negative" factor an immigrant's income falling below 125% FPG, even if the immigrant works full-time and has never so much as applied for public benefits. 84 Fed. Reg. at 41,502-03 (§ 212.22(b)(4)(i)(A)); *id.* at 41,413. Moreover, this factor is irrational on its own terms.  The Rule justifies the adoption of 125% FPG income baseline as the threshold income required for a sponsor to provide an affidavit of support for an immigrant.  *See id.* at 41,413.  But a sponsor seeks to support not only herself but the immigrant applicant; that threshold has no rational connection to the ability of working class immigrants to support themselves.  *See, e.g., McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1187 (D.C. Cir. 2004) (courts will "not defer to [an] agency's conclusory or unsupported suppositions").

Other factors fare no better.  For example, the Final Rule negatively views an immigrant's mere application for benefits, even if they have never received *any* public benefits of any kind.  *See* 84 Fed Reg. at 41,503 (§ 212.22(b)(4)(i)(E)).  Likewise, the Rule negatively views immigrants with limited English proficiency, regardless of whether the absence of English proficiency—something common to countless recent immigrants—actually has hindered their employment or otherwise resulted in government dependency.  *See id.* at 41,504 (§ 212.22(b)(5)(ii)(D)); *see also Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 411 (BIA 1962).

And Defendants' assumption that larger families are more likely to be public charges is similarly irrational, *see* Fed. Reg. at 41,502 (§ 212.22(b)(3)(i)), as it is based on a study that DHS concedes shows no statistically significant relationship between larger household sizes and an increase in cash assistance.[69] *See id.* at 41,395. Moreover, the Final Rule irrationally discounts affidavits of support that should weigh strongly in favor of working poor immigrants. *See id.* at 41,439-40. Specifically, the Final Rule invents a new assessment as to "the likelihood that the sponsor would actually provide" the requisite financial support to the immigrant, looking to whether the sponsor lives with and is related to the immigrant, while conceding that such support is "statutorily-required" and is legally enforceable by the Defendants. *See id.*; *id.* at 41,504 (§ 212.22(b)(7)); 8 U.S.C. § 1183a(a)(1). Likewise, the Final Rule negatively views receipt of immigration-related fee-waivers, but these waivers are regularly submitted prior to an immigrant obtaining work authorization, *see* 84 Fed. Reg. at 41,424, and if anything suggest that an immigrant is seeking to become self-sufficient by obtaining work authorization.

The Final Rule also irrationally creates insurmountable barriers for immigrants of limited means and immigrants with disabilities, *see infra* at 33-37, by counting the same factors multiple times against the applicant.[70] Regardless of whether these immigrants are able to support themselves in the future, the Rule's weighted factors virtually ensure that they will be considered inadmissible. In sum, the Final Rule adopts a framework for evaluating public charge factors

---

[69] The data on which the federal government relies reflects that non-cash benefits use is *higher* among families of three than of families of four; and that families of five or more have lower rates of cash benefits use than do households of only one person. 83 Fed. Reg. at 51,185.

[70] For example, an immigrant working full-time at a minimum wage job who receives a nominal amount of food stamps each month receives at least three negative or heavily-negative factors: (1) her income is less than 125 percent of the FPG, (2) she receives the public benefits for which her income qualifies her, and (3) gets a negative financial status rating for her application for and use of public benefits. 84 Fed. Reg. 41,502-03 (§ 212.22(b)(4)(A),(E); *id.* at 41,504 (§ 212.22(c)(1)(ii)). At the same time, the same factor—her income— forecloses her from making 250 percent of the FPG, one of the few heavily positive factors. *Id.* at 41,504 (§ 212.22(c)(2)(i)).

that lack the requisite "rational connection between the facts found and choice made." *State Farm*, 463 U.S. at 43.

