**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.* | |
| *Plaintiffs*, | |
| v. | **No. 19-cv-07777 (GBD)** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 5

I.      STANDARD OF REVIEW ....................................................................................... 5

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ................................................................................................................... 6

      A.     Plaintiffs Have Not Established Standing or Ripeness. .............................. 6

      B.     Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule ................. 11

      C.     Plaintiffs' Substantive Claims Lack Merit ............................................... 13

            1.     The Rule Is Consistent With The Plain Meaning Of "Public Charge." ..... 13

            2.     The Plain Meaning of Public Charge Does Not Require Permanent Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash ...................................................................................................... 17

            3.     The Rule Exercises Interpretive Authority That Congress Delegated To The Executive Branch, A Delegation Congress Has Maintained ........ 20

            4.     The Rule Is Not Arbitrary And Capricious ............................................... 22

                  a.     The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking. ................................................................................... 22

                  b.     The Rule Sets Forth Reasonable Factors To Be Considered In Making A Totality Of The Circumstances Determination ............ 25

                  c.     DHS Reasonably Considered Section 504 Of The Rehabilitation Act, Which The Rule Does Not Violate. ....................................... 29

                  d.     The Rule Reasonably Evaluates The Likely Costs And Benefits ...................................................................... 31

III.    PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM. ................................. 34

IV.    THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION. .................................................................................. 37

V.     THE COURT SHOULD NOT GRANT A NATIONWIDE INJUNCTION OR
       STAY OF RELIEF. ...........................................................................................................39

CONCLUSION ....................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Hosp. Ass'n v. Harris*,

    625 F.2d 1328 (7th Cir. 1980) ............................................................................. 35

*Am. Sec. & Tr. Co. v. Utley*,

    382 F.2d 451 (D.C. Cir. 1967) .............................................................................. 18

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,

    452 U.S. 490 (1981) .............................................................................................. 33

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,

    681 F.3d 427 (D.C. Cir. 2012) .............................................................................. 31

*Baker v. Johnston*,

    21 Mich. 319 (Mich. 1870) ................................................................................... 13

*Batalla Vidal v. Duke*,

    295 F. Supp. 3d 127 (E.D.N.Y. 2017) .................................................................... 7

*Batalla Vidal v. Nielsen*,

    279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018) ..................................................... 35, 38

*Borey v. Nat'l Union Fire Ins. Co.*,

    934 F.2d 30 (2nd Cir. 1991) ................................................................................. 35

*Cacchillo v. Insmed*,

    638 F.3d 401 (2d Cir. 2011) ................................................................................... 7

*California v. Azar*,

    911 F.3d 558 (9th Cir.  2018) .......................................................................... 39, 40

*Chevron, U.S.A., Inc. v. NRDC*,

    467 U.S. 837 (1984) ........................................................................................ 20, 23

*City & Cty. of San Francisco v. Trump*,

    897 F.3d 1225 (9th Cir. 2018) ........................................................................... 9, 40

*Clapper v. Amnesty Int'l USA,*

  568 U.S. 398 (2013) ............................................................................................. 8, 9, 10

*Clarke v. Sec. Indus. Ass'n,*

  479 U.S. 388 (1987) ....................................................................................................... 12

*Competitive Enter. Inst. v. U.S. Dep't of Transp.,*

  863 F.3d 911 (D.C. Cir. 2017) ...................................................................................... 22

*Consumer Elecs. Ass'n v. FCC,*

  347 F.3d 291 (D.C. Cir. 2003) ................................................................................. 31, 32

*Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor,*

  782 F.3d 102 (2d Cir. 2015) .......................................................................................... 13

*Crane v. Johnson,*

  783 F.3d 244 (5th Cir. 2015) ...................................................................................... 9, 10

*Cushing v. Moore,*

  970 F.2d 1103 (2d Cir. 1992) ........................................................................................ 30

*Defs. of Wildlife v. Zinke,*

  856 F.3d 1248 (9th Cir. 2017) ...................................................................................... 33

*Dep't of Commerce v. New York,*

  139 S. Ct. 2551 (2019) ............................................................................................... 8, 34

*Derby & Co, Inc. v. DOE,*

  524 F. Supp. 398 (S.D.N.Y. 1981) ............................................................................... 11

*E. Bay Sanctuary Covenant v. Barr,*

  No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ................................... 39, 40

*EarthWeb, Inc. v. Schlack,*

  71 F. Supp. 2d 299 (S.D.N.Y. 1999) ............................................................................ 35

*Entergy Corp. v. Riverkeeper, Inc.,*

  556 U.S. 208 (2009) ....................................................................................................... 33

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*

    733 F.3d 393 (2d Cir. 2013) ............................................................................. 10, 11

*Ex Parte Horn,*

    292 F. 455 (W.D. Wash. 1923) .................................................................................. 15

*Ex Parte Mitchell,*

    256 F. 229 (N.D.N.Y. 1919) ....................................................................................... 15

*Ex Parte Pugliese,*

    209 F. 720 (W.D.N.Y. 1913) ...................................................................................... 21

*FCC v. Fox Television Stations, Inc.,*

    556 U.S. 502 (2009) ............................................................................................ 22, 23

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*

    93 F.3d 897 (D.C. Cir. 1996) ..................................................................................... 13

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.,*

    19 F. Supp. 3d 111 (D.D.C. 2014) ............................................................................ 33

*Freedom Holdings, Inc. v. Spitzer,*

    408 F.3d 112 (2nd Cir. 2005) .............................................................................. 34, 35

*Gegiow v. Uhl,*

    239 U.S. 3 (1915) ....................................................................................................... 15

*Gill v. Whitford,*

    138 S. Ct. 1916 (2018) .............................................................................................. 39

*Grand River Enter. Six Nations, Ltd. v. Pryor,*

    481 F.3d 60 (2nd Cir. 2007) ...................................................................................... 34

*Harris Found. v. FCC,*

    776 F.3d 21 (D.C. Cir. 2015) ..................................................................................... 17

*Harris v. Mills,*

    572 F.3d 66 (2d Cir. 2009) ........................................................................................ 30

*Hellon Assocs. v. Phoenix Resort Corp.*,

    958 F.2d 295 (9th Cir. 1992) ................................................................................ 29, 30

*Hirschfeld v. Bd. of Elec.*,

    984 F.2d 35 (2nd Cir. 1993) .......................................................................................... 35

*Howe v. Burwell*,

    Case No. 2:15-cv-6, 2015 U.S. Dist. LEXIS 94595 (D. Vt. July 21, 2015) ............................ 35

*Howe v. United States*,

    247 F. 292 (2d Cir. 1917) ............................................................................................. 15

*Humane Soc'y of U.S. v. Zinke*,

    865 F.3d 585 (D.C. Cir. 2017) ..................................................................................... 32

*In Re Application for Temporary Resident Status*,

    USCIS AAO, 2009 WL 4983092 (Sept. 14, 2009) ........................................................ 29

*In re MTBE Prods. Liability Litig.*,

    725 F.3d 65 (2d Cir. 2013) ........................................................................................... 11

*INS v. Jong Ha Wang*,

    450 U.S. 139 (1981) .................................................................................................... 20

*INS v. Legalization Assistance,Proj.*,

    510 U.S. 1301 (1993) .................................................................................................. 12

*Inv. Co. Inst. v. CFTC*,

    720 F.3d 370 (D.C. Cir. 2013) ..................................................................................... 33

*Iowa ex rel. Miller v. Block*,

    771 F.2d 347 (8th Cir. 1985) .......................................................................................... 9

*Johnson Controls, Inc. v. A.P.T. Critical Sys.*,

    323 F. Supp. 2d 525 (S.D.N.Y. 2004) .......................................................................... 36

*JSG Trading Corp. v. Tray-Wrap, Inc.*,

    917 F.2d 75 (2d Cir. 1990) ........................................................................................... 36

*Knutzen v. Eben Ezer Lutheran Hous. Ctr.*,

    815 F.2d 1343 (10th Cir. 1987) .................................................................. 29

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,

    191 F.3d 229 (2d Cir. 1999).......................................................................... 8

*Lam Fung Yen v. Frick*,

    233 F. 393 (6th Cir. 1916) ........................................................................... 14

*Lewis v. Thompson*,

    252 F.3d 567 (2d Cir. 2001).......................................................................... 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

    572 U.S. 118 (2014)....................................................................................... 12

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992)..................................................................................... 6, 7

*Lyons v. Legal Aid Soc'y*,

    68 F.3d 1512 (2d Cir. 1995)...................................................................... 30, 31

*Madsen v. Women's Health Ctr., Inc.*,

    512 U.S. 753 (1994)....................................................................................... 39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

    567 U.S. 209 (2012)....................................................................................... 12

*Matter of A—*,

    19 I. & N. Dec. 867 (BIA 1988) ............................................................... 19, 20

*Matter of B—*,

    3 I. & N. Dec. 323 (BIA 1948) ..................................................................... 19

*Matter of Harutunian*,

    14 I. & N. Dec. 583 (BIA 1974) ............................................................... 19, 21

*Matter of Martinez-Lopez*,

    10 I. & N. Dec. 409 (A.G. 1964) ................................................................. 19

*Matter of Perez,*

   15 I. & N. Dec. 136 (BIA 1974) ........................................................................ 22

*Matter of Vindman,*

   16 I. & N. Dec. 131 (BIA 1977) ........................................................................ 21

*McAleenan v. Vidal,*

   No. 18-589, 139 S. Ct. 2773 (June 28, 2019) ...................................................... 8

