# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF CONNECTICUT, and STATE OF VERMONT,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KEVIN K. McALEENAN, *in his official capacity as Acting Secretary of the United States Department of Homeland Security*; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; KENNETH T. CUCCINELLI II, *in his official capacity as Acting Director of United States Citizenship and Immigration Services*; and UNITED STATES OF AMERICA,<br><br>　　　　　　　　Defendants. | **19 Civ. 7777 (GBD)** |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING JUDICIAL REVIEW

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ...................................................................................................................... 1

    I.    Plaintiffs have standing and this case is ripe for judicial review. ........................................ 1

    II.   Plaintiffs are within the zone of interests. ............................................................................ 4

    III.  Plaintiffs are likely to succeed on the merits of their claims. .............................................. 5

       A.   Plaintiffs are likely to succeed on their claim that the Final Rule is contrary to the INA and therefore violates the Administrative Procedure Act. ......................................................... 5

       B.   Plaintiffs are likely to succeed on their claim that the Final Rule is arbitrary and capricious. ................................................................................................................................... 9

    IV.   The balance of equities and public interest strongly favor a preliminary injunction in light of the irreparable harm Plaintiffs will suffer. ...................................................................... 14

    V.   The Court should enjoin the Final Rule without geographic limitation. ............................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018)...........................................................................................3

*Alexander v. Choate*,
   469 U.S. 287 (1985).............................................................................................................13

*Am. Sec. & Tr. Co. v. Utley*,
   382 F.2d 451 (D.C. Cir. 1967).............................................................................................6

*Arizona v. United States*,
   567 U.S. 387 (2012).............................................................................................................15

*Baltimore v. Trump*,
   No. CV ELH-18-3636, 2019 WL 4598011 (D. Md. Sept. 20, 2019) ................................. 3-4

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ..........................................................................2, 3, 15

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983).............................................................................................................7

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .............................................................................................2, 3

*Chamber of Commerce v. U.S. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) .............................................................................................11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).............................................................................................................3

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) .............................................................................................2

*CREW v. Trump*,
   No. 18-474, 2019 WL 4383205 (2d Cir. Sept. 13, 2019) ...................................................4

*Edenburg Borough Poor Dist. v. Strattanville Borough Poor Dist.*,
   5 Pa. Super. 516 (1897)......................................................................................................8

*Ex parte Kichmiriantz*,
   283 F. 697 (N.D. Cal. 1922) ..............................................................................................9

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................................................9

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ......................................................................................4

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ..................................................................................15

*Heilweil v. Mount Sinai Hosp.*,
32 F.3d 718 (2d Cir. 1994)........................................................................................13

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*,
482 F.3d 79 (2d Cir. 2006).........................................................................................10

*King v. Burwell*,
135 S. Ct. 2480 (2015)...............................................................................................10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
191 F.3d 229, 240 (2d Cir. 1999)................................................................................2

*Lam Fung Yen v. Frick*,
233 F. 393 (6th Cir. 1916) ..........................................................................................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)......................................................................................................4

*Make the Road v. McAleenan*,
No. 19-CV-2369, 2019 WL 4738070 (D.D.C. Sept. 27, 2019)................................14

*Nat'l Org. for Marriage v. Walsh*,
714 F.3d 682 (2d Cir. 2013).........................................................................................3

*People ex rel. Durfee v. Commissioners of Emigration*,
1858 WL 7084 (N.Y. Gen. Term. 1858).....................................................................8

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
908 F.3d 476 (9th Cir. 2018) .....................................................................................15

*Ross v. Bank of Am.*,
524 F.3d 217 (2d Cir. 2008).........................................................................................4

*Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*,
67 F. Supp. 3d 373 (D.D.C. 2014).............................................................................14

*St. Johnsbury Acad. v. D.H.*,
240 F.3d 163 (2d Cir. 2001).......................................................................................13

*Susan B. Anthony List v. Driehaus*,
　134 S. Ct. 2334 (2014)..................................................................................................1

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015) ................................................................................4, 15

*U.S. Dep't of Commerce v. New York*,
　139 S. Ct. 2551 (2019)..............................................................................................3, 15

*Util. Air Regulatory Grp. v. EPA*,
　573 U.S. 302 (2014)......................................................................................................5

*WildEarth Guardians v. Salazar*,
　741 F. Supp. 2d 89 (D.D.C. 2010)............................................................................12

*Wyoming v. U.S. Dep't of Interior*,
　674 F.3d 1220 (10th Cir. 2012) ..................................................................................2

**FEDERAL STATUTES**

5 U.S.C.
　§ 705..........................................................................................................................15

