**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* <br><br> *Defendants*. | **No. 19-cv-07777 (GBD)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR STAY OF INJUNCTION PENDING APPEAL**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 1

    I. THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS ......................... 2

    II. THE REMAINING FACTORS FAVOR A STAY .......................................................... 6

    III. THE COURT SHOULD AT LEAST STAY THE INJUNCITON IN PART. .............. 8

CONCLUSION ....................................................................................................................... 9

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,

   458 U.S. 592 (1982) ................................................................................................ 3

*Cook County v. McAleenan*, No. 19 C 6334,

   2019 WL 5110267 (N.D. Ill. Oct. 14, 2019) ............................................................ 8

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*,

   846 F.3d 492 (2d Cir. 2017) ..................................................................................... 4

*City & Cty. of S.F. v. United States Citizenship & Immigration Servs.*,

   No. 19-cv-04717-PJH, 2019 WL 5100718 (N.D. Cal. Oct. 11, 2019) .................. 6, 8

*City of Milwaukee v. Illinois & Michigan*,

   451 U.S. 304 (1981) ................................................................................................ 4

*Clapper v. Amnesty Int'l USA*,

   568 U.S. 398 (2013) ................................................................................................ 2

*Crane v. Johnson*,

   783 F.3d 244 (5th Cir. 2015) ................................................................................... 3

*East Bay Sanctuary Covenant v. Barr*,

   934 F.3d 1026 (9th Cir. 2019) ................................................................................. 8

*Henderson v. Stalder*,

   287 F.3d 374 (5th Cir. 2002) ................................................................................... 2

*Lopez v. Davis*,

   531 U.S. 230 (2001) ................................................................................................ 5

*Maryland v. King*,

   567 U.S. 1301 (2012) .............................................................................................. 6

*Massachusetts v. Mellon*,

   262 U.S. 447 (1923) ................................................................................................ 3

*Matter of Harutunian*,

    14 I. & N. Dec. 583 (BIA 1974) .................................................................................................. 4

*National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,

    545 U.S. 967 (2005) ................................................................................................................... 4

*Nken v. Holder*,

    556 U.S. 418 (2009) ................................................................................................................... 2

*Regents of Univ. of California v. DHS*,

    279 F. Supp. 3d 1011 (N.D. Cal.) .............................................................................................. 3

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,

    531 U.S. 159 (2001) ................................................................................................................... 4

### Statutes

8 U.S.C. § 1182(a)(4) ............................................................................................................. 3, 4, 6

8 U.S.C. § 1601 ........................................................................................................................... 4, 6

8 U.S.C. § 1601(7) ........................................................................................................................... 1

### Regulations

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,

    64 Fed. Reg. 28689 (May 26, 1999) .......................................................................................... 5

*Inadmissibility on Public Charge Grounds*,

    84 Fed. Reg. 41292 (Aug. 14, 2019) ................................................................................... 1, 5, 7

### Legislative Materials

S. Rep. No. 81-1515 (1950) ............................................................................................................ 4

H.R. 2202, 104th Cong. §202 (1996) ............................................................................................. 5

# INTRODUCTION

The federal government respectfully moves to stay pending appeal the Court's order granting a nationwide preliminary injunction. At the least, the Court should stay the injunction insofar as it applies beyond redressing the relevant injuries to Plaintiffs in this case. All the factors justifying a stay are met here. The government is likely to succeed on appeal both because the Plaintiffs lack standing and do not fall within the zone of interests of the relevant statute, and because the Department of Homeland Security's rule—Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41292 (Aug. 14, 2019) ("Rule")—is fully consistent with the Immigration and Nationality Act (INA) and the Administrative Procedure Act ("APA"). The government will also suffer irreparable harm in the absence of a stay. As things stand, DHS may be forced to grant lawful permanent resident ("LPR") status to aliens likely at any time to become public charges under the Rule and depend on public resources designated as public benefits for purposes of a public charge inadmissibility determination under the Rule. And it may be compelled to do so even if the aliens have no link to Plaintiffs—the States of New York, Connecticut, and Vermont, and the City of New York. This state of affairs irreparably harms the government (and hence the public), who, as Congress has confirmed, has a "compelling … interest" in ensuring that "aliens be self-reliant." 8 U.S.C. § 1601(7).

Such an ongoing and significant intrusion into DHS's authority over who is entitled to admission or adjustment of status is particularly unwarranted here, where the only alleged injuries Plaintiffs would face from a stay are speculative downstream effects from the decisions of nonparties in response to the challenged Rule during the pendency of the litigation. Even if these purported injuries could give Plaintiffs standing (they cannot), they certainly would not justify inflicting such substantial harm on DHS, especially as it is likely to prevail on appeal.

