**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY, et al.,

                Defendants.

19 Civ. 7777 (GBD)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY OF
INJUNCTION PENDING APPEAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.      The balance of hardships and public interest tip decisively in Plaintiffs' favor ................. 2

      A.     Plaintiffs and the public would be substantially harmed by a stay ........................ 2

      B.     Defendants have not shown that they would suffer irreparable harm absent a stay ..................................................................................................... 5

II.     Defendants are unlikely to prevail on the merits ................................................ 8

      A.     Plaintiffs have standing ..................................................................... 8

      B.     The Final Rule exceeds Defendants' statutory authority and is contrary to law ..................................................................................................... 9

      C.     The Final Rule is arbitrary and capricious .......................................... 12

III.    The Court should deny the motion to stay in full ............................................ 15

CONCLUSION ..................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air All. Houston v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) ...................................................................................9

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................................3

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................................15

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ....................................................................................16

*California v. U.S. Dep't of Health & Human Servs.*,
  No. 19-15072, 2019 WL 5382250 (9th Cir. Oct. 22, 2009) ......................................16

*Casa de Maryland, Inc. v. Trump*,
  No. 19-cv-2715, 2019 WL 5190689 (D. Md. Oct. 14, 2019) ......................................1

*Citigroup Glob. Mkts. Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
  598 F.3d 30 (2d Cir. 2010) ..........................................................................................1

*Citizens for Responsibility & Ethics in Washington v. Trump*,
  939 F.3d 131 (2d Cir. 2019) ........................................................................................9

*City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*,
  Nos. 19-cv-4717 ..........................................................................................................1

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ....................................................................................................9

*Cook Cty. v. McAleenan*,
  No. 19-cv-6334, 2019 WL 5110267 (N.D. Ill. Oct. 14, 2019) ...................................1

*Doe v. Pfrommer*,
  148 F.3d 73 (2d Cir. 1998) ........................................................................................14

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ....................................................................................7

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989) ..................................................................................15

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003).................................................................................. 13-14

*Kidder v. Peabody & Co. v. Maxus Energy Corp.*,
    925 F.2d 556 (2d Cir. 1991)...................................................................................5

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936).................................................................................................6

*Make the Road N.Y. v. McAleenan*,
    No. 19-cv-2369, 2019 WL 4738070 (D.D.C. Sept. 27, 2019)...............................15

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984)....................................................................................7

*New York v. BB's Corner, Inc.*,
    No. 12-cv-1828, 2012 WL 2402624 (S.D.N.Y. June 25, 2012) .............................3

*New York v. United States Dep't of Homeland Sec.*,
    No. 19-cv-7777, 2019 WL 5100372 (S.D.N.Y. Oct. 11, 2019)...................... passim

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................1, 8

*Ruckelshaus v. Monsanto Co.*,
    463 U.S. 1315 (1983) (Blackmun, J., in chambers)................................................1

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................................16

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)...............................................................................................11

*Washington v. U.S. Dep't of Homeland Sec.*,
    No. 19-cv-5210, 2019 WL 5100717 (E.D. Wash. Oct. 11, 2019) ......................1, 14

**FEDERAL STATUTES**

5 U.S.C.
    § 705...................................................................................................................15
    § 706...................................................................................................................15

8 U.S.C.
    § 1182...................................................................................................................5
    § 1183a.................................................................................................................9
    § 1227...................................................................................................................5

Illegal Immigration Reform and Immigrant Responsibility Act,
Pub. L. 104-208, 110 Stat. 3009-546 (1996) ..........................................................................10

Rehabilitation Act of 1973,
Pub. L. 93-112, 87 Stat. 394 (1973) (codified at 29 U.S.C. § 794) ............................12, 13,14

Personal Responsibiility and Work Opportunity Reconciliation Act,
Pub. L. 104-193, 110 Stat. 2260 (1996) (codified at 8 U.S.C. § 1601) ........................... 11-12

**FEDERAL REGULATIONS**

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,
64 Fed. Reg. 28,689 (Mar. 26, 1999)...................................................................6, 10, 11, 12

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) .............. passim

U.S. Citizenship & Immigration Servs., *Regulatory Impact Analysis:
Inadmissibility on Public Charge Grounds* (2019) ...................................................................4

**MISCELLANEOUS AUTHORITIES**

142 Cong. Rec. S11612 (daily ed. Sept. 16, 1996).......................................................................10

147 Cong. Rec. S13245-07 (Dec. 14, 2001) ................................................................................11

