**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF CONNECTICUT, and STATE OF VERMONT,<br><br>                Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KEVIN K. McALEENAN, *in his official capacity as Acting Secretary of the United States Department of Homeland Security*; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; KENNETH T. CUCCINELLI II, *in his official capacity as Acting Director of United States Citizenship and Immigration Services*; and UNITED STATES OF AMERICA,<br><br>                Defendants. | **CIVIL ACTION NO.**<br>**19 Civ. 07777 (GBD)** |
| MAKE THE ROAD NEW YORK, AFRICAN SERVICES COMMITTEE, ASIAN AMERICAN FEDERATION, CATHOLIC CHARITIES COMMUNITY SERVICES, and CATHOLIC LEGAL IMMIGRATION NETWORK, INC.,<br>     Plaintiffs,<br>       v.<br>KEN CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services; UNITED STATES CITIZENSHIP & IMMIGRATION SERVICES; KEVIN K. McALEENAN, in his official capacity as Acting Secretary of Homeland Security; and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>     Defendants. | **CIVIL ACTION NO.**<br>**19 Civ. 07993 (GBD)** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND STAY OR TEMPORARY RESTRAINING ORDER**
**PENDING NATIONAL EMERGENCY**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

PROCEDURAL BACKGROUND....................................................................................... 2

CHANGES IN FACTUAL CIRCUMSTANCES ............................................................... 3

    A.   The Nationwide COVID-19 Pandemic ................................................................. 4

    B.   The Importance of Public Benefits in Responding to the COVID-19 Crisis..................... 6

    C.   The Harms Imposed by the Rule and the COVID-19-Related Guidance Issued by the
Department of Homeland Security ................................................................... 8

ARGUMENT ................................................................................................................... 12

    A.   The Court has authority to issue a new, narrow injunction to address the drastic changed
circumstances engendered by the COVID-19 pandemic. ......................................... 13

    B.   The Court should issue a targeted and limited preliminary injunction for the duration of
the national emergency. ............................................................................. 16

        1.     The Rule causes irreparable harms not previously before the Court.......................... 16

           i.   The Rule is impeding efforts to mitigate the spread of the virus. ............................. 16

           ii.    The Rule deters access to public benefits that are necessary to respond to the severe
economic crisis caused by COVID-19................................................................. 19

           iii.   USCIS's alert does not remedy these substantial harms........................................ 21

        2.     Balance of equities and public interest favor issuance of an injunction.................... 23

        3.     Plaintiffs have demonstrated likelihood of success on the merits of their claims...... 24

    C.   Nationwide relief is warranted and essential. ................................................. 25

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

*Andino v. Fischer*,
   555 F. Supp. 2d 418 (S.D.N.Y. 2008).......................................................................................12

*City & Cty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ...............................................................................................25

*Coronel v. Decker*,
   No. 20 Civ. 2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ...................13, 24, 25

*Department of Homeland Security, et al. v. New York, et al.*,
   No. 19A785 (S. Ct. Apr. 20, 2020)..........................................................................................22

*Flatiron Health, Inc. v. Carson*,
   No. 19 CIV. 8999 (VM), 2020 WL 257505 (S.D.N.Y. Jan. 17, 2020)...................................15

*Gortat v. Capala Bros.*,
   No. 07-CV-3629(ILG), 2008 WL 5273960 (E.D.N.Y. Dec. 18, 2008)...................................13

*Ideal Toy Corp. v. Sayco Doll Corp.*,
   302 F.2d 623 (1962).................................................................................................................14

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*,
   847 F.2d 1014 (2d Cir. 1988)..................................................................................................13

*Mayweathers v. Newland*,
   258 F.3d 930 (9th Cir. 2001) ..................................................................................................14

*New York State Nat. Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989)..................................................................................................13

*New York v. United States Dep't of Homeland Sec.*,
   408 F. Supp. 3d 334 (S.D.N.Y. 2019) .....................................................................................24

*New York v. United States Dep't of Homeland Sec.*,
   No. 19 Civ. 7777 (GBD), 2019 WL 6498250 (S.D.N.Y. Dec. 2, 2019) .................................24

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990).....................................................................................................13

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ...................................................................................................13

*Trump v. International Refugee Assistance Project*,
   137 S. Ct. 2080 (2017).......................................................................................................14, 23

*United States v. Carr*,
   557 F.3d 93 (2d Cir. 2009)...........................................................................................24

*Webb v. GAF Corp.*,
   78 F.3d 53 (2d Cir. 1996) ...........................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7, 26 (2008)) ................................................................................................24

*Wolf v. Cook Cty., Ill.*,
   140 S. Ct. 681 (2019)....................................................................................................3

**FEDERAL STATUTES**

5 U.S.C.
   § 705............................................................................................................2, 12, 25

50 U.S.C.
   § 1601 et seq. ..............................................................................................................4

Coronavirus Aid, Relief, and Economic Security Act,
   Pub. L. No. 116-136§ 6428(d), 134 Stat. 281, 335 (2020) ......................................8

**FEDERAL REGULATIONS**

83 Fed. Reg. 51,114 (Oct. 10, 2018)........................................................................8, 17

84 Fed. Reg. 41,292 (Aug. 14, 2019)....................................................................*passim*

85 Fed. Reg. 15,337 (Mar. 13, 2020).............................................................................5

**RULES**

Fed. R. Civ. P. 62.1 ....................................................................................2, 15, 16, 25

Fed. R. Civ. P 65 ...................................................................................................12, 25

**MISCELLANEOUS AUTHORITIES**

Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §
   3949.1 (3d ed. Aug. 2019 update)........................................................................14, 15

## PRELIMINARY STATEMENT

In the last two months, the novel coronavirus SARS-CoV-2 has triggered a devastating global pandemic, afflicting almost a million people in the United States with a potentially lethal illness, coronavirus disease 2019 (COVID-19). The virus has already killed over 53,000 people in the United States, including almost 20,000 in the three Plaintiff states alone. The rapid and ongoing spread of COVID-19 is causing a nationwide public-health crisis and wreaking havoc on the economy. The President has declared a state of national emergency. And state and local authorities—including Governmental Plaintiffs here, the States of New York, Connecticut, and Vermont, and the City of New York—have also declared states of emergency and are undertaking extraordinary efforts to stop the spread of COVID-19 and protect the health and well-being of our residents.

Extensive recent evidence presented with this motion—evidence developed during and pertaining to the period following this Court's October 2019 preliminary injunctions and the Supreme Court's January 2020 stay order—shows that the Public Charge Rule (the "Rule") is gravely hindering those efforts. By deterring immigrants from accessing publicly funded healthcare, including programs that would enable immigrants to obtain testing and treatment for COVID-19, the Rule makes it more likely that immigrants will suffer serious illness if infected. In turn, those infected are likely to spread the virus inadvertently to others—a risk that is heightened because the essential workers who interact daily with the public are disproportionately immigrants. The Rule also deters access to public benefits, including nutrition benefits, that are critical for both immigrants and the country as a whole to weather the economic crisis triggered by COVID-19. The Rule thereby impedes efforts to protect the public at large from further spread of the virus and to promote our nation's recovery from the economic crisis

1

that the virus has caused.

