**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK, CITY OF NEW YORK,  :
STATE OF CONNECTICUT, and STATE OF  :
VERMONT,  :
  :
      Plaintiffs,  :  **MEMORANDUM DECISION**
  :  **AND ORDER**
  -against-  :
  :  19 Civ. 7777 (GBD)
UNITED STATES DEPARTMENT OF HOMELAND :
SECURITY; KEVIN K. MCALEENAN, *in his official* :
*capacity as Acting Secretary of the United States* :
*Department of Homeland Security*; UNITED STATES :
CITIZENSHIP AND IMMIGRATION SERVICES; :
KENNETH T. CUCCINELLI II, *in his official capacity* :
*as Acting Director of United States Citizenship and* :
*Immigration Services*; and UNITED STATES OF :
AMERICA.,  :
  :
      Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAKE THE ROAD NEW YORK, AFRICAN  :
SERVICES COMMITTEE, ASIAN AMERICAN :
FEDERATION, CATHOLIC CHARITIES  :
COMMUNITY SERVICES (ARCHDIOCESE OF NEW :
YORK), and CATHOLIC LEGAL IMMIGRATION :
NETWORK, INC.,  :
  :
      Plaintiffs,  :  **MEMORANDUM DECISION**
  :  **AND ORDER**
  -against-  :
  :  19 Civ. 7993 (GBD)
KEN CUCCINELLI, *in his official capacity as Acting* :
*Director of United States Citizenship and Immigration* :
*Services*; UNITED STATES CITIZENSHIP & :
IMMIGRATION SERVICES; KEVIN K.  :
MCALEENAN, *in his official capacity as Acting* :
*Secretary of Homeland Security*; and UNITED STATES :
DEPARTMENT OF HOMELAND SECURITY, :
  :
      Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Before this Court is a now-consolidated action, (*see* Endorsed Letter, No. 19 Civ. 7777, ECF No. 142; Endorsed Letter, No. 19 Civ. 7993, ECF No. 178), in which Plaintiffs challenge Defendants' promulgation, implementation, and enforcement of a rule, Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (the "Rule"). The Rule redefines the term "public charge" and establishes new criteria for determining whether a noncitizen seeking entry into the United States or adjustment of status is ineligible because he or she is likely to become a "public charge."

In one action, the State of New York, the City of New York, the State of Connecticut, and the State of Vermont (together, the "Governmental Plaintiffs") filed suit against Defendants United States Department of Homeland Security ("DHS"); United States Citizenship and Immigration Services ("USCIS"); Secretary Kevin K. McAleenan, in his official capacity as Acting Secretary of DHS; Director Kenneth T. Cuccinelli II, in his official capacity as Acting Director of USCIS; and the United States of America. (Compl. for Declaratory and Injunctive Relief ("Gov't Pls. Compl."), No. 19 Civ. 7777, ECF No. 17.) In a separate case, Plaintiffs Make the Road New York, African Services Committee, Asian American Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc. (together, the "Organizational Plaintiffs") brought claims against Defendants Ken Cuccinelli, in his official capacity as Acting Director of USCIS; Kevin K. McAleenan, in his official capacity as Acting Secretary of DHS; USCIS; and DHS. (Compl. ("Org. Pls. Compl."), No. 19 Civ. 7993, ECF No. 1.)

On October 11, 2019, this Court issued a preliminary injunction in both actions preventing implementation of the Rule. (Mem. Decision and Order ("Gov't Pls. Decision"), No. 19 Civ. 7777,

ECF No. 110 (reported at 408 F. Supp. 3d 334 (S.D.N.Y. 2019)); Mem. Decision and Order ("Org. Pls. Decision"), No. 19 Civ. 7993, ECF No. 147 (reported at 419 F. Supp. 3d 647 (S.D.N.Y. 2019)).) Specifically, this Court issued a nationwide injunction, as well as a stay postponing the effective date of the Rule, pending adjudication on the merits or further order of the Court (the "October 2019 Injunction"). (Gov't Pls. Decision at 24; Org. Pls. Decision at 26.) Between October 11 and October 14, four other district courts issued similar injunctions, two of which were also nationwide in scope. *Cook Cty., Illinois v. McAleenan*, 417 F. Supp. 3d 1008, 1014 (N.D. Ill. 2019) (injunction as to Illinois); *Casa de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 767 (D. Md. 2019) (nationwide); *City & Cty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1073 (N.D. Cal. 2019) (injunction as to San Francisco City or County, Santa Clara County, California, Oregon, the District of Columbia, Maine, and Pennsylvania); *Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1199 (E.D. Wash. 2019) (nationwide).

Defendants appealed to the Second Circuit, seeking to vacate this Court's orders. Defendants' also moved before this Court to stay the October 2019 Injunction, pending resolution of Defendants' appeal. That application was denied by this Court. (*See* Mem. Decision and Order, No. 19 Civ. 7777, ECF No. 122; Mem. Decision and Order, No. 19 Civ. 7993, ECF No. 159.) Defendants then moved for a stay before the Second Circuit. The Circuit court also denied Defendants' stay request, instead setting an expedited briefing schedule on the merits of their appeal. *New York v. U.S. Dep't of Homeland Sec.*, Nos. 19-3591, 19-3595, 2020 WL 95815, at *1 (2d Cir. Jan. 8, 2020). Defendants next sought emergency relief from the Supreme Court. On January 27, 2020, the Supreme Court granted Defendants' request and stayed this Court's preliminary injunctions, pending disposition of Defendants' appeal in the Second Circuit and further petition for a writ of certiorari, if timely sought. *Dep't of Homeland Sec. v. New York*, 140

S. Ct. 599 (2020) (mem.).   Following the Supreme Court's stay, the Rule went into effect on February 24, 2020.[1]

Much has significantly changed since January 27.  Today, the world is in the throes of a devastating pandemic, triggered by the novel coronavirus SARS-CoV-2.   In six months, approximately 16.5 million people around the globe have been afflicted by the disease caused by this virus.  That disease (COVID-19) has claimed over 650,000 lives worldwide.  In the United States alone, COVID-19 has spread rapidly, infecting over four million people.  Close to 150,000 American residents have died.  All of these staggering numbers continue to climb on a daily basis.