DHS's purported interest in promoting self-sufficiency among immigrant populations ultimately proves hollow.  The Final Rule's factors do not measure whether an immigrant has the capacity to earn a living, but rather serve as a proxy to determine whether she hails from a wealthier, predominately white country.  Defendants and their administration have repeatedly spread falsehoods that immigrants of color, particularly those from Latin American countries, are a violent threat to U.S. citizens and a drain on the economy.  *See* Compl. ¶¶ 175-76.  Propagating de-humanized caricatures of these immigrants, Defendants have sought continually to exclude or remove them from the country.  *See*, *e.g.*, Compl. ¶ 177.  It is therefore no surprise that the changes to the public charge determination disproportionately disadvantage non-white applicants.[71]  The irrational explanations that DHS provides for its new weighted factors—which undermine, instead of promote, self-sufficiency—are mere pretext for Defendants' discriminatory agenda.  *New York*, 139 S. Ct. at 2575 (finding agency action arbitrary where the agency offered "an explanation . . . that is incongruent with what the record reveals about the agency's priorities and decisionmaking process").

> c. *The Final Rule is arbitrary and capricious because it fails to consider the federal government's obligations to accommodate and include individuals with disabilities and is contrary to Section 504 of the Rehabilitation Act.*

The Final Rule is arbitrary because DHS failed entirely to consider an important aspect of

---

[71] *See* 84 Fed. Reg. 41,401, 41,418 (recognizing comments that explained the Final Rule's disproportionate impact on minority populations) (citing Capps, Randy et al, ''Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration,'' Migration Policy Institute (November 2018)), https://www.migrationpolicy.org/research/impact-dhspublic-charge-rule-immigration).  *See also* Ex. 25 (National Immigration Law Center ("NILC") Ltr.) 55 (raising that Proposed Rule would have disparate impact on people of color); Ex. 21 (Asian Americans Advancing Justice ("AAAJ") Ltr.) 6.

the problem—namely, how its provisions comport with DHS's obligations under Section 504 of the Rehabilitation Act ("Section 504"), Pub. L. 93-112, 87 Stat. 394 (1973) (codified at 29 U.S.C. § 794), and with Congress's clear intent that individuals with disabilities should not be categorically excluded from the benefits and programs that the federal government administers. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if Defendants "entirely failed to consider an important aspect of the problem").

Section 504 provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency[.]" 29 U.S.C. § 794(a). DHS must ensure access to its programs, and is prohibited from using discriminatory criteria or methods of administration. 6 C.F.R. §§ 15.30(b), 15.49; 28 C.F.R. § 41.51(b)(3). "[T]he central purpose of . . . [Section 504] is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998). To effectuate this purpose, Section 504 "requires that [individuals with disabilities] receive reasonable accommodations that permit them to have access to and take a meaningful part in . . . public accommodations." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sciences*, 804 F.3d 178, 186 (2d Cir. 2015) (internal quotation marks omitted). "Exclusion or discrimination [under Section 504] may take the form of disparate treatment, disparate impact, or failure to make reasonable accommodation." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).

The Final Rule's provisions make it impossible for noncitizens with disabilities to receive the "evenhanded treatment in relation to the able-bodied" that Section 504 requires. *Pfrommer*, 148 F.3d at 83 (2d Cir. 1998). Nor does DHS provide for meaningful access to admissibility.

Case 1:19-cv-07777-GBD   Document 35   Filed 09/09/19   Page 44 of 51

*See Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014)

("[P]ublic entities may not afford persons with disabilities services that are not equal to that

afforded others." (internal quotation marks omitted)); *Franco-Gonzalez v. Holder*, No. 10 Civ.

02211, 2013 WL 3674492, at *4 (C.D. Cal. Apr. 23, 2013) (finding a prima facie violation of

Section 504 where plaintiffs were "unable to meaningfully access the benefit offered—in this

case, full participation in their removal and detention proceedings—because of their disability").