*McElwee v. Cty. of Orange,*

   700 F.3d 635 (2d Cir. 2012) ............................................................................ 30

*Metro. Life Ins. Co. v. Bucsek,*

   919 F.3d 184 (2nd Cir. 2019) .......................................................................... 37

*Meyer v. Bush,*

   981 F.2d 1288 (D.C. Cir. 1993) ....................................................................... 33

*Michigan v. EPA,*

   135 S. Ct. 2699 (2015) .............................................................................. 33, 34

*Monserrate v. New York State Senate,*

   599 F.3d 148 (2d Cir. 2010) ............................................................................ 34

*Munaf v. Geren,*

   553 U.S. 674 (2008) ........................................................................................ 6

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*

   545 U.S. 967 (2005) .................................................................................. 22, 23

*Natofsky v. City of New York,*

   921 F.3d 337 (2d Cir. 2019) ............................................................................ 29

*New York v. U.S. Dep't of Labor,*

   363 F. Supp. 3d 109 (D.D.C. 2019) .................................................................... 9

*Ohio Forestry Ass'n v. Sierra Club,*

   523 U.S. 726 (1998) ....................................................................................... 11

*One West Bank v. Melina,*

    827 F.3d 214 (2d Cir. 2016) ........................................................................... 13, 14

*Overseers of Princeton v. Overseers of S. Brunswick,*

    23 N.J.L. 169 (N.J. 1851) ............................................................................... 14, 27

*Pennsylvania v. New Jersey,*

    426 U.S. 660 (1976) ............................................................................................ 10

*People ex rel. Durfee v. Comm'rs of Emigration,*

    27 Barb. 562 (N.Y. Gen. Term 1858) ................................................................. 17

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville,*

    5 Pa. Super. 516 (Pa. Super. Ct. 1897) ......................................................... 17, 18

*Pub. Citizen, Inc. v. FAA,*

    988 F.2d 186 (D.C. Cir. 1993) ............................................................................ 31

*Regents of Univ. of Cal. v. DHS,*

    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................................... 8

*Rodriguez ex rel. Rodriguez v. DeBuono,*

    175 F.3d 227 (2nd Cir. 1999) ......................................................................... 34, 37

*SIFMA v.CFTC,*

    67 F. Supp. 3d 373 (D.D.C. 2014) ...................................................................... 33

*St. Johnsbury Acad. v. D.H.,*

    240 F.3d 163 (2d Cir. 2001) ............................................................................... 30

*Stewart v. Azar,*

    313 F. Supp. 3d 237 (D.D.C. 2018) .................................................................... 32

*Summers v. Earth Island Inst.,*

    555 U.S. 488 (2009) ......................................................................................... 6, 7

*Taniguichi v. Kan Pac. Saipan, Ltd.,*

    566 U.S. 560 (2012) ............................................................................................ 13

*Texas v. EPA*,

    829 F.3d 405 (5th Cir. 2016) ........................................................................... 6, 39

*Town of Chester v. Laroe Estates, Inc.*,

    137 S. Ct. 1645 (2017) ......................................................................................... 39

*Town of Hartford v. Town of Hartland*,

    19 Vt. 392 (Vt. 1847) .......................................................................................... 18

*Trump v. Hawaii*,

    138 S. Ct. 2392 (2018) ......................................................................................... 8

*United States v. Lipkis*,

    56 F. 427 (S.D.N.Y. 1893) .................................................................................. 16

*U.S. ex rel. Mantler v. Comm'r of Immigration*,

    3 F.2d 234 (2d Cir. 1924) .................................................................................... 15

*Vill. of Barrington v. Surface Transp. Bd.*,

    636 F.3d 650 (D.C. Cir. 2011) ............................................................................ 33

*VIP of Berlin v. Town of Berlin*,

    593 F.3d 179 (2d Cir. 2010) ................................................................................. 6

*Wallis v. U.S. ex rel. Mannara*,

    273 F. 509 (2d Cir. 1921) .................................................................................... 21

*Weinberger v. Romero-Barcelo*,

    456 U.S. 305 (1982) ............................................................................................ 40

*Winter v. NRDC*,

    555 U.S. 7 (2008) ............................................................................................. 6, 38

*Wisc. Central, Ltd. v. United States.*,

    138 S. Ct. 2067 (2018) ......................................................................................... 13

*Whitmore v. Arkansas*,

    495 U.S. 149 (1990) .............................................................................................. 6

*Wyoming v. U.S. Dep't of Interior*,

  674 F.3d 1220 (10th Cir. 2012) ................................................................ 9

**STATUTES**

5 U.S.C. § 705 ................................................................................................ 6, 39

8 U.S.C. § 1103 .................................................................................................... 21

8 U.S.C. § 1182 ............................................................................................ *passim*

8 U.S.C. § 1183a ............................................................................................ 26, 27

8 U.S.C. § 1227 .................................................................................................... 19

8 U.S.C. § 1252 ............................................................................................ 11, 12

8 U.S.C. § 1601 ............................................................................................ *passim*

29 U.S.C. § 794 ............................................................................................ 29, 30

42 U.S.C. § 607 .................................................................................................... 24

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),
  Pub. L. No. 104-208, 110 Stat. 3009 (1996) ............................................ 1

Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"),
  Pub. L. No. 104-193, 110 Stat. 2105 (1996) ............................................ 4

Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214 (1882) ................. 3

Immigration Act of 1891, 51st Cong. ch. 551, 26 Stat. 1084 (1891) .......... 3, 4, 14

Immigration Act of 1907, 59th Cong. ch. 355, 34 Stat. 898 (1907) ................. 3

Immigration Act of 1917, 64th Cong. ch. 29, 39 Stat. 874 (1917) .......... 3, 15, 16

INA of 1952, 82nd Cong. ch. 477, 66 Stat. 163 (1952) ................................. 3

**LEGISLATIVE MATERIALS**

13 Cong. Rec. 5109 (1882) ................................................................................ 16

26 Cong. Rec. 657 (1894) .................................................................................. 16

H.R. Doc. No. 64-886 (1916) ............................................................................ 15

H.R. Rep. No. 104-828 (1996) (Conf. Rep.) ...................................................... 1

S. Rep. No. 64-352 (1916) ...................................................................................................15

S. Rep. No. 81-1515 (1950) ...................................................................................20, 21, 22

**REGULATIONS**

6 C.F.R. § 15.30 ................................................................................................................ 29

8 C.F.R. § 103.7(c) ........................................................................................................... 28

*Inadmissibility and Deportability on Public Charge Grounds* ("1999 NPRM"),
   64 Fed. Reg. 28676 (May 26, 1999) .................................................................. *passim*

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"),
   64 Fed. Reg. 28689 (May 26, 1999) ................................................................. *passim*

*Inadmissibility on Public Charge Grounds* ("NPRM"),
   83 Fed. Reg. 51114 (Oct. 10, 2018) ................................................................. *passim*

*Inadmissibility on Public Charge Grounds* ("Rule"),
   84 Fed. Reg. 41292 (Aug. 14, 2019) ................................................................ *passim*

**OTHER AUTHORITIES**

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929) .............................. 14, 15, 16

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of
   Terms Used in the Law, with References to Authorities (1882) ............................. 13

Century Dictionary & Cyclopedia (1911) .................................................................. 14

E. P. Hutchinson, Legislative History of American Immigration Policy,
   1798-1965 (1981) ................................................................................................... 3

Frederic Jesup Stimson, Glossary of the Common Law (1881) ................................. 13

Immigration Laws and Rules of January 1, 1930 with Amendments from January
   1, 1930 to May 24, 1934 (1935) .......................................................................... 15

Kate M. Manuel, Cong. Research Serv., *Public Charge Grounds of Inadmissibility
   and Deportability: Legal Overview*, Summary (Jan. 5, 2016) ................................. 19

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ...................................................... 13

**INTRODUCTION**

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustment of status to lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292 (Aug. 14, 2019). This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-828, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective

immigrants, and the public with nothing more than an interim guidance document to specify how the factors are being implemented.

The Rule revises the anomalous definition of "public charge" set forth for the first time in that 1999 interim guidance to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. In addition, the Rule has a limited scope: it does not apply to naturalization applications filed by lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—a group of three States and the City of New York (collectively, "States")—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are States rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a stay of the effective date of the Rule or a nationwide injunction.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of

2

public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.* § 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A). An unbroken line of predecessor statutes going back to at least 1882 has contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1907, 59th Cong. ch. 355, 34 Stat. 898 ("1907 Act"); Immigration Act of 1917, 64th Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, section 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of

himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in notice and comment rulemaking to guide immigration officers, aliens, and the public in understanding public charge inadmissibility determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Interim Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id.* at 28689, and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See id.* at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely at any time in the future to become a public charge than an alien who was entirely self-sufficient.

4

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of the Rule. Among the Rule's major components are provisions defining "public charge" and "public benefit" (neither of which are defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge inadmissibility determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining the nonimmigrant status they seek to extend or change. The Rule supersedes the Interim Field Guidance in its entirety, establishing a new definition of "public charge" based on a minimum duration threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within any 36-month period. *Id*. at 41297. Such "public benefits" are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id*. at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances determination.

## ARGUMENT

### I. STANDARD OF REVIEW

Preliminary injunctions are "extraordinary and drastic remed[ies]" that are "never . . .

awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation omitted). A party seeking to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme" in a way that would "alter, rather than maintain, the status quo . . . must demonstrate irreparable harm and a clear or substantial likelihood of success on the merits," *VIP of Berlin v. Town of Berlin*, 593 F.3d 179, 185-86 (2d Cir. 2010) (internal quotation marks omitted), and must also show that the balance of equities tips in their favor and that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Where, as here, there are serious questions as to the Court's jurisdiction, it is "more *unlikely*" that the plaintiff can establish a "likelihood of success on the merits." *Munaf*, 553 U.S. at 690. In the alternative, Plaintiffs seek a stay of the effective date of the Rule under Section 705 of the APA. As they correctly observe, "[t]he standard for a stay under § 705 is the same as the standard for a preliminary injunction." Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. and Stay Pending Judicial Review at 6, ECF No. 35 ("Mot.") (citing *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016)).