8 U.S.C.
　§ 1183a.........................................................................................................................4
　§ 1183...........................................................................................................................4
　§ 1614...........................................................................................................................9
　§ 1642...........................................................................................................................9

29 U.S.C.
　§ 705..........................................................................................................................13

Rehabilitation Act of 1973,
　Pub. L. 93-112, 87 Stat. 394 (1973) (codified at 29 U.S.C. § 794) .................................. 12-13

**FEDERAL REGULATIONS**

28 C.F.R.
　§ 41.51........................................................................................................................13

*Field Guidance on Deportability and Inadmissibilty on Public Charge Grounds*,
　64 Fed. Reg. at 28,676 (May 26, 1999) ...........................................................6, 8, 9

*Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) .........................2

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) .............. passim

**ADMINISTRATIVE DECISIONS**

*In the Matter of A-*
    19 I. & N. Dec. 867 (B.I.A. 1988) ....................................................................... 6-7

*In the Matter of Harutunian*
    14 I. & N. Dec. 583, 588 (B.I.A. 1974) .................................................................7, 9

**MISCELLANEOUS AUTHORITIES**

Black's Law Dictionary (6th ed. 1994)......................................................................6

Arthur Cook, <u>Immigration Laws of the United States</u> (1929) .......................................9

Stewart Rapalje, <u>Dictionary of American and English Law</u> (1888) ...............................6

S. Rep. No. 81-1515 (1950)......................................................................................7

U.S. Citizenship & Immigration Servs., Regulatory Impact Analysis:
    Inadmissibility on Public Charge Grounds (2019) ...........................................1, 2, 3

13A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u>
    § 3531.4 (3d ed. 2008) ...................................................................................2

## PRELIMINARY STATEMENT

DHS seeks to enact a sea change in immigration law and public benefits eligibility, which the agency concedes will increase the prevalence of disease and cause economic, public health, and other imminent harms to states and cities.  The Final Rule should be vacated because the agency has not justified its radical departure from longstanding application of the "public charge" definition, and because DHS arbitrarily relies on irrational justifications that fail to support the Rule's draconian provisions.

## ARGUMENT

### I.    Plaintiffs have standing and this case is ripe for judicial review.

Defendants' challenge to Plaintiffs' standing ignores their own conclusions that the Final Rule will predictably reduce participation in vital public benefits programs operated by Plaintiffs, thereby imposing costs on Plaintiffs.  Plaintiffs have plainly shown that—at a minimum—the Final Rule poses a "substantial risk" of concrete injury-in-fact, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014), in the following ways.

First, the Rule will reduce participation in benefits programs enumerated in the Rule as well as other, unenumerated programs.  Defendants offer no evidence to contest Plaintiffs' showing that this drastic enrollment drop will directly and predictably harm Plaintiffs' proprietary interests by (a) reducing Plaintiffs' consumers and revenue as operators of hospitals and healthcare systems, and (b) simultaneously increasing Plaintiffs' costs by causing many of Plaintiffs' noncitizen residents to rely on costly emergency healthcare and shelter systems operated and subsidized by Plaintiffs.[1]  These injuries directly implicate Plaintiffs' proprietary

---

[1] For example, Plaintiff New York City runs the largest public health care system in the United States, serving nearly 300,000 non-citizens last year; if a modest percentage of non-citizen patients disenroll from Medicaid, the City will lose millions in revenue. *See* Ex. 10 (Katz Decl.) ¶¶ 7, 10, 17, 19; 84 Fed. Reg. 41,301; U.S. Citizenship &

interests. *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434-35 (E.D.N.Y. 2018); *California v. Azar*, 911 F.3d 558, 573 (9th Cir. 2018).

Second, such losses of funding will not coincide with Plaintiffs spending less on healthcare for immigrants and their families. *See* Def. Mem.8-9 & n.3. The costs of such care will *rise* as patients avoid preventative care in favor of costly emergency services, withdraw from other subsidized health care programs designed to decrease healthcare costs while providing better access to care, and public health worsens.[2] While DHS asserts that the Rule imposes cost-savings elsewhere, such off-setting benefits, even if true, would not defeat Plaintiffs' standing. *See* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (3d ed. 2008) ("[S]tanding is not defeated by other benefits that outweigh the injury that establishes standing, even if the other benefits may defeat damages."). Ultimately, DHS concedes that state and local governments will be economically harmed. 84 Fed. Reg. at 41,301, 41,473. Their quibbles over the magnitude of such harms cannot defeat standing.[3]

Third, because Congress has tasked Plaintiffs with operating the targeted benefit programs, the Rule will require Plaintiffs to undertake costly changes to their benefits systems. *See* Pl. Mem. 14-17. Defendants acknowledge that the Rule will cause "State and local governments" to incur costs associated with making "administrative changes" to their benefits