This Court should therefore stay its injunction of the Rule pending the resolution of the government's appeal. At a minimum, it should issue a stay limiting the effect of its injunction to Plaintiff States.

**ARGUMENT**

In considering whether to grant a stay pending appeal, the Court must consider four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors favor a stay here.

**I.   THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS**

The government respectfully submits that notwithstanding the Court's decision, it is likely to succeed on the merits of its appeal. As Defendants explained in their Opposition to Plaintiff's Motion for a Preliminary Injunction and at oral argument, Plaintiffs are neither the appropriate parties to challenge the Rule nor have presented tenable objections to it. ECF No. 99 (PI Opp.) 6-33. The Court's conclusions to the contrary are unlikely to withstand appellate review.

**A.**   At the outset, the Court concluded that Plaintiffs have suffered a cognizable injury—and have ripe claims—on the theory that the Rule will have various downstream effects on their fiscs based on the independent decisions of nonparty aliens affected by the Rule. Op. 7-9. But the Supreme Court has repeatedly "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," and that reluctance should apply with even more force where, as here, such a theory "relies on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013); *see* PI Opp. 8-10. And even if Plaintiffs were able to establish that they would incur these speculative costs, they have not and cannot show that these costs would outweigh the ones they would have incurred based on aliens who would have resided within their jurisdictions, and consumed their resources, but for the Rule. *Cf. Henderson v. Stalder*, 287 F.3d 374, 379-80 (5th Cir. 2002) (use of plaintiffs' tax dollars to produce a challenged license plate "is insufficient to confer standing" in part because motorists who choose the license plate pay additional fees that "offset the administrative costs" of the plates). Nor can Plaintiffs rely on "programmatic costs stemming from their role of "administrators of the public benefits implicated by the Rule"— namely, updating their "enrollment, processing, and recordkeeping systems; retraining staff and

2

preparing updated materials; and responding to public concerns." Op. 8 & n.2. Plaintiffs have identified no authority for the remarkable proposition that State may challenge any federal policy so long as it would require them to make administrative updates. *See Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) (rejecting state officials' claim that they have standing to challenge DACA on the theory that policy would require that them to "alter their current processes to ensure" compliance and agreeing that "a government employee responsible for carrying out an agency policy does not have standing to challenge that policy merely because of work responsibilities related to that policy").

In any event, even if Plaintiffs had Article III standing, they would fall outside the zone of interests governed by 8 U.S.C. § 1182(a)(4). *See* PI Opp. 11-13. Although the Court observed that Plaintiffs have the obligation of "representing and protecting the rights and welfare of its residents," Op. 10, no provision of the INA departs from the well-settled rule that States cannot raise a derivative claim on behalf of their residents against the federal government for its administration of the federal laws. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) ("[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government."); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982). Nor do Plaintiffs fall within § 1182(a)(4)'s zone of interests simply due to their role as "administrators of … public benefits programs." Op. 10. Even if Plaintiffs somehow had standing on this theory—which they do not—they have identified no provision of the INA that protects them from bureaucratic inconvenience. *Cf. Regents of Univ. of California v. DHS*, 279 F. Supp. 3d 1011, 1036 (N.D. Cal.), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 2779 (2019) ("Plaintiffs are also unable to point to any provision of the INA indicating that Congress intend to protected Plaintiff States' interests in maintaining income tax revenue or avoiding increased healthcare costs.").

**B.**     On the merits, this Court held that the Rule exceeds Defendants' statutory authority primarily on the ground that the government had not used the 12/36 standard in the past. Op. 13. As the government has showed, however, Congress delegated interpretive authority concerning

the meaning of the statutory term "public charge" to DHS. That delegation permits DHS to adopt different interpretations of the same statutory language over time, so long as those interpretations are "based on a permissible construction of the statute." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 507 (2d Cir. 2017). Indeed, "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency may consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)) (cleaned up). After all, the 1999 Interim Field Guidance likewise announced a "new definition" of "public charge" at the time it was announced. Op. 13; *see* PI Opp. 21. Here, the new 12/36 standard implements the general "principle of United States immigration law" of "[s]elf-sufficiency," 8 U.S.C. § 1601—and the specific requirement that "[a]ny alien who … is likely at any time to become a public charge is inadmissible," 8 U.S.C. § 1182(a)(4)—by ensuring that aliens who seek admission or an adjustment of status have not received or will not receive public benefits for an extended period. That determination is well within Defendants' delegated interpretive authority. As the Political Branches have long recognized, "[s]ince the elements constituting likelihood of becoming a public charge are varied," the government should have considerable "discretion" in determining whether "an alien falls into that category." *Matter of Harutunian*, 14 I. & N. Dec. 583, 588 (BIA 1974) (quoting S. Rep. No. 81-1515 at 349 (1950)). The mere fact that the 12/36 standard has not been used before is no basis for holding that it exceeds DHS's delegated authority.