H.R. Rep. 104-651 (1996).............................................................................................................11

S. Rep. 113-40 (2013)...................................................................................................................10

S. Rep. No. 104-249 (1996) .........................................................................................................10

## INTRODUCTION

Courts do not lightly grant a motion for stay pending appeal—especially when, as here, the requested "stay" would radically alter, rather than preserve, a decades-long status quo. *See Nken v. Holder*, 556 U.S. 418, 427 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify" such an extraordinary and discretionary remedy. *Id.* at 433; *see also, e.g.*, *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1316 (1983) (Blackmun, J., in chambers) (a stay pending appeal may be granted "only under extraordinary circumstances"). To make this determination, a court considers: (1) whether the issuance of a stay would substantially harm the other parties to the proceeding; (2) whether the moving party will suffer irreparable harm without a stay; (3) where the public interest lies; and (4) whether the moving party has made a strong showing of likelihood of success on the merits. *Id.* at 434. These factors "overlap substantially with the preliminary injunction standard." *Citigroup Glob. Mkts. Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010). Indeed, Defendants' motion simply rehashes their opposition to Plaintiffs' Motion for Preliminary Injunction. As this Court—and every other court to consider the Final Rule[1]—has effectively concluded, these factors weigh against a "stay" that would disrupt the status quo here.

---

[1] *See Casa de Maryland, Inc. v. Trump*, No. 19-cv-2715, 2019 WL 5190689, at *18-19 (D. Md. Oct. 14, 2019) (granting stay of the effective date of the Final Rule pursuant to Section 705 of the APA and granting nationwide injunctive relief); *Washington v. U.S. Dep't of Homeland Sec.*, No. 19-cv-5210, 2019 WL 5100717, at *23 (E.D. Wash. Oct. 11, 2019) (same); *Cook Cty. v. McAleenan*, No. 19-cv-6334, 2019 WL 5110267, at *13-14 (N.D. Ill. Oct. 14, 2019) (grating preliminary injunction in Illinois); *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, Nos. 19-cv-4717, *et al.*, 2019 WL 5100718, at *53 (N.D. Cal. Oct. 11, 2019) (granting injunction in San Francisco City and County, Santa Clara County, California, Oregon, the District of Columbia, Maine, and Pennsylvania).

**ARGUMENT**

**I.     The balance of hardships and public interest tip decisively in Plaintiffs' favor.**

    **A.     Plaintiffs and the public would be substantially harmed by a stay.**

For over a century, immigrants have been excluded from the United States on grounds that they may become a "public charge" only if they fell in a narrowly-defined category of individuals likely to become primarily dependent on the government for long-term subsistence. This Court's preliminary injunction properly preserved this status quo pending further litigation on the merits.  By contrast, the "stay" requested by Defendants here would radically disrupt the status quo by allowing the Final Rule to take effect, thereby causing Plaintiffs and the public immediate and irreparable harm by an unprecedented and unjustifiable redefinition of "public charge" that "has *never* been referenced in the history of U.S. immigration law." *New York v. United States Dep't of Homeland Sec.*, No. 19-cv-7777, 2019 WL 5100372, at *6 (S.D.N.Y. Oct. 11, 2019) (emphasis in original).

As this Court previously concluded, Plaintiffs will suffer irreparable harm absent immediate injunctive relief.  As DHS concedes, allowing the Final Rule to take effect will deter immigrants and their families from participating in public benefits programs, including not only those benefits expressly covered by the Final Rule, but also other similar benefits.  Final Rule, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41, 292, 41,307, 41,463 (Aug. 14, 2019) (to be codified at 8 C.F.R. pt. 103, 212, 213, 214, 245, 248) (the "Final Rule"); *see* Pls.' Mem. in Supp. of Their Mot. for a Prelim. Inj., Dkt. 35 ("Pls.' PI Mem.") 7-9.  As the Court found, "Plaintiffs provide[d] declarations extensively describing and calculating" the irreparable proprietary, economic, and programmatic harms that they will suffer if the Final Rule takes effect. *New York*, 2019 WL 5100372, at *9.  As detailed in those declarations, the Final Rule will cause irreparable injury by, *inter alia*, "shifting to Plaintiffs the burden of providing services

to those who can no longer obtain federal benefits without jeopardizing their status in the United States," slashing the revenue and consumer base of hospitals that Plaintiffs operate, and forcing Plaintiffs to bear "increased healthcare and programmatic costs." *Id*. at *4, 9. Defendants offered *no* evidence to controvert these harms, which include millions of dollars lost by Plaintiffs' health care institutions, billions of dollars in economic impacts, and millions of dollars in programmatic costs to overhaul public benefit systems and to combat fear and confusion regarding the Rule. *See id.* at *4; Pls.' PI Mem. 9-13; *see also Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018) (irreparable harm where residents' loss of health insurance would "impose tremendous burdens on the State Plaintiffs' public health systems" and policy would have "staggering adverse economic impacts"). And Defendants' motion papers do not even purport to assert that this Court's findings of harm are clearly erroneous.