In light of the dire risks the Rule poses to the public, on April 13, 2020, the Governmental Plaintiffs filed a motion in the Supreme Court to temporarily lift or modify the Supreme Court's stay on this Court's injunction for the duration of the COVID-19 pandemic. In the alternative, the Governmental Plaintiffs requested that the Supreme Court clarify that the stay pending appeal did not preclude Plaintiffs from seeking emergency relief from this Court on the same grounds. On April 24, 2020, the Supreme Court denied the Governmental Plaintiffs' request to modify or lift the stay, but ruled that "[t]his order does not preclude a filing in the District Court as counsel considers appropriate."[1]

Accordingly, Plaintiffs respectfully request that the Court make factual findings recognizing the harmful effects of the Rule during this time of crisis, and issue a new injunction or a Section 705 stay temporarily halting implementation of the Rule during the national COVID-19 emergency declared by the President. Plaintiffs also request that the Court issue an indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure, indicating that the court would issue the preliminary injunction if the Second Circuit were to remand the case for that purpose. In the alternative, Plaintiffs respectfully request that the Court issue a temporary restraining order until Plaintiffs' motion for an injunction or stay can be adjudicated.

## PROCEDURAL BACKGROUND

In August 2019, DHS issued its Public Charge Rule, which modified its criteria for determining inadmissibility on public charge grounds. 84 Fed. Reg. 41,292 (Aug. 14, 2019). Under the Rule, DHS officials must now deem an immigrant to be a "public charge" if the immigrant is likely to receive any amount of certain "public benefits," including supplemental

---

[1] Exhibit 2 to Declaration of Elena Goldstein dated April 28, 2020 (hereinafter "Ex. __") (Supreme Court April 24, 2020 Order)

benefits such as Medicaid, Supplemental Nutrition Assistance Program (SNAP) benefits, and Section 8 housing assistance during "more than 12 months in the aggregate within any 36-month period" during the immigrant's life. *Id.* at 41,501.

On October 11, 2019, the Court issued two orders that preliminarily enjoined the enforcement of the Rule on a nationwide basis, and postponed the Rule's effective date pursuant to 5 U.S.C. § 705. On December 2, 2019, the Court denied Defendants' request to stay the injunction pending appeal. *See* Dkt. No. 122. On January 7, 2020, the Second Circuit also denied Defendants' stay request. *See* Dkt. No.132. On January 27, 2020, the Supreme Court issued a stay of this Court's orders of preliminary relief, thereby allowing the Rule to take effect.[2] On February 21, 2020, the Supreme Court issued a stay of a preliminary injunction issued by the United States District Court for the Northern District of Illinois that had prevented enforcement of the Rule in Illinois alone. *Wolf v. Cook Cty., Ill.*, 140 S. Ct. 681, 681 (2019) (Justices Ginsburg, Breyer, Sotomayor, and Kagan dissenting). In reliance on the Supreme Court's stay orders, Defendants began enforcing the Rule nationwide on February 24, 2020.

On April 24, 2020, in response to the Governmental Plaintiffs' motion, the Supreme Court denied the Governmental Plaintiffs' request to modify or lift the stay but ruled that "[t]his order does not preclude a filing in the District Court as counsel considers appropriate."[3] Pursuant to the Supreme Court's order, Plaintiffs now seek new preliminary relief to halt implementation of the Rule during the COVID-19 pandemic.

**CHANGES IN FACTUAL CIRCUMSTANCES SINCE THE COURT'S PRIOR ORDERS**

Since October 11, 2019, when this Court entered preliminary injunctions in these matters, and January 27, 2020, when those injunctions were stayed by the Supreme Court, the nationwide

---

[2] Ex. 1 (Supreme Court January 27, 2020 Order) (Justices Ginsburg, Breyer, Sotomayor, and Kagan dissenting).
[3] Ex. 2 (Supreme Court April 24, 2020 Order).

COVID-19 pandemic has dramatically increased the public harm caused by the Rule, and thus substantially altered the balance of hardships from allowing it to take effect. We summarize here the extensive recent evidence submitted with this motion demonstrating how the Rule is severely impeding efforts to mitigate the dire health and economic harms done by the pandemic.

### A. The Nationwide COVID-19 Pandemic

After the Supreme Court issued its stays, COVID-19 began sweeping across the United States. COVID-19 has already exacted a tremendous toll on the nation, and the pace of its spread continues to increase rapidly. In the United States, 957,875 individuals have confirmed cases of COVID-19, and at least 53,000 people have died from the disease.[4]

Plaintiffs and Governmental Plaintiffs' residents have been particularly hard hit. In New York, which has become the current epicenter of the pandemic in the United States, 291,996 people have confirmed cases of COVID-19, and at least 17,300 people have died from the disease.[5] In New York City alone, there are currently more than 156,000 confirmed positive cases and more than 11,000 confirmed deaths.[6] The New York communities where Plaintiff Make the Road New York has community centers in Queens, Brooklyn, Westchester, and Long Island have been particularly devastated by the pandemic.[7] And other jurisdictions across the country have likewise seen rising numbers of infections and fatalities.[8] These figures likely vastly underrepresent the number of actual infections and related deaths for many reasons,

---

[4] Center for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Apr. 28, 2020).
[5] *See* New York Dep't of Health, *NYSDOH COVID-19 Tracker*, https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases (last updated Apr. 28, 2020); New York Dep't of Health, *Fatalities by County*, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/ NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last updated Apr. 28, 2020).
[6] *See* New York City Dep't of Health & Mental Hygiene, *COVID-19: Data: Cases, Hospitalizations and Deaths*, https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last updated Apr. 28, 2020).
[7] Ex. 24 (Oshiro Decl.) ¶ 6.
[8] *See, e.g.*, *Corona Virus: Michigan Data*, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last updated Apr. 28, 2020) (38,210 confirmed infections and 3,407 confirmed deaths in Michigan).

including that many people who likely have the virus have not been tested for it.[9]

On March 13, 2020, the President declared a state of national emergency concerning the COVID-19 outbreak, invoking his authority under the National Emergencies Act. Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020); *see generally* 50 U.S.C. § 1601, et seq. The President declared that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems." 85 Fed. Reg. at 15,337. He also declared that because additional measures "are needed to successfully contain and combat the virus in the United States," he was authorizing the Department of Health and Human Services and the Social Security Administration to temporarily waive or modify certain requirements of various public-health and medical-insurance related statutes "throughout the duration of the public health emergency declared in response to the COVID-19 outbreak." *Id.* The governors of each of the Governmental Plaintiff States, as well as the mayor of Plaintiff New York City, have each declared public-health emergencies in their respective jurisdictions based on the COVID-19 pandemic.[10] In each of the Governmental Plaintiffs' jurisdictions, state officials and agencies have also been taking increasingly drastic measures to slow the spread of COVID-19 and provide testing and treatment for residents who are already infected. For example, state officials have required all nonessential employees to work from home, closed schools, and issued orders to increase hospital capacity to care for COVID-19 patients.[11]

---

[9] *See* Jacqueline Howard, *US coronavirus death count likely an underestimate. Here's why*, CNN (Apr. 6, 2020), https://www.cnn.com/2020/04/06/health/us-coronavirus-death-count-cdc-explainer/ index.html.

[10] New York declared a state of emergency on March 7, 2020; Connecticut on March 10, 2020; and Vermont on March 13, 2020.  *See* New York Exec. Order No. 202, 9 N.Y.C.R.R. § 8.202 (2020); Connecticut Office of the Governor, Declaration of Public Health and Civil Preparedness Emergencies (Mar. 10, 2020), available at https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf?la=en; Vermont Exec. Order No. 01-20 (2020), available at https://dcf.vermont.gov/sites/dcf/files/DCF/EO-01-20.pdf.