The Secretary of Health and Human Services declared a public health emergency in response to the virus on January 31, 2020.  As of March 12, 1,645 people from 47 states had been infected.  On March 13, the President declared a state of national emergency, beginning March 1, 2020, which is ongoing.  Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).  Thousands continue to die indiscriminately.  Attempting to effectively combat this plague has immediately come in conflict with the federal government's new "public charge" policy, a policy which is intended to discourage immigrants from utilizing government benefits and penalizes them for receipt of financial and medical assistance.  In an effort to ensure that the Rule will not deter immigrants from seeking necessary medical treatment and preventive services related to COVID-19, the federal government issued an "alert," contemporaneous with the President's declaration of a national emergency, that excludes COVID-19 medical treatment and services from public charge determinations.  *Public Charge Alert*, U.S. Citizenship & Immigr. Servs.,

---

[1] The relevant factual background regarding the Rule and the framework for public charge determinations prior to the Rule is set forth in greater detail in this Court's October 11, 2019 decisions. (Gov't Pls. Decision at 2–5; Org. Pls. Decision at 2–5.)  Such background is incorporated by reference herein.

https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge   (last

updated March 27, 2020) (the "Alert").

Defendants and Plaintiffs have each filed additional motions in the instant actions.

Defendants move to dismiss all of Plaintiffs' claims for lack of subject matter jurisdiction pursuant

to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal

Rule of Civil Procedure 12(b)(6).  (*See* Mot. to Dismiss, No. 19 Civ. 7777, ECF No. 140; Mot. to

Dismiss, No. 19 Civ. 7993, ECF No. 176.)   Plaintiffs, on the other hand, seek additional

preliminary injunctive relief in light of the COVID-19 pandemic.  Specifically, Plaintiffs move,

pursuant to Federal Rule of Civil Procedure 65, for a new limited preliminary injunction enjoining

Defendants from implementing, applying, or taking any action under the Rule, during the national

emergency.  (*See* Pls.' Notice of Mot., No. 19 Civ. 7777, ECF No. 168.)  Alternatively, Plaintiffs

seek, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, a stay postponing

the effective date of the Rule during the national emergency.  (*Id.*)  Plaintiffs also request that this

Court issue an indicative ruling under Federal Rule of Civil Procedure 62.1, stating that this Court

would issue the new preliminary injunction, and factual findings supporting that injunction, if the

Second Circuit determines that this Court currently lacks jurisdiction and remands the case for that

purpose.[2]  (*Id.*)  Plaintiffs' motion for a preliminary injunction enjoining the application of the

---

[2] Federal Rule of Civil Procedure 62.1 details a court's options for addressing a motion when a pending appeal divests the court of jurisdiction to grant such motion.  In particular, under Rule 62.1, a court may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.  Fed. R. Civ. P. 62.1(a).

Rule during the national public health emergency, and issuance of an indicative ruling, is GRANTED.[3]

Defendants' motion to dismiss is GRANTED to the extent that Count III of Organizational Plaintiffs' complaint, claiming that DHS and USCIS lacked authority to promulgate the Rule, is dismissed.

## I.   DEFENDANTS' MOTIONS TO DISMISS

### A.  Rule 12(b)(1) Lack of Subject Matter Jurisdiction.

Defendants contend that Plaintiffs cannot meet the jurisdictional requirements of standing and ripeness.  The proper procedural route for such a challenge is a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("[T]he proper procedural route [for a standing challenge] is a motion under Rule 12(b)(1)."); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y. 2003) ("Ripeness is jurisdictional in nature and therefore properly considered on a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules.").

Defendants raise several arguments that Plaintiffs' claims are not justiciable.  This Court has heard these arguments before and need not revisit in great detail its analysis of whether Plaintiffs have standing or whether their claims are ripe for judicial review.  (*See* Gov't Pls. Decision at 6–9; Org. Pls. Decision at 6–11.)  First, as this Court previously found, Plaintiffs sufficiently allege "concrete and particularized" injuries stemming from Defendants' promulgation of the Rule.  Organizational Plaintiffs establish that they have already diverted

---

[3] Today, this Court also grants a preliminary injunction enjoining Department of State and Department of Health and Human Services actions relevant to public charge determinations in a related action, *Make the Road New York v. Pompeo*, 19 Civ. 11633 (GBD).

substantial resources to mitigate the Rule's harmful effects and will continue to do so. Governmental Plaintiffs adequately demonstrate that the Rule will continue to have a chilling effect on enrollment in benefits programs that directly reduces Governmental Plaintiffs' revenue, shifts certain healthcare costs to Governmental Plaintiffs who offer subsidized healthcare services, and causes economic harm in the form of lost jobs and tax revenue.  Second, Plaintiffs' claims are ripe for review because the legal questions presented do not depend on any factual contingencies. Plaintiffs bring facial challenges to the Rule, which is already in effect.  And as Plaintiffs have demonstrated, they will suffer significant harm by further delay.  Defendants' motions to dismiss for lack of subject matter jurisdiction are denied.

### B.  Rule 12(b)(6) Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citation omitted).[4]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*,

---

[4] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

This Court previously found that Plaintiffs are likely to succeed on their claims under the APA that promulgation of the Rule was contrary to the Immigration and Nationality Act ("INA") and arbitrary and capricious.[5] Such claims also meet the lower threshold of surviving a motion to dismiss.[6] *See Fashion Television Assocs., L.P. v. Spiegel, Inc.*, 849 F. Supp. 19, 22 n.7 (S.D.N.Y. 1994) ("[T]he standard in deciding a motion for a preliminary injunction is more stringent than that used in a motion to dismiss . . . ."). Defendants, however, argue that this Court should reconsider its analysis of the merits of Plaintiffs' claims.

This Court specifically concluded that Plaintiffs are likely to prevail on their claim that Defendants lacked the authority to redefine "public charge" as they have in the Rule, contrary to the INA and in violation of the APA. (*See* Gov't Pls. Decision at 11–14; Org. Pls. Decision at 13–15.) The longstanding definition of "public charge" is someone who is primarily dependent on the

---

[5] These claims are reflected in Counts I and III of the Governmental Plaintiffs' complaint and Counts I and II of the Organizational Plaintiffs' complaint.