      The Final Rule's expansive new factors effectively exclude individuals with a wide range

of disabilities from admissibility, even if they have stable incomes and even if their disabilities

could be reasonably accommodated.  The Final Rule instructs that DHS consider evidence of a

"a medical condition that is likely to require extensive medical treatment or institutionalization

or that will interfere with the [noncitizen's] ability to provide and care for himself, or herself, to

attend school, or to work upon admission or adjustment of status."  84 Fed. Reg. at 41,502

(§ 212.22(b)(2)).  Accordingly, nearly every individual with a "disability" will receive a negative

weight under the Final Rule.  *See* 29 U.S.C. § 705(9)(b).  Additionally, the Final Rule requires

DHS to assess independently whether, in relation to that same medical condition, a noncitizen

has sufficient resources "to cover any reasonably foreseeable medical costs," 84 Fed. Reg.  at

41,503 (§ 212.22(b)(4)(i)(C)), while simultaneously penalizing and chilling noncitizens from

receiving Medicaid, the primary source of health insurance for individuals with disabilities, *id.*

(§ 212.22(b)(4)(i)(E)).  The Final Rule then commands DHS to "weigh heavily in favor of a

finding that [a noncitizen] is likely at any time in the future to become a public charge," by once

again considering the same medical condition, *id.* at 41,504 (§ 212.22(c)(1)(iii)(A)), the receipt

or authorization to receive benefits, including Medicaid, *id.* (§ 212.22(c)(1)(ii)), and an

individual's ability to obtain insurance coverage or pay for care related to that medical condition,

*id.* (§ 212.22(c)(1)(iii)(B)).  On the other side of the coin, the Final Rule assigns a heavily

positive weight to noncitizens that can obtain private insurance.  *Id.* (§ 212.22(c)(2)(iii)).

In response to the notice of proposed rulemaking, commenters raised serious concerns

with respect to the grave and unsupportable disproportionate impacts the Final Rule would have

on individuals with disabilities, including that individuals with disabilities rely on Medicaid for

reasons entirely unrelated to any of DHS's purported concerns about economic self-sufficiency.[72]

For example, people with disabilities are often unable to procure private health insurance, and

Medicaid is the only appropriate and available program.  *See* 84 Fed. Reg. at 41,367.

Rather than confront or address the serious concerns with respect to individuals with

disabilities that the proposed rulemaking portended, DHS arbitrarily cemented these infirmities

into the Final Rule.  Indeed, DHS's responses to comments show that it disregarded Congress's

judgment that individuals with disabilities should be provided meaningful access to DHS's

program, and entirely failed to consider its obligations under Section 504.  *See* 84 Fed. Reg. at

41,367-68.  Congress passed Section 504, and made clear that its prohibitions on discrimination

apply to all INS activities and programs, including public charge determinations.  *See* 29 U.S.C.

§ 794(a).[73]  To ignore this congressional mandate is arbitrary.  *See Cape May Greene, Inc. v.

Warren*, 698 F.2d 179, 190 (3d Cir. 1983) ("A shadow is cast [in violation of the APA] when

agency action, not clearly mandated by the agency's statute, begins to encroach on congressional

policies expressed elsewhere.").

Likewise, DHS's conclusory statement that the addition of weighted factors means a

---

[72] *See, e.g.*, Ex. 21 (AAAJ Ltr.) 32-34; Ex. 23 (Disability Rights and Education & Defense Fund Ltr.) 5-9; Ex. 20 (American Civil Liberties Union Ltr.) 6-15.
[73] *See also, e.g.*, March 2003 Memorandum Opinion for the General Counsel of the Immigration and Naturalization Service at 2 (March 13, 2002), https://www.justice.gov/file/19086/download (advising that all INS activities qualify as "activit[ies] conducted by an Executive agency" within the meaning of the Rehabilitation Act).

disability would not be "the sole basis for an inadmissibility finding," 84 Fed. Reg. at 41,368, reflects DHS's fundamental misunderstanding of what Section 504 requires, namely, reasonable accommodation of individuals with disabilities.  *See Disabled in Action*, 752 F.3d at 200 ("To assure meaningful access, reasonable accommodations in [a Section 504 covered] program may have to be made.") (alterations and internal quotation marks omitted).  Here, DHS does not even purport to consider what reasonable accommodations may be appropriate or necessary to meet their "affirmative obligations" under Section 504.  *Id.*  This complete failure is arbitrary.