## II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. Plaintiffs Have Not Established Standing or Ripeness.

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly impending to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Where, as here, "the plaintiff is not [itself] the object of the government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562.

The States have not met, or even tried to meet, this burden. Neither their Complaint nor

their preliminary injunction motion makes any serious effort to establish standing. The former brushes past standing with a conclusory *ipse dixit* referencing unspecified "sovereign, quasi-sovereign, economic, and proprietary interests." Compl. for Decl. and Inj. Relief ¶ 17 ("Compl."). The motion does not even reference standing. It is Plaintiffs' burden to establish standing, and they have failed to do so. *Lujan*, 504 U.S. at 560.

Plaintiffs' claims of irreparable harm do not establish standing because those claims consist of potential future harms that, if they ever came to pass, would be spurred by decisions of third parties not before the Court. Such speculative allegations are insufficient to establish Article III standing, particularly at the preliminary injunction stage. *See Cacchillo v. Insmed*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment") (internal quotation marks omitted). Here, the Rule governs DHS personnel and certain aliens. It "neither require[s] nor forbid[s] any action on the part of" Plaintiffs, *Summers*, 555 U.S. at 493, nor does it expressly interfere with any of their programs applicable to aliens. To be sure, Plaintiffs allege irreparable harms of (i) a theoretical economic impact that might arise should aliens choose to rely more on State and local services; (ii) speculation that a public health episode could occur should noncitizens choose to forgo health services altogether; and (iii) interference with certain administrative programs. But none of these alleged harms would be sufficient to confer standing on any State Plaintiff. Indeed, finding standing under these circumstances would blow the courthouse door open to virtually any conceivable suit by States against the federal government, given that virtually any administration of federal law by a federal agency could be cast as creating such derivative effects.

For this reason, even when courts have found State standing to challenge federal immigration policies, they have limited it to circumstances in which the States' claims arise out of their proprietary interests as employers or operators of state universities. *See, e.g.*, *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 160-62 (E.D.N.Y. 2017) (rejecting state standing under "quasi-sovereign interests" and "injur[y] [to] a State's economy" theories where state proprietary interests

7

were unidentified).[1] And unlike other recent cases concerning immigration policy, no private parties directly affected by the Rule are named as plaintiffs here. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (plaintiffs included individuals claiming they were "separated from certain relatives who seek to enter the country"); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1027 (N.D. Cal. 2018) (plaintiffs challenging DACA rescission included several "Individual DACA recipients").

Plaintiffs' purported economic harms from the possibility that certain aliens may unnecessarily choose to forgo *all* federal health and housing benefits (thereby resulting in greater reliance on state and local benefits) do not establish standing. Mot. at 30. As an initial matter, this theory is inconsistent with Plaintiffs' assertion that immigrants will generally "forgo public assistance altogether," rather than just federal assistance. Compl. ¶ 182; Mot. at 6 (aliens will disenroll from "benefits that are beyond the express scope of the Final Rule"). Further, plaintiffs do not have "standing to sue [in] situations where the chain of causation leading to damages" is "complicated by the intervening agency of third parties." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 240 (2d Cir. 1999); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013) (courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors"). For any Plaintiff to suffer a net-increase in public benefit expenditures (i) a material number of aliens must unnecessarily choose to forgo all federal health benefits (a result not required by the Rule); (ii) these aliens must then either apply for, and receive, additional state or local health benefits, or use emergency room services ultimately financed by the government; and (iii) the increased state or local expenses for these aliens must be greater than the costs they would have incurred for aliens who would have resided in the State, and consumed State and local resources, but for the Rule.[2] Plaintiffs' allegation that the Rule may harm their economies because fewer aliens may receive and then spend federal funds

---

[1] Defendants disagree with the substantive merits of the Court's decision in *Vidal*, and the Supreme Court has granted certiorari. *See McAleenan v. Vidal*, No. 18-589, 139 S. Ct. 2773 (June 28, 2019).
[2] This is distinct from New York's standing theory in *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). There, plaintiff did not rely on an elongated causal chain of independent third-party decisions. The Court noted that plaintiff relied on a single, "predictable" reaction to a new federal policy (lower census response rates) resulting in definitive injuries to the State itself. *Id.* at 2565-66.

within their territories is equally speculative. Plaintiffs do not even allege that this speculative injury would noticeably affect their total state economies.[3]

Numerous courts have concluded that analogous indirect economic effects are insufficient to confer standing on a State. In *Wyoming v. U.S. Dep't of Interior*, for example, the National Park Service set a cap on the number of snowmobiles permitted in certain national parks. 674 F.3d 1220 (10th Cir. 2012). The Tenth Circuit held that Wyoming's "speculative economic data" alleging "economic detriment" through reduced tourism and tax revenues was "conclusory" and "failed to . . . show[] direct injury to their . . . proprietary interests." *Id.* at 1231 & n.5, 1233-34. Nor could Iowa challenge USDA's refusal to implement disaster relief programs, because the State's allegation that it would "face increased responsibility for the welfare and support of its" citizens was "insufficiently proximate to the actions at issue." *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353-54 (8th Cir. 1985); *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (no standing for state challenge to DACA).

In their discussion of purported irreparable harms, Plaintiffs also speculate that the Rule could cause some aliens to forgo all health care, possibly causing the "spread of disease." Mot. at 13. But this alleged harm does not suffice as a basis for standing, because such health effects would be borne by affected individuals, not States. *See New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 124 (D.D.C. 2019) ("[T]he States' general responsibility for their citizens' health and welfare . . . cannot directly support State standing because the underlying harms would be suffered by the States' citizens."). Further, like the alleged economic impacts, this allegation is too speculative to support standing—it turns on individual choices by aliens to forgo *all* federal health benefits and, as a result, contract and spread "communicable diseases," or otherwise cause a public health crisis. *See Clapper*, 568 U.S. at 410 (rejecting "highly attenuated chain" theory of standing).

---

[3] Plaintiffs also claim they will receive fewer federal funds under the Rule since fewer aliens will enroll in Medicaid and SNAP. Mot. at 9-10. But Plaintiffs do not explain, either in their motion or their Complaint, how this would create a harm, given that such a reduction in funding would be commensurate with a reduction in benefit enrollment such that the States should still receive appropriate federal funding for remaining enrollees. This is distinct from the alleged "federal funds" injury deemed sufficient in *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), where the challenged executive order withheld federal funds from the plaintiffs that were not linked to enrollment levels. *See id.* at 1242.

The alleged irreparable harm from "programmatic and administrative" changes, Mot. at 14, also is insufficient for standing. Plaintiffs claim that the Rule will affect certain protocols and decisions implemented by their agencies concerning "public benefits programs." Mot. at 15. For example, Plaintiffs claim that they will have to "change their systems for administering and enrolling individuals," and "revamp their recordkeeping" practices. *Id*. Bureaucratic inconvenience occasioned by a change in federal policy, however, is insufficient to confer standing. *See*, *e.g.*, *Crane*, 783 F.3d at 253 (rejecting government officials' claim that they have standing since DACA would require that them to "alter their current processes to ensure" compliance). Nor could standing exist from resources Plaintiffs may expend to educate residents about the Rule. Mot. at 15. Plaintiffs' voluntary expenditures in response to the Rule do not give rise to standing. *See Clapper*, 568 U.S. at 416 ("respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (rejecting state standing where states could not "demonstrate that the injury . . . was directly caused by the actions" challenged because "nothing prevent[ed]" states from structuring their laws to prevent the harms). "If the law were otherwise, an enterprising plaintiff" could construct standing to challenge virtually *any* new federal statute or regulation. *Clapper*, 568 U.S. at 416.

"Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary" and serves as another prerequisite of justiciability. *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013). Ripeness "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Id.* Here, the gravamen of Plaintiffs' claims is that individual aliens—not the Plaintiffs themselves—may be erroneously determined as "likely at any time to become a public charge" under the totality of the circumstances test set forth in the Rule. Plaintiffs' claims therefore present the precise circumstance in which ripeness precludes review: resolving questions about the application of "public charge" in the context of an "actual dispute" over application of that ground of inadmissibility is needed to avoid "constructing generalized legal

rules" in a "vacuum." *Shumlin*, 733 F.3d at 429; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine is "'an important exception to the usual rule that where jurisdiction exists a federal court must exercise it,' and allows a court to determine 'that the case will be better decided later.'" *In re MTBE Prods. Liability Litig.*, 725 F.3d 65, 110 (2d Cir. 2013). "In determining whether a case is prudentially ripe," courts examine "whether the claim is fit for judicial resolution" and "whether and to what extent the parties will endure hardship if decision is withheld." *Id.* (cleaned up). Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are all premised on hypothesizing about the potential future applications of the Rule to individuals, speculation about the effects of the Rule on individual decision-making, and disagreement with DHS's predictions based on the available evidence. *See, e.g.*, Mot. at 7-13, 37-38. In such a context, "[j]udicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application" of the Rule, rather than "in a factual vacuum." *Derby & Co, Inc. v. DOE*, 524 F. Supp. 398, 408 (S.D.N.Y. 1981) (internal quotations omitted).

In addition, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. With respect to the States bringing this case, the Rule "do[es] not create adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm," and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Instead, the harms alleged are possible cumulative side effects of third party individuals' decisions to take action not required by the Rule, so they do not create a ripe facial challenge.