---

Immigration Servs., Regulatory Impact Analysis: Inadmissibility on Public Charge Grounds (2019), at 6, 109 ("RIA"). *See also* Ex. 3 (Barbot Decl.) ¶¶ 25-28, 42-44; Ex. 6 (Gifford Decl.) ¶¶ 34-36; Ex. 10 (Katz Decl.) ¶ 19; Ex. 11 (Ku Decl.) ¶¶ 64, 71; Ex. 12 (Maksym Decl.) ¶¶ 48-49; Ex. 13 (Mosequera-Bruno Decl.) ¶¶ 16, 22-23; Ex. 17 (Visnaukas Decl.) ¶¶ 26-27; Ex. 19 (Zucker Decl.) ¶¶ 16-19.

[2] *See id.* Defendants concede that the Rule will shift medical care to emergency rooms, 84 Fed. Reg. at 41,384, and will increase the prevalence of disease, 84 Fed. Reg. at 41,384; 83 Fed. Reg. 51,270. *See also* RIA at 109.

[3] The cases cited by Defendants are inapposite, as they do not pertain to constitutional standing, *see Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 240 (2d Cir. 1999), or involve cases where plaintiffs presented literally *no* evidence of injury, *see Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232-34 (10th Cir. 2012); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

programs.[4]  These changes will require large-scale alterations to enrollment, processing, and recordkeeping systems; retraining staff and preparing updated materials; and responding to public concerns.[5]  Such necessary measures are by no means "manufactured."  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Azar*, 911 F. 3d at 573.  To the contrary, "[m]onetary expenditures to mitigate and recover from harms that could have been prevented absent the . . . Rule are precisely the kind of 'pocketbook' injury that is incurred by the state itself."  *Air All. Houston v. EPA*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018); *see also Baltimore v. Trump*, No. CV ELH-18-3636, 2019 WL 4598011, at *46 (D. Md. Sept. 20, 2019) (city's "education and outreach" costs concerning public charge changes sufficient for standing).

Finally, the Rule will severely harm Plaintiffs' economies.  Pl. Mem. 12-13.  Defendants have not offered any evidence to the contrary.  *See Batalla Vidal,* 279 F. Supp. 3d at 434-35.

These injuries are the predictable result of the Rule and are fairly traceable to Defendants' conduct.  *See U.S. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (the "predictable effect of Government action on the decisions of third parties" can support standing, regardless of whether third parties' decisions are lawful or even rational).  Here, DHS, experts, and fact witnesses confirm that the Rule has already deterred participation in enumerated benefits programs and programs not expressly subject to the Rule.  84 Fed. Reg. at 41,463; Pl. Mem. 7-9.

Plaintiffs' claims also concern legal questions that are ripe for review, both constitutionally and prudentially.  *See Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 691 (2d

---

[4] 84 Fed. Reg. at 41,469.  *See also id*. at 41,470, 41,457; 83 Fed. Reg. 51,114, 51,270.
[5] *See, e.g.*, Ex. 2 (Banks Decl.) ¶¶ 25-28; Ex. 6 (Gifford Decl.) ¶¶ 41, 43-47; Ex. 7 (Gonzalez-Murphy Decl.) ¶¶ 20-21; Ex. 10 (Katz Decl.) ¶¶ 20, 25-26; Ex. 12 (Maksym Decl.) ¶¶ 18, 37-38; Ex. 13 (Mosquera-Bruno Decl.) ¶ 24; Ex. 19 (Zucker Decl.) ¶¶ 61-62, 65-69.  *See also* RIA 14, 103, 107.

Cir. 2013) (prudential ripeness did not apply where future contingencies were not determinative of the legal questions before the court); *Baltimore*, 2019 WL 4598011, at *21 (holding changes to parallel State Department public charge framework were ripe).  The harms to Plaintiffs from that final administrative action are not "hypothetical" and do not turn on whether any specific public-charge determination violates the INA.  *See Ross v. Bank of Am.*, 524 F.3d 217, 226 (2d Cir. 2008).  Indeed, such harms are already accruing.  *See infra*; *Walsh*, 714 F.3d at 691.

## II.       Plaintiffs are within the zone of interests.

Defendants' contention that Plaintiffs are outside of the "zone of interests" is without merit.  The zone of interests test is "not meant to be especially demanding," particularly where, as here, Plaintiffs seek review "under the generous review provisions of the APA."  *Lexmark Int'l, Inc. v. Static Control Components, Inc*. 572 U.S. 118, 130 (2014) (internal quotation marks omitted).  The test "does not require the plaintiff to be an intended beneficiary of the law in question," but rather allows entities "who are injured" to seek redress.  *CREW v. Trump*, No. 18-474, 2019 WL 4383205, at *54 (2d Cir. Sept. 13, 2019).