The Court also observed that Congress had rejected proposed expansions of the statutory term public charge in 1996 and 2013. Op. 13-14. But "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001) (citation omitted). For that reason, "unsuccessful attempts at legislation are not the best of guides to legislative intent" as a general matter, and "the views of a subsequent Congress form a

hazardous basis for inferring the intent of an earlier one." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 332 n.24 (1981) (citations omitted). In any event, the 1996 proposal is beside the point, as it sought to amend the public-charge provision governing deportations, *see* Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996), which has long used a different standard than the public-charge provision governing admissibility, *see* PI Opp. 19-20.

**C.** The Court further erred in holding that the Rule is arbitrary and capricious based on the Court's view that there was no rational relationship between self-sufficiency and receipt of public benefits. Op. 15-17. But the Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689, 28689 (May 26, 1999) (1999 Interim Field Guidance) is vulnerable to exactly the same criticism; that Guidance also tied the definition of public charge to the receipt of public benefits, by defining a "public charge" as an alien who has become or is likely to become "primarily dependent on the government for subsistence, as demonstrated by," for example, "the receipt of public cash assistance for income maintenance." 1999 Interim Field Guidance at 28689. And the fact that the Rule uses the 12/36 standard to account for this consideration simply reflects Defendants' reasonable determination that *short-term* reliance on public benefits is not necessarily inconsistent with self-sufficiency. *See* Rule 41360. The 1999 Interim Field Guidance drew a similar distinction, explaining that an alien is a public charge if he was "institutionaliz[ed] for long-term care at government expense," whereas "[i]nstitutionalization for short periods" would not trigger that determination. 1999 Interim Field Guidance 28689. As that guidance confirms, there is nothing irrational about using a long-term reliance on public benefits as evidence of a lack of self-sufficiency, and DHS may implement that framework through an easily administrable rule. *Cf. Lopez v. Davis*, 531 U.S. 230, 243-44 (2001) (rejecting argument that Bureau of Prisons had to make "case-by-case assessments" of eligibility for sentence reductions rather than "categorical exclusions" and explaining that an agency "is not required

continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking'").[1]

**D.** Finally, the Court incorrectly held that the Rule should be enjoined on the ground that it may violate the Rehabilitation Act on an as-applied basis. Op. 19-20. As another district court concluded, there are not "even serious questions" that the Rule complies with the Rehabilitation Act. *San Francisco*, 2019 WL 5100718, at *30. For one thing, "the Rehabilitation Act requires that a plaintiff show that a disabled person was denied services 'solely' by reason of her disability," and "[t]he Rule does not deny any alien admission into the United States, or adjustment of status, 'solely by reason of' disability." *Id.* at *29. For another, "Congress, not the Rule, requires DHS to take this factor into account," as "the INA explicitly lists 'health' as a factor that an officer 'shall consider' in making a public charge determination," and "'[h]ealth' includes an alien's disability and whatever impact the disability may have on the alien's expenses and ability to work." *Id.* (ellipsis and citation omitted). In all events, this Court's concern that the Rule *may* result in *as-applied* violations of the Rehabilitation Act is no basis for *facially* invalidating the Rule.

## II. THE REMAINING FACTORS FAVOR A STAY

Both the government and the public will be irreparably harmed if the nationwide injunction is not stayed. The federal government sustains irreparable injury whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). That injury is particularly acute here because the Court's injunction will require DHS, on a nationwide basis, to grant lawful permanent resident status to aliens who are likely at any time to become public charges under the Rule and who depend on public resources designated as public benefits for purposes of a public charge inadmissibility

---

[1] The Court also believed that it was irrational to use an alien's lack of English proficiency or low credit score as a predictor of a lack of self-sufficiency. Op. 17 & n.3. But such objections are properly directed to Congress, which has directed DHS to consider an alien's "education and skills," as well as "assets, resources, and financial status," 8 U.S.C. § 1182(a)(4), terms that plainly encompass English proficiency and credit status.