A stay would also irreparably harm public health and welfare in Plaintiffs' jurisdictions. As this Court recognized, the Final Rule will frustrate Plaintiffs' efforts to promote health insurance and positive health outcomes, facilitate nutrition, reduce the spread of communicable diseases, and combat homelessness. *See New York*, 2019 WL 5100372, at *10; Pls.' PI Mem. 13-14; *see also New York v. BB's Corner, Inc.*, No. 12-cv-1828, 2012 WL 2402624, at *3 n.3 (S.D.N.Y. June 25, 2012) (a "potential impact on public health" is "itself sufficient irreparable harm to support preliminary injunctive relief"). And "[n]o less important is the immediate and significant impact that the implementation of the Rule will have on law-abiding residents who have come to this country to seek a better life" and who will suddenly be exposed "to economic insecurity, health instability, denial of their path to citizenship, and potential deportation—none of which is the result of any conduct by those such injuries will affect." *New York*, 2019 WL 5100372, at *9. These "consequences that Plaintiffs must address, and America must endure,

3

will be personal and public disruption, much of which cannot be undone." *Id.*

Contrary to Defendants' contention that the Final Rule will only "*eventually* cause Plaintiffs irreparable injury," Mem. of Law in Supp. of Defs.' Mot. for Stay of Inj. Pending Appeal, Dkt. 112 ("Defs.' Mem.") 8, Plaintiffs and the public will *immediately* and continuously experience harms from the Final Rule as soon as it becomes effective. If a stay issues and the Final Rule takes effect, increasing numbers of immigrants and their families will forgo and disenroll from public benefits, which will have immediate impacts on Plaintiffs, immigrants, and their families.[2] For example, as individuals disenroll from Medicaid—a result that Defendants concede will happen, *see* 84 Fed. Reg. at 41,463; U.S. Citizenship & Immigration Servs., Regulatory Impact Analysis: Inadmissibility on Public Charge Grounds (2019), at 6, 107, 109— Plaintiffs' institutions will immediately begin losing revenue and shouldering higher healthcare costs stemming from uncompensated care. Indeed, in the first year of the Final Rule's implementation alone, NYC Health + Hospitals expects a net financial loss of $121 to $187 million.[3] Moreover, Plaintiffs will immediately expend significant resources to adjust their benefits programs to account for the Rule. Connecticut, for example, estimates that it will spend millions of dollars simply to revise its integrated web-based applications.[4]

The effects of a stay will not only be immediate but also long lasting—even if the preliminary injunction is affirmed on appeal or the Final Rule is ultimately vacated or permanently enjoined. Because the Final Rule counts the receipt of multiple benefits in a single month as multiple months of benefits, noncitizens will quickly disenroll from or forgo

---

[2] *See, e.g.*, Exhibit 10 to the Decl. of Elena Goldstein in Supp. of Pls.' Mot. for a Prelim. Inj. ("Goldstein Decl."), Dkt. 34 (hereinafter "Ex.__") (Katz Decl.) ¶ 28 (explaining that "we can expect a significant additional impact with the final rule put in place compared to when it was still just a proposal").
[3] *Id.*
[4] Ex. 6 (Gifford Decl.) ¶ 43.

enumerated benefits and other programs that they fear might count against them, with devastating and permanent consequences for individuals and their families.  For example, once an individual drops affordable housing benefits, they cannot simply reenroll or return to their old apartment because waiting lists are years-long or closed.[5]  Likewise, many health consequences to noncitizens and their families from foregoing medical insurance and nutrition benefits will be severe, enduring, and potentially life-threatening.[6]  Further, many individuals deemed public charges pursuant to the Final Rule may be subject to removal, *see* 8 U.S.C. § 1182(a)(4); *id.* § 1227(a)(1), (5), and may subsequently face multi-year bars to reentering, *see id.* § 1182(a)(9)(A)-(B).  And at minimum, deep uncertainty will pervade; there is no obvious recourse for noncitizens subject to such determinations once the Rule is eventually enjoined.