[11] *See, e.g.*, New York Exec. Order No. 202.4, 9 N.Y.C.R.R. § 8.202.4 (2020) (closing schools in New York); New York Exec. Order No. 202.8, 9 N.Y.C.R.R. § 8.202.8 (2020) (ordering all nonessential workers in New York to work from home); New York Exec. Order No. 202.10, 9 N.Y.C.R.R. § 8.202.10 (2020) (ordering various measures

### B.  The Importance of Public Benefits in Responding to the COVID-19 Crisis

Experts in infectious disease control and public health have warned that everyone should be minimizing the spread of the virus to the greatest extent possible.[12] Testing and medical treatment for COVID-19 are critically important to slowing infection rates, preserving hospital capacity and medical equipment, and saving lives.[13] If individuals are deterred from testing and thus do not know they are infected, they are more likely to inadvertently spread the virus to others—who will then spread the virus to still more people.[14] And if individuals suffering from COVID-19 delay obtaining medical care, they are more likely to spread the virus, experience serious illness and need intensive care in a hospital, and potentially die from the disease.[15]

Individuals who lack health insurance are much less likely to obtain necessary treatment for COVID-19 because of the prohibitive costs of medical care and hospital stays.[16] A recent report from a nonprofit organization that analyzes healthcare costs estimated that a six-day hospital stay for COVID-19 treatment will cost approximately $73,300.[17] This burden will fall

---

to increase hospital capacity); Connecticut Exec. Order No. 7H (2020) (ordering all nonessential workers in Connecticut to work from home); Vermont Exec. Order No. 01-20, add. 6 (2020) (ordering all nonessential businesses in Vermont to cease in-person business operations).

[12] *See* Center for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated Apr. 8, 2020).

[13] Ex. 6 (Barbot Ltr.) ¶ 10 (letter from Plaintiff New York City to DHS requesting suspension of the Rule during the pandemic); Ex. 16 (Ku Decl.) ¶¶ 9, 11, 20.

[14] Ex. 16 (Ku Decl.) ¶¶ 11-12, 20, 22; Ex. 8 (Almasude Decl.) ¶ 9; Ex. 24 (Oshiro Decl.) ¶ 6 ("[F]ear of accessing health care, including COVID-19 testing and treatment, because of public charge implications can have life-altering health consequences for . . . clients; other members of their households, including U.S. citizens; and their neighbors and communities.). *See also* Washington State Dep't of Health, *Testing for COVID-19*, https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/ TestingforCOVID19 (last visited Apr. 12, 2020) (testing allows public-health officials to "keep people with COVID-19 and their contacts away from others to prevent spread of the virus"); Ex. 26 (Yoo Decl.) ¶¶ 4-5.

[15] Ex. 16 (Ku Decl.) ¶¶ 11, 20, 22; Ex. 17 (Moreno Decl.) ¶¶ 4, 9; Ex. 14 (Kennedy Decl.) ¶ 15.

[16] Ex. 16 (Ku Decl.) ¶¶ 9, 15-19; Ex. 27 (Aguilar Decl.) ¶ 19.

[17] FAIR Health, *COVID-19: The Projected Economic Impact of the COVID-19 Pandemic on the US Healthcare System* 2, 8, 13, 16 (Mar. 25, 2020). And the cost of treatment will be higher for patients who suffer more severe symptoms or require longer hospital stays. *See* Center for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated Apr. 6, 2020).

heavily on immigrants, who are significantly more likely than citizens to be uninsured.[18]

Many immigrants residing in Plaintiffs' jurisdictions and in other jurisdictions are highly vulnerable to contracting and spreading COVID-19 because they work in industries that have been deemed "essential," and thus continue to operate during the crisis. For example, executive orders in New York, Connecticut, and Vermont that direct residents to work from home do not apply to workers in essential sectors such as healthcare, grocery stores, food and retail delivery, building maintenance, farms and agriculture, and sanitation.[19] Because immigrants are a significant proportion of the workers in these front-line industries, they must interact with others or spend time in high-risk environments—such as caring for the aging in nursing homes, cleaning public spaces, and preparing or delivering food and supplies to other residents who must stay at home.[20] These workers are thus more likely to be exposed to the virus. Without adequate testing and treatment, these workers, if infected, are more likely to suffer worse health outcomes and to spread the virus to others inadvertently.[21]

In addition to the public-health crisis, the COVID-19 pandemic has triggered a severe economic crisis, with millions of workers losing significant income or employment, and needing to turn to supplemental benefit programs like Medicaid and SNAP.[22] An unprecedented 26 million individuals applied for the first time for unemployment benefits in the five-week period

---

[18] Kaiser Family Foundation, *Health Coverage of Immigrants* (March 18, 2020), available at: https://www.kff.org/disparities-policy/fact-sheet/health-coverage-of-immigrants/.
[19] *See* New York Exec. Order No. 202.8, *supra* n.10; Connecticut Exec. Order No. 7H § 1 (2020), available at https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7H.pdf?la=en; Vermont Exec. Order No. 01-20, add. 6 (2020), available at https://governor.vermont.gov/sites/scott/files/documents/ADDENDUM%206%20 TO%20EXECUTIVE%20ORDER%2001-20.pdf.
[20] *See* Ex. 12 (Fong Decl.) ¶¶ 12-13; Ex. 14 (Kennedy Decl.) ¶ 15.
[21] *See* Ex. 16 (Ku Decl.) ¶¶ 11, 20, 22; Ex. 8 (Almasude Decl.) ¶ 9; *see also* Ex. 14 (Kennedy Decl.) ¶ 15 (immigrant workers in Colorado meatpacking plants and dairies are essential workers at high risk of contracting and spreading COVID-19).
[22] *See* Ex. 16 (Ku Decl.) ¶¶ 23-24.

from March 19 to April 23.[23] The number of those seeking unemployment benefits in Plaintiffs'

jurisdictions has steeply increased due to the pandemic. In New York, for example, the number

of new unemployment claims last week was 394,701, over 380,000 more than the same week

one year ago.[24] Immigrant workers, particularly in the hospitality and service industries, have

been disproportionately impacted by layoffs and furloughs.[25]

Workers who lose their jobs because of the pandemic are likely temporarily to need

supplemental benefit programs, including Medicaid and SNAP, until they can get back on their

feet.[26] For example, many workers who lose their jobs and employer-sponsored health insurance

because of the pandemic are likely to need Medicaid coverage until they can find another job.[27]

And programs like SNAP are particularly important to immigrants and their family members,

many of whom are ineligible for unemployment insurance benefits or certain COVID-19 related

benefits recently enacted by Congress.[28]

### C. The Harms Imposed by the Rule and the COVID-19-Related Guidance Issued by the Department of Homeland Security

As DHS has acknowledged, *e.g.*, 83 Fed. Reg. 51,114, 51,270 (Oct. 10, 2018), and the

record evidence here confirms, the Rule's expansion of the grounds for deeming immigrants

inadmissible as public charges has already deterred many immigrants from using supplemental

public benefits, including Medicaid and SNAP benefits, or led them to disenroll from programs