[6] Defendants also argue that these claims, along with the rest of Plaintiffs' claims, fail because Plaintiffs fall outside the zone of interests regulated by the Rule. However, as this Court already concluded, Plaintiffs plainly satisfy the lenient zone-of-interests test. (*See* Gov't Pls. Decision at 10–11; Org. Pls. Decision at 11–12.) Plaintiffs' interests are not "so marginally related to or inconsistent with the purposes implicit in the [INA] that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). Governmental Plaintiffs are administrators of public benefits programs targeted by the Rule and Organizational Plaintiffs' very mission is to assist, advise, and advocate for immigrants, including in immigration proceedings. Moreover, all plaintiffs allege economic injury as a result of the Rule.

government for subsistence. (*See* Gov't Pls. Decision at 11–13; Org. Pls. Decision at 13–14.) Further, it is undisputed that the term has never been construed as receipt of 12 months of benefits within a 36-month period. (*See* Gov't Pls. Decision at 13; Org. Pls. Decision at 14.) Rather, prior to the implementation of the Rule, public charge determinations were an inquiry about self-subsistence, not about lawful receipt of benefits that are in many cases temporary and supplemental. Moreover, there is no evidence that Congress ever intended for a redefinition of the term as set forth in the Rule, including the consideration of non-cash assistance. (*See* Gov't Pls. Decision at 13–14; Org. Pls. Decision at 15.) In fact, Congress repeatedly rejected attempts to implement such a framework, (*see* Gov't Pls. Compl. ¶¶ 37–42; Org. Pls. Compl. ¶¶ 80–85)—a fact that strongly favors finding that Defendants acted in excess of statutory authority, *see Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."). Simply put, Defendants' definition is outside the bounds of the statute, considering the inherent meaning of the words "public charge" and its historical context. And because Defendants fail to provide any reasonable justification for this change in the definition of "public charge," or the framework for determining whether an individual is likely to become a public charge, the Rule is also arbitrary and capricious. (*See* Gov't Pls. Decision at 14–17; Org. Pls. Decision at 15–19.)

Defendants claim that the Supreme Court's order staying the October 2019 Injunction and the Ninth Circuit's decision to stay preliminary injunctions issued by judges in the Eastern District of Washington and the Northern District of California, *City & Cty. of San Francisco v. USCIS*, 944 F.3d 773 (9th Cir. 2019), provide reason to revisit this Court's analysis and dismiss Plaintiffs' complaints, (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Gov't MTD Mem."), No. 19 Civ.

7777, ECF No. 141, at 1; Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Org. MTD Mem."), No. 19 Civ. 7993, ECF No. 177, at 1). To the contrary, the Supreme Court did not address the merits of the claim that the Rule is unlawful. *See Wolf v. Cook Cty., Illinois*, 140 S. Ct. 681, 682 (2020) (Sotomayor, J., dissenting) (noting that in issuing a stay of the October 2019 Injunction, "[n]o Member of the [Supreme] Court discussed the application's merit apart from its challenges to the injunction's nationwide scope."). Further, the Ninth Circuit's analysis stands in contrast to the Seventh Circuit's recent decision to affirm the preliminary injunction issued in the Northern District of Illinois.[7] *See Cook Cty., Illinois v. Wolf*, 962 F.3d 208 (7th Cir. 2020). Here, Defendants' appeal of this Court's prior order issuing the October 2019 Injunction is currently pending before the Second Circuit. As such, this Court's determination regarding the propriety of a preliminary injunction remains undisturbed.

1. *Governmental Plaintiffs State a Claim that the Rule is Contrary to the Rehabilitation Act.*

Governmental Plaintiffs allege in Count II of their complaint that the Rule is "not in accordance with law" in violation of the APA, because it conflicts with (1) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), (2) the Supplemental Nutrition Assistance Program ("SNAP") statute, 7 U.S.C. § 2017(b), and (3) the Welfare Reform Act, 8 U.S.C. § 1612(b)(1). (Gov't Pls. Compl. ¶¶ 272–78.) This Court already concluded that

---

[7] The Ninth Circuit determined that "Congress has not spoken directly to the interpretation of 'public charge' in the INA" and did not "unambiguously foreclose the interpretation articulated in the [Rule]." *City & Cty. of San Francisco v. USCIS*, 944 F.3d at 798. The panel concluded, *inter alia*, that "the phrase 'public charge' is ambiguous" and "DHS's interpretation of 'public charge' is a permissible construction of the INA," including its decision to consider non-cash benefits for the first time. *Id.* at 798–99. In contrast, the Seventh Circuit found that DHS's interpretation "falls outside the boundaries set by the statute," because, *inter alia*, "it does violence to the English language and the statutory context to say that [the term 'public charge'] covers a person who receives only *de minimis* benefits for a *de minimis* period of time" and the "term requires a degree of dependence that goes beyond temporary receipt of supplemental in-kind benefits from any type of public agency." *Cook Cty., Illinois v. Wolf*, 962 F.3d at 229.

Plaintiffs raise "at least a colorable argument that the Rule as to be applied may violate" Section 504 of the Rehabilitation Act, (*see* Gov't Pls. Decision at 18; Org. Pls. Decision at 19–20), which prohibits government discrimination against a person with a disability "solely by reason of her or his disability," 29 U.S.C. § 794(a). "Exclusion or discrimination [under Section 504] may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016). Defendants do not dispute that a disability is considered a negative factor under the public charge framework. Indeed, the Rule indicates that DHS will consider whether "the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work." 84 Fed. Reg. 41,502. Defendants, however, justify this treatment by pointing to the fact that the INA lists "health" as a factor for consideration in public charge determinations. (Gov't MTD Mem. at 28–29; Org. MTD Mem. at 30–31.) While the INA directs officials to consider an individual's health, it does not provide license to penalize an applicant solely because of a disability. Defendants apparently make no distinction between a disabled individual who is not self-sufficient and one who is able to cope with his or her disability, even if it requires extensive medical treatment or accommodation. The Rule treats disabilities as a per se negative health factor, in apparent violation of the Rehabilitation Act.[8] Governmental Plaintiffs therefore adequately state a claim that the Rule is "not in accordance with law."

---

[8] The Seventh Circuit recently found, for similar reasons, that "the Rule penalizes disabled persons in contravention of the Rehabilitation Act." *Cook Cty., Illinois v. Wolf*, 962 F.3d at 228. The Seventh Circuit concluded the Rule "disproportionately burdens disabled people and in many instances makes it all but inevitable that a person's disability will be the but-for cause of her being deemed likely to become a public charge." *Id.*

### 2. *Governmental Plaintiffs State a Claim that the Rule Violates Procedural Requirements of the APA*

In Count IV of their complaint, Governmental Plaintiffs claim that Defendants failed to meet the procedural requirements of the APA in promulgating the Rule. (Gov't Pls. Compl. ¶ 290–95.) Specifically, Governmental Plaintiffs allege that Defendants did not "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments," 5 U.S.C. § 553(c). They argue that the Rule's definition of "public charge" was not a logical outgrowth of DHS's notice of proposed rulemaking, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018) ("NPRM"), in two respects. First, Governmental Plaintiffs point to the fact that the NPRM included a value threshold (i.e., 15% of the Federal Poverty Guidelines) for counting public benefits as relevant to the public charge determination. That value threshold was eliminated in the Rule in favor of a purely durational standard. (Gov't Pls. Compl. ¶ 124.) Second, Governmental Plaintiffs argue that DHS did not provide public notice of the so-called "stacking scheme" for counting multiple benefits received in a given month when calculating the 12/36-month durational threshold (i.e., each benefit received in a month counts as one month of benefits towards the threshold). (*Id.* ¶ 125.) Governmental Plaintiffs claim that these policies were neither discussed in, nor a logical outgrowth of, the NPRM. "A final rule qualifies as a logical outgrowth 'if interested parties "should have anticipated" that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009) (citations omitted). Here, both the value threshold and the stacking scheme on the 12/36-month standard were discussed in the NPRM, but the former was limited to monetizable benefits (e.g., cash benefits and SNAP) and the latter was proposed for non-monetizable benefits (e.g., Medicaid). 83 Fed. Reg. 51,163–66, 51,289–90. Ultimately, DHS decided to apply the