For the foregoing reasons, the Final Rule also conflicts with DHS's obligations under Section 504 and thus is contrary to law.  5 U.S.C. § 706(2)(A); *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (an agency's action that is "[n]ot in accordance with law . . . means of course, *any* law, and not merely those laws that the agency itself is charged with administering") (emphasis in original).

### d. *The Rule is arbitrary and capricious because it fails to consider or quantify significant harms.*

DHS failed to adequately consider the magnitude of the harms and calculate the costs that will result from the Final Rule.  *See State Farm*, 463 U.S. at 43.  "As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act."  *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016).

First, DHS dismisses without discussion the Final Rule's predictable and devastating chilling effects.  DHS acknowledges comments predicting that at least 24 million people nationwide will be chilled from enrolling in vital nutrition, healthcare, and housing benefits as a direct result of the Rule.[74]  DHS likewise concedes immigrants will be deterred from additional

---

[74] *See* 84 Fed. Reg. at 41,312-14, 41,463.  Commenters detailed the significant harms the Final Rule would cause including increases in diseases and infections, malnutrition, homelessness, mental health issues, pregnancy and birth

benefits beyond those enumerated in the Rule, and that the chilling effects will extend to immigrants' families, including citizen children, but DHS affirmatively disregards the vast majority of those impacts; DHS claims simply that mass disenrollment is "unwarranted" because these collateral effects are not "directly regulated by this rule." 84 Fed. Reg. at 41,334.[75] DHS's head-in-the-sand response, however, does not meaningfully address or consider the consequences of the Rule. This troubling indifference to the suffering that the Final Rule will impose is arbitrary and capricious. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS's regulations, explaining that "the Secretary never once *mentions* the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare") (emphasis in original); *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017).

The Final Rule, aside from making narrow changes that permit pregnant women and children to enroll in Medicaid without penalty, also failed to address or adequately calculate the impact of public health and economic harms. *See* 84 Fed. Reg. at 41,489 (listing costs DHS did *not* calculate). DHS further acknowledged that the Final Rule would create administrative burdens for states but again did not even attempt to quantify the corresponding costs. *Id.* DHS's refusal to quantify or fully explain the financial implications of the Final Rule is arbitrary and capricious. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

---

complications and decreases in economic productivity. *See* Ex. 29 (New York Office of Temporary and Disability Assistance Ltr.) 8-9; Ex. 26 (New York Department of Health Ltr.) 2-5; Ex. 30 (New York State Homes and Community Renewal Ltr.) 4-5; Ex. 31 (State of Viginia, et al. Ltr.) 3-6; Ex. 24 (LAS Ltr.) 37-46; Ex. 25 (NILC Ltr.) 16-29; Ex. 28 (New York Immigration Coalition Ltr.) 3-7; Ex. 22 (City of Chicago, et al. Ltr.) 11-17.
[75] DHS drastically underestimates the disenrollment rate at 2.5%. 84 Fed. Reg. at 41,463. *See, e.g.*, Ex. Ku Decl. ¶¶ 34-45 (discussing flaws in DHS's methodology).

**C.** **The public interest and balance of equities tip sharply in Plaintiffs' favor and the Court should preliminarily enjoin the Final Rule without geographic limitation.**

The balance of the equities and public interest tip sharply in Plaintiffs' favor.  When the government is a party, courts consider the balance of equities and the public interest together. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (N.D. Cal. 2014).  Maintaining the current public charge definition, which has been in effect for over a century, is in the public interest.  Enrollment in food, healthcare, and housing programs implicated by the Final Rule benefits the economy by enabling immigrants to realize their economic potential and move toward greater self-sufficiency.  It is also evident that "[t]here is generally no public interest in the perpetuation of an unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  On the other hand, "there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *Id.* at 12 (citation and internal quotations omitted).  If implemented, the Final Rule will cause irreparable and grave harm to the Plaintiffs and to the health and well-being of their residents.  By contrast, Defendants will not be harmed by continuing to apply the longstanding public charge definition.  Provisional relief will preserve the status quo pending resolution of the merits of the Plaintiffs' challenges.