## B. Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule.

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would

still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are … marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not States or a city, who "fall within the zone of interests protected" by any limitations implicit in § 1182(a)(4)(A) and § 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). The purported "economic harms," "undermining [of] Plaintiffs'" health programs, and "administrative costs and burdens" asserted by the Plaintiffs, Mot. at 6-7, are not even "marginally related" to those of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an

organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

## C. Plaintiffs' Substantive Claims Lack Merit.

### 1. The Rule Is Consistent With The Plain Meaning Of "Public Charge."

The definition of "public charge" in the Rule is consistent with the plain meaning of the statutory text, which "is to be determined as of the time that it became law." *One West Bank v. Melina*, 827 F.3d 214, 220 (2d Cir. 2016); *see Wisc. Central, Ltd. v. United States.*, 138 S. Ct. 2067, 2070 (2018) (a court's "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute'"). To do so, a court begins by "consulting 'dictionaries in use when Congress enacted [the] statute in question' for ordinary meaning." *Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*, 782 F.3d 102, 109 (2d Cir. 2015) (quoting *Taniguichi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). Here, it is undisputed that since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become "public charges," *compare* Mot. at 2-3 *with* NPRM at 51125, and that 1882 is therefore the relevant year to understand the plain meaning of this statutory term.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[4] Together, these early definitions make clear that an alien becomes a "public charge" when his inability to achieve self-sufficiency imposes an "obligation"

---

[4] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882) ("[P]ublic" means "not any corporation like a city, town, or county but the body of the people at large." (quoting *Baker v. Johnston*, 21 Mich. 319, 355 (Mich. 1870))).

or "liability" on "the body of the citizens" to provide for his basic necessities, as reflected in early legal sources addressing the term "public charge." *See* Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance, rendered from public funds").[5]

Nothing about the plain meaning of this term suggests that a person must be "unable or unlikely to work," or "primarily dependent on the government," as Plaintiffs contend. Mot. at 19. When Congress originally enacted the public charge inadmissibility ground, the distinct term "pauper" was in common use for a person in extreme poverty. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *see also Overseers of Princeton v. Overseers of S. Brunswick*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). Indeed, in early versions of the statute, Congress provided a *separate* inadmissibility ground for paupers. *See, e.g.*, 1891 Act.[6] Congress thereby made "clear that the term 'persons likely to become a public charge' is *not* limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added).

The expansiveness of the meaning of "public charge" relative to "pauper" is highlighted

---

[5] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge simply as 'one that is supported at public expense.'" NPRM at 51158 (quoting "Public Charge", http://www.merriam-webster.com/dictionary/public%20charge (last visited Sept. 25, 2019)). Similarly, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.* Apparently misreading the 1999 NPRM, Plaintiffs contend that a 1986 dictionary definition supports their interpretation. Mot. at 14-15. But as the 1999 NPRM makes clear, the definition that Plaintiffs quote is one of the "many meanings" of "[t]he word 'charge,'" set forth in that dictionary, not the definition of "public charge." 1999 NPRM at 28677; *see generally Webster's Third New Int'l Dict.* (1986). In any event, the definitions provided by Defendants from "the time that it became law" are much more probative of the meaning of the term. *One West Bank v. Melina*, 827 F.3d 214, 220 (2d Cir. 2016).

[6] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "[a]ll idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." 1891 Act at 1094.

by the response of the Executive Branch and Congress to a 1916 Supreme Court opinion reasoning that the term "public charge" must be read as "generically similar" to terms "mentioned before and after" (such as "pauper"). *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915). Shortly after the decision, the Secretary of Labor sent a letter to Congress, requesting that the statute be amended to supersede the Supreme Court's ruling. *See* H.R. Doc. No. 64-886, at 3-4 (Mar. 11, 1916) ("1916 Letter"). The Secretary defined "public charge" as "a charge (an economic burden) upon the community" in which an alien intends to reside. He then described the Court's opinion in *Gegiow* as having highlighted a never-before recognized "defect in . . . the arrangement of the wording," which, if left uncorrected, would "materially reduce[] the effect of the clause" as the "chief measure of protection in the law . . . intended to reach economic . . . objections to the admission" of aliens. Congress acted and explained why: "The purpose of this change [is to overcome recent decisions of the courts limiting the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl)." S. Rep. 64-352 at 5 (1916);[7] *see also* 1917 Act § 3 n.5; as reprinted in Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935) (explaining that "[t]his clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and "overcoming the decision of the Supreme Court in *Gegiow*"). Subsequent authorities recognized that this alteration negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"); *accord* Arthur Cook, Immigration Laws, §§ 128-34; *but see Ex Parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) (declining to give effect to

[7] In *Gegiow*, the Court analyzed the terms adjacent to "public charge" in the statute to conclude that the "overstocked" "state of the labor market" in plaintiffs' destination city could not serve as the basis for exclusion. 239 U.S. at 9. Although issued after enactment of the 1917 Act, the question before the Second Circuit in *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917), involved an interpretation of the 1907 Act and the court relied on a similar adjacent-terms analysis, citing *Gegiow*. In *U.S. ex rel. Mantler v. Comm'r of Immigration*, the Second Circuit quoted *Howe* without comment in a review of past interpretations of the "public charge" exclusion. 3 F.2d 234, 235 (2d Cir. 1924).

relocation of "public charge" within the 1917 Act).[8]

Although Plaintiffs assert that the "primarily and permanently dependent" standard they describe has been "well-settled" for "130 years," Mot. at 2-3, 19, they identify no source—and Defendants are aware of none—that defines "public charge" using those words or their cognates prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means *any* maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285 (emphasis added); *see also* 26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] . . . earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge").[9] Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *United States v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This

---

[8] The 1917 Act listed, *inter alia*, "idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others. 1917 Act at 875-76

[9] Plaintiffs assert that legislative history from 1882 supports their interpretation that "life-long" dependency is required, *see* Mot. at 20, but the quotation on which they rely is actually from a resolution by the New York State Board of Charities discussing "the custom for many of the cities and towns in different governments of Europe to send to this country blind, crippled, lunatic, and other infirm paupers." 13 Cong. Rec. 5109 (June 19, 1882) (quoting W.P. Letchworth, President, and C.S. Hoyt, Secretary, New York State Board of Charities). Further as noted above, however, Congress chose in the 1882 Act to exclude the broader category of "public charges," not "paupers," and, through subsequent enactments, made clear that these two terms do not describe the same category of alien.

interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

### 2. The Plain Meaning of Public Charge Does Not Require Permanent Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash

An alien's temporary receipt of public benefits also constitutes an obligation on the public to support the basic necessities of life, and is therefore encompassed by the plain meaning of public charge. Both administrative practice and the analysis in early cases confirm that the plain meaning of "public charge" is not limited to an alien who is "permanently dependent," as Plaintiffs assert. *See* Mot. at 3, 22.

First, as the NPRM in this case explained, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n. 304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor'") (quoting 1999 Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstances to trigger a public charge determination and set no minimum period below which the receipt of such benefits would be less meaningful. 1999 Interim Field Guidance at 28690. Nothing in the 1999 standard would ensure that an alien who received, in the previous 36 months, 12 months of a public benefit considered relevant under that guidance (such as Supplemental Security Income) would not be treated as a public charge. And nothing in the plain meaning of "public charge" precludes DHS from clarifying the standard by adopting a recognizable and meaningful threshold for receipt of public benefits in a given period. *Cf. Harris Found. v. FCC*, 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule.").

DHS's treatment of recurring, but non-permanent, receipt of public relief is also consistent with early case law. For example, a lower court in New York in the mid-nineteenth century recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg*

17

*v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id.* at 527-28; *see also Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847) (widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges after receiving relief in "the amount of some five dollars").

Nor does anything in the plain meaning of "public charge" suggest a distinction between benefits provided in cash and benefits provided as services, as Plaintiffs suggest. *See* Mot. at 25. Both types of assistance create an obligation on the part of the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's receipt of public benefits for "housing, food and medical care," as "examples of the obvious basic necessities of life," falls within the reasonable parameters of determining whether that person creates a liability on the body of the public. *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs concede that receipt of in-kind services such as health care, food, and housing—the equivalents of modern benefits covered by the Rule such as Medicaid, SNAP, and public housing—were among the types of public support that rendered a person a public charge in the past, by acknowledging that such persons included those who were "residents of almshouses." Mot. at 21. The fact that the modern mores governing public assistance have appropriately deinstitutionalized the poor by providing assistance through subsidies for private housing, private food purchases, and the like does not in any way change the fact that the receipt of such subsidies imposes an "obligation" or "burden" on the body of the public.

Plaintiffs contend that several agency decisions declining to find individuals to be inadmissible on public charge grounds require that non-cash benefits be disregarded in making

18

public charge inadmissibility determinations, but none of the decisions they cite support that result. As a threshold matter, many of the decisions Plaintiffs cite arise in the context of *deportation*, not inadmissibility, and it is widely recognized that "administrative authorities [have] interpreted *public charge* differently for purposes of the grounds of inadmissibility than for the grounds of deportability." Kate M. Manuel, Cong. Research Serv., *Public Charge Grounds of Inadmissibility and Deportability: Legal Overview*, Summary (Jan. 5, 2016) ("CRS 2016"). "Public charge" deportation is a different statutory provision, 8 U.S.C. § 1227(a)(5), and, as a 1974 agency decision explained, the agency viewed it as "incorrect to interpret 'public charge' in the context of inadmissibility, "as narrowly as in the deportation section." *Matter of Harutunian*, 14 I. & N. Dec. 583, 589 (BIA 1974); *see id.* at 588 ("[T]he deportation statute must be strictly construed. The rule is otherwise as to exclusion"). In that context, the agency developed a test—not at issue in the inadmissibility context addressed by the Rule—that examined whether the government agency providing public benefits had demanded repayment of the benefits and whether the alien had failed to do so. *See* CRS 2016 (citing, *e.g.*, *Matter of B—*, 3 I. & N. Dec. 323, 324-25 (BIA 1948)).