Here, Plaintiffs administer the public benefit programs that are integral to the public charge analysis and the Final Rule's framework.  *See* Pl. Mem. 14-17.  The Final Rule contemplates that states will be among those "who are injured" by the Rule, and expressly purports to protect state fiscs from an alleged drain from public charges.  *CREW*, 2019 WL 4383205, at *54.  And the INA directly references the role of states as administrators of public benefits.  *See* 8 U.S.C. §§ 1183a(a), (b), (e)(2); *see also id.* § 1183.  Accordingly, Plaintiffs' interests as administrators of public benefits programs are not so "marginally related" as to bring Plaintiffs outside of the "lenient" zone-of-interests test.[6]  *Lexmark*, 572 U.S. at 130; *see*

---

[6] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) (anti-immigration group with a "[g]eneral interest" in seeking to halt Cuban immigration was not within the INA's zone of interests).

4

*Baltimore*, 2019 WL 4598011, at *66-67; *see also Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (states' role in administering public benefits put states within INA's zone of interests).

**III.    Plaintiffs are likely to succeed on the merits of their claims.**

   **A.    Plaintiffs are likely to succeed on their claim that the Final Rule is contrary to the INA and therefore violates the Administrative Procedure Act.**

DHS's defense of the Final Rule confirms the radical nature of its reinterpretation of "public charge."  DHS's broad, unbounded legal position would authorize the agency to make a public charge determination based on the receipt of "'*any* maintenance, or financial assistance, rendered from public funds.'"  Def. Mem.16.  This sweeping interpretation of "public charge" is not supported by the INA or the well-established historical understanding of this term of art.

The term, "public charge" means persons who are primarily dependent on the government for subsistence in the long term.  DHS does not have any authority to ignore this established meaning—which Congress incorporated into the INA—and to impose instead an implausible interpretation of "public charge" that "stretches" far "beyond what the [INA's] text and purpose will bear."  *New York*, 363 F. Supp. 3d at 117; *see Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014).  But that is what DHS has done here by expanding "public charge" beyond its historical meaning to include immigrants who receive *any* public benefits—including working individuals who earn incomes sufficient to support the majority of their needs, while lawfully receiving nominal amounts of supplemental public benefits designed to provide higher quality food, housing, and medical care than they are purchasing with their own funds.

*(1) Public charge has an established scope.*  More than a century of history, case law, and agency interpretations establish that "public charge" means an individual who is unlikely to earn a living and thus must look to government as the primary means of support.  Pl. Mem. 20-24.  Indeed, DHS acknowledges that historical sources from the time of Congress's original

5

enactment of the public charge statute make clear that "public charge" has historically been understood to mean "a pauper being chargeable to the parish or town," Stewart Rapalje, Dictionary of American and English Law (1888)—i.e., a person who cannot "provide for his basic necessities."  Def. Mem.14; *see also* Black's Law Dictionary (6th ed. 1994) (defining "public charge" as one "*supported* at public expense" (emphasis added)).

By contrast, a person who is willing and able to work has historically not been considered a public charge.  *See* Pl. Mem. 21 n.22.  Judicial and agency interpretations confirm that receiving supplemental benefits that improve quality of life or provide temporary assistance do not render a person incapable of earning a living.[7]  Pl. Mem. 22-23; *see, e.g.*, *Matter of A-,* 19 I. & N. Dec. 867, 870 (B.I.A. 1988) (temporary use of welfare did not render applicant a public charge where she had "joined the workforce").  In fact, both *United States v. Lipkis* and *In re Feinknopf* confirm that immigrants likely to earn a living are not excludable as public charges. In *Lipkis*, the court observed that an immigrant's "capacity for work, and the probability that he will obtain work, furnish ordinary and sufficient security, in the ordinary course of things," reflect that the immigrant will *not* become a public charge.  56 F. 427, 428 (S.D.N.Y. 1893). And in *Feinknopf*, an immigrant was not likely to be a public charge where he "can find employment in his trade and is willing to exercise the same."  47 F. 447, 447 (E.D.N.Y. 1891).

Given this history and case law, there is no merit to Defendants' contention that the INS's 1999 Guidance adopted a novel understanding of the scope of public charge.  Def. Mem. 16.  To the contrary, the 1999 Guidance accurately distilled "the plain meaning of the word 'charge,' the historical context," and long-standing public charge case law.  Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (May 26, 1999).