determination under the Rule to meet their needs. *See* 8 U.S.C. § 1601 ("principle of United States immigration law" of "[s]elf-sufficiency"); *Id.* § 1601(2)(A) ("[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs."). DHS estimates that roughly 382,264 people apply for an adjustment of status and are subject to a public charge inquiry each year. *See* Declaration of Daniel Renaud, Exh. 1, ¶ 4; Rule at 41497, 41464. If the Rule remains enjoined, some subset of this population will receive an adjustment of status that otherwise would not under the Rule's more thorough review process. Renaud Decl. ¶ 4. DHS currently has no practical means of revisiting these determinations made under the prior guidance, and subjecting them to the Rule, if the injunction against the Rule is ultimately vacated. *Id.* And because those persons, by definition, are likely to receive government benefits in the future, the injunctions will inevitably result in the additional expenditure of government resources, precisely the harm that Congress and the rule seek to prevent. Moreover, every day the effective date of the Rule remains stayed, the Rule's future effectiveness is reduced: any public benefits received by aliens submitting status adjustment applications before the Rule takes effect will be counted only if they would have been covered by the 1999 Interim Field Guidance, Rule 41321, which means that even if the government ultimately prevails, the Rule's future operation will be irreparably undermined.

The injunction also imposes significant administrative burdens on Defendants and needless uncertainty on the aliens Plaintiffs claim to support. For instance, USCIS has devoted significant time to preparing implementation of the Rule, including preparing training for the relevant officers at its National Benefit Center as well as across 88 Field Offices. *Id.* ¶ 5. The rollout of such widespread training cannot happen overnight, and USCIS will be forced to start much of the process over again if and when the injunction is vacated. *Id.* USCIS also hired contractors to enter the significant amount of data required on its new forms associated with the Rule. *Id.* ¶ 6. If the injunction is not stayed in the near future, contractors are likely to seek other employment, which will only further impede USCIS's ability to implement the Rule if and when the injunction is vacated. *Id.*

On the other side of the ledger, Plaintiffs will not suffer any irreparable injury. Their alleged harms stemming from downstream effects of the Rule are insufficient to create standing, *see supra* Pt. I.A, much less satisfy the more exacting requirements to establish irreparable injury, *see* PI Opp. 34-37. And even if the Court accepts that the Rule will *eventually* cause Plaintiffs irreparable injury, they have provided no evidence that the Rule will irreparably drain their fiscs *during the pendency of an appeal*. *See* PI Opp. 37. And even then, if it were clear that a stay would somehow irreparably harm these States, any such injuries would be substantially outweighed by the harms to the government (and the public) associated with the threat of mandating the ongoing admission of aliens likely to become public charges under the Rule.

### III. THE COURT SHOULD AT LEAST STAY THE INJUNCITON IN PART.

At a minimum, the Court should stay its injunction insofar as it sweeps more broadly than necessary to redress Plaintiffs' alleged injuries. *See* PI Opp. 39-40. Indeed, district courts in two related challenges have limited the scope of their injunctions to particular jurisdictions—namely, California, Oregon, Maine, Pennsylvania, Illinois, and the District of Columbia. *See Cook County v. McAleenan*, No. 19 C 6334, 2019 WL 5110267, at *14 (N.D. Ill. Oct. 14, 2019); *San Francisco*, 2019 WL 5100718, at *51-53. Yet those decisions have been rendered largely academic by the scope of this Court's injunction.

Although the Court sought to justify its injunction's scope on the theory that immigration enforcement requires uniformity, Op. 22-24, "a nationwide injunction is not 'appropriate simply because this case presents a rule that applies nationwide,'" even when the rule is "an immigration policy." *San Francisco*, 2019 WL 5100718, at *53 (quoting *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019)). Here, a universal injunction would be particularly inappropriate given that Plaintiffs represent only three States. Nor can the mere possibility that Plaintiffs' residents may choose to voluntarily move throughout the country during the pendency of a preliminary injunction, *see* Op. 23, justify extending an injunction to every alien affected by the Rule—including those with no connection to New York, Connecticut, or Vermont.

8

## CONCLUSION

The government respectfully requests that the Court stay its preliminary injunction either in whole or in part pending final resolution of the government's appeal.

Dated:  October 25, 2019                                          Respectfully submitted,

GEOFFREY S. BERMAN                           JOSEPH H. HUNT
United States Attorney                                 Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

/s/ *Joshua M. Kolsky*                            _
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar No. 993430
U.S. Dept. of Justice, Civil Division,
Federal Programs Branch
1100 L Street, N.W., Rm. 12002
Washington, DC 20001
Phone: (202) 305-7664
Fax: (202) 616-8470
Email: joshua.kolsky@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

   I hereby certify that on October 25, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Joshua M. Kolsky*
JOSHUA M. KOLSKY