The disruption and uncertainty that would be caused by a stay of this Court's preliminary injunction counsel strongly against a stay.  Allowing the Rule to take effect would severely disrupt the operation of Plaintiffs' healthcare institutions, Plaintiffs' public benefits programs, and the lives of many law-abiding residents who have relied on the public charge rules that have governed for over a century.  Accordingly, the Court should preserve the status quo by denying the stay request.  *Cf. Kidder v. Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991) (explaining that a stay is proper "only when it is necessary to preserve the status quo pending the appeal").

### B.   Defendants have not shown that they would suffer irreparable harm absent a stay.

The Supreme Court has held that "if there is even a fair possibility that [a] stay . . . will work damage to someone else," the movant "must make out a clear case of hardship or inequity

---

[5] Ex. 17 (Visnauskas Decl.) ¶ 39; *see also* Ex. 1 (Allen Decl.) ¶¶ 20-21 (describing wait lists).
[6] Ex. 10 (Katz Decl.) ¶¶ 12, 15.

in being required to go forward." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).  As discussed above, there is more than a "fair possibility" of harm to Plaintiffs and the public if the case is stayed (*see supra* Part I.A).  By contrast, Defendants are unable to demonstrate *any* cognizable harm pending appeal—much less the "clear case of hardship or inequity" they are required to show.  *Landis*, 299 U.S. at 255.

First, the preliminary injunction merely preserves the status quo that has existed for over a century.  Defendants' argument that the injunction will require DHS to grant lawful permanent resident status to noncitizens who are not public charges under the long-established framework but who are "public charges" under the Final Rule, Defs.' Mem. 7, simply assumes the validity of their argument on the merits.  But this Court—and every other court to consider the matter— has concluded that the Rule is likely contrary to law, and Defendants do not have any cognizable interest in implementing an unlawful rule.  And Defendants have not demonstrated *any* interest separate from their views on the merits—let alone an urgent interest—to implement the Final Rule now.  *See New York*, 2019 WL 5100372, at *8.  For decades, if not more than a century, immigration officers have made public charge determinations consistent with the well-established meaning of public charge.  *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999) (the "1999 Field Guidance").  Defendants identify no emergency or crisis requiring them to *immediately* discard this established meaning of public charge while they pursue their appeal.  Indeed, when pressed at oral argument, Defendants failed to articulate any basis for radically transforming the meaning of public charge "now[,] when it has never been the rule."  Tr. of Prelim. Inj. Hr'g dated October 7, 2019 at 53.

Second, Defendants' conclusory assertion that this Court's injunction "imposes

significant administrative burdens," Defs.' Mem. 7, does not justify the extraordinary relief of a stay. Defendants' references to their purported administrative costs absent a stay, *see* Decl. of Daniel Renaud ¶ 5, are vague, speculative, unquantified, and in some cases downright puzzling, *see id.* ("USCIS always maintains an active social media presence . . ., [but] [a]ll outreach plans were put on hold as a result of the injunction."). Indeed, Defendants fail to provide any plausible basis to conclude that they cannot reuse materials or rehire contractors at little or no cost if they prevail on their appeal. And Defendants will incur no costs to implement the Rule if the preliminary injunction is affirmed—as is likely given that they are unlikely to succeed on the merits of their appeal. In any event, even if Defendants may incur some administrative costs associated with duplication of efforts to prepare for implementation of the Final Rule, *id.* ¶¶ 5-6, such vague and unquantified costs—such as the delay in distributing an "informational toolkit" that USCIS had "planned to" send to District Offices, *id.* ¶ 5—do not come close to presenting the required "clear case of hardship or inequity" when compared with the millions of dollars of financial burdens on Plaintiffs, and the enormous human costs on their residents, if the Final Rule becomes effective.[7]

Moreover, if there is a "conflict between financial concerns and preventable human suffering," the balance of hardships tips sharply in favor of preventing human suffering. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (internal quotation marks omitted); *see also Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) (affirming district court's finding that a risk of substantial harm to plaintiffs seeking injunction

---

[7] *See, e.g.*, Ex. 6 (Gifford Decl.) ¶ 43 (explaining that Connecticut estimates it will spend millions of dollars to revise applications); Ex. 10 (Katz Decl.) ¶ 20; Ex. 13 (Mosquera-Bruno Decl.) ¶ 24; Ex. 19 (Zucker Decl.) ¶¶ 61-62. Indeed, Defendants contend on the one hand that Plaintiffs' documented, unrecoupable costs are not cognizable, *see* Defs.' Mem. 3, while simultaneously arguing that they will suffer irreparable injury due to the unquantified "administrative burdens" of delaying training rollouts and seeking alternatives to data entry contractors that Defendants speculate "are likely to seek out other employment," *id.* at 7.

outweighed the government's "financial and administrative concerns").  A stay is thus not warranted here given the harms it will inflict on Plaintiffs and their residents.