---

[23] Patricia Cohen, *'Jobless Numbers Are 'Eye-Watering' but Understate the Crisis*, N.Y. Times (Apr. 23, 2020), available at https://www.nytimes.com/2020/04/09/business/economy/unemployment-claim-numbers-coronavirus.html.
[24] United States Dep't of Labor, *Unemployment Insurance Weekly Claims* 7 (Apr. 23, 2020), available at https://www.dol.gov/ui/data.pdf.
[25] Ex. 18 (Mostofi Decl.) ¶ 16 (immigrants in New York have lost jobs in restaurants and as domestic workers); Ex. 10 (Benito Decl.) ¶ 10 (immigrants in Illinois have lost jobs as domestic workers, personal care aides, and nannies).
[26] *See* Ex. 16 (Ku Decl. ¶¶ 23-24.
[27] *Id.* at ¶ 24.
[28] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 6428(d), 134 Stat. 281, 335 (2020).

that provide such benefits. Since the Rule came into effect following the Supreme Court's stay orders, increasing numbers of immigrants have begun forbearing from Medicaid coverage and other publicly funded healthcare benefits based on concerns that using such benefits will render them a "public charge" and thus jeopardize their ability to obtain legal permanent resident (LPR) status and, eventually, citizenship.[29] Across the country, immigrants have been deterred from seeking COVID-19 testing and treatment and the health benefits that cover these critical services. For example:

- A physician in Connecticut has spoken with patients who had symptoms consistent with COVID-19, but were afraid to obtain COVID-19 testing or seek treatment due to concerns about the Rule and fears that they could not afford to pay for treatment.[30]

- As the pandemic took hold of New York City in March, Plaintiff Make the Road New York has seen members and clients reluctant to access health and nutrition assistance such as SNAP and food pantries for fear that public charge will result in them or their family members being penalized for using such assistance or benefits.[31]

- Telephone hotlines operated by Plaintiff Catholic Charities Community Services, Archdiocese of New York, in partnership with state or city agencies, have been receiving public-charge-related inquiries from callers who are fearful of seeking medical treatment for COVID-19.[32]

- The New York Legal Assistance Group has observed immigrants and their family members declining or delaying medical treatment they needed because of COVID-19, due to concerns about the Rule.[33]

- Staff at Bronx Legal Services in New York have spoken with noncitizen clients who are afraid to obtain COVID-19 testing or treatment because they fear that doing so will require them to obtain Medicaid coverage.[34]

- Multiple other community organizations in New York City have reported that immigrant clients are afraid to obtain testing or treatment for COVID-19, even if they are feeling ill, based on concerns that doing so will

---

[29] Ex. 19 (Newstrom Decl.) ¶¶ 19-25; Ex. 14 (Kennedy Decl.) ¶¶ 5-9.
[30] Ex. 8 (Almasude Decl.) ¶¶ 4-8.
[31] Ex. 24 (Oshiro Decl.) ¶ 7.
[32] Ex. 25 (Russell Decl.) ¶ 6.
[33] Ex. 23 (Nolan Decl.) ¶¶ 9-10.
[34] Ex. 20 (Newton Decl.) ¶ 19.

jeopardize their immigration status.[35]

- Physicians in Monterey County, California, are working with an increasing number of immigrant patients who have symptoms of COVID-19, but are refusing to seek medical care for these symptoms based on concerns about the Rule and the costs of treatment.[36]

- Nonprofit organizations in Chicago, Illinois, have received calls from immigrants who are afraid to seek virus-related testing and treatment because of the Rule. Many of these immigrants are seniors or individuals with underlying health conditions, who are at greater risk of suffering severe illness or death from COVID-19.[37]

- In February and March 2020, even as the COVID-19 crisis became increasingly severe, health clinics in Virginia have continued to see an increasing number of immigrant families declining to seek Medicaid coverage (or withdrawing from existing coverage) because of the Rule.[38]

- In the past two months, a health educator in California has worked with multiple clients who have forgone publicly funded health insurance for themselves or their citizen children based on fears about the Rule.[39]

The Rule's deterrent effects have not been limited to the LPR applicants or public-benefit programs that are directly subject to the Rule. Rather, substantial fear and confusion, along with the complicated nature of benefits programs, have led immigrants and their families to avoid state-funded health insurance programs, reduce their use of medical services, and forbear from using other public benefits not covered by the Rule.[40] Immigrants have also increasingly been declining to use SNAP benefits, which are included in the public charge analysis, as well as other nutrition programs, such as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), that are not implicated in the public-charge analysis.[41]

---

[35] Ex. 18 (Mostofi Decl.) ¶¶ 13, 15.
[36] Ex. 17 (Moreno Decl.) ¶¶ 4-5; Ex. 22 (Voit Decl.) ¶¶ 27-30.
[37] Ex. 10 (Benito Decl.) ¶ 13.
[38] Ex. 21 (Pryor Decl.) ¶¶ 11-17.
[39] Ex. 27 (Aguilar Decl.) ¶¶ 9-13.
[40] Ex. 23 (Nolan Decl.) ¶¶ 9-14; Ex. 19 (Newstrom Decl.) ¶¶ 20-22, 25; Ex. 14 (Kennedy Decl.) ¶¶ 5-9; Ex. 24 (Oshiro Decl.) ¶10; Ex. 26 (Yoo Decl.) ¶¶ 4-5.
[41] Ex. 20 (Newton Decl.) ¶ 16; Ex. 13 (Heinrich Decl.) ¶¶ 4-5; Ex. 19 (Newstrom Decl.) ¶¶ 20-22, 25-26. Agencies and nonprofit organizations that work with immigrants experienced a substantial increase in inquiries about the Rule

The Rule's impacts have become particularly acute as the COVID-19 crisis has escalated. See *infra*, at 16-20. As a result, on March 6, the Attorneys General of the Governmental Plaintiff States, fifteen other state Attorneys General, and over fifty other elected officials sent a letter to DHS requesting that the agency temporarily halt implementation of the Rule given the harms to public health from its implementation during the COVID-19 crisis.[42] DHS did not respond.

On March 13, DHS posted an "alert" on the website of the U.S. Citizenship and Immigration Services ("USCIS"). The alert, issued only in English, stated that DHS officials conducting public-charge determinations would not "consider testing, treatment, nor preventative care (including vaccines, if a vaccine becomes available) related to COVID-19 as part of a public charge inadmissibility determination . . . even if such treatment is provided or paid for by one or more public benefits" targeted by the Rule, such as federally funded Medicaid.[43] However, the alert also stated that the Rule will still require DHS officials to treat as a negative factor an applicant's receipt of public benefits, including federally funded Medicaid, even when such benefits "may be used to obtain testing or treatment for COVID-19."[44] Thus, under the alert, an LPR applicant who obtains or maintains Medicaid coverage that helps him access COVID-19 testing or treatment will still receive an automatic negative factor in the public-charge analysis based on his Medicaid coverage, even if his COVID-19 test or treatment will not itself be considered. *See* 84 Fed. Reg. at 41,422 (DHS will consider "any application, approval, or certification for, or receipt of, public benefits as a negative factor").[45]

---

after the Rule took effect in February 2020. Ex. 18 (Mostofi Decl.) ¶ 8; Ex 27 (Aguilar Decl.) ¶ 5 (health educator received "more questions about public charge" during February and March than she had ever previously received).
[42] Ex. 5 (Ltr. from State Attorneys General to Chad Wolf, Acting Secretary, U.S. Department of Homeland Security et al., dated Mar. 6, 2020); *see also* Ex. 6, (Barbot Ltr.).
[43] Ex. 4 (Printout of USCIS Public Charge Alert, dated Mar. 13, 2020).
[44] *Id.*
[45] In its brief opposing Plaintiffs' request to the Supreme Court to temporarily modify its stay, Defendants claimed for the first time that obtaining Medicaid coverage specifically for COVID-19 testing or treatment will not count under the public-charge inquiry—despite the alert's language to the contrary.