12/36-month standard, including the stacking scheme, to all benefits, whether monetizable or not. Governmental Plaintiffs had an opportunity to comment on the stacking structure, but this Court cannot conclude that they should have anticipated DHS eliminating the value threshold and replacing it with an entirely durational threshold for all benefits. DHS only proposed the 12/36-month durational threshold because it lacked "an easily administrable standard for assessing the monetary value of an alien's receipt of some non-cash benefits." *Id.* at 51,165. DHS even sought comments on "other potential approaches to monetizing these benefits." *Id.* at 51,166. If anything, Governmental Plaintiffs could have anticipated a valuation-based standard for all benefits in the final rule. They could not have reasonably expected DHS to do away with the valuation-based threshold entirely. Accordingly, Governmental Plaintiffs sufficiently allege that the Rule violates procedural requirements of the APA.

### 3. *Plaintiffs State a Claim that the Rule Violates the Equal Protection Guarantee of the Fifth Amendment.*

In Count IV of their complaint, Organizational Plaintiffs claim that the Rule violates the equal protection guarantee of the Fifth Amendment. This Court previously determined that Organizational Plaintiffs have "at the very least, raised serious questions going to the merits of their Equal Protection Claim." (Org. Pls. Decision at 21 (quoting *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019).) In particular, this Court concluded that the Rule likely fails to satisfy even the highly deferential standard of rational basis scrutiny, because it disproportionately harms noncitizens of color, and Defendants have not articulated a "rational relationship between the disparity of treatment and some legitimate government purpose." *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Governmental Plaintiffs bring similar claims under Count V of their complaint, which likewise survive Defendants' motion to dismiss. Plaintiffs also sufficiently plead animus required for an equal

13

protection claim under the legal standard set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). In addition to their allegations that the Rule will disparately impact immigrants of color, (Gov't Pls. Compl. ¶¶ 151–56, 258–62; Org. Pls. Compl. ¶¶ 235–37), which Defendants do not dispute, Plaintiffs provide extensive evidence of statements that may evince discriminatory intent made by high-level officials who were allegedly the decision-makers behind the Rule or influenced such decision-makers, (Gov't Pls. Compl. ¶¶ 174–78; Org. Pls. Compl. ¶¶ 203–34). Plaintiffs include, *inter alia*, statements by the President allegedly expressing "dismay that [the United States] do[es] not 'have more people from places like Norway,' contrasting such immigrants with those from '[expletive deleted] countries' such as Haiti and countries in Africa." (Org. Pls. Compl. ¶ 211; *see also* Gov't Pls. Compl. ¶ 175.)

The Supreme Court recently rejected an equal protection challenge to the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program that was based, in part, on disparate impact on Latinos and alleged discriminatory statements by the President. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915–16 (2020). Defendants argue that the plurality opinion in *Regents* strongly supports dismissal of Plaintiffs' equal protection claims in this case. (Defs.' Letter dated June 26, 2020, No. 19 Civ. 7777, ECF No. 193; Defs.' Letter dated June 26, 2020, No. 19 Civ. 7993, ECF No. 219.) Defendants point to two aspects of the plurality opinion, in particular. First, the plurality discounted the disparate impact of the rescission of DACA because "Latinos make up a large share of the unauthorized alien population," and so "one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Regents*, 140 S. Ct. at 1915. The Court explained that "[w]ere this fact sufficient to state a[n] [equal protection] claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916. But here,

14

Plaintiffs are not simply alleging that more immigrants of color are hurt by the agency action at issue.  Instead, Plaintiffs cite evidence regarding the disproportionate *percentage* of nonwhite immigrants that would be hurt by the agency action at issue, as compared to the *percentage* of immigrants from predominantly white countries.  (*See, e.g.*, Gov't Pls. Compl. ¶¶ 151, 262; Org. Pls. Compl. ¶¶ 235–36.)  This finding is unaffected by the share of the immigrant population that is nonwhite.

Second, the *Regents* plurality dismissed the President's statements as "unilluminating" because they were "remote in time and made in unrelated contexts."  *Id.* at 1916.  Here, the President's statements cited by Plaintiffs were not "remote in time" to Defendants' promulgation of the Rule and actions by the President that allegedly precipitated promulgation of the Rule.  (*See, e.g.,* Gov't Pls. Compl. ¶ 175; Org. Pls. Compl. ¶¶ 93–94, 203–11.)  For instance, Plaintiffs cite statements from January 2018, May 2018, and July 2019.  (Gov't Pls. Compl. ¶ 175; Org. Pls. Compl. ¶¶ 208–209, 211.)  The Rule's development fits squarely within this timeframe.  Drafts of the Rule were obtained by the news outlets in February and March 2018, (Org. Pls. Compl. ¶ 94), the NPRM was published in October 2018, and the Rule was issued in August 2019.  Plaintiffs allegations also extend beyond the President's statements to include statements by high-level officials that are responsible for the Rule.  Indeed, Defendant Cuccinelli, a day after announcing the Rule, stated that the Emma Lazarus poem etched on the base of the Statue of Liberty welcoming "tired," "poor," and "huddled masses" of immigrants was referring to "people coming from Europe."  (Gov't Pls. Compl. ¶ 176; Org. Pls. Compl. ¶ 227.)  Drawing reasonable inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged that issuance of the Rule was based, at least in part, on discriminatory motives and their claims survive Defendants' motions to dismiss.