The Court should also enjoin Defendants from implementing the Final Rule without geographic restriction or, in the alternative, postpone the effective date of the Final Rule pursuant to 5 U.S.C. § 705.  The purpose of interim equitable relief "is not to conclusively determine the rights of the parties . . . but to balance the equities as the litigation moves forward," bearing in mind "'the overall public interest.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quoting *Winter*, 555 U.S. at 26).  The Supreme Court has held that that the "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical

39

extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, Plaintiffs have demonstrated a likelihood of success on the merits of their claims that Defendants violated the APA, and nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Additionally, because immigration laws and policies must be uniform, a nationwide injunction is not only appropriate, but also required. *See* U.S. Const. art. 1, § 8, cl. 4 (requiring a "uniform Rule of Naturalization"); *Arizona v. United States*, 567 U.S. 387, 401-402 (2012) ("Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.").

In the alternative, the Court should stay the effective date of the Final Rule pending adjudication of this case on the merits. The APA permits this Court to "postpone the effective date of an agency action" where "necessary to prevent irreparable injury . . . pending conclusion of the review proceedings." 5 U.S.C. § 705. Courts assessing requests for a Section 705 stay apply the same four-factor test used to evaluate requests for preliminary injunctive relief. *Bauer*, 325 F. Supp. 2d at 104-05. Here, for the reasons set forth above, Plaintiffs have made the showing required of a request for preliminary injunctive relief. *See, e.g.*, *Texas*, 829 F.3d at 435.

## CONCLUSION

Plaintiffs respectfully request that the Court enjoin implementation of the Final Rule.

DATED:  September 9, 2019                          Respectfully submitted,

                                                    LETITIA JAMES
                                                    *Attorney General of the State of New York*

                                                    By: */s/ Elena Goldstein*
                                                    Elena Goldstein, *Senior Trial Counsel*

                                                    Matthew Colangelo
                                                       *Chief Counsel for Federal Initiatives*
                                                    Ming-Qi Chu, *Section Chief, Labor Bureau*
                                                    Amanda Meyer, *Assistant Attorney General*
                                                    Abigail Rosner, *Assistant Attorney General*
                                                    Ajay Saini, *Assistant Attorney General*
                                                    Office of the New York State Attorney
                                                    General
                                                    New York, New York 10005
                                                    Phone:  (212) 416-6201
                                                    elena.goldstein@ag.ny.gov

                                                    *Attorneys for the State of New York*


ZACHARY W. CARTER                                   WILLIAM TONG
*Corporation Counsel of the City of New York*        *Attorney General of Connecticut*

By: */s/ Tonya Jenerette*                            By: */s/ Joshua Perry*
Tonya Jenerette                                      Joshua Perry*
   Deputy Chief for Strategic Litigation                *Special Counsel for Civil Rights*
Cynthia Weaver, Senior Counsel                       55 Elm Street
Hope Lu, *Senior Counsel*                            Hartford, CT 06106-0120
Doris Bernhardt, *Senior Counsel*                    (860) 808-5318
Melanie Ash, *Senior Counsel*                        Joshua.perry@ct.gov
100 Church Street, 20th Floor
New York, NY 10007                                   *Attorneys for the State of Connecticut*
Phone: (212) 356-4055
tjeneret@law.nyc.gov

*Attorneys for the City of New York*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Benjamin Battles*
Benjamin Battles, *Solicitor General*
Eleanor Spottswood, *Assistant Attorney
General*
Julio Thompson,* *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*