Plaintiffs also misread the substance of these decisions as supporting their interpretation of the plain meaning of public charge, but they do not. In *Matter of Martinez-Lopez*, for example, then-Attorney General Robert F. Kennedy explained that a "specific circumstance," which he described as any "fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," is the standard for demonstrating a likelihood to become a public charge. 10 I. & N. Dec. 409, 421 (A.G. 1964) (rejecting argument that an alien's misrepresentation of an offer of employment was sufficient to render the alien deportable). The receipt of public benefits— whether cash or non-cash—for an extended period such as to fall within the 12/36 standard set forth in the Rule readily qualifies as a "specific circumstance" demonstrating that a burden of support has been "cast on the public." *Id.* Similarly, although the applicant in *Matter of A—*, 19 I. & N. Dec. 867, 870 (BIA 1988), was held not to be deportable based on the past receipt of public benefits, that decision emphasized that financial status *is* to be included in the totality of the circumstances; the agency simply concluded that a specific type of temporary unemployment— that of "a mother to stay at home to care for her children, especially when the children have not

started school"—did not outweigh the applicant's current employment in making a *prospective* determination (now that the children were six years of age or greater). *Id.* Far from suggesting that temporary receipt of public benefits can never be considered, this decision highlights that it can be considered and outweighed in the totality of the circumstances, just as the Rule provides.

Finally, although the 1999 Interim Field Guidance and the 1999 NPRM adopted a different interpretation regarding non-cash benefits, those documents provide further support for DHS's determination that inclusion of such benefits in the Rule is consistent with the plain meaning of "public charge." Both documents describe the exclusion of "non-cash public benefits" at that time as "reasonable," confirming that although they did not conclude that the meaning of "public charge" required consideration of such benefits, they also did not conclude that the meaning of public charge foreclosed their consideration. 1999 NPRM at 28677-78; *see id.* at 28678 ("It has never been [the] policy that the receipt of any public service or benefit must be considered."). Indeed, the only examples of prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: (1) broadly-available public benefits such as "public schools"; and (2) the exclusion of food stamps (*i.e.*, "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692.

### 3. The Rule Exercises Interpretive Authority That Congress Delegated To The Executive Branch, A Delegation Congress Has Maintained.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized this implicit delegation of authority to interpret the meaning of "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950) (stating that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is

reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). This expansive delegation of authority grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term itself.[10]

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. *See, e.g.*, *Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. Administrative decisions have explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Matter of Harutunian*, 14 I. & N. Dec. 583, 588-90 (BIA 1974) (quoting S. Rep. No. 81-1515 at 349 (1950) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")); *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (BIA 1977) (citing regulations in the visa context, and explaining that the "elements constituting likelihood of an alien becoming a public charge are varied . . . [and] are determined administratively"). Indeed, Plaintiffs themselves seek to preserve a *prior* exercise of this delegated interpretive authority by requiring DHS to revert to the "primarily dependent" standard for public charge determinations that appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999 NPRM. *See* Mot. at 22 (asserting—wrongly—that the nonbinding 1999 Interim Field Guidance "formally codified" the new "primarily dependent" standard); *id.* at 39 (seeking to require Defendants to "continu[e] to apply" the 1999 Interim Field Guidance).

The long history of congressional delegation of definitional authority over the meaning of

---

[10] These delegations of authority specific to the public charge ground of inadmissibility are reinforced by the explicit overall delegation of authority by Congress to the Secretary of Homeland Security the authority to "establish such regulations . . . as he deems necessary for carrying out" the INA, 8 U.S.C. § 1103(a)(3). Congress has also provided the Secretary with specific responsibility to carry out the INA and to make public charge inadmissibility decisions, as spelled out in detail in the NPRM and Rule. *See* NPRM at 51124; Rule at 41295.

"public charge" demonstrates the error in Plaintiffs' claim that Congress has, by choosing not to impose a definition of "public charge" when revising the statute, "constrain[ed] DHS's ability" to adopt a definition administratively. Mot. at 24-25. By its inaction in 1996 and 2013, the occasions Plaintiffs cite, *see id.*, Congress left the public charge provision unchanged. This inaction cannot plausibly be read to withdraw the longstanding delegation to the Executive Branch to exercise definitional authority over the "varied" elements of the meaning of "public charge." S. Rep. No. 81-1515, at 349. Certainly the INS, when it adopted the 1999 Interim Field Guidance and proposed to issue a sweeping new definition of "public charge" through notice-and-comment rulemaking in 1999, did not understand Congress's 1996 action to have altered the statute by withdrawing the long-understood delegation. *See* 1999 NPRM at 28677 ("[T]he proposed rule provides a definition for the ambiguous statutory term 'public charge'").

At a minimum, the likelihood that Congress intended to preserve the delegation means that, under the circumstances, "[c]ongressional inaction lacks persuasive significance" because competing "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 917 (D.C. Cir. 2017). And the more plausible of the competing inferences is that Congress intended for DHS to retain the authority delegated to it to analyze the "totality of the alien's circumstances" to make "a prediction" about the likelihood that an alien will become a public charge, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974), including the delegated authority for DHS to adopt further procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

### 4. The Rule Is Not Arbitrary And Capricious.

#### a. The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking.

There is "no basis in the Administrative Procedure Act . . . for a requirement . . . [of] more searching review" when an agency changes its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). This is particularly true here, where the "prior policy" to which the Plaintiffs seek to revert is nonbinding guidance that could not possibly foreclose DHS from adopting a different reasonable interpretation through notice-and-comment rulemaking. *See Nat'l Cable &*

22

*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).[11] As the Supreme Court explained in *Fox*, all that DHS was required to do to permissibly change course from the 1999 Interim Field Guidance was to acknowledge that the Rule is adopting a policy change, provide a reasoned explanation for the change, and explain how it believes the new interpretation is reasonable. *See generally Fox*, 556 U.S. 514-16. The Rule readily meets these standards, and so DHS is entitled to full deference to its changed interpretations, consistent with its obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64 (recognizing agencies receive deference to a "changed . . . interpretation of [a] term").

First, the NPRM and Rule acknowledged that DHS was changing course. In the former, DHS announced it was proposing "major changes," *see, e.g.*, NPRM at 51116, and that these changes included "a new definition of public charge." *Id.* at 51158; *see also id.* at 51163 (describing DHS's intent to make "a change from the standard" of "primary dependence" set forth in the 1999 Interim Field Guidance). DHS also stated that it would change and "improve upon the 1999 Interim Field Guidance" by changing the treatment of non-cash benefits. *Id.* at 51123. In the Rule, DHS "agree[d] with commenters that the public charge inadmissibility rule constitutes a change in interpretation from the 1999 Interim Field Guidance," Rule at 41319, and repeatedly explained that it was "redefin[ing]" public charge, and adopting a "new definition" of "public benefit" that would be "broader" than before. *Id.* at 41295, 41297, 41334; *see also id.* at 41347 (explaining that the agency may justifiably change course).

Second, DHS explained the reasons for the change in course. DHS described how the "focus on cash benefits" in the 1999 Interim Field Guidance had proved "to be insufficiently protective of the public budget, particularly in light of significant public expenditures on non-cash benefits." NPRM at 51164. DHS quantified the "significant federal expenditure on low-income

---

[11] As explained *supra*, the standards of "primary dependency" (or "primarily dependent") and exclusion of non-cash benefits were newly-adopted by the 1999 Interim Field Guidance, and thus, Plaintiffs are incorrect to suggest that the Rule "alter[s] a framework . . . applied for more than a century." Mot. at 28.

23

individuals" specifically associated with "benefits directed toward food, housing and healthcare." *Id*. at 51160; *see id*. at Table 10. Recognizing that these benefits are provided to citizens and aliens alike, DHS also examined the substantial participation rate among foreign-born aliens for these programs. *See id*. at 51161 & Table 11. In this analysis, DHS found that public benefits programs provide, on average, thousands of dollars of "assistance to those who are not self-sufficient" and who are aliens, *id*. at 51163, and that millions of aliens receive such benefits: 3.1 million receive Medicaid alone. *Id*. at 51161-62 & Table 12. These statistics reasonably support DHS's conclusion that, under the 1999 Interim Field Guidance, the agency was failing to carry out the principles mandated by Congress that "aliens . . . not depend on public resources to meet their needs," and instead "rely on their own capabilities" and support from families, sponsors, and private organizations. 8 U.S.C. § 1601; *see also* Rule at 41308, 41319 (explaining that the prior guidance "failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective"). Consistent with the long-understood purpose of the public charge ground of inadmissibility as the "chief measure of protection in the law" for the public fisc, *see* 1916 Letter, DHS's analysis demonstrates the reasonableness of the decision to exercise delegated authority to adopt a new definition and approach for public charge inadmissibility determinations.

Plaintiffs' argument in response misinterprets 8 U.S.C. § 1601 and PRWORA to suggest that the principles described therein apply only to "the Welfare Reform Act itself." Mot. at 26. The statutory provision describes these principles as the "continu[ing] . . . *immigration policy* of the United States," 8 U.S.C. § 1601(2), and *not* the continuing "public benefits policy." Moreover, rather than locate these provisions in Title 42 with other provisions governing public benefits, *see, e.g.*, 42 U.S.C. § 607(e) (codifying PRWORA's work requirement for receipt of benefits), Congress located this language in Title 8, "Aliens and Nationality," thereby choosing to require that these principles guide immigration policy, not just public benefits policy.