---

[7] Defendants also misplace their reliance on *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967), which involved a spendthrift trust fund designed to guard against extravagant spending.  *Id.*

Defendants simply ignore the far-reaching consequences of the Final Rule in contending that "public charge" is not always synonymous with "pauper" or other terms included in early immigration statutes. Although the scope of who constitutes a public charge may have expanded or contracted at the margins, it has never included a person who has or is expected to have a regular source of income. The central premise of *Gegiow v. Uhl*—that a person without a "permanent objection," and thus able to earn a living in the future, will not be considered a public charge—has always remained in force. *See Matter of Harutunian*, 14 I. & N. Dec. 583, 588 (BIA 1974); *Matter of A-*, 19 I. & N. Dec. at 869. Yet the Final Rule reverses this well-established line, sweeping within its expansive definition of "public charge" immigrants who have jobs and regular income, solely because they receive temporary, supplemental benefits that Congress intended to support their upward mobility. *See infra* at 8-9. Defendants' arguments about the precise degree of destitution in early case law are beside the point, as the Final Rule exceeds even the outer limits of what has historically been a "public charge."

*(2) Congress incorporated and preserved the established scope of public charge.*
Congress adopted the longstanding, narrow meaning of "public charge" into the INA. There is no indication that Congress intended to give the Executive Branch carte blanche to ignore the settled scope of "public charge" in interpreting that term. To the contrary, three bills were defeated because of their potential effect on enrollment in crucial benefits programs, not to preserve agency discretion. *See* Pl. Mem. 24-25. This repeated rejection demonstrates clear Congressional intent to preserve the established scope of public charge. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600-01 (1983). And to the extent that Congress vested some discretion with DHS to interpret "public charge," they must stay "within the reasonable limits of" the meaning of "public charge." Def. Mem. 20. DHS has utterly failed to do so here.

7

*(3) The Rule contravenes the established scope of public charge*.  The Final Rule improperly expands "public charge" beyond its settled limits—and any plausible bound—by including working individuals who provide for their own basic needs, simply because they also use supplemental public benefits that enhance health, safety, and economic mobility.

Contrary to Defendants' contentions, supplemental benefit programs do not cover the expenses of subsistence.  64 Fed. Reg. at 28,678 (benefits-granting agencies found that "it is extremely unlikely that an individual or family could subsist on a combination of non-cash support benefits or services alone").  Rather, these programs increase access to more nutritious food, safer housing, and better healthcare—public policy goals that give low- or moderate-income individuals a boost without signaling dependence or poverty.  *Id.*

Defendants' conflation of various public benefits programs with the type of income replacement assistance previously considered relevant for a public charge analysis thus repeats the same fatal error that infects the Final Rule.  Nor do the cases cited by Defendants support the Final Rule's expansion of the phrase "public charge"  to sweep in vast swaths of working class immigrants who are able earn a living, based on their receipt of benefits that help them maintain or increase their economic prospects or health.[8]  And the weighted factors are likewise unmoored from the settled scope of "public charge," assigning negative weight to items that simply do not relate to whether someone is primarily dependent on the government for subsistence or even self-sufficient.  Indeed, Defendants' radical understanding of "charge" would include anyone who has received *any* amount of *any* government assistance—including public school students or

---

[8] *See Edenburg Borough Poor Dist. v. Strattanville Borough Poor Dist.*, 5 Pa. Super. 516, 523 (1897) (property-owner had no source of income in the future); *Lam Fung Yen v. Frick*, 233 F. 393, 397 (6th Cir. 1916) (chronic gambler would "not work for a living").  *People ex rel. Durfee v. Commissioners of Emigration*, 1858 WL 7084 (N.Y. Gen. Term. 1858) did not even involve a public charge determination.  And Defendants are incorrect in dismissing deportation cases, *see* Def. Mem.19, because the same definition of public charge applies to both admissibility and deportation decisions.  *See* 64 Fed. Reg. at 28,689.

recipients of veteran medical benefits. *See* Def. Mem.13-14.[9] No reasonable interpretation of "public charge" permits DHS's definition, which would deem nearly one third of the U.S.-born population "charges" of the government.[10]

Defendants miss the mark in equating supplemental benefits with cash assistance for income, almshouses, or long-term care institutions. Such programs have long been considered relevant to "public charge" because, unlike supplemental benefits, they usually serve as an individual's primary source of support for nearly all subsistence expenses. In other words, it is not the cash or in-kind form of a government program that matters but rather whether participation in a program actually reflects primary reliance on the government in the long term. *See* 64 Fed. Reg. at 28,677-79; *Harutunian*, 14 I. & N. Dec. at 589.