## II.  Defendants are unlikely to prevail on the merits.

The Court should deny a stay for the additional reason that Defendants have failed to make a "strong showing" that they are likely to succeed on the merits of their appeal.  *Nken*, 556 U.S. at 434.

### A.  Plaintiffs have standing.

The Court correctly held that Plaintiffs have standing, that their claims are ripe for review, and that they are within the zone of interests regulated by the Final Rule.  *New York*, 2019 WL 5100372, at *6-11.

Defendants' claim that Plaintiffs' standing is dependent on "'a highly attenuated chain of possibilities,'" Defs.' Mem. 2 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013)), is belied by (1) the uncontroverted record evidence and (2) DHS's own admissions. Plaintiffs submitted nearly two dozen declarations from experts and leaders who oversee programs and institutions that provide for the health and well-being of Plaintiffs' residents, containing hundreds of pages of testimony documenting, explaining, and analyzing the chilling effects and attendant harms that the Final Rule will cause.  *See supra* Part I.A; *see also* Goldstein Decl.  Notably, though Defendants have labeled Plaintiffs' harms "speculative," they have not addressed, let alone refuted, any of this evidence.  Nor could they.  DHS itself acknowledges the chilling effects of the Final Rule, 84 Fed. Reg. at 41,307; *id.* at 41,463, and the resulting "adverse health effects," "increase in medical expenses," and "lost productivity," *id.* at 41,489.  DHS likewise squarely acknowledges that the Rule will cause "State and local governments" to incur

costs associated with making "administrative changes" to their benefits programs, *id.* at 41,469.[8]

Defendants' argument that Plaintiffs fall outside the zone of interests of the Final Rule also fails. *See Citizens for Responsibility & Ethics in Washington v. Trump*, 939 F.3d 131, 158 (2d Cir. 2019) (explaining that the zone of interests test "does not require the plaintiff to be an intended beneficiary of the law in question," but rather allows entities "who are injured" by an alleged violation of law to seek redress). Indeed, the public charge framework is designed in part to protect state and city coffers; Congress expressly contemplated Plaintiffs' interests in creating this framework. *See* 8 U.S.C. § 1183a. Plaintiffs administer the public benefits targeted by the Rule, have interests that are "inextricably intertwined" with their immigrant residents, and as such, "plainly fall within the INA's zone of interests." *New York*, 2019 WL 5100372, at *5.

**B.    The Final Rule exceeds Defendants' statutory authority and is contrary to law.**

Defendants are unlikely to succeed on the merits of their appeal because DHS's unprecedented expansion of the meaning of "public charge" plainly goes "beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). DHS's transformation of "public charge" to mean receipt of 12 months of benefits within a 36-month period (or the "12/36 standard") contravenes the unambiguous meaning of the INA and is unreasonable given "the plain language of the INA, the history and common-law meaning of 'public charge,'" and judicial and administrative understandings of that term. *New York*, 2019 WL 5100372, at *6. As the Court found, Defendants' definition of public charge "has *never* been referenced in the history of U.S. immigration law." *Id.* There is "*zero* precedent supporting

---

[8] Moreover, contrary to Defendants' claim, it is far from a "remarkable proposition," Defs.' Mem. 3, that Plaintiffs have standing because the Rule requires them to incur costs. *See, e.g., Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the . . . Rule are precisely the kind of 'pocketbook' injury that is incurred by the state itself."); Pls.' Reply in Supp. of Their Mot. For Preliminary Inj. & Stay Pending Judicial Review, Dkt. 102 ("Pls.' PI Reply") 3.

this definition." *Id.* Rather, Congress has consistently made clear that "public charge" does not encompass limited receipt of non-cash public benefits that promote self-sufficiency.