DHS's alert appears to leave in place other aspects of the Rule during the COVID-19 crisis, even though these aspects of the Rule deter immigrants from using supplemental benefits that will help Plaintiffs' residents and the country recover from the current economic crisis. Thus, an applicant who applies for SNAP benefits because a COVID-19 public-health order forced him out of his job will continue to receive a negative factor in the public-charge inquiry. *See* 84 Fed. Reg. at 41,422. At most, the alert states that an applicant may inform DHS if "disease prevention methods" prevent him from working or attending school, and DHS officials will consider such information to the extent it is "relevant and credible."[46]

## ARGUMENT

The COVID-19 outbreak and its ramifications on public health and the economy present sudden and stark new circumstances not previously considered by the Court. The exigencies of this pandemic warrant entry of a new injunction temporarily halting implementation of the Rule during the national emergency concerning COVID-19 declared by the President, or a time-limited stay of the Rule pursuant to Section 705 of the Administrative Procedure Act ("APA"). In the alternative, Plaintiffs respectfully request that the Court issue a temporary restraining order until Plaintiffs' motion for an injunction and stay can be adjudicated. *See* Fed. R. Civ. P 65.

"The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (quoting *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,* 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002)). The standard for a stay under § 705

---

[46] Ex. 4 (Printout of USCIS Public Charge Alert, dated Mar. 13, 2020). After DHS posted the alert, the Attorneys General of the Plaintiff States and fifteen other state Attorneys General sent DHS another letter explaining that the alert did not address the harms imposed by the Rule during the pandemic. Ex. 7 (Ltr. From State Attorneys General to Chad Wolf, Acting Secretary, U.S. Department of Homeland Security, et al., dated Mar. 19, 2020). DHS did not respond to this letter.

is the same as the standard for a preliminary injunction. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016). All require a showing of "a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Coronel v. Decker*, No. 20 Civ. 2472 (AJN), 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) (citing *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015)). The irreparable harm factor is "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Given the catastrophic harms that the Rule causes during the COVID-19 pandemic, Plaintiffs have shown that injunctive relief is necessary.

### A. The Court has authority to issue new temporary relief to address the drastic changed circumstances engendered by the COVID-19 pandemic.

As a preliminary matter, the Court has authority to issue new injunctive relief to address the new public health and economic harms that the Rule is causing during the COVID-19 crisis. While the preliminary injunction that the Court issued on October 11, 2019 is pending before the Circuit, the Court retains authority to issue a new injunction based on changed circumstances. An interlocutory appeal of a preliminary injunction "only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989) (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)); *see also, e.g.*, *Gortat v. Capala Bros.*, No. 07-CV-3629(ILG), 2008 WL 5273960, at *1 (E.D.N.Y. Dec. 18, 2008) ("[A] district court retains jurisdiction over those matters not involved in the appeal.").

Accordingly, where, as here, the Circuit is considering an interlocutory appeal from an order granting a preliminary injunction, the matter otherwise "proceeds" in the district court. *Terry*, 886 F.2d at 1350; *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E.*

*Air Lines, Inc.*, 847 F.2d 1014, 1018 (2d Cir. 1988) (affirming issuance of new injunction in

district court based on new development while district court's previous grant of preliminary

injunction was pending appeal); *Webb v. GAF Corp.*, 78 F.3d 53, 56 (2d Cir. 1996) (district court

retains jurisdiction to rule on issues—including requests for injunctive relief—that are not

present in the interlocutory appeal); Wright, Arthur R. Miller & Mary Kay Kane, *Federal*

*Practice and Procedure* ("Wright & Miller") § 3949.1 (3d ed. Aug. 2019 update) (interlocutory

appeal "does not oust district-court jurisdiction to continue with proceedings that do not threaten

either the appeal's orderly disposition or its raison d'etre"). During this unprecedented and

rapidly escalating COVID-19-related crisis, this Court is the best-placed to consider and make

findings on new factual issues that are not part of the appellate record.

      Moreover, Plaintiffs' motion does "not threaten [] the appeal's orderly disposition,"

Wright & Miller § 3949, but instead seeks new relief based upon new facts and circumstances

that were not—and could not have been—before the Court when it issued its prior order. The

relief that Plaintiffs seek does not undermine or interfere with the pending appeal; to the

contrary, the Court's issuance of a new, narrowly tailored injunction to address the COVID-19

pandemic would not alter the questions presented to the Second Circuit or change the scope of its

review.[47] Plaintiffs do not seek a second bite at the apple to obtain a more favorable result on an

issue up on appeal; to the contrary, Plaintiffs have already received a favorable ruling from this

---

[47] As Plaintiffs detail above, they seek new relief based upon new facts. However, the Court also has inherent
authority to modify its previous injunction and "'may mold its decree to meet the exigencies of the particular case.'"
*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citing Wright & Miller § 2947).
Under Federal Rule of Civil Procedure 62(d), "an order suspending, modifying, restoring or granting an injunction
during the pendency of an appeal must ordinarily be made in the first instance in the district court." A district court
may modify an existing injunction pending appeal if such modification would "neither chang[e] the status quo at the
time of the first appeal nor materially alte[r] the status of the appeal." *Mayweathers v. Newland*, 258 F.3d 930 (9th
Cir. 2001); *see Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623 (1962). Because the Rule was enjoined at the
time of appeal, issuance of a subsequent injunction would properly preserve that status quo without undermining the
Circuit's ability to review the prior preliminary injunction based on the previous record.

Court on their prior request for injunctive relief and do not seek to disturb or alter that injunction.

Indeed, Plaintiffs' request for relief is particularly appropriate in light of the unusual procedural posture of this case. Absent the Supreme Court's stay of this Court's orders of preliminary relief, there would be no need for additional preliminary relief to address the drastically changed circumstances caused by COVID-19. And after Plaintiffs requested that the Supreme Court lift or modify its stay, the Supreme Court allowed Plaintiffs to return to the district court to address the new circumstances.[48] The Supreme Court's order thus further clarifies that this Court is the proper forum to address in the first instance the new and urgent harms caused by the Rule during this time of crisis.

Moreover, in addition to the entry of a new preliminary injunction, Plaintiffs also respectfully request that the Court enter an indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure, indicating that the court would issue the preliminary injunction and factual findings supporting that injunction if the Second Circuit were to remand the case for that purpose. Rule 62.1 is designed to ameliorate potential concerns about the scope of the district court's jurisdiction pending an appeal by authorizing the district court to indicate its decision on an issue if the Second Circuit were to determine that the district court lacked jurisdiction and remand the matter to the district court to issue its decision. *See* Fed. R. Civ. P. 62.1(a)(3) (where a district court has been divested of authority because of a pending appeal, authorizing the district court to nonetheless "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue"); *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999 (VM), 2020 WL 257505, at *5 (S.D.N.Y. Jan. 17, 2020), *order superseded on other grounds*, 2020 WL 416423 (S.D.N.Y. Jan. 27, 2020) (concluding that court

---

[48] *See* Ex. 2 (Supreme Court April 24, 2020 Order) (explaining that order "does not preclude a filing" in this Court).

had jurisdiction to modify an injunction, but stating that if the Circuit were to conclude that the district court "lack[ed] authority to grant" the modification, the opinion "shall also serve as an indicative ruling under Rule 62.1"). Given the ongoing and irreparable harms alleged here, an alternative indicative ruling will ensure more timely relief in the event that the Second Circuit determines that it retains jurisdiction over this matter. *See* Wright & Miller § 3921.2.