### 4. *Organizational Plaintiffs Fail to State a Claim that DHS and USCIS Lack Rulemaking Authority to Issue the Rule.*

Organizational Plaintiffs allege in Count III of their complaint that DHS and USCIS lack rulemaking authority to issue the Rule. (*See* Org. Pls. Compl. ¶¶ 179–83, 285–91.) Section 103 of the INA, as amended by the Homeland Security Act of 2002 ("HSA"), sets forth the powers and duties of the Secretary of Homeland Security (the "Secretary") as it relates to the immigration laws. *See* 8 U.S.C. § 1103. Specifically, the Secretary is "charged with administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General." *Id.* § 1103(a)(1). The Secretary is authorized to "establish such regulations . . . as he deems necessary for carrying out his authority." *Id.* § 1103(a)(3). Additionally, under the HSA, Congress specifically conferred on DHS the authority to "carry[] out the immigration enforcement functions," 6 U.S.C. §§ 202(3), and "establish[] and administer[] rules . . . governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States," *id.* § 202(4).

The public charge provision states that the Attorney General is responsible for public charge determinations for those seeking admission or adjustment of status, *see* 8 U.S.C. § 1182(a)(4)(A), which Organizational Plaintiffs argue divests the Secretary of responsibility for making such determinations, pursuant to 8 U.S.C. § 1103(a)(1), and therefore also any associated rulemaking authority. However, as Defendants note, under the HSA, Congress also made clear that such references to the Attorney General should be construed as references to the Secretary. *See* 6 U.S.C. § 557 ("With respect to any function transferred by or under this chapter, . . . reference in any other Federal law to . . . any officer or office the functions of which

are so transferred shall be deemed to refer to the Secretary, other official, or component of [DHS] to which such function is so transferred."). The Secretary is thus at least concurrently responsible for administering public charge determinations and any associated rulemaking.[9] *Cf. Scheerer v. U.S. Atty. Gen.*, 513 F.3d 1244, 1251 & n.6 (11th Cir. 2008). Count III of Organizational Plaintiffs' complaint is dismissed.

---

[9] To be sure, there must be some set of powers, functions and duties conferred on the Attorney General that are excluded from the purview of DHS and the Secretary for the plain language of 8 U.S.C. § 1103(a)(1), as amended by the HSA, to carry meaning. As Defendants aptly point out, we find a likely set of such duties elsewhere in Section 1103. Under clause (g)(1), also added as part of the HSA, the Attorney General explicitly retains the authorities and functions exercised by the Executive Office for Immigration Review. 8 U.S.C. § 1103(g)(1).

## II.   PLAINTIFFS' MOTION FOR A NEW TEMPORARY INJUNCTION

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted).  To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The standard for a stay of agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019).

Plaintiffs now seek a limited preliminary injunction temporarily halting implementation of the Rule in light of new circumstances not previously considered by the Court—namely, the COVID-19 outbreak and the attendant consequences of Defendants implementing the Rule in the midst of a public health crisis.  Plaintiffs bring their motion in this Court after first seeking relief from the Supreme Court to lift its stay of this Court's October 2019 Injunction.  On April 13, 2020, the Governmental Plaintiffs filed a motion in the Supreme Court to temporarily lift or modify the Supreme Court's stay for the duration of the national emergency.  Mot. by Gov't Pls. to Temporarily Lift or Modify the Court's Stay of the Orders Issued by the U.S. Dist. Ct. for S.D.N.Y. ("Gov't Pls. SCOTUS Mot.") at 1, *Dep't of Homeland Sec. v. New York*, 2020 WL 1969276 (U.S. Apr. 24, 2020) (No. 19A785); (*see also* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. and Stay or TRO Pending National Emergency ("Emergency PI Mem."), No. 19 Civ. 7777, ECF No. 169, at 2.)  Alternatively, Governmental Plaintiffs asked the Supreme Court to clarify that the stay "does not preclude the district court here from considering whether the new circumstances caused by the novel coronavirus warrant temporarily halting implementation of the Rule."  Gov't Pls.

SCOTUS Mot. at 1–2. In a two-line order, the Supreme Court denied the request to modify or lift the stay, but indicated that the order "does not preclude a filing in the District Court as counsel considers appropriate." *Dep't of Homeland Sec. v. New York*, No. 19A785, 2020 WL 1969276, at *1 (U.S. Apr. 24, 2020) (mem.). Consistent with that order, Plaintiffs then filed the instant motion in this Court.

### A. This Court Has Jurisdiction to Issue A New Temporary Injunction.

Defendants challenge whether this Court retains jurisdiction to issue a limited preliminary injunction. Specifically, they argue this Court lacks authority to provide such preliminary relief because (1) Defendants' interlocutory appeal seeking to vacate the October 2019 Injunction is still pending before the Second Circuit and (2) a new preliminary injunction would effectively overrule the Supreme Court's stay of the October 2019 Injunction. (*See* Opp'n to Pls.' Mot. for Prelim. Inj. and Stay or TRO Pending Nat'l Emergency ("Emergency PI Opp'n"), No. 19 Civ. 7777, ECF No. 176, at 6–10.)

"As a general rule, an appeal may be taken only from a final judgment." *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989). As an exception to this rule, "Congress permits . . . an immediate appeal from an interlocutory order that either grants or denies a preliminary injunction." *Id.* at 1350. Such an appeal, however, does not prevent the matter from otherwise proceeding in the district court. *See id.* at 1350. "[A] notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *Id.* at 1350 (citations omitted); *see also Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.") (citations omitted). Moreover, the "divestiture of jurisdiction rule is . . . not a per se rule." *United*

*States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). The rule is judicially crafted and is "rooted in the interest of judicial economy." *Id.* Therefore, "its application is guided by concerns of efficiency and is not automatic." *Id.* (citing *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996) and *United States v. Salerno*, 868 F.2d 524, 539–40 (2d Cir. 1989)).

Here, Plaintiffs seek "new relief based upon new facts and circumstances that were not— and could not have been—before the Court when it issued its prior order." (Emergency PI Mem. at 14.) In deciding Defendants' pending appeal, the Second Circuit is charged with reviewing this Court's analysis and conclusions based on the information available to this Court at the time of its original decision. Therefore, by considering new, materially different evidence and issuing a new, narrowly tailored, temporary injunction, this Court does not disturb its prior orders or interfere with the particular questions presented by Defendants' pending appeal.

Overlapping legal issues between this Court's previous order and Plaintiffs' instant motion do not automatically divest this Court of jurisdiction. A district court may advance a case despite a pending interlocutory appeal and, in doing so, is often required to rule on issues relevant to those on appeal. The Second Circuit has held that a district court retains jurisdiction to issue a permanent injunction despite a pending appeal from an order granting a preliminary injunction. *Webb*, 78 F.3d at 55; *cf. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*, 847 F.2d 1014, 1019 (2d Cir. 1988) (affirming issuance of an injunction by the district court based on new evidence while the district court's previous denial of an injunction was pending appeal). Indeed, Defendants ask this Court to revisit its prior legal analysis in deciding their instant motion to dismiss. Moreover, the judicial efficiency concerns that guide the divestiture of jurisdiction rule counsel against depriving this Court of authority to hear Plaintiffs' motion. As Plaintiffs correctly note, this Court, as a district court, is best suited to make factual findings and issue concordant,

narrowly tailored relief. (Reply Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. and Stay or TRO Pending Nat'l Emergency ("Emergency PI Reply"), No. 19 Civ. 7777, ECF No. 183, at 2.)