DHS also adequately explained how the new approach reasonably advances the stated purposes, including by "implement[ing] the public charge ground of inadmissibility consistent with . . . [Congress's goal of] minimiz[ing] the incentive of aliens to attempt to immigrate to, or to

24

adjust status in, the United States due to the availability of public benefits." Rule at 41305 (citing 8 U.S.C. § 1601(2)(B)). Although aliens may face a five-year waiting period prior to eligibility for public benefits, they can be expected to base their present decisions on the availability of those future benefits. *Cf. Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (Congress could reasonably "believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits").

Plaintiffs' contention that DHS's discussion of self-sufficiency is internally inconsistent equally misunderstands the relevant law. They suggest that the public benefits enumerated in the Rule are "designed to help working individuals" attain self-sufficiency and that this renders the Rule arbitrary and capricious. Mot. at 30. But Plaintiffs' argument ignores that Congress's goal of ensuring, in the inadmissibility context, that aliens do not rely on public resources is not identical to the goal of self-sufficiency for those enrolled in public benefit programs. For specific purposes of the public charge inadmissibility ground, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," not that they should someday attain self-sufficiency by drawing on public resources to improve their financial condition. Rule at 41308; *see* 8 U.S.C. § 1601. Nothing about the existence of such programs, which also help indigent citizens or aliens who are here but do not intend to later adjust status or seek admission, obligates Congress or DHS to admit to the United States other persons who have not achieved self-sufficiency, even if they aspire to do so.

### b. The Rule Sets Forth Reasonable Factors To Be Considered In Making A Totality Of The Circumstances Determination.

Congress required DHS to consider "at a minimum" certain specified factors in determining whether an alien is inadmissible as a public charge. 8 U.S.C. § 1182(a)(4)(B). Consistent with the statute, the Rule adopts a totality of the circumstances test that considers each of these statutorily required factors as well as other relevant information. Rule at 41295. Plaintiffs nevertheless insist that the Rule "lists numerous factors that bear no reasonable relationship to a finding of public charge." Mot. at 31. The examples Plaintiffs identify, however, are each highly

relevant in assessing an individual's likelihood of becoming at any time a public charge. DHS therefore reasonably incorporated them into the public charge analysis in the Rule.

First, the Rule logically considers an applicant's income in the totality of the circumstances. Under the Rule, "[a]ny household income between 125 percent and 250 percent of the [Federal Poverty Guidelines ("FPG")] is considered a positive factor in the totality of the circumstances." Rule at 41448. Income above 250 percent of FPG is considered a heavily weighted positive factor. *Id*. at 41446. If household income is less than 125 percent of the FPG, it will generally be a heavily weighted negative factor, *id*. at 41323, although DHS will consider whether the alien has sufficient assets and resources to offset the lower income. *Id*. at 41413. Plaintiffs argue that the income factor is "irrational" to the extent it may be applied to an alien who has never applied for public benefits. Mot. at 31. But there is nothing irrational about the Rule's income threshold, as it is supported by data establishing a correlation between low incomes and the receipt of public benefits. Rule at 41416-17; NPRM at 51204-06. Implicit in Plaintiffs' argument is the assumption that an alien cannot be likely to become a public charge if he or she has not previously received public benefits. But that ignores the express statutory requirement that a variety of factors, besides receipt of benefits, be considered, including "assets, resources, and financial status." 8 U.S.C. § 1182(a)(4)(B)(i). It is entirely rational for the Rule to consider an alien's income, which certainly pertains to his or her "assets, resources, and financial status," as part of the public charge determination, regardless of whether the alien has received public benefits.

Furthermore, the 125 percent income threshold is based on the income threshold set by Congress for sponsors of aliens who execute affidavits of support. Rule at 41447-48. Specifically, the INA requires a sponsor of an alien to agree "to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line[.]" 8 U.S.C. § 1183a(a)(1)(A). The Rule's use of the 125 percent threshold therefore maintains consistency with the threshold in the sponsor context. Rule at 41448. Plaintiffs believe there is an inconsistency because "a sponsor seeks to support not only herself but the immigrant applicant[.]" Mot. at 31. But the income threshold for the sponsor is higher as a result of the fact that he or she is supporting

an additional person. *See* 8 U.S.C. § 1183a(f)(6)(A)(iii) (applicable FPG for sponsor income threshold is based on number of members of sponsor's household "plus the total number of other dependents and aliens sponsored by that sponsor"). Accordingly, both in the sponsor context and the Rule, the 125 percent income threshold is applied consistently based on the number of individuals being supported by the income.

Similarly, there is nothing irrational about the Rule's consideration of an alien's application for benefits as part of the totality of the circumstances. Mot. at 31. An application for benefits, though "not the same as receipt," is nonetheless "indicative of an alien's intent to receive such a benefit." Rule at 41422. The fact that an alien believed he or she needed public assistance to support his or her basic needs, though not dispositive on its own, is a relevant factor when considering the likelihood that that person will become a public charge. *Id.* ("The fact that an alien has in the past applied for . . . public benefits . . . would never be dispositive on its own, but would be relevant to assessing an alien's likelihood of becoming at any time in the future a public charge.").[12]

Also, it was entirely reasonable for DHS to include English proficiency as a factor to be considered in the totality of the circumstances, particularly given the statutory requirement to consider an applicant's "education and skills." 8 U.S.C. § 1182(a)(4)(B)(i). The correlation between a lack of English language skills and public benefit usage, lower incomes, and lower rates of employment, is amply supported in the record. For instance, DHS discussed U.S. Census Bureau data showing a direct relationship between an individual's English fluency and his income, as well as data demonstrating that those who spoke a language other than English at home were less likely to be employed. Rule at 41448. Data considered by DHS also shows that "among the noncitizen adults who speak a language other than English at home, the participation rates for both cash and non-cash benefits are higher among those who do not speak English well, or at all, than among

---

[12] Consideration of an application for public benefits is also consistent with early case law discussing the standard for identifying a person as a public charge. *See Princeton Twp.*, 23 N.J.L. 169, 179 (Carpenter, J., concurring) ("The probability of [a person] becoming chargeable is sufficiently shown by his application for relief").

those who speak the language well." *Id.* at 41432; *see also* NPRM at 51195-96.

Next, it is not unreasonable for the Rule to consider family size in the public charge analysis. Mot. at 32. Indeed, the pertinent statute expressly requires that DHS consider "family status" in determining whether an alien is inadmissible on public charge grounds. 8 U.S.C. § 1182(a)(4)(B)(i)(III). Plaintiffs' suggestion that DHS relied on certain data described as not statistically significant, *see* Mot. at 32, ignores that DHS relied on *other* data that are described as statistically significant, and such data showed a higher rate of non-cash benefit use as family size increases. *See* Rule at 41395. This supports the commonsense notion that financial strains increase as families grow in size.

Plaintiffs' suggestion that DHS acted unreasonably in considering whether a sponsor who signs an affidavit of support is likely to actually provide the promised financial support to the alien is deficient in logic. As the Rule notes, "a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future" due to the potential "inability or unwillingness of the sponsor to financially support the alien." Rule at 41440. The fact that the sponsor is required to support the alien, *see* Mot. at 32, does not mean he or she necessarily will do so. Also, it was reasonable for DHS to conclude that receipt of immigration-related fee waivers is relevant to the public charge analysis because those waivers are granted based on "inability to pay." 8 C.F.R. § 103.7(c). As the Rule explains, "requesting or receiving a fee waiver for an immigration benefit suggests a weak financial status," because "fee waivers are based on an inability to pay, [and] seeking or obtaining a fee waiver for an immigration benefit suggests an inability to be self-sufficient." Rule at 41424-25.

Plaintiffs further claim that it is irrational for DHS to have identified factors relevant to the public charge analysis that may overlap in some instances, *see* Mot. at 32, but it is not. This is not an objection to the Rule, but rather, to the statute itself: Many of the specific factors that the statute requires DHS to consider—*e.g.*, education, skills, and assets—will correlate highly with financial status. Further, it is highly unlikely that *any* evidence-based determination of "financial status" could be made without considering different kinds of evidence that would overlap in their tendency

28

to demonstrate whether an individual is, or is not, likely at any time to become a public charge.

Last, Plaintiffs' contention that DHS's explanations "are mere pretext for Defendants' discriminatory agenda" is entirely unsupported. Mot. at 33. But since these plaintiffs have not argued that their Fifth Amendment claims support entry of a preliminary injunction, Defendants will not further address Plaintiffs' speculation.

### c. DHS Reasonably Considered Section 504 Of The Rehabilitation Act, Which The Rule Does Not Violate.

Plaintiffs note that the Rule requires DHS to consider certain "medical conditions" in the public charge inquiry, and claim, incorrectly, that the Rule "effectively exclude[s] individuals with a wide range of disabilities from admissibility" in violation of Section 504 of the Rehabilitation Act. Mot. at 35. That section provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a) (emphasis added); *see also* 6 C.F.R. § 15.30 (DHS implementing regulation). The statute imposes a "strict[] 'solely' causation standard," *Natofsky v. City of New York*, 921 F.3d 337, 350–51 (2d Cir. 2019), and Plaintiffs cannot satisfy it.

As a threshold matter, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(i). "Health" certainly includes an alien's disability, and it is therefore Congress, not the Rule, that requires DHS to take this factor into account. *See*, *e.g.*, *In Re: Application for Temporary Resident Status*, USCIS AAO, 2009 WL 4983092, at *5 (Sept. 14, 2009) (considered application for disability benefits in public charge inquiry). A specific, later statutory command, such as that contained in the INA, supersedes section 504's general proscription to the extent the two are in conflict (which they are not, as explained below). *See*, *e.g.*, *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987) ("[A] general . . . statute, § 504" may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress[.]" (internal quotation marks omitted)); *Hellon Assocs. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992) ("in case of an irreconcilable

29

inconsistency between them the later and more specific statute usually controls the earlier and more general one").