**B.    Plaintiffs are likely to succeed on their claim that the Final Rule is arbitrary and capricious.**

*(1) Defendants rely on irrational justifications that undermine the Welfare Reform Act.* Defendants fail to offer even a rational explanation for their drastic changes to the long-standing framework that has "engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); s*ee* Pl. Mem. 27, 29-30. Defendants primarily stake their radical transformation of the INA's "public charge" provision on policy goals from a different statute, the Welfare Reform Act. But responsibility to enforce the Welfare Reform Act's public-benefit eligibility requirements lies with benefits-granting agencies, not DHS. *See* 8 U.S.C. §§ 1614, 1642. And those agencies concluded that supplemental benefits do not serve as a

---

[9] Defendants rely on a book stating that "public charge" includes someone who received "any maintenance, or financial assistance, rendered from public funds." Arthur Cook, *Immigration Laws of the United States*, § 285 (1929). But that statement is not supported by the overwhelming history and case law of "public charge." Indeed, the only case relied on for that statement, *Ex parte Kichmiriantz*, held that assistance from public funds *could not* automatically lead to a public charge finding. 283 F. 697, 698 (N.D. Cal. 1922).

[10] *See* Ex. 9 (Kallick Decl.) ¶¶ 57-59; Ex. 24 at 1.

primary means of subsistence and should not result in a public charge finding.

In any event, the Welfare Reform Act already fulfills its policy goals by implementing strict benefits-eligibility requirements selecting by Congress.  These limits thus impose Congress's considered judgment that allowing immigrants qualified under the Welfare Reform Act to receive benefits that help promote general health and welfare was consistent with goals of promoting self-sufficiency and eliminating improper incentives to immigrate.  *See* Pl. Mem. 29-30.  Indeed, most immigrants must sustain themselves without benefits for five years to become benefits eligible.  And DHS's contrary view is particularly egregious in light of Congress's subsequent actions to expand access to food stamps to many immigrants who do not otherwise meet the Welfare Reform Act's requirements.  *See* Pl. Mem. 26 n.67.

Ultimately, the Rule irrationally seeks to "undo what [Congress] has done" in the Welfare Reform Act and the INA by radically remaking immigration law and benefit programs through the two-word phrase "public charge."  *See King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).  But such determinations are for Congress rather than DHS—especially given that they raise questions "of deep economic and political significance."  *Id.* at 2489 (quotation marks omitted).

*(2) The Rule's purported totality of circumstances test is arbitrary and capricious.*  The Final Rule's purported "totality of circumstances" test is arbitrary because it assigns automatic and blanket negative or positive weights to factors that do not reasonably reflect whether most individuals are likely to be primarily dependent on the government for subsistence—or even self-sufficient.  *See* Pl. Mem. 30-33; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  Defendants' attempts to defend the irrational factors make no sense or depend on DHS's disregard of substantial record evidence.  *See Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 102 (2d Cir. 2006).  Defendants' attempt to reframe the

10

question presented here as whether DHS could rationally believe that certain factors are correlated with lower income or lower rates of employment. Def. Mem. 27. But the dispositive question is whether the Final Rule reasonably identifies individuals who *will be a public charge*—a far narrower status. And the Final Rule does not rationally draw such a connection.

For example, DHS acknowledges that "mere public benefit receipt is not a good measure of dependence," 84 Fed. Reg. at 41,357, but it nonetheless relies on data that conflates *de minimis* use of public benefits with long-term use to justify their negative weighing of incomes below 125% FPG. *See id.* at 41,417; 83 Fed. Reg. at 51,204-06. DHS further acknowledges that an application for benefits is "not the same as receipt," 84 Fed. Reg. at 41,422; *see also id.* at 41,502 (§ 212.20(e)), but the Final Rule irrationally assigns the exact same negative weight to an application for benefits as to receipt of the same without explanation. *Id.* at 41,503 (§ 212.22(4)(i)(E)). "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).[11]

Defendants' defense of their factors is meritless. Despite Defendants' claim that these factors correlate with higher use of benefits, the data that they cite show the opposite: the vast majority of people with incomes lower than 125% FPG, limited English proficiency, and larger families are *not* enrolled in any benefits programs. 83 Fed. Reg. at 51,206 (60.2% of people who make less than 125% FPG); *id.* at 51,196 (75.4% of people who do not speak English well and 68.3% of people who do not speak English at all); *id.* at 51,186 (79.3% of people in families of

---

[11] The Final Rule also inexplicably dilutes consideration of statutorily-required affidavits of support by mandating that DHS officials consider additional sponsor factors, despite that such affidavits are legally enforceable. Defendants also fail to explain how a past receipt of a fee waiver to obtain work authorization supports a *forward-looking* determination that an immigrant is more likely than not to become a public charge given that such a waiver suggests an immigrant is seeking work to become self-sufficient. *See* 84 Fed. Reg. at 41,424.

four and 69.2% of people in families of five or more).  Moreover, to the extent that DHS claims that Congress authorized it to discriminate against immigrants with limited English proficiency or large families, such contention is wrong.  *See* 84 Fed. Reg. at 41,309.  Congress required DHS to consider "education and skills" and "family status" in a totality of circumstances.  But the Final Rule contorts these factors by assigning automatic negative weights irrespective of whether an applicant has relevant "education and skills," or whether her larger "family status" will help her avoid dependence on assistance in the future.