*First*, in 1952, Congress incorporated the term "public charge" into the INA against a backdrop of early immigration statutes as well as judicial and agency opinions defining a "public charge" as an individual who is unable or unlikely to work and who is thus primarily dependent on the government for subsistence in the long-term. *See* Pls.' PI Mem. 20-22. Indeed, the first federal immigration statute enacted in 1882 did not consider an immigrant who received temporary assistance to be a "public charge." *See id.* at 20 (citing sections 1 and 2 of the Immigration Act of 1882, which authorized immigration officials to provide "support and relief" to immigrants who may "need public aid" after their arrival). More than a century of judicial and administrative interpretations of "public charge" confirm that Congress intended to and did adopt this well-established meaning. Pls.' PI Mem. 20-22. The 1999 Field Guidance, in turn, reiterated this consistent understanding of "public charge" in immigration law. *Id.* at 22-23.

*Second*, Congress has repeatedly rejected efforts to expand the definition of "public charge" to include the non-cash benefits implicated by the Rule. Specifically, in 1996, Congress declined to pass the Immigration Control and Financial Responsibility Act, which would have expanded "public charge" to encompass immigrants receiving public benefits, including SNAP and Medicaid. S. Rep. No. 104-249, at 2 (1996). That same year, during debates over the Illegal Immigration Reform and Immigrant Responsibility Act, members of Congress again tried and failed to expand the public charge definition to include use of non-cash public benefits. *See* 142 Cong. Rec. S11612, at S11712 (daily ed. Sept. 16, 1996); Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). And in 2013, Congress again rejected attempts to expand public charge to encompass immigrants if they qualified for benefit programs like SNAP and Medicaid. *See* S.

Rep. 113-40, at 42 (2013).  Defendants seek here to take action that Congress itself has repeatedly refused to condone.

*Third*, Congress, federal agencies, and practical experience have all made clear that using supplemental benefits programs like Medicaid, SNAP, and Section 8 "does not necessarily reflect that the individual is unable to support herself"—let alone that they will be primarily dependent on the government for subsistence.  Congress has already addressed concerns about immigrants relying on public benefits rather than becoming self-sufficient by imposing strict eligibility criteria for noncitizens to obtain many benefits.  *See* Pls.' PI Mem. 26-27.  Congress has also repeatedly emphasized that such benefits promote rather than hinder self-sufficiency and stability.  *See* H.R. Rep. 104-651, at 3 (1996) (explaining that the Welfare Reform Act "converts welfare into a helping hand, rather than a handout by limiting lifetime welfare benefits"); 147 Cong. Rec. S13245-07, S13269-70 (Dec. 14, 2001) (Statement of Sen. Graham) (stating, in support of the 2002 Farm Bill, "I am acutely aware of the role that the Food Stamp Program plays in helping families leave welfare for work.").  And federal agencies have made clear that that supplemental benefits do not reflect a lack of self-sufficiency because such benefits are often "made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient."  64 Fed. Reg. at 28,692.  The Final Rule improperly seeks to reverse these congressional judgments.

Defendants' contention that "[t]he mere fact that the 12/36 standard has not been used before is no basis for holding that it exceeds DHS's regulatory authority" misses the mark. Defs.' Mem. 4.  Even assuming that "public charge" is ambiguous, DHS "must operate within the bounds of reasonable interpretation."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321

(2014).  It is plainly unreasonable to ignore and contravene consistent congressional decisions to exclude the receipt of non-cash benefits from the public charge framework.  Defendants' radical expansion of a framework that for a century excluded less than one percent of immigrants to encompass vast swaths of the population, *see* Pls.' PI Mem. 3-4, 24, stretches the definition of "public charge" beyond recognition and statutory authority.

For much the same reason, Defendants' attempt to analogize to the 1999 Field Guidance falls flat.  *See* Defs.' Mem. 4.  The 1999 Field Guidance "summarize[ed] longstanding law with respect to public charge," "provide[d] new guidance on public charge determinations in light of [the Welfare Reform Act]," 64 Fed. Reg. at 28,689, and defined "public charge" in a manner that took into account existing "law and public policy decisions concerning alien eligibility for public benefits and public health considerations, as well as past practice by the [agency] and the Department of State," *id.* at 28,692.  The Final Rule, by contrast, thwarts the long-established understanding of the term that Congress incorporated into the INA.  Moreover, as the Court found, "Defendants have made no showing that Congress was anything but content with the current definition set forth in the Field Guidance."  *New York*, 2019 WL 5100372, at *6.

Because the Final Rule conflicts with the INA and contravenes Congress's intent, Defendants are unlikely to succeed on the merits of their appeal.