**B. The Court should issue a targeted and limited preliminary injunction for the duration of the national emergency.**

Plaintiffs have met the standard governing issuance of a preliminary injunction. The pandemic has drastically altered the nature and magnitude of the irreparable harms faced by Plaintiffs, their residents, and the nation due to the Rule and tipped the balance of the equities decisively in favor of granting injunctive relief while the COVID-19 emergency continues. And Plaintiffs have already demonstrated that they are likely to succeed on the merits of their claims that the Rule is contrary to law and is arbitrary and capricious in violation of the APA—issues that the Second Circuit is currently considering and that Plaintiffs do not seek to relitigate here.

**1. The Rule causes irreparable harms not previously before the Court.**

The Rule is irreparably harming public health in the Governmental Plaintiffs' jurisdictions and throughout the country during the public-health disaster caused by the COVID-19 pandemic. The Rule deters immigrants from seeking testing and treatment for the virus and from accessing other benefits like food assistance when they have suffered temporary job loss. While DHS recognizes these disastrous consequences, its efforts to alleviate the chilling effect have been ineffectual and only affirm the message that use of Medicaid or SNAP during the pandemic can give rise to a public charge finding.

**i. The Rule is impeding efforts to mitigate the spread of the virus.**

By penalizing immigrants and their families from obtaining publicly funded health

insurance and medical care, the Rule is undermining efforts to slow the spread of the virus—putting everyone at higher risk of infection. As DHS itself has acknowledged, the Rule's expanded criteria for inadmissibility will deter immigrants from enrolling (or maintaining enrollment for) themselves and their family members in Medicaid, due to the understandable fear that simply applying will be deemed a negative factor in any future public-charge analysis. *See* 84 Fed. Reg. at 41,422. Indeed, DHS admitted in its notice of proposed rulemaking that the Rule "could lead to . . . [i]ncreased prevalence of communicable diseases, including among members of the U.S. citizen population." 83 Fed. Reg. at 51,270.

Even in light of the pandemic, fear and confusion about the Rule are *now* driving many immigrants to forgo *any* publicly funded health coverage for fear that using such supplemental public benefits will jeopardize their ability to obtain LPR status and, eventually, citizenship.[49] Indeed, since the Rule took effect, medical personnel, state and local officials, and staff at nonprofit organizations have encountered many immigrants refusing to enroll in Medicaid or other publicly funded healthcare coverage based on concerns that receiving such coverage will increase the risk of being deemed a "public charge" under the Rule.[50]

Such avoidance of Medicaid and other publicly funded healthcare programs will prevent immigrants from receiving testing or treatment for COVID-19, materially impeding public-health officials' efforts to stem the current crisis. Without Medicaid or other health insurance, the costs of COVID-19 treatment are prohibitively high for most patients—particularly if they develop severe symptoms necessitating hospitalization. And since the pandemic began, doctors and other front-line workers have seen many immigrants avoid COVID-19 testing and treatment

---

[49] Ex. 16 (Ku Decl.) ¶ 18; Ex. 27 (Aguilar Decl.) ¶¶ 7-13; Ex. 15 (Kritzman Decl.) ¶¶ 3-4; Ex. 14 (Kennedy Decl.) ¶¶ 5-9.
[50] *See, e.g.*, Ex. 21 (Pryor Decl.) ¶¶ 13-17; Ex. 14 (Kennedy Decl.) ¶¶ 5-7.

altogether, even if they might be able to obtain publicly funded care, due to the fear generated by the Rule.[51] These effects of the Rule on COVID-19 testing and treatment are not speculative.

Immigrants' inability or unwillingness to obtain testing and treatment for COVID-19 due to concerns about the Rule jeopardizes the health and safety of not only immigrants and their families but also the public. Without proper testing and treatment, immigrants and their family members who become infected are more likely to suffer severe illness or death from the virus.[52] Immigrants who lack testing and treatment are also more likely to spread the virus to other people inadvertently, contributing to the exponential growth of infection and fatalities.[53]

This risk of virus spread is further increased by the high number of immigrants who work in essential industries and who thus must continue to work outside of their homes and interact with others. See *supra*, at 9-10. Indeed, in New York City, the current epicenter of the COVID-19 crisis, noncitizens make up approximately 42.4% of home health aides, 42.3% of cooks, 37.1% of food preparation workers, and 26.9% of janitors and building cleaners.[54] By deterring these essential workers from obtaining health insurance and medical care for COVID-19, the Rule is increasing the risk of infection for the public.

The Rule further impedes current attempts to stem the COVID-19 crisis by deterring immigrants and their family members from obtaining treatment for preexisting conditions that either make individuals more vulnerable to the virus, or make their COVID-19 symptoms worse. Immigrants who decline Medicaid or other health insurance coverage because of the Rule often

---

[51] Ex. 8 (Almasude Decl.) ¶¶ 4-8; Ex. 18 (Mostofi Decl.) ¶¶ 13, 15; Ex. 17 (Moreno Decl. ¶ 4); Ex. 22 (Voit Decl.) ¶¶ 27-28, 30; Ex. 21 (Pryor Decl.) ¶ 19; Ex. 14 (Kennedy Decl.) ¶ 13.
[52] Ex. 16 (Ku Decl.) ¶ 11; Ex. 8 (Almasude Decl.) ¶ 9.
[53] Ex. 16 (Ku Decl.) ¶¶ 11, 20, 22; Ex. 8 (Almasude Decl.) ¶ 9; Ex. 17 (Moreno Decl.) ¶¶ 4, 9; Ex. 14 (Kennedy Decl.) ¶ 15.
[54] Ex. 12 (Fong Decl.) ¶ 13. And in other areas of the country, large numbers of noncitizens continue to work in essential industries such as agriculture or food packing and distribution. Ex. 22 (Voit Decl.) ¶¶ 9-10; Ex. 10 (Benito Decl.) ¶ 11; Ex. 14 (Kennedy Decl.) ¶ 15.

stop seeking primary care for conditions like diabetes, asthma, and heart disease.[55] But these conditions put patients at higher risk of suffering severe symptoms or death from COVID-19.[56] For example, since this crisis began, staff at Bronx Legal Services have already seen noncitizen clients who declined Medicaid coverage rather than risk their immigration status, did not treat their serious medical conditions as a result, and have now fallen extremely ill with COVID-19 symptoms.[57] These uninsured individuals will wait to seek medical care until their condition gets serious, further straining hospitals and clinics that are reaching capacity and facing challenges obtaining ventilators and other critical medical supplies.[58] Without insurance, these patients will likely be forced to make in-person visits to hospitals and clinics rather than use telehealth services, placing themselves and medical staff at higher risk.[59]

### ii.   The Rule deters access to public benefits that are necessary to respond to the severe economic crisis caused by COVID-19.