By issuing such relief, this Court would also not be ignoring the Supreme Court's stay of the October 2019 Injunction. First, as discussed above, there is no indication that the Supreme Court disagreed with this Court's analysis of the merits of Plaintiffs' case. Second, the Supreme Court issued its stay on a significantly different factual record. In issuing a stay of a lower court's "exercise of equitable discretion [in granting a preliminary injunction], [the Supreme Court] bring[s] to bear an equitable judgment of [its] own." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citing *Nken v. Holder*, 556 U.S. 418, 433 (2009)). Specifically, before issuing a stay, the Supreme Court "balance[s] the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Id.* (quoting *Barnes v. E– Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers)). Here, the Supreme Court provided no analysis for its decision to stay the October 2019 Injunction, nor any insight into its equitable judgment. What is clear, however, is that the irreparable harm and public interests that warrant an injunction have come into sharper focus in the intervening months since the Supreme Court issued its stay. What were previously theoretical harms have proven to be true. We no longer need to imagine the worst-case scenario; we are experiencing its dramatic effects in very real time. Equitable relief has become nothing short of critical. In issuing temporary relief today, this Court certainly is mindful of the Supreme Court's stay of the previously issued injunctions, but exercises equitable discretion based on the record now before it—one the Supreme Court never had the opportunity to consider when it stayed the pending October 2019 Injunction.[10]

---

[10] Though the Supreme Court denied Governmental Plaintiffs' recent motion to temporarily lift or modify the Supreme Court's stay of the October 2019 Injunction, the Justices did not indicate whether they

**B. The COVID-19 Pandemic Warrants Temporary Equitable Relief**

As an initial matter, this Court has already found that Plaintiffs are likely to succeed on the merits of their claims.  As to the remaining factors to be considered for preliminary injunctive relief, Plaintiffs argue that the "pandemic has drastically altered the nature and magnitude of the irreparable harms faced by Plaintiffs, their residents, and the nation due to the Rule and tipped the balance of the equities decisively in favor of granting injunctive relief while the COVID-19 emergency continues." (Emergency PI Mem. at 16.)

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  Though Plaintiffs need not show "that irreparable harm already ha[s] occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d. Cir. 2010), they have done just that here.

*1.  Plaintiffs Are Subject to Pressing and Substantial Harms.*

In addition to the national emergency, Governmental Plaintiffs have declared public-health emergencies in their respective jurisdictions. (Emergency PI Mem. at 5.)  Officials have taken a variety of dramatic measures to reverse the course of the pandemic, including "requir[ing] all

---

considered the evidence regarding COVID-19 and rejected Governmental Plaintiffs' motion on that basis. Further, the Supreme Court did not state that its stay of the October 2019 Injunction, or refusal to modify such stay, precluded Governmental Plaintiffs' from seeking new temporary relief tailored to the national emergency in the district court. Instead, the Supreme Court instructed that its denial "does not preclude a filing in the District Court as counsel considers appropriate."

nonessential employees to work from home, clos[ing] schools, and issu[ing] orders to increase hospital capacity to care for COVID-19 patients." (*Id.*) Medical care is a vital component of these efforts to "slow[] infection rates, preserv[e] hospital capacity and medical equipment, and sav[e] lives." (*Id.* at 6.) Infected individuals who are not tested or receive inadequate medical care are more likely to spread the virus to others and experience serious complications from COVID-19, including death. (*Id.* at 6; *see also* Decl. of Elena Goldstein, Ex. 16 (Decl. of Leighton Ku), No. 19 Civ. 7777, ECF No. 170-16, ¶¶ 11–12, 20, 22.)

Plaintiffs provide ample evidence that the Rule deters immigrants from seeking testing and treatment for COVID-19, which in turn impedes public efforts in the Governmental Plaintiffs' jurisdictions to stem the spread of the disease. Doctors and other medical personnel, state and local officials, and staff at nonprofit organizations have all witnessed immigrants refusing to enroll in Medicaid or other publicly funded health coverage, or forgoing testing and treatment for COVID-19, out of fear that accepting such insurance or care will increase their risk of being labeled a "public charge." (*See, e.g.,* Decl. of Elena Goldstein, Ex. 8 (Decl. of Eden Almasude), No. 19 Civ. 7777, ECF No. 170-8, ¶¶ 4–8; Ex. 14 (Decl. of Dana Kennedy), No. 19 Civ. 7777, ECF No. 170-14, ¶¶ 5–9, 11–13; Ex. 15 (Decl. of Camille Kritzman), No. 19 Civ. 7777, ECF No. 170-15, ¶¶ 2–4; Ex. 16 (Decl. of Leighton Ku), No. 19 Civ. 7777, ECF No. 170-16, ¶¶ 10–11; Ex. 17 (Decl. of Pedro Moreno), No. 19 Civ. 7777, ECF No. 170-17, ¶ 4; Ex. 18 (Decl. of Bitta Mostofi), No. 19 Civ. 7777, ECF No. 170-18, ¶¶ 13, 15; Ex. 21 (Decl. of Rachel Pryor), No. 19 Civ. 7777, ECF No. 170-21, ¶¶ 13–17, 19; Ex. 22 (Decl. of Aaron Coskey Voit), No. 19 Civ. 7777, ECF No. 170-22, ¶¶ 27–28, 30; Ex. 27 (Decl. of Alejandra Aguilar), No. 19 Civ. 7777, ECF No. 170-27, ¶¶ 7–13, 18.) As a direct result of the Rule, immigrants are forced to make an impossible choice between jeopardizing public health and personal safety or

their immigration status. Defendants claim that any such effect of the Rule is based on "mistaken beliefs" about the Rule's application and therefore cannot be fairly attributed to the Rule. (*See* Emergency PI Opp'n at 15–17.) Defendants point to statements in Plaintiffs' declarations that describe instances of immigrants incorrectly believing they are subject to the Rule or declining benefits that are not treated negatively under the Rule.[11] (*Id.* at 16.) However, even if immigrants act in part on mistaken belief, the Supreme Court has recognized injury where the plaintiff's harms are based on the "predictable effect of Government action on the decisions of third parties," even if such decisions are "motivated by unfounded fears." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Here, such decisions are more than predictable, they are already occurring.