In any event, the Rule is fully consistent with section 504 of the Rehabilitation Act. The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability. All covered aliens, disabled or not, are subject to the same inquiry: whether they are likely to use one or more covered federal benefits for the specified period of time. Although disability is one factor (among many) that may be considered, it is not dispositive, and is relevant only to the extent that an alien's particular disability tends to show that he is "more likely than not to become a public charge" at any time, Rule at 41368. Further, any weight assigned to this factor may be counterbalanced by other factors, including "[an] affidavit of support," "employ[ment]," "income, assets, and resources," and "private health insurance." *Id.* Thus, any public charge determination cannot be based "solely" on an applicant's disability. Moreover, to fall within the coverage of the Rehabilitation Act, an individual must be "otherwise qualified," 29 U.S.C. § 794(a), which means that the individual "must be 'able to meet all of a program's requirements in spite of his handicap.'" *St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 173 (2d Cir. 2001). An alien who is likely to become a public charge because of his or her medical condition is not otherwise qualified for admission or adjustment of status. *See Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992) (explaining that "an institution is not required to disregard . . . disabilities . . . , provided the handicap is relevant to reasonable qualifications").

Plaintiffs also claim that Defendants failed to provide a "reasonable accommodation," as required by the Rehabilitation Act. Mot. at 34. But *Plaintiffs* must demonstrate that an appropriate reasonable accommodation exists, and fail to do so. *See McElwee v. Cty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012). Additionally, here, it is unlikely any reasonable accommodation exists. "An accommodation is not reasonable if it . . . would fundamentally alter the nature of the . . . program." *Id.* at 641. Any accommodation Plaintiffs would likely propose would effectively require Defendants to transform its definition of public charge, and the factors considered. The Rehabilitation Act "requires no such diminishment of otherwise applicable standards." *Harris v. Mills*, 572 F.3d 66, 74 (2d Cir. 2009) (discussing ADA requirements); *Lyons v. Legal Aid Soc'y*,

68 F.3d 1512, 1515 (2d Cir. 1995) (reasonable accommodation requirements under the ADA and the Rehabilitation Act are the same).

### d.   The Rule Reasonably Evaluates The Likely Costs And Benefits.

An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Nevertheless, Plaintiffs insist that DHS did not adequately consider potential harms that may result from the Rule. Plaintiffs' arguments regarding DHS's responses to comments are not well-founded.

Plaintiffs first suggest that DHS failed to respond to comments concerning the possibility that the Rule may cause people to disenroll from public benefits in what Plaintiffs describe as the "chilling effects" of the Rule. Mot. at 37-38. Their claim that DHS "dismisse[d] without discussion" comments on this issue, Mot. at 37, is easily disproven. The Rule, in fact, provided a detailed discussion of the comments raising concerns regarding the disenrollment impact and offered a lengthy, reasoned discussion explaining precisely why DHS believed the Rule was justified notwithstanding this potential harm. Rule at 41310-14. As DHS stated, notwithstanding the disenrollment impact, the "rule's overriding consideration, *i.e.*, the Government's interest" in (1) minimizing the incentive of aliens to immigrate or adjust status to obtain public benefits and (2) promoting self-sufficiency of aliens in the United States "is a sufficient basis to move forward." *Id.* at 41312. DHS explained that it is not "sound policy to ignore the longstanding self-sufficiency goals set forth by Congress" because of the potential for disenrollment. *Id.* at 41314. Thus, DHS did not ignore potential harms; rather, it found that other policy interests outweighed the interests in avoiding potential disenrollment impacts of the Rule. DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious. *See Consumer Elecs. Ass'n v. FCC*,

31

347 F.3d 291, 303 (D.C. Cir. 2003) ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive."). Plaintiffs may not agree with DHS's weighing of the costs and benefits, but that does not mean that DHS ignored costs or that the Rule is arbitrary and capricious. *See id.* (the principle "that a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies").

Nor did DHS "affirmatively disregard" the disenrollment impact on individuals not subject to the Rule, such as U.S. citizens. Mot. at 38. On the contrary, DHS expressly considered that potential impact and reasonably decided that the possibility of such impacts did not outweigh the policy benefits of the Rule, including in serving goals such as self-sufficiency. DHS noted that it is "difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule" and exercised its policy judgment to conclude that the possibility that individuals not subject to the Rule might make unwarranted choices to disenroll from benefits does not override the important benefits likely to ensue from the Rule. Rule at 41313-14. Thus, what Plaintiffs characterize as DHS's "indifference" to potential harms, Mot. at 38, was actually DHS's judgment that the benefits of the Rule outweigh the harms. Moreover, DHS set forth its plans to lessen the unwarranted disenrollment by individuals not subject to the Rule and explained that it will help "individuals who are not subject to this Rule" better understand the Rule's consequences by "issu[ing] clear guidance" that such individuals can consult. Rule at 41313.[13]

Last, Plaintiffs contend that DHS "failed to address or adequately calculate the impact of public health and economic harms" and did not "quantify" the costs of administrative burdens on states. Mot. at 38. Far from failing to address such costs at all, DHS did consider them and made

---

[13] DHS's express consideration of the disenrollment impact and its reasoned response is nothing like *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018), cited by Plaintiffs, in which the agency "never once mention[ed]" the people who would lose health coverage because of the rule at issue in that case, *id*. at 263. *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) similarly involved "a failure to address 'an important aspect of the problem,'" which, again, did not occur here.

the reasonable decision to adopt the Rule in its balancing of costs and benefits. *See* Rule at 41310-14, 41469, 41471. Specifically as to administrative costs on states, DHS "consider[ed] these costs qualitatively in the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and what the cost of making such changes will be." *Id.* at 41469. And as to impacts on public health, DHS explained that it made a number of changes to the Rule to mitigate some of the concerns raised, such as excluding certain benefits from the scope of the Rule. *Id.* at 41471. As for Plaintiffs' argument that DHS did not "calculate" or "quantify" these harms, Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. Mot. at 37-38. Nor could they. *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (the "law does not require agencies to measure the immeasurable"); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). Plaintiffs fail to identify any methodology DHS could have followed to reliably measure these costs. "As predicting costs and benefits without reliable data is a primarily predictive exercise, the [agency] need[s] only to acknowledge [the] factual uncertainties and identify the considerations it found persuasive in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014).[14]

---

[14] Plaintiffs cite to a discussion of DHS's regulatory impact analysis conducted pursuant to Executive Orders 12866, 13563, and 13771. Mot. at 38 (citing Rule at 41489). Any claim challenging the adequacy of that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights— is not subject to judicial review."). The APA, standing alone, does not require a detailed cost-benefit analysis. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) (upholding agency choice to seek "only to avoid extreme disparities between costs and benefits"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510-12 & n.30 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011) (rejecting argument that "the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis"). While the Supreme Court noted in *Michigan v. EPA* that "reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions," 135 S. Ct. 2699, 2707 (2015), it did not require the agency "to conduct a formal cost-benefit analysis," leaving it

### III. PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM.

Plaintiffs identify ephemeral, speculative harms that—if they ever occurred—would be traceable to the independent choices of third parties. But, "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and . . . accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67 (2nd Cir. 2007) (citation omitted).[15] "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2nd Cir. 1999)). Plaintiffs have failed to carry this burden because their alleged injuries are speculative and they have provided no evidence that such harms will occur immediately. Indeed, as explained above, Plaintiffs have not even met the less demanding standing requirement. *See supra* II.A.

Plaintiffs allege that the Rule will cause them irreparable harm by damaging their economies, undermining their public health systems, and imposing various administrative costs on non-federal benefit programs. First, Plaintiffs have not established that some of their alleged economic injuries are cognizable at all, much less irreparable harms. Plaintiffs have provided no support for their assertion that they are entitled to federal Medicaid reimbursements or SNAP payments for individuals who do not use those programs. *See* Mot. at 9-10.[16] Similarly, Plaintiffs

---

up to the agency "to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* at 2711.

[15] Although Second Circuit case law suggests that a moving party may make a lesser showing of "sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation," to obtain a preliminary injunction, that alternative standard is unavailable to a party challenging "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010).

[16] Plaintiffs attempt to rely on *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), for the proposition that a threatened loss of federal funding is a sufficient injury to establish irreparable

have not explained why they believe they are *entitled* to any economic side effects from federal benefits that independent third parties may choose not to use. Mot. at 12.

Second, Plaintiffs' alleged obligations to update their administrative systems and procedures to come into compliance with the Rule, Mot. 15-17, do not constitute irreparable harms. *See supra* at 10. Any significant change to any statutory or regulatory scheme is likely to require similar costs, and "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings*, 408 F.3d at 115 (citing *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from compliance with government regulation ordinarily is not irreparable harm.")). Moreover, because the Rule does not actually apply to Plaintiffs, and does not require them to do or refrain from doing anything, some if not all of these alleged harms are self-inflicted and cannot satisfy the irreparable harm requirement. *See, e.g., Hirschfeld v. Bd. of Elec.*, 984 F.2d 35, 40 (2nd Cir. 1993) (Movant's "claim of irreparable injury was meritless because any injury in the absence of the stay would be self-inflicted."); *Howe v. Burwell*, Case No. 2:15-cv-6, 2015 U.S. Dist. LEXIS 94595, at *19 (D. Vt. July 21, 2015).