Finally, Defendants' repeated refrain that no one factor is determinative ignores the interrelatedness of the factors, and the skewed effect of the weighted analysis.  The Final Rule assigns automatic negative weights to a broad range of factors; effectively counts the same factors multiple times against applicants; and aggregates negative factors that occur during the same time period so that, in practice, the ostensible 12-month limitation could be satisfied by receipt of only a few months of public benefits.  Pl. Mem. 32.  Defendants fail to acknowledge that the cumulative effect of every change they have made stacks the deck against working immigrants who cannot reasonably be considered public charges.  *See, e.g.*, *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 102-03 (D.D.C. 2010) (agency action is arbitrary where the agency failed to consider "cumulative effect" of factors individually considered).

(3) *The Rule is contrary to the requirements of the Rehabilitation Act.*  The Final Rule is arbitrary because DHS failed to consider its obligations under Section 504 of the Rehabilitation Act ("Section 504"), and is contrary to Section 504.  Pl. Mem. 33-37.  Defendants, conceding that the Rule penalizes immigrants for merely having a disability, Def. Mem. 30, misconstrue the INA and the mandates of Section 504.

First, DHS's conflation of "health" with "disability" finds no support in the text or

12

history of the INA.  Congress passed Section 504 to "rectify the harms resulting from action that

discriminated [against individuals with disabilities]."  *Alexander v. Choate*, 469 U.S. 287, 295

(1985); *see also* 28 C.F.R. § 41.51(b)(3).  When Congress included health in the INA, Congress

did not exempt DHS from Section 504.  And Section 504's narrow bar against disability

discrimination is far more targeted than the INA's generalized instruction to consider "health" as

a factor.[12]

Second, Defendants' empty assurances that an applicant's disability is not dispositive

misconstrues Defendants' affirmative obligations under Section 504.  Pl. Mem. 34-37; ALCU

Br. 9-10.  The Final Rule, by automatically assigning a negative weight to an individual's

disability, regardless of whether its limitations can be eliminated or reduced by reasonable

accommodations, revives and promotes the very stereotypes the Rehabilitation Act was enacted

to defeat.  *Compare* 84 Fed. Reg. at 41,504 (§ 212.22(c)(1)(ii)) *with* 29 U.S.C. § 705(9)(b); *see*

*also St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 173 (2d Cir. 2001).  This intentional

discrimination violates Section 504.  *See* ACLU Br. 9; *Henrietta D. v. Bloomberg*, 331 F.3d 261,

276 (2d Cir. 2003) (proving Rehabilitation Act violation requires only that there be "something

different about the way the plaintiff is treated 'by reason of . . . disability'").

*(4) The Rule fails to adequately consider harms.*  Defendants' failure to address the full

scope of relevant harms and costs resulting from the Final Rule, *see* 84 Fed. Reg. at 41,312-14,

41,489, is arbitrary.  Defendants merely acknowledged, and subsequently ignored,

evidence-based estimates of harms, including the total chilling effect of the Final Rule.

Defendants attempt to justify this approach by suggesting that reliable data on the impact of the

---

[12] Section 504 explicitly defines what does and does not constitute a disability.  *See* 29 U.S.C. § 705(20)(A), (D), (F).  And "[b]ecause the [Rehabilitation] Act is a remedial statute, it and the regulations promulgated under it are to be construed broadly."  *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994).

Final Rule is unavailable. *See* Def. Mem. 32-33. But the commenters included significant data on these issues, none of which the Defendants analyzed. *See State Farm*, 463 U.S. at 43. And it is arbitrary "if an agency refuses to acknowledge (or fails to obtain) the facts and figures that matter prior to exercising its discretion to promulgate a rule." *Make the Road v. McAleenan*, No. 19-CV-2369, 2019 WL 4738070, at *39 (D.D.C. Sept. 27, 2019). Indeed, even if the available data vary or lead to some uncertainty, agencies are obligated "to make tough choices about which of the competing estimates is most plausible, and to hazard guesses to which is correct, even if the lack of [data] means that the estimates will be imprecise." *Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014) (internal quotation marks omitted).