## C.      The Final Rule is arbitrary and capricious.

The Final Rule is also likely arbitrary and capricious because (1) Defendants fail to justify their radical expansion of the definition of public charge; (2) the factors in the purported "totality of circumstances test" bear no reasonable relationship to determining whether an individual is in fact likely to become a public charge; (3) the Final Rule fails to consider the federal government's obligations under Section 504 of the Rehabilitation Act ("Section 504") and is contrary to Section 504; and (4) the Final Rule fails to consider or quantify significant

harms.  Pls.' PI Mem. 27-38; Pls.' PI Reply 9-14.  Defendants' arguments to the contrary fail.

*First*, the Court correctly held that the Final Rule likely violates the APA because "Defendants do not articulate why they are changing the public charge definition, why this new definition is needed now, or why the definition set forth in the Rule—which has absolutely no support in the history of U.S. immigration law—is reasonable."  *New York*, 2019 WL 5100372, at *8.  Defendants' only response—that the Court "erred in holding . . . that there was no rational relationship between self-sufficiency and receipt of public benefits," Defs.' Mem. 5—not only largely ignores the Court's reasoning but obfuscates that "[u]nder the Rule, receipt of [public] benefits is not *one* of the factors considered; it is *the* factor."  *New York*, 2019 WL 5100372, at *8.  And as DHS itself acknowledges, "mere public benefit receipt is not a good measure of dependence."  84 Fed. Reg. at 41,357.  Defendants simply offer no rational basis for its decision to "entirely rework[ ] the framework" for making public charge determinations.  *New York*, 2019 WL 5100372, at *8.

*Second*, Defendants' suggestion that the Court erred in holding that the Rule "may violate the Rehabilitation Act on an as-applied basis" once again reflects Defendants' fundamental misunderstanding of Section 504 and the INA.  Defs.' Mem. 6.  Defendants are simply wrong in arguing that the Rule can violate Section 504 only if the ultimate public charge determination is based "solely" on an applicant's disability.  *See id.*  The statute prohibits a federal agency not only from excluding individuals from a program or benefit, but also from subjecting them to discrimination "solely by reason" of disability.  29 U.S.C. § 794(a); *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) (explaining a Rehabilitation Act violation requires only that there be "something different about the way the plaintiff is treated 'by reason of . . .

disability'").[9]  The Rule clearly treats applicants differently based solely on their disability given

that it automatically "considers disability as a negative factor in the public charge assessment."

*New York*, 2019 WL 5100372, at *9.  *See also Washington*, 2019 WL 5100717, at *18

(recognizing that the Rule mandates consideration of disability as "one of the minimum factors

that the officer must consider"); Pls.' PI Reply 13.  Such automatic negative consideration of

"disability" makes it impossible for DHS officers to provide individuals with disabilities the

"'even-handed treatment' in relation to the able-bodied" required by Section 504.  *Doe v.

Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998).

Moreover, the Final Rule's negative and automatic consideration of disability is also

irrational.  As the Court explained, "Defendants do not" and cannot "explain how disability alone

is itself a negative factor indicative of being more likely to become a public charge."  *New York*,

2019 WL 5100372, at *9.  Rather, such consideration "is inconsistent with the reality that many

individuals with disabilities live independent and productive lives."  *Id.*  Indeed, access to

benefits like Medicaid, on which individuals with disabilities often rely, "logically would assist

immigrants, not hinder them, in becoming self-sufficient, which is DHS's stated goal of [the

Final Rule]."  *Washington*, 2019 WL 5100717, at *18.

For these reasons, as well as the additional reasons raised in Plaintiffs' motion for

preliminary relief, Defendants are unlikely to succeed on the merits because the Final Rule is

arbitrary and capricious.

---

[9]  For this reason, the district court in the Northern District of California erred in holding otherwise.  *See City and Cty. of San Francisco*, 2019 WL 5100718, at *29 (focusing only on whether disability would be the "sole cause" of a public charge determination); *cf. Henrietta D.*, 331 F.3d at 274-275 (explaining that "the Rehabilitation Act requires affirmative accommodations to ensure that facially neutral rules do not in practice discriminate against individuals with disabilities").

**III.    The Court should deny the motion to stay in full.**

The Court should also deny Defendants' alternative request for a stay that allows the Rule to go into effect outside of Plaintiffs' jurisdictions.  Defs.' Mem. 8.