The Rule is further injuring Plaintiffs and the public interest by undermining efforts to mitigate the vast economic consequences of the COVID-19 pandemic. The unemployment rates in the Governmental Plaintiffs' jurisdictions and across the country are already reaching unprecedented levels due to the virus outbreak. *See supra*, at 7-8. And the economic downturn is likely to grow worse as the virus continues to spread.[60] Supplemental benefits are crucial to helping employable individuals through a sudden emergency like losing a job or incurring substantial medical bills for COVID-19 treatment.[61] By providing short-term help to individuals

---

[55] Ex. 20 (Newton Decl.) ¶¶ 21-23.
[56] Ex. 16 (Ku Decl.) ¶ 26; Ex. 20 (Newton Decl.) ¶¶ 21-23.
[57] Ex. 20 (Newton Decl.) ¶ 22; *see also* Ex. 23 (Nolan Decl.) ¶¶ 9-10 (staff at New York Legal Assistance Group have seen clients declining or delaying medical treatment based on concerns about the Rule).
[58] *See* Ex. 16 (Ku Decl.) ¶¶ 11, 26; Ex. 21 (Pryor Decl.) ¶ 12.
[59] Ex. 16 (Ku Decl.) ¶ 22.
[60] Ex. 16 (Ku Decl.) ¶¶ 23-24.
[61] *See* Ex. 16 (Ku Decl.) ¶¶ 23-24; Ex. 18 (Mostofi Decl.) ¶ 16; Ex. 20 (Newton Decl.) ¶ 27; Ex. 10 (Benito Decl.) ¶¶ 10-11.

until they can get back on their feet, supplemental benefits promote economic stability and recovery for all of Plaintiffs' residents, the clients they serve, and the nation.

Many hard-working immigrants, who are not "public charges" under any reasonable interpretation of that term, have begun to face sudden financial strains as their employers cut jobs due to the current economic crisis and government mandates ordering "nonessential" businesses to limit their services or have their employees work from home.[62] But the Rule deters immigrants and their family members from using such benefits to maintain health and nutrition during the crisis.[63] These irreparable harms further warrant an injunction during the current national emergency. For example, since the Rule went into effect and since the pandemic began, immigrants have increasingly been declining to participate in SNAP or other publicly funded nutrition programs due to fear that doing so will jeopardize their immigration status.[64] Indeed, under the Rule, using SNAP for just a few months during the current economic crisis places an LPR applicant at risk of being deemed a public charge. *See* 84 Fed. Reg. at 41,422 (mere application for SNAP is negative factor); *id.* at 41,506 (using SNAP and another public benefit during a single month counts as two months of benefits use for calculating heavily weighted negative factor of 12 out of 36 months of benefits use).

Immigrants' avoidance of the public benefits covered by the Rule has already resulted in worse harms to both immigrants and Plaintiffs during this difficult economic period. For example, immigrants who decline SNAP for fear of being deemed a "public charge" are turning to emergency food assistance programs, such as food pantries.[65] But many food pantries have

---

[62] *See* Ex. 16 (Ku Decl.) ¶¶ 23-24; Ex. 18 (Mostofi Decl.) ¶16.
[63] *See* Ex. 8 (Almasude Decl.) ¶ 6; Ex. 20 (Newton Decl.) ¶ 11, Ex. 17 (Moreno Decl.) ¶ 6.
[64] Ex. 20 (Newton Decl.) ¶¶ 11; 26-27, Ex. 17 (Moreno Decl.) ¶ 6, Ex. 15 (Kritzman Decl.) ¶ 4.
[65] Ex. 20 (Newton Decl.) ¶¶ 26-27; Ex. 10 (Benito Decl.) ¶ 12; *see also* Ex. 24 (Oshiro Decl.) ¶ 7 (nothing that some instances immigrants are afraid to access food pantries due to public charge concerns).

closed or reduced their hours due to COVID-19. And many of the emergency food programs that are still operating "are running out of food at alarming rates."[66] The Court should grant a narrowly tailored injunction to avoid such irreparable public-health and economic harms.

**iii.      USCIS's alert does not remedy these substantial harms.**

By revising its application of the Rule during the current COVID-19 crisis, USCIS has effectively acknowledged the Rule's deterrent effect on immigrants' willingness to obtain necessary medical care. On March 13, USCIS issued an alert that purports to limit this deterrent effect, but this alert does not fully address the grave harms that the Rule is causing during the ongoing pandemic, and is thus no substitute for the relief requested here.

First, although the alert excludes "testing, treatment, [and] preventative care . . . related to COVID-19" from future public-charge determinations,[67] it continues to treat as an automatic negative factor an LPR applicant's application for or receipt of public benefits "that may be used to obtain testing or treatment for COVID-19," including federally funded Medicaid.[68] In other words, an LPR applicant who applies for federally funded Medicaid will have that application count against him in the public-charge inquiry, even if subsequently obtained COVID-19 treatment paid for by federally funded Medicaid does not itself count in the public-charge inquiry. *See supra*, at 11-12. But deterring immigrants from accessing the benefits that they need to get healthcare prevents them from getting necessary testing and treatment for COVID-19. This aspect of the alert thus preserves the very problem USCIS has purported to address.

Second, the alert does not provide sufficiently clear direction to assure immigrants that

---

[66] Ex. 20 (Newton Decl.) ¶ 27; *see* Ex. 13 (Heinrich Decl.) ¶ 6 (food banks and pantries are facing increased food costs and "new challenges for accepting donated food"); Ex. 10 (Benito Decl.) ¶ 12 (many food pantries in Chicago, Illinois have "either closed or are seeing a marked increase in requests for food assistance").
[67] Ex. 4 (Printout of USCIS Public Charge Alert, dated Mar. 13, 2020).
[68] *Id.*

21

they will not be penalized in a future public-charge determination for accessing critical healthcare now. Even setting aside that the alert was published only in English and only on a single federal website, the alert is replete with ambiguity. It is unclear how the alert would apply to an individual who receives medical treatment for COVID-19-like symptoms but is never tested, perhaps because of a shortage of testing kits. Furthermore, although the alert clarifies that the Rule will not apply to state or local benefits, it is unclear how an immigrant is supposed to discern or control whether federal, state, or local benefits apply—especially if she may require emergency care. And under the alert, an LPR applicant will continue to be penalized for having Medicaid coverage to obtain treatment for medical conditions such as asthma, diabetes, or heart disease, even though these conditions place patients at high risk of suffering more severe symptoms or death if they contract COVID-19. And an LPR applicant who does not need COVID-19 testing or treatment now will be penalized for seeking Medicaid as a precaution to protect the applicant and his family in the event that they become infected with the virus.

Defendants have effectively conceded that that the USCIS alert does not adequately address the Rule's chilling effects. Defendants' principal response to the objections Plaintiffs raised to the alert in their motion before the Supreme Court was to *further* modify the Rule's application by stating for the first time that "if an alien enrolls in Medicaid to receive COVID-19-related care, that enrollment will not be a negative factor in a public-charge inadmissibility determination."[69] Although Defendants purport to base this position on the text of the alert they issued, the alert actually appears to say the opposite; it admonishes that Defendants will continue "to consider the receipt of certain cash and non-cash public benefits, *including those that may be*

---

[69] *Department of Homeland Security, et al. v. New York, et al.*, No. 19A785 (S. Ct. Apr. 20, 2020), available at https://www.supremecourt.gov/DocketPDF/19/19A785/142052/20200420132042768_IRLI%20Pub%20Charge%20 Stay%20Amicus%202d.pdf .

*used to obtain testing or treatment for COVID-19* in a public charge inadmissibility determination."[70] Defendants' attempt to engage in rulemaking through opposition brief not only highlights the defects in the original alert, but will also likely cause more confusion about the Rule's applicability during these tumultuous times—thus further demonstrating the need for the Court to issue a clear ruling that stays the Rule until the national emergency ends.