Any policy that deters residents from seeking testing and treatment for COVID-19 increases the risk of infection for such residents and the public. Adverse government action that targets immigrants, however, is particularly dangerous during a pandemic. Immigrants make up a substantial portion of workers in essential industries who have continued to work throughout the national emergency and interact with large swaths of the population, whether in healthcare, agriculture, food packing and distribution, or sanitation, among other industries. (*See, e.g.*, Decl. of Elena Goldstein, Ex. 10 (Decl. of Lawrence L. Benito), No. 19 Civ. 7777, ECF No. 170-10, ¶ 11; Ex. 12 (Decl. of Sabrina Fong), No. 19 Civ. 7777, ECF No. 170-12, ¶¶ 12–13; Ex. 14 (Decl. of Dana Kennedy), No. 19 Civ. 7777, ECF No. 170-14, ¶ 15; Ex. 16 (Decl. of Leighton Ku), No. 19 Civ. 7777, ECF No. 170-16, ¶ 20; Ex. 22 (Decl. of Aaron Coskey Voit), No. 19 Civ. 7777, ECF No. 170-22, ¶¶ 9–10.) Essential workers have been disproportionately affected by COVID-19. Protecting them is in their best interest and the interest of the public at large. When

---

[11] Plaintiffs' declarations also cite instances of immigrants avoiding benefits that may be covered by the Rule. (*See, e.g.,* Decl. of Elena Goldstein, Ex. 8 (Decl. of Eden Almasude), No. 19 Civ. 7777, ECF No. 170-8, ¶ 6; Ex. 14 (Decl. of Dana Kennedy), No. 19 Civ. 7777, ECF No. 170-14, ¶ 11.)

individuals with a high percentage of public exposure are fearful of receiving medical care for a deadly, contagious disease, the health and security of communities across the country is jeopardized.

2. *USCIS's Alert Does Not Sufficiently Mitigate the Harms.*

USCIS's own efforts to address these substantial harms are particularly revealing, though plainly insufficient.   In the first test of the Rule's immediate application, Defendants have determined that the Rule cannot be uniformly or effectively applied in response to this deadly health crisis.  For good reasons, Defendants have now immediately changed the Rule by what it calls "informal guidance."  That "informal guidance" presently indicates that the Rule will not be applied to certain coronavirus-related benefits.  Specifically, on March 13, 2020, USCIS issued an alert that excludes "testing, treatment, [and] preventative care . . . related to COVID-19" from public charge inadmissibility determinations, "even if such treatment is provided or paid for by one or more public benefits, as defined in the [R]ule (e.g., federally funded Medicaid)." *Public Charge Alert*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge (last updated March 27, 2020).   That response is a recognition of "the possibility that some aliens impacted by COVID-19 may be hesitant to seek necessary medical treatment or preventive services." *Id.*   Still, the Alert is unlikely to remedy Plaintiffs' harms considering its limited scope in the context of the Rule.  As Defendants explain, an immigrant's enrollment in Medicaid will only be excluded from the public charge analysis if the immigrant enrolls "*solely* in order to obtain COVID-19-related testing, treatment, or preventative care" and provided the immigrant "disenrolls from Medicaid once he or she no longer needs COVID-19-related care, or provides evidence of a request to disenroll." (Decl. of Joseph B.

Edlow, No. 19 Civ. 7777, ECF No. 177, ¶ 12 (emphasis added); *see also* Emergency PI Opp'n at 13.)

Plaintiffs argue that the Alert exempts testing and treatment related to COVID-19 paid for by federally funded Medicaid, but not the enrollment in Medicaid itself. But even crediting Defendants' interpretation leaves immigrants in an impractical position. As this Court explained at oral argument, few enroll in Medicaid for a single purpose. There is no box for applicants to check off that limits their use of Medicaid to COVID-19-related treatment. (*See* Tr. of Oral Arg. dated May 18, 2020, at 59:9–17.) Defendants offer no direction regarding how an immigrant should establish that he or she enrolled in Medicaid solely to obtain COVID-19-related care. In sum, an immigrant who uses federally funded Medicaid to access COVID-19 treatment is now told that he will not be negatively impacted in a future public charge determination by such COVID-19 treatment, but his enrollment in Medicaid itself may be counted against him and any use not determined to be COVID-19 related will count against him. At a minimum, such ambiguity and strict limitations belie any notion that the Alert adequately encourages immigrants to seek medical treatment or preventative care related to COVID-19.

The Alert falls short in a number of other respects as well. First, it keeps in place the Rule's disincentives for using economic supplemental benefits. The country is experiencing a sharp economic downturn, as a predictable direct and indirect effect of the pandemic. Accordingly, many immigrants and citizens alike, who otherwise would not be classified as public charges under any reasonable definition, are experiencing substantial financial burdens as employers slash jobs, benefits, and pay. Yet, the Rule offers no meaningful relief or incentive for immigrants in such circumstances to confidently access supplemental benefits, such as SNAP. Instead, the Alert explains that an individual who:

lives and works in a jurisdiction where disease prevention methods such as social distancing or quarantine are in place, or where [his or her] employer, school, or university voluntarily shuts down operations to prevent the spread of COVID-19, . . . may submit a statement with his or her application for adjustment of status to explain how such methods or policies have affected [him or her] as relevant to the factors USCIS must consider in a public charge inadmissibility determination.

What an adequate statement should say is unknown. The Alert provides no articulable standard to which one should conform one's conduct. USCIS will then take such statement "into consideration" to the extent "relevant and credible." Such a hollow promise provides little comfort. Simply relying on the compassion or sympathy of immigration officials is not rational, either in rulemaking or in informally attempting to amend those rules.

Additionally, the exception for coronavirus-related treatment likely does not cover a wide variety of other reasonable steps that may be taken to protect public health during the pandemic. At oral argument, Defendants at least implied that if an immigrant obtained Medicaid for purposes of securing COVID-19 treatment, but during such treatment he or she was also treated for the flu, such flu treatment would not be exempt from the public charge determination because it is unrelated to COVID-19 treatment. (Tr. of Oral Arg. dated May 18, 2020, at 58–59.) It appears that an individual would be similarly penalized for utilizing Medicaid to receive treatment for medical conditions that place patients at increased risk of suffering severe illness or death if they contract COVID-19, such as chronic obstructive pulmonary disease (COPD), Type 2 diabetes, or serious heart conditions. *See Coronavirus Disease 2019 (COVID-19) – People of Any Age with Underlying Medical Conditions*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated July 17, 2020).