Third, Plaintiffs' remaining allegations of economic and public health injuries are too speculative to satisfy the irreparable harm standard. It is well-established that "[t]he mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied . . . [i]f irreparable harm is remote, speculative, or a mere possibility, the motion must be denied." *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999); *see also, e.g., Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2nd Cir. 1991). As discussed *supra*, Plaintiffs' alleged economic and public health harms are speculative, founded on an attenuated chain of inferences, and contingent on the aggregate decisions of independent third parties to take action not required by the Rule. Assuming Plaintiffs

---

harm, however that case concerned the potential loss of funding for which state plaintiffs were the direct and intended beneficiaries. Similarly Plaintiffs rely on statements in *Vidal,* but the alleged harms in that case are distinguishable. Whereas in this case Plaintiffs' alleged harms would result from the independent decisions of third parties, the court in *Vidal* found that rescission of DACA would necessarily cause the alleged harms by operation of law. 279 F. Supp. 3d 401, 434-35 (E.D.N.Y. 2018).

are correct that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, Plaintiffs must still demonstrate a likelihood that such disenrollment will occur at a sufficiently high rate and magnitude to cause harm to state-level, as opposed to individual, interests.[17] Given the size of the States' programs, the number of individuals involved, and the many other reasons that individuals (aliens or citizens) might choose to forgo or disenroll from federal benefits, Plaintiffs' assertions of significant harmful effects are unsupported.

Beyond failing to demonstrate the accuracy of this underlying premise, Plaintiffs have provided no evidence of the number of disenrollments necessary to produce the effects they allege on a meaningful scale nor how likely such magnitude of disenrollments is to occur. This falls far short of the showing necessary to obtain a preliminary injunction. "The movant is required to establish not a mere *possibility* of irreparable harm, but that it is '*likely* to suffer irreparable harm if equitable relief is denied' . . . '[l]ikelihood sets, of course, a higher standard than possibility.'" *Johnson Controls, Inc. v. A.P.T. Critical Sys.*, 323 F. Supp. 2d 525, 531-32 (S.D.N.Y. 2004) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990)) (emphasis in original). Indeed, Plaintiffs' own motion and supporting declarations belie their assertion that they have alleged sufficient harms, as these filings explicitly use the language of possibility rather than probability. *See, e.g.*, Mot. at 8-9 ("[H]undreds of thousands of noncitizens in Plaintiffs' jurisdictions *may* cease receiving SNAP food stamp benefits because of the Final Rule") (emphasis added); Zucker Decl. ¶ 14 ("The Department estimates that the Final Rule *could* disincentivize up to 2 million New Yorkers from applying for or continuing to receive health insurance") (emphasis added); *Id*. at ¶ 41; Visnauskas Decl. ¶ 23; Gifford Decl. ¶ 18; Guinn Decl. ¶ 24; David Decl. ¶ 28;

---

[17] Plaintiffs provide projections for the number of individuals potentially chilled, Mot. at 8, and the amount of economic activity lost, Mot. at 10, 12. These projections suffer from several flaws in addition to being entirely speculative. First, the population Plaintiffs suggest will be chilled includes all individuals with at least one non-citizen in their family and who receive one of the benefits considered a heavily weighted negative factor. This population thus includes substantial numbers of people who will never be subject to a public charge assessment and benefits that were already considered under the previous Rule. As for the economic projections, as discussed *supra*, Plaintiffs have provided no support for their assertion that they are entitled to federal payments or the side effects of federal payments for which they are not the intended beneficiaries, and thus these are not cognizable injuries.

Williams Decl. ¶ 15.

Finally, Plaintiffs have also failed to demonstrate that their alleged economic and public health harms will "be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm." *Rodriguez*, 175 F.3d at 235. Plaintiffs have alleged no facts in support of their conclusory statements that the economic or public health harms they claim would likely develop so quickly.[18] Any such harms, if they ever emerged, would be the cumulative effect of independent decisions of thousands of third-party aliens over the course of years. Plaintiffs offer no prediction about when these harms might arise and why the Rule's effective date must be enjoined when record-review briefing could occur in a matter of months. Indeed, Plaintiffs' own motion and declarations acknowledge the logical conclusion that the speculative and attenuated alleged public health impacts of the Rule, such as worse health outcomes caused by avoidance of preventative care, would develop over time. *See, e.g.*, Mot. at 11 ("And because individuals without health insurance tend to forgo preventative healthcare, wait longer to seek care, and eventually obtain urgent care from emergency departments, the care they eventually receive is far more costly."); Mot. at 14 ("An increase in food insecurity will likewise cause long-term public health harms in Plaintiffs' jurisdictions."); Schanzenbach Decl. ¶ 39 n.54 ("The prior studies . . . find that disenrollment continues for several years after a policy change until the total impact on enrollment is realized, and the same is expected in this case."); Gifford Decl. ¶¶ 20, 34, 40; Ku Decl. ¶ 57; Allen Decl. ¶ 39-40; Zucker Decl. ¶ 17; Mosquera-Bruno Decl. ¶¶ 21-22; Barbot Decl. ¶¶ 37-38.

## IV.   THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *See Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2nd Cir. 2019). These

---

[18] Plaintiffs' declarants recount their anecdotal experiences that some individuals have forgone or disenrolled from benefits prior to the effective date of the Rule, *see, e.g.*, Barbot Decl. ¶¶ 12, 24, Katz Decl. ¶¶ 11-15, but these cannot establish that sufficient numbers of individuals will disenroll sufficiently quickly to create the alleged harms before this case can be decided on the merits.

two factors merge when the government is a party, Batalla *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018), but Plaintiffs have not made a sufficient showing to meet the standard for either factor.

It is not the case, as Plaintiffs assert, that the balance of equities and public interest "tip sharply" in favor an injunction merely because they have alleged economic and public health impacts. Mot. at 39.[19] Nor is it correct that Defendants will suffer no harm because an injunction will allegedly preserve the status quo. *Id*.[20] As explained in detail *supra*, Plaintiffs' purported economic and public health harms are wholly speculative, and there is no support for their assertions that these harms would be realized during the pendency of this case. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the "status quo" referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would significantly harm Defendants.

Plaintiffs' speculative harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone, their motion for a preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

---

[19] Plaintiffs also allege that enrollment in public benefit programs "benefits the economy by enabling immigrants to realize their economic potential and move toward greater self-sufficiency," Mot. at 39, however they do not identify any support for this proposition.

[20] Plaintiffs also allege that the balance of equities favors them because there is a public interest in having government agencies abide by federal law. Mot. at 39. However, the interests of the Defendants, as federal regulators, are also served by proper APA compliance, which was undertaken in this case. *See supra*. Thus this factor is merely neutral in the balance.

## V. THE COURT SHOULD NOT GRANT A NATIONWIDE INJUNCTION OR STAY OF RELIEF.

Were the Court to order a preliminary injunction or a stay of the effective date of the Rule, it should be limited to redressing only any established injuries to the individual Plaintiff States (and city). Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Plaintiffs have requested either a stay of the effective date of the regulation or a preliminary injunction, but have neither requested nor alleged any facts in support of a nationwide injunction or a stay with that effect. Equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Accordingly, Courts of Appeals have repeatedly vacated or stayed the nationwide scope of injunctions, including in a challenge to a federal immigration rule. *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *2 (9th Cir. Aug. 16, 2019) ("Under our case law . . . all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"); *see also California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases).

Relief under 5 U.S.C. § 705 is similarly limited, as that provision permits a court to stay the effective date of an agency action only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Although Plaintiffs have requested a stay of the effective date of the Rule without limitation, narrower relief is both available under § 705 and required by equitable principles applicable to extraordinary forms of relief. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (indicating that courts should consider any "brief[ing] [regarding] how [to] craft a limited stay"); 5 U.S.C. § 705 (Courts "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review process." (emphasis added)). Plaintiffs acknowledge that relief under § 705 is governed by equitable

principles under the "same" standards as govern preliminary injunctions, Mot. at 40, and nothing in § 705 speaks clearly enough to work "a major departure from the long tradition of equity practice." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

Plaintiffs have not alleged, nor can their cited evidence establish, that nationwide relief is necessary to remedy their alleged harms. Any stay or injunction should be limited, at most, to the Plaintiffs and should be further limited to any relief necessary to remedy those specific harms found to be non-speculative, irreparable, and tied to the effects of the Rule. *See Azar*, 911 F.3d at 584 (rejecting argument that "complete relief" for "plaintiff states" requires enjoining "all . . . applications nationwide" of challenged regulations). It is settled law that "all injunctions – even ones involving national policies – must be 'narrowly tailored to remedy the specific harm shown.'" *E. Bay*, 2019 WL 3850928, at \*2 (quoting *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Here, Plaintiffs have neither shown nor attempted to show any harm beyond their geographical borders, and any relief must therefore be limited, at most, to the Plaintiff States.

## CONCLUSION

Defendant respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction or stay of the effective date of the Rule

Dated:  September 27, 2019
 GEOFFREY S. BERMAN
 United States Attorney

 Respectfully submitted,

 JOSEPH H. HUNT
 Assistant Attorney General

 ALEXANDER K. HAAS
 Director, Federal Programs Branch

 /s/ *Joshua M. Kolsky*
 ERIC J. SOSKIN
 Senior Trial Counsel
 KERI L. BERMAN
 KUNTAL V. CHOLERA
 JOSHUA M. KOLSKY, DC Bar No. 993430
 U.S. Dept. of Justice, Civil Division,
 Federal Programs Branch
 1100 L Street, N.W., Rm. 12002

Washington, DC 20001
Phone: (202) 305-7664
Fax: (202) 616-8470
Email: joshua.kolsky@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Joshua M. Kolsky*_____

JOSHUA M. KOLSKY