IV.    **The balance of equities and public interest strongly favor a preliminary injunction in light of the irreparable harm Plaintiffs will suffer.**

Rather than controvert the testimony of Plaintiffs' nineteen fact and expert witnesses, Defendants contend that Plaintiffs' overwhelming evidence of harm must be dismissed because it is, first, speculative, and second, insufficiently immediate. *See* Def. Mem. 33-34. Defendants are wrong on both counts. First, for the reasons set forth *supra*, Plaintiffs' harms are not speculative, but pose a substantial threat of concrete harm if the Rule goes into effect.

Second, Plaintiffs' harms are immediate. Plaintiffs' programmatic injuries are directly tied to the finalization of the Rule. *See supra* at 2-3. Defendants' suggestion that the "ordinary compliance costs" do not typically qualify as irreparable harm ignores that the Rule requires Plaintiffs to undertake significant, unrecoupable expenditures. Plaintiffs' economic harms are also immediate, as they accrue immediately as participants leave benefits programs, *see supra* at 2; withdrawals from public benefits have begun and will increase as the Rule becomes effective

14

and more immigrants and their families learn of the Rule.[13] *See, e.g.*, *Dep't of Commerce*, 139 S. Ct. at 2565 (loss of federal funds "is a sufficiently concrete and imminent injury").

Likewise, the Rule's impacts on public health are immediate and irreparable; once individuals are sick and sicken others, Plaintiffs' health care institutions absorb these costs and harms cannot be unwound.  If the Rule "is allowed to go into effect" "there is no way the court can 'unscramble the egg' and undo the damage caused by" action plainly in violation of the APA.  *Batalla Vidal*, 279 F. Supp. 3d at 435.

**V.       The Court should enjoin the Final Rule without geographic limitation.**

This Court should preliminarily enjoin implementation of the Final Rule, or postpone its effective date pursuant to 5 U.S.C. § 705.  This provisional relief is consistent with the ultimate relief that the APA authorizes: When "agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 496 n.1 (D.C. Cir. 1989).

Moreover, because immigration policies require uniformity, *see Arizona v. United States*, 567 U.S. 387, 401-02 (2012), injunctive relief without geographic limitation is both appropriate and necessary.  A geographically limited injunction would have the practical effect of allowing for different public charge assessments and continued confusion regarding the Rule and would not afford Plaintiffs complete relief.  *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) ("Allowing uneven application of nationwide immigration policy flies in the face of [uniformity] requirements."); *see also Texas*, 809 F.3d at 187-88; *Batalla Vidal*, 279 F. Supp. 3d at 438.

---

[13] *See* Pl. Mem. 17 n.58; *see also* Ex. 11 (Ku Decl.) ¶ 28 (explaining how awareness of the Rule is related to avoidance of benefits, and detailing how awareness will increase after the effective date); Ex. 9 (Kallick Decl.) ¶ 28 (same); Ex. 5 (Fong Decl.) Ex. A (explaining results of NYC survey); Ex. 10 (Katz Decl.) ¶¶ 16-21, 23 (explaining chill and expected impacts of further chill).

DATED:  October 4, 2019

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Elena Goldstein*
Elena Goldstein, *Senior Trial Counsel*

Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Ming-Qi Chu, *Section Chief, Labor Bureau*
Amanda Meyer, *Assistant Attorney General*
Abigail Rosner, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Office of the New York State Attorney
General
New York, New York 10005
Phone:  (212) 416-6201
elena.goldstein@ag.ny.gov

*Attorneys for the State of New York*

GEORGIA M. PESTANA
*Acting Corporation Counsel of the City of New York*

By: */s/ Tonya Jenerette*
Tonya Jenerette
   Deputy Chief for Strategic Litigation
Cynthia Weaver, Senior Counsel
Hope Lu, *Senior Counsel*
Doris Bernhardt, *Senior Counsel*
Melanie Ash, *Senior Counsel*
100 Church Street, 20th Floor
New York, NY 10007
Phone: (212) 356-4055
tjeneret@law.nyc.gov

*Attorneys for the City of New York*

WILLIAM TONG
*Attorney General of Connecticut*

By: */s/ Joshua Perry*
Joshua Perry
   *Special Counsel for Civil Rights*
55 Elm Street
Hartford, CT 06106-0120
(860) 808-5318
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*

16

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Benjamin Battles*
Benjamin Battles, *Solicitor General*
Eleanor Spottswood, *Assistant Attorney General*
Julio Thompson,* *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*

* *Admitted pro hac vice*

17