The Court properly postponed the effective date of the Final Rule under 5 U.S.C. § 705, a statutory remedy under the APA that inherently applies to the Rule as a whole.  Federal agencies have a parallel statutory authority to postpone the effective date of their actions pending judicial review—a postponement that applies to the Rule and not to particular geographical localities or parties.  5 U.S.C. § 705.  *See, e.g.*, *NRDC v. U.S Dep't of Energy*, No. 17 Civ. 6989, 2018 WL 1229733, at *2-3 (Mar. 5, 2018) (describing Department of Energy administrative stay of regulation's effective date).  And section 705's preliminary postponement power mirrors the scope of court's ultimate authority under the APA to "hold unlawful and set aside" defective agency action, i.e., set aside the rule in its entirety.  *See* 5 U.S.C. § 706(2); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is prescribed").  Given that Congress has expressly provided for temporary relief from the Rule pending review, there is no plausible basis to import wholesale general equitable principles about the proper scope of injunctions.

In any event, the Court also properly issued a preliminary injunction without geographic limitation.  *New York*, 2019 WL 5100372, at *12.  Defendants' alternative request to stay the injunction in part should be rejected.  The Supreme Court has squarely held that the "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Here, the Court's injunction does not "sweep[ ] more broadly than necessary to redress Plaintiffs' alleged injuries," Defs.' Mem. 8, because vacating an improper rule "actually *does* redress the injury that an APA

plaintiff presents." *Make the Road N.Y. v. McAleenan*, No. 19-cv-2369, 2019 WL 4738070, at

*46 (D.D.C. Sept. 27, 2019); *see id.* at *44 (rejecting argument that APA allows geographically

limited vacatur of regulation, an argument "patently inconsistent with the dictates of the law"

that "reeks of bad faith" and would deprive "successful plaintiffs of the full measure of the

remedy to which they are entitled").

Nor is there any merit to Defendants' claims that the scope of this Court's injunction

renders other decisions about the Final Rule "academic." Defs.' Mem. 8. "[I]n practice,

nationwide injunctions do not always foreclose percolation." *California v. U.S. Dep't of Health*

*& Human Servs.*, No. 19-15072, 2019 WL 5382250, at *5 (9th Cir. Oct. 22, 2009) (internal

quotation marks omitted). Indeed, this Court's preliminary injunction did not deter four other

courts from subsequently resolving other plaintiffs' requests for preliminary relief from the Rule.

In any event, "a nationwide injunction is necessary to accord Plaintiffs and other

interested parties with complete redress." *New York*, 2019 WL 5100372, at *11. Defendants

improperly ignore that "the equities of [this] case" support national relief. *California v. Azar*,

911 F.3d 558, 584 (9th Cir. 2018). For example, "an individual should not have to fear that

moving from one state to another could result in a denial of adjustment of status." *New York*,

2019 WL 5100372, at *11. Nor would a patchwork injunction obviate the confusion attendant to

the Rule and concomitant chilling effect. *See* Pls.' PI Mem. 39-40. Limiting relief to Plaintiffs

would thus be "ineffective" in addressing these grave concerns. *Texas v. United States*, 809 F.3d

134, 187-88 (5th Cir. 2015).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion for a stay pending

appeal.

DATED:  November 8, 2019

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Amanda Meyer*
Amanda Meyer, *Assistant Attorney General*

Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Ming-Qi Chu, *Section Chief, Labor Bureau*
Abigail Rosner, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Office of the New York State Attorney
General
New York, New York 10005
Phone:  (212) 416-6225
Amanda.Meyer@ag.ny.gov

*Attorneys for the State of New York*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Tonya Jenerette*
Tonya Jenerette
  Deputy Chief for Strategic Litigation
Cynthia Weaver, Senior Counsel
Hope Lu, *Senior Counsel*
Doris Bernhardt, *Senior Counsel*
Melanie Ash, *Senior Counsel*
100 Church Street, 20th Floor
New York, NY 10007
Phone: (212) 356-4055
tjeneret@law.nyc.gov

*Attorneys for the City of New York*

WILLIAM TONG
*Attorney General of Connecticut*

By: */s/ Joshua Perry*
Joshua Perry
  *Special Counsel for Civil Rights*
55 Elm Street
Hartford, CT 06106-0120
(860) 808-5318
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: <u>*/s/ Benjamin Battles*</u>
Benjamin Battles, *Solicitor General*
Eleanor Spottswood, *Assistant Attorney General*
Julio Thompson,* *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*

* *Admitted pro hac vice*