Furthermore, after DHS posted the alert on its website, the Rule has in fact continued to deter immigrants from accessing needed medical care during the pandemic. In the weeks following DHS's alert, physicians and others working on the front lines of the current emergency have continued to see many immigrants and their families expressing fear about and declining to obtain COVID-19 testing and treatment based on their persistent concerns about the Rule.[71]

Finally, the alert is limited to testing and treatment for COVID-19, but the Rule will also deter immigrants from accessing public benefits that are especially critical for their well-being in light of the dire public-health and economic crisis that COVID-19 has triggered. Placing immigrants in a situation where they must choose between forgoing essential aid for healthcare, food, or housing, or risking their future chances of obtaining LPR status is particularly inequitable during this unprecedented moment in our history, and will inhibit the country's ability to recover from the current economic crisis.

### 2.   Balance of equities and public interest favor issuance of an injunction.

Given the Rule's substantial harms to public health, the balance of the equities and the public interest weigh heavily in favor of issuing an injunction.[72] The purpose of interim equitable

---

[70] *Id.*

[71] *See, e.g.*, Ex. 22 (Voit Decl.) ¶¶ 27-28; Ex. 21 (Pryor Decl.) ¶¶ 18-19; Ex. 11 (Chavez Decl.) ¶ 9; Ex. 14 (Kennedy Decl.) ¶ 14; Ex. 24 (Oshiro Decl.) ¶¶ 7, 15.

[72] Where the government is a party, "the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest—merge." *Coronel*, 2020 WL 1487274, at *7.

relief is "but to balance the equities as the litigation moves forward," bearing in mind "'the

overall public interest.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)

(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008)). As detailed above,

Plaintiffs and the nation are struggling to contain the public health and economic threats posed

by COVID-19, efforts that are materially hindered by the continued implementation of the Rule.

The public's interest in mitigating disease spread and saving lives weighs strongly and

inexorably in favor of new, targeted injunctive relief. In contrast, the harm to DHS of

temporarily halting implementation of the Rule, particularly while USCIS offices are closed and

green card processing has been suspended, is "far outweighed by the public interest" in

mitigating the spread of disease and other harms "in light of the rapidly-evolving public health

crisis engendered by the spread of COVID-19." *Coronel*, 2020 WL 1487274, at *8.

### 3. Plaintiffs have demonstrated likelihood of success on the merits of their claims.

The Court has twice ruled that Plaintiffs are likely to succeed on the merits of their claims

that the Rule exceeds Defendants' statutory authority, is contrary to law, and is arbitrary and

capricious. *New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d at 334, 345-350

(S.D.N.Y. 2019); *New York v. United States Dep't of Homeland Sec*, No. 19 Civ. 7777 (GBD),

2019 WL 6498250, at *2 (S.D.N.Y. Dec. 2, 2019). These holdings are dispositive under the law

of the case doctrine. *See United States v. Carr,* 557 F.3d 93, 102 (2d Cir. 2009). And because the

Second Circuit is currently reviewing this Court's determination that Plaintiffs are likely to

succeed on the merits, Plaintiffs do not seek to relitigate that issue here. Accordingly, and for the

reasons stated in Plaintiffs' initial motion for preliminary relief, Dkt. 35, opposition to

Defendants' motion for a stay of the preliminary injunction, Dkt. 117, and opposition to

Defendants' motion for a stay pending appeal, Dkt. 128, Plaintiffs are likely to succeed on the

merits.     !

### C.  Nationwide relief is warranted and essential.

During this crisis, the Court should enjoin Defendants from continuing to implement the Rule without geographic restriction or, in the alternative, postpone the effective date of the Rule pursuant to 5 U.S.C. § 705. *See* Dkt. No. 35 at 39-40 (detailing applicable legal framework). Nationwide relief during the COVID-19 pandemic is essential in light of the nationwide harms, interconnected nature of the risks between and within states, and the realities attendant to the spread of this disease. As essential workers travel between states for work, and travelers come into the Governmental Plaintiffs' jurisdictions as other states lift their stay at home restrictions, it is vital that this Court ensure that the Public Charge Rule does not contribute to the spread of the epidemic. Far from a case where "the record is not sufficiently developed on the nationwide impact of the [agency action]," *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018), Plaintiffs have adduced evidence of irreparable harms across the nation. Nationwide relief is not only warranted, but necessary.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiffs respectfully request that the Court make factual findings recognizing the harmful effects of the Rule during this time of crisis, issue a new preliminary injunction forbidding implementation of the Rule during the national emergency declared on March 13, 2020, or a stay of the effective date of the Rule pursuant to Section 705 of the APA, and issue an indicative ruling pursuant to Rule 62.1 confirming that that the Court would grant Plaintiffs' motion. In the alternative, Plaintiffs respectfully request that the Court issue a temporary restraining order until the motion for preliminary injunction may be heard.

DATED:  April 28, 2020                                Respectfully submitted,

**LETITIA JAMES**
*Attorney General of the State of New York*

By: /s/ *Elena Goldstein*
Elena Goldstein,
  *Deputy Bureau Chief, Civil Rights Bureau*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Ming-Qi Chu, *Section Chief, Labor Bureau*
Amanda Meyer, *Assistant Attorney General*
Abigail Rosner, *Assistant Attorney General*
Office of the New York State Attorney
General
New York, New York 10005
Phone: (212) 416-6201
elena.goldstein@ag.ny.gov

*Attorneys for the State of New York*

**JAMES JOHNSON**
*Corporation Counsel of the City of New York*

By: /s/ *Tonya Jenerette*
Tonya Jenerette
  Deputy Chief for Strategic Litigation
Cynthia Weaver, Senior Counsel
Doris Bernhardt, *Senior Counsel*
Melanie Ash, *Senior Counsel*
100 Church Street, 20th Floor
New York, NY 10007
Phone: (212) 356-4055
tjeneret@law.nyc.gov

*Attorneys for the City of New York*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: /s/ *Joshua Perry*
Joshua Perry*
  *Special Counsel for Civil Rights*
165 Capitol Avenue
Hartford, CT 06106-0120
(860) 808-5318
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*

**THOMAS J. DONOVAN, JR.**
*Attorney General of Vermont*

By: */s/ Benjamin Battles*
Benjamin Battles, *Solicitor General*
Eleanor Spottswood, *Assistant Attorney General*
Julio Thompson,* *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*

*\*Application for admission pro hac vice forthcoming*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew J. Ehrlich
Jonathan H. Hurwitz
Elana R. Beale
Robert J. O'Loughlin
Daniel S. Sinnreich
Amy K. Bowles

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
ebeale@paulweiss.com
roloughlin@paulweiss.com
dsinnreich@paulweiss.com
abowles@paulweiss.com

**CENTER FOR CONSTITUTIONAL RIGHTS**
Ghita Schwarz
Brittany Thomas
Baher Azmy

666 Broadway

27

7th Floor
New York, New York 10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

**THE LEGAL AID SOCIETY**
Susan E. Welber, Staff Attorney, Law Reform
Unit
Kathleen Kelleher, Staff Attorney, Law Reform
Unit
Susan Cameron, Supervising Attorney, Law
Reform Unit
Hasan Shafiqullah, Attorney-in-Charge,
Immigration Law Unit

199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3320
sewelber@legal-aid.org
kkelleher@legal-aid.org
scameron@legal-aid.org
hhshafiqullah@legal-aid.org

*Attorneys for Plaintiffs Make the Road New
York, African Services Committee, Asian
American Federation, Catholic Charities
Community Services (Archdiocese of New York),
and Catholic Legal Immigration Network, Inc.*

28