Finally, at oral argument, Defendants conceded that USCIS has no obligation to retain the Alert for any period of time, let alone for the pendency of the public health emergency. (Tr. of

Oral Arg. dated May 18, 2020, at 75:16–25.) Nor is there any protection from a retroactive change in policy.[12]   The characterization of the published "alert" as "informal guidance" outside of rulemaking provides no assurance of its future reliability.   Any semblance of a mitigating effect that the Alert has on the tangible harms caused by the Rule's general application may be wiped out at a moment's notice.   The uncertainty surrounding the scope of the Alert's coronavirus treatment exception further adds confusion and chaos.   It defeats the stated purpose of encouraging immigrants to seek COVID-19 diagnosis and treatment.

### 3. The Balance of the Equities and Public Interest Decidedly Favor Temporary Injunctive Relief During the National Health Emergency.

Considering the substantial harm to the public caused by the Rule during the present pandemic, the balance of the equities and public interest also strongly favor an injunction.   While the Rule has only been in effect since February 24, 2020, the prior public charge framework has been uniformly applied for decades.   (Gov't Pls. Decision at 21.)   Defendants' interest in effectuating the Rule fails to measure up to the gravity of this global pandemic that continues to threaten the lives and economic well-being of America's residents.   No person should hesitate to seek medical care, nor should they endure punishment or penalty if they seek temporary financial aid as a result of the pandemic's impact.

Moreover, Defendants' new "informal guidance" that attempts to carve out a COVID-19 exception is an admission that it is neither in the public interest nor compelled by the balance of equities to currently apply the Rule as written and adopted.   Plainly, Defendants have indicated that the Rule's uniform application is likely to be injurious to Plaintiffs, immigrants, and the public

---

[12] Defendants asserted at oral argument that "as long as the policy is in place, people who use benefits in a way that's described by the policy, they can be sure that at any point in the future, if they submit an application for adjustment of status, this is the policy that will be applied to their benefit usage that occurred while this policy was in place." (Tr. of Oral Arg. dated May 18, 2020, at 75:5–10.) This Court is aware of no legal obligation that accompanies this pledge, in the Alert, the Rule, or otherwise.

at large during this national public health emergency. The problem is not with the decision to issue the Alert or declare a public health emergency, but with the Rule. All agree that the Rule should not to be applied, as written, during this current pandemic. There is also a question of whether it should be applied to future deadly plagues, earthquakes, hurricanes, tornadoes, floods, or other natural and manmade disasters that threaten the health and safety of citizens and immigrants alike, through no fault of their own. The Rule has demonstrably failed the first real world test of its application.

### C. A Nationwide Temporary Injunction is Appropriate.

As this Court found with respect to its initial injunction regarding the Rule, and for additional reasons, a nationwide injunction is both necessary to redress the harms caused by the Rule, and appropriate given the strong federal interest in uniformity of the national health and immigration policies at issue here. (*See* Gov't Pls. Decision at 21–24; Org. Pls. Decision at 24–26); *see also Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (upholding a nationwide injunction of the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) immigration relief program, in part, because the Constitution requires and Congress has called for uniform administration of immigration laws). The scope of preliminary injunctive relief generally should be "no broader than necessary to cure the effects of the harm caused by the violation," *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016), but "is dictated by the extent of the violation established, not by the geographical extent of the plaintiff," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The likely unlawful agency action in this case applies universally, to every public charge determination made by immigration officials across the country. Limited relief would simply not protect the interests of all stakeholders. A geographically restricted injunction, in particular, would undoubtedly result in

inconsistent applications of the Rule, and different public charge determinations based solely on location. The effect of the Rule's application should not depend on what side of the George Washington bridge between New York and New Jersey one fortuitously finds oneself.

Moreover, as Plaintiffs correctly point out, nationwide relief is critical to curing Plaintiffs' harms associated with the pandemic, considering the "interconnected nature of the risks between and within states, and the realities attendant to the spread of this disease." (Emergency PI Mem. at 25.) Even Defendants' limited COVID-19 exception does not distinguish its benefits geographically. A patchwork public charge framework would only contribute to the spread of COVID-19 in our communities. As we have all come to recognize, the virus knows no artificial boundaries. And as the country returns to business, so too will interstate travel and commerce. Each infected individual that travels to Governmental Plaintiffs' jurisdictions risks undoing crucial progress made in combatting this disease. Discouraging noncitizens nationwide from obtaining necessary treatment and care certainly undermines those efforts. Issuing geographically limited relief would not meaningfully abate the public health risk, especially when applied to a population that represents a significant portion of essential workers who continue to work outside of their homes and interact with the public at large. Thus, a temporary injunction entirely barring the Rule is appropriate. [13]

---

[13] This Court is cognizant of the equitable and constitutional concerns regarding nationwide injunctions. *See, e.g., Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020) (Gorsuch, J., concurring). Nevertheless, in the appropriate circumstances, "district courts sitting in equity have the authority to issue nationwide injunctions." *Saget v. Trump*, 375 F. Supp. 3d 280, 378 (E.D.N.Y. 2019) (citing *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932)). To be sure, a court's authority to issue nationwide injunctions is a power that should be exercised sparingly, and certainly cannot be applied in conflict with each circuit's own determination of its appropriateness. This Court certainly does not discount legitimate concerns, but concludes that the convoluted geographic patchwork of artificially limited temporary relief, in this case, is just as likely to be "patently unworkable, sowing chaos for litigants, the government, courts, and all those affected." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (discussing the costs associated with nationwide injunctions).

### III.   CONCLUSION

Defendants' motion to dismiss, (No. 19 Civ. 7993, ECF No. 176), Count III of Organizational Plaintiffs' complaint, claiming that DHS and USCIS lacked authority to promulgate the Rule, is GRANTED.

Plaintiffs' motion for a preliminary injunction, and temporary stay of the Rule's application under 5 U.S.C. § 705, (No. 19 Civ. 7777, ECF No. 168), is GRANTED.  Defendants are enjoined from enforcing, applying, implementing, or treating as effective the Rule for any period during which there is a declared national health emergency in response to the COVID-19 outbreak.

This opinion shall also serve alternatively as an indicative ruling under Federal Rule of Civil Procedure 62.1.  Should the Second Circuit determine that this Court does not presently have jurisdiction to issue this injunction and remands this case for the purpose of further considering Plaintiffs' present motion, this Court would issue a preliminary injunction based on factual findings as set forth herein.

The Court of Clerk is directed to close the motions, (No. 19 Civ. 7777, ECF Nos. 140, 168; No. 19 Civ. 7993, ECF No. 176), accordingly.

Dated: New York, New York
      July 29, 2020

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge