

**U.S. Department of Justice**

Civil Division, Federal Programs Branch

---

Joshua Kolsky                                             Tel.:  (202) 305-7664
Trial Attorney                                            E-mail:  joshua.kolsky@usdoj.gov


August 4, 2020


Hon. George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street, Room 1310
New York, NY 10007

      Re:     *State of New York, et al. v. United States Department of Homeland Security, et al.,*
No. 19-cv-7777; *Make the Road New York v. Cuccinelli*, No. 19-7993 (S.D.N.Y.)

Dear Judge Daniels,

      I represent Defendants in the above-referenced matters.  Defendants respectfully submit this letter to inform the Court of recent supplemental authority supporting Defendants' Motion for Stay of Injunction Pending Appeal.  *See New York*, Civil Action No. 19-7777, ECF No. 197; *Make the Road New York*, Civil Action No. 19-7993, ECF No. 223.

      Earlier today, the Second Circuit issued an opinion in Defendants' appeal of the Court's first preliminary injunctions in these cases.  *See New York v. Dep't of Homeland Security*, Nos. 19-3591, 19-3595 (2d Cir. Aug. 4, 2020), attached hereto as Exhibit A.  In that opinion, the Second Circuit ruled that a preliminary injunction was warranted but it modified the scope of the injunctions to cover only the states of New York, Connecticut, and Vermont.  Ex. A at 108-09.

      The Second Circuit shared "DHS's concern that a district judge issuing a nationwide injunction may in effect override contrary decisions from co-equal and appellate courts, imposing its view of the law within the geographic jurisdiction of courts that have reached contrary conclusions."  *Id*. at 106.  And the "issuance of unqualified nationwide injunctions is a less desirable practice where, as here, numerous challenges to the same agency action are being litigated simultaneously in district and circuit courts across the country."  *Id*. at 107.  In these circumstances, it is "not clear" that "the court that imposes the most sweeping injunction should control the nationwide legal landscape."  *Id.*

      The Second Circuit encouraged district courts in this situation to "consider crafting preliminary injunctions that anticipate the possibility of conflict with other courts and provide for such a contingency" which may include limiting "the injunction to the situation of particular plaintiffs or to similarly situated persons within the geographic jurisdiction of the court."  *Id*. at 107-08.  It therefore modified this Court's injunctions to limit them to the states of New York,

- 2 -

Connecticut, and Vermont, which cover "the State plaintiffs and the vast majority of the Organizations' operations."  *Id.* at 108.

  For the same reasons, the Court's July 29, 2020 nationwide injunction sweeps more broadly than necessary to redress Plaintiffs' alleged injuries. If the Court does not stay its injunction altogether pending appeal, it at least should stay it to the extent that it applies outside of New York, Connecticut, and Vermont.  As with the first injunctions, there is "no need for a broader injunction at this point[.]"  *Id.*

       Respectfully submitted,

        /s/
       Joshua Kolsky

CC: All counsel of record via ECF.

Exhibit A

19-3591, 19-3595
*New York v. United States Department of Homeland Security, Make the Road New York v. Cuccinelli*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

——————————

August Term, 2019

Argued: March 2, 2020     Decided: August 4, 2020

Docket Nos. 19-3591, 19-3595

——————————

STATE OF NEW YORK, CITY OF NEW YORK, STATE OF CONNECTICUT, STATE OF VERMONT,

*Plaintiffs-Appellees,*

— v. —

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, SECRETARY CHAD F. WOLF, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, DIRECTOR KENNETH T. CUCCINELLI II, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED STATES OF AMERICA,

*Defendants-Appellants.*[*]

——————————

---

[*] The Clerk of the Court is respectfully directed to amend the caption as set forth above.

_____

MAKE THE ROAD NEW YORK, AFRICAN SERVICES COMMITTEE, ASIAN AMERICAN FEDERATION, CATHOLIC CHARITIES COMMUNITY SERVICES, (ARCHDIOCESE OF NEW YORK), CATHOLIC LEGAL IMMIGRATION NETWORK, INC.,

*Plaintiffs-Appellees,*

— v. —

KENNETH T. CUCCINELLI, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, CHAD F. WOLF, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

_____

B e f o r e :

LEVAL, HALL, and LYNCH, *Circuit Judges.*

_____

The Department of Homeland Security appeals from two orders of the United States District Court for the Southern District of New York (Daniels, *J.*) granting motions for preliminary injunctions in these cases. Two sets of Plaintiffs-Appellees – one a group of state and local governments and the other a group of non-profit organizations – filed separate suits under the Administrative Procedure Act, both challenging the validity of a Department of Homeland Security rule interpreting 8 U.S.C. § 1182(a)(4). This statutory provision renders inadmissible to the United States any non-citizen deemed likely to become a

public charge. The district court concluded that Plaintiffs-Appellees demonstrated a likelihood of success on the merits of their claims that the rule is contrary to the Immigration and Nationality Act and that it is arbitrary and capricious. After finding that the other preliminary injunction factors also weighed in favor of granting relief, the district court entered orders in both cases to enjoin implementation of the rule nationwide. We agree with the district court that a preliminary injunction is warranted, but modify the scope of the injunctions to cover only the states of New York, Connecticut, and Vermont. The orders of the district court are thus **AFFIRMED AS MODIFIED**.

——————————

JUDITH N. VALE, Senior Assistant Solicitor General, State of New York, New York, NY (Letitia James, Attorney General, Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, Matthew Colangelo, Chief Counsel for Federal Initiatives, Elena Goldstein, Deputy Bureau Chief, Civil Rights, Ming-Qi Chu, Section Chief, Labor Bureau, State of New York, New York, NY, William Tong, Attorney General, State of Connecticut, Hartford, CT, Thomas J. Donovan, Jr., Attorney General, State of Vermont, Montpelier, VT, James E. Johnson, Corporation Counsel, City of New York, New York, NY, *on the brief*), *for Plaintiffs-Appellees State of New York, City of New York, State of Connecticut, State of Vermont.*

JONATHAN H. HURWITZ, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY (Andrew J. Ehrlich, Elana R. Beale, Robert J. O'Loughlin, Daniel S. Sinnreich, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, Ghita R. Schwarz, Brittany Thomas, Baher A. Azmy, Center for Constitutional Rights, New York, NY, Susan E. Welber, Kathleen Kelleher, Susan Cameron, Hasan Shafiqullah, The Legal Aid Society of New York, New York, NY, *on the brief*), *for Plaintiffs-Appellees Make the*

3

> Road New York, African Services Committee, Asian
> American Federation, Catholic Charities Community
> Services, (Archdiocese of New York), Catholic Legal
> Immigration Network, Inc.

GERARD SINZDAK, Appellate Staff Attorney, Civil Division,
United States Department of Justice, Washington, DC
(Joseph H. Hunt, Assistant Attorney General, Civil
Division, United States Department of Justice,
Washington, DC, Geoffrey S. Berman, United States
Attorney for the Southern District of New York, New
York, NY, Daniel Tenny, Joshua Dos Santos, Appellate
Staff Attorneys, Civil Division, United States
Department of Justice, Washington, DC *on the brief*), *for
Defendants-Appellants United States Department of
Homeland Security, Acting Secretary Chad F. Wolf, United
States Citizenship and Immigration Services, Acting
Director Kenneth T. Cuccinelli, United States of America.*

WILLIAM E. HAVEMANN, Office of General Counsel, United
States House of Representatives, Washington, DC
(Douglas N. Letter, General Counsel, Todd B. Tatelman,
Principal Deputy General Counsel, Megan Barbero,
Josephine Morse, Adam A. Grogg, Office of General
Counsel, United States House of Representatives,
Washington, DC, Robert M. Loeb, Thomas M. Bondy,
Peter E. Davis, Orrick, Herrington & Sutcliffe LLP,
Washington, DC, Rene Kathawala, Orrick, Herrington &
Sutcliffe LLP, New York, NY, *on the brief*), *for Amicus
Curiae* United States House of Representatives, *in
support of Plaintiffs-Appellees.*

*Additional amici curiae listed in Appendix A.*

———————

6

GERARD E. LYNCH, *Circuit Judge*:

In August 2019, the Department of Homeland Security ("DHS") issued a final rule setting out a new agency interpretation of a longstanding provision of our immigration law that renders inadmissible to the United States any non-citizen who is likely to become a "public charge." *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("the Rule" or "the Final Rule"). The Rule expands the meaning of "public charge," with the likely result that significantly more people will be found inadmissible on that basis. Lawsuits challenging the lawfulness of the Rule were quickly filed around the country, including two cases in the Southern District of New York, which we now consider in tandem on appeal.

These two cases – one brought by New York State, New York City, Connecticut, and Vermont, and the other brought by five non-profit organizations that provide legal and social services to non-citizens – raise largely identical challenges to the Rule, centering on the Rule's validity under the Administrative Procedure Act. After hearing combined oral argument on the Plaintiffs' motions for preliminary injunctions filed in both cases, the district court (George B.

4

Daniels, *J.*) concluded that the Plaintiffs had demonstrated a likelihood of success

on the merits of their claims and that the other preliminary injunction factors also

favored interim relief. The district court enjoined DHS from implementing the

Rule throughout the United States in the pair of orders from which DHS now

appeals.

We agree that a preliminary injunction is warranted in these cases, but

modify the scope of the injunctions to cover only the states of New York,

Connecticut, and Vermont. The orders of the district court are thus AFFIRMED

AS MODIFIED.

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    1999 Public Charge Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    II.    2019 Public Charge Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.    The Proposed Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.    Revised Definition and Relevant Public Benefits . . . . . . . . . . . 16

        C.    Adjudicative Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    III.    Procedural Posture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    I.    Threshold Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.    Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      B.     Zone of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.     Likelihood of Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . 38

      A.     Legal Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      B.     The Rule is Contrary to the INA. . . . . . . . . . . . . . . . . . . . . . . . 41

           1.   Origins of the Public Charge Ground . . . . . . . . . . . . . . . . . 42

           2.   The Immigration Act of 1917 . . . . . . . . . . . . . . . . . . . . . . . . 47

           3.   The Immigration and Nationality Act of 1952 . . . . . . . . . 51

           4.   The Current Public Charge Ground . . . . . . . . . . . . . . . . . . . 54

           5.   The Settled Meaning of "Public Charge" . . . . . . . . . . . . . 56

           6.   The Rule's Inconsistency with the Settled Meaning . . . . . 67

      C.     The Rule is Arbitrary and Capricious. . . . . . . . . . . . . . . . . . . . . 84

           1.   Explanation for Changed Definition . . . . . . . . . . . . . . . . . . 85

           2.   Explanation for Expanded List of Benefits . . . . . . . . . . . . 89

III.    Irreparable Harm to the Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IV.    Balance of Equities and the Public Interest . . . . . . . . . . . . . . . . . . . . 99

V.     Scope of Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Appendix A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

# BACKGROUND

The Immigration and Nationality Act ("INA") contains ten grounds of

inadmissibility, each listing various bases on which a non-citizen can be denied

admission to the United States. *See* 8 U.S.C. § 1182(a)(1)-(10). These appeals

7

concern the public charge ground, a constant feature of our immigration law since 1882, which renders inadmissable any non-citizen who "is likely at any time to become a public charge." *Id.* § 1182(a)(4)(A). The statute itself does not define "public charge," and its precise meaning is the hotly contested question in this litigation. In general terms, however, "public charge" has historically been understood to refer to a person who is not self-sufficient and depends on the government for support. *See, e.g.*, 84 Fed. Reg. at 41,295.

The grounds of inadmissibility are assessed not only when a person is physically entering the country, but at multiple points in the immigration process. Consequently, the public charge ground of inadmissibility is applied by three agencies that oversee different aspects of our immigration system. The Department of State considers whether non-citizens are inadmissible as likely public charges when adjudicating visa applications overseas. U.S. Customs and Border Protection ("CBP"), a unit of DHS, assesses the public charge ground when it inspects non-citizens arriving at airports or other ports of entry. And U.S. Citizenship and Immigration Services ("USCIS"), another component of DHS, applies the ground when adjudicating applications for adjustment of status, the

process by which a non-citizen who is already present in the United States in a

temporary immigration status can become a lawful permanent resident ("LPR"),

authorized to live and work in the United States indefinitely.[1] *See id.* at 41,294 n.3.

      The Department of Justice also has a role to play when it comes to public

charge adjudications, albeit on a different statutory basis. In addition to the

public charge ground of inadmissibility, the INA also contains a public charge

ground of removal.[2] 8 U.S.C. § 1227(a)(5). That provision authorizes the

government to remove non-citizens who have already been admitted to the

country but who became public charges within five years of their date of entry. *Id.*

The public charge ground of removal is primarily applied by the Executive Office

for Immigration Review, a component agency of the Department of Justice that

houses the immigration courts.

      While multiple agencies are tasked with interpreting and applying the

public charge grounds of inadmissibility and removal, the Rule at issue in these

cases is an interpretation by DHS of the ground of inadmissibility. Accordingly,

---

[1] LPRs are frequently referred to in popular discussion as "green card holders."

[2] "Removal" is the current legal term for the process popularly known as "deportation." *See Karageorgious v. Ashcroft*, 374 F.3d 152, 154 (2d Cir. 2004).

the Rule governs only public charge determinations carried out by CBP and

USCIS, as component agencies of DHS.[3] 84 Fed. Reg. at 41,294 n.3. As a practical

matter, moreover, the Rule is likely to be applied primarily by USCIS as it

adjudicates applications for adjustment of status, as the lengthy application

process provides more opportunity for a full consideration of the Rule's

provisions than a CBP screening at a port of entry. *See id.* at 41,478.

## I.    1999 Public Charge Guidance

For twenty years preceding the publication of the Rule at issue in these

cases, the governing agency interpretation of the public charge ground was

guidance published in 1999 ("the 1999 Guidance") by the Immigration and

---

[3] In October 2019, the State Department issued an interim final rule aligning its interpretation of "public charge" with the Rule. *See* Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019). Litigation challenging the State Department interim final rule is underway in the Southern District of New York. *See Make the Road New York v. Pompeo*, No. 1:19-cv-11633 (S.D.N.Y.). The Department of Justice has drafted a proposed rule that likewise is intended to adopt a conforming interpretation of the public charge ground of removal, which has been sent to the Office of Management and Budget for review, but no actual text of such a rule has yet been published. *See* Inadmissibility and Deportability on Public Charge Grounds, RIN 1125-AA84, Office of Mgmt. & Budget, Spring 2020 Unified Agenda of Regulatory and Deregulatory Actions.

Nationality Service ("INS"), the predecessor agency of DHS.[4] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999). The 1999 Guidance was issued in response to two pieces of legislation passed by Congress in 1996 that had significant impact on the public charge ground.

The first was the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), a sweeping set of reforms to various public benefits programs. *See* Pub. L. No. 104-193, 110 Stat. 2105 (1996). Among other changes, PRWORA greatly restricted non-citizen access to public benefits in response to concerns that non-citizens were "applying for and receiving public benefits . . . at increasing rates." 8 U.S.C. § 1601(3). The resulting benefits eligibility scheme for non-citizens is complex, to say the least. It suffices for present purposes to say that non-citizens who are present in the United States illegally or who are admitted in a lawful non-immigrant (i.e., temporary) status are ineligible for almost all federal benefits, *see* 8 U.S.C. §§ 1611(a), 1641(b), while

---

[4] INS was dissolved, and many of its responsibilities were transferred to DHS, by the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, §§ 402(3), 471, 116 Stat. 2135, 2205, 2178.

11

those who are in LPR status, which is permanent, are ineligible for means-tested

federal benefits for their first five years as an LPR, *see* 8 U.S.C. §§ 1613(a), 1641(b).

At the conclusion of this five-year waiting period, LPRs become eligible to receive

benefits for which they otherwise qualify.[5]

A little over a month after enacting PRWORA, Congress passed the Illegal

Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). *See* Pub. L.

No. 104-208, div. C, 110 Stat. 3009-546 (1996). In IIRIRA, Congress revisited the

public charge ground to add five factors that adjudicators must consider when

determining whether a non-citizen is likely to become a public charge: the non-

citizen's "[(1)] age; [(2)] health; [(3)] family status; [(4)] assets, resources, and

financial status; and [(5)] education and skills." 8 U.S.C. § 1182(a)(4)(B)(i). IIRIRA

also required non-citizens seeking to immigrate to the United States based on

---

[5] The majority of the public benefits to which the Rule applies are means-tested benefits, that is, there are income and asset limits for eligibility. However, the housing programs administered by the Department of Housing and Urban Development are not considered means-tested benefits and there is thus no five-year waiting period before LPRs can access these services. *See* Eligibility Restrictions on Noncitizens: Inapplicability of Welfare Reform Act Restrictions on Federal Means-Tested Public Benefits, 65 Fed. Reg. 49,994 (Aug. 16, 2000).

their family ties[6] to obtain affidavits of support, in which a sponsor agrees to maintain the non-citizen at an income of no less than 125% of the federal poverty guidelines ("FPG"), and instructed adjudicators to consider those affidavits as a discretionary sixth factor in their analysis. 8 U.S.C. §§ 1182(a)(4)(c), 1183a(a)(1).

After the passage of PRWORA and IIRIRA, INS observed widespread "confusion about the relationship between the receipt of federal, state, [and] local public benefits and the meaning of 'public charge' under the immigration laws." 64 Fed. Reg. at 28,689. Concerned that this confusion was "deterr[ing] eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they [we]re legally entitled to receive," INS issued the 1999 Guidance, thus for the first time publishing its interpretation of "public charge" in the Federal Register.[7] *Id.* at 28,692.

––––––––––––––––––––

[6] Persons seeking to immigrate to the United States are eligible for admission as immigrants on various bases, including having certain familial relationships to United States citizens or LPRs.

[7] The 1999 Guidance was not a final rule, but was published in the Federal Register as an interim measure to establish the agency's "public charge" definition while INS went through the rulemaking process. 64 Fed. Reg. at 28,689. The Guidance was a reproduction of INS's field guidance, making public the internal directive of the agency to its officials tasked with applying the "public charge" standard. INS did publish a proposed rule alongside the 1999 Guidance,

13

The 1999 Guidance defined "public charge" to mean a person who is "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Id.* at 28,689 (internal quotation marks omitted). The Guidance identified four public benefits that could be taken as evidence of primary dependence: Supplemental Security Income ("SSI"), which "guarantees a minimum level of income" for older adults and people who are blind or disabled; Temporary Assistance for Needy Families ("TANF"), which provides cash assistance to families living in poverty;[8] state and local cash assistance programs, often called "General Assistance" programs; and any program (including Medicaid) supporting people institutionalized for long-term care. *Id.* at 28,692, 28,687; *see* 45 C.F.R. § 260.20.

---

but it was never finalized. *See* Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999). The 1999 Guidance remained the operative agency interpretation until 2019.

[8] TANF also funds various forms of non-cash assistance, e.g., subsidized child care. These additional forms of support were excluded from consideration under the Guidance. *See* 64 Fed. Reg. at 28,692 n.17.

14

INS explained that the nature of these benefits suggested that recipients may be dependent on the government for subsistence, explicitly distinguishing non-cash benefits that are "by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." 64 Fed. Reg. at 28,692.[9] The Guidance instructed that the ultimate determination as to whether a non-citizen was primarily dependent on the government was to be made by considering the totality of the circumstances: neither current nor past "receipt of cash income-maintenance benefits . . . automatically ma[de] an alien inadmissible as likely to become a public charge." *Id.* at 28,690.

## II.     2019 Public Charge Rule

### A.     The Proposed Rule

Nearly two decades after INS issued its 1999 interpretation of "public charge," DHS published a notice of proposed rulemaking ("the Proposed Rule") announcing its intention to change the agency's interpretation of the public charge ground. *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114

---

[9] The 1999 Guidance explicitly stated that adjudicators "should not place any weight on the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance." 64 Fed. Reg. at 28,689.

(Oct. 10, 2018). Among other provisions, the Proposed Rule suggested redefining "public charge" to mean "an alien who receives one or more public benefit" at certain defined usage thresholds, and listed a broader set of benefits as relevant to the public charge definition. *Id.* at 51,289-90.[10]

The Proposed Rule divided its list of relevant benefits into two groups – monetizable and non-monetizable – and set usage thresholds for each. The monetizable benefits (e.g., SSI) were to be considered in the public charge analysis if the cumulative value of the benefits received in one year exceeded 15% of FPG for a household of one. *Id.* The non-monetizable benefits (e.g., Medicaid) were counted if the non-citizen received the benefit "for more than 12 months in the aggregate within a 36 month period." *Id.* at 51,290. The Proposed Rule garnered 266,077 comments during the notice and comment period, "the vast majority of which opposed the rule."[11] 84 Fed. Reg. at 41,297.

---

[10] Technically, the Proposed Rule defined public charge to mean any non-citizen who received any "public benefit," but then further defined "public benefit" to mean one of the listed benefits if usage exceeded the prescribed threshold level, as described in the next paragraph.

[11] We note that these appeals have also generated significant public interest and acknowledge with appreciation the contributions of the amici curiae appearing before us. The twenty amicus briefs we received (nineteen of which support the

## B.  Revised Definition and Relevant Public Benefits

In August 2019, DHS published its Final Rule, which made a number of changes from the Proposed Rule. Most relevant for our purposes, the Rule enacts a different definition of "public charge," interpreting the term as a person "who receives one or more public benefits, as defined in [a subsequent] section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." *Id.* at 41,501. While the Final Rule incorporates the same expanded list of relevant public benefits as the Proposed Rule, it did away with the categorization of "monetizable" versus "non-monetizable" benefits, eliminated the 15% of FPG threshold requirement for monetizable benefits, and elevated the 12-month threshold requirement for non-monetizable benefits into the definition of public charge itself, thus making it the usage threshold for all of the listed benefits. *Id.* at 41,501-02.

---

Plaintiffs, and one of which supports the government) represent the views of a diverse collection of more than four hundred organizations, businesses, and scholars and provided helpful nuance on many aspects of the complex questions before us.

17

With respect to the relevant benefits, the Final Rule retains those benefits INS made relevant to the public charge determination in 1999 – SSI, TANF, and state or local cash assistance programs – and adds a number of other benefits: Medicaid;[12] the Supplemental Nutrition Assistance Program ("SNAP"), commonly referred to as food stamps; the Section 8 Housing Choice Voucher Program; Section 8 Project-Based Rental Assistance; and public housing. *Id.* at 41,501. Thus, under the Final Rule, use of any quantity of one of these benefits in a given month counts as one month towards the 12-months-within-36 months limit beyond which one is considered a public charge. And because the definition aggregates benefits usage, use of two benefits in a single month counts as two months (and three benefits in a single month counts as three months, etc.), with the result that a person could reach the 12-month threshold in six months or fewer. The 12-month threshold is thus deceptive: an industrious, self-sufficient

---

[12] The 1999 Guidance identified Medicaid as a relevant public benefit only when it was used to fund long-term institutionalization, but the Rule broadens the consideration to include Medicaid used to fund most forms of routine healthcare. The Rule does not count Medicaid benefits only when they are used for emergency medical conditions, for services provided under the Individuals with Disabilities Education Act, for school-based services, and by children or pregnant and newly postpartum women. 84 Fed. Reg. at 41,501.

person who, by reason of a temporary injury or illness, used three benefits per month for four months would thereby be conclusively established as a public charge.

The Rule's public charge definition would be complex to apply even to assess past or current benefits usage. But lest we forget the context in which the Rule operates, we highlight that the vast majority of non-citizens will not have been eligible to receive any of the relevant public benefits (and therefore presumably will not have received such benefits) at the time the Rule is applied and their likelihood of becoming a public charge is assessed.[13] Recall that the Rule applies primarily to non-citizens seeking to adjust status to *become* LPRs but that, in general, non-citizens are not eligible to receive the relevant public benefits until five years *after* they obtain LPR status. Accordingly, very few non-citizens will have a history of public benefits usage at the time the forward-looking public charge ground is applied. Under the revised public charge definition, the Rule

---

[13] We note that PRWORA allows states flexibility to determine non-citizen eligibility for state-funded benefits programs and some states have chosen to fund benefits for those who do not yet have LPR status. *See* 83 Fed. Reg. at 51,131; *see also* 8 U.S.C. § 1621(d). However, as counsel for the government acknowledged at oral argument, it would be the rare exception if a non-citizen received benefits prior to the public charge determination. Oral Argument at 32:00-33:30.

thus requires adjudicators to predict whether, five years or more into the future, the non-citizen is likely to use one of the enumerated benefits for more than twelve months, or to use two of the enumerated benefits for more than six months, and so on, within a thirty-six-month period. *Id.* at 41,502.

### C. Adjudicative Framework

To support adjudicators in making what might seem an impracticable prediction about future benefits usage, the Rule lays out an adjudicative framework. This framework fleshes out the five factors adjudicators are statutorily required to consider – age, health, family status, finances, and education – and explains how each should be analyzed to decide whether a non-citizen is a likely future user of public benefits. The Rule further instructs adjudicators how to assess the sixth, discretionary factor – the affidavit of support – and adds a seventh factor for consideration, the immigration status sought. As laid out below, the framework identifies the particular characteristics adjudicators should look for with each factor and, for some, lists the forms of evidence the non-citizen must submit.

*Age*. Adjudicators are to assess whether a non-citizen's age affects his ability to work. The Rule suggests that preference be given to non-citizens between eighteen and sixty-one years of age. Being under eighteen or over sixty-one is treated as making it more likely that the applicant will become a public charge. 84 Fed. Reg. at 41,502.

*Health*. Adjudicators are to be on the lookout for non-citizens with medical conditions that are "likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work." *Id.*

*Family Status*. Adjudicators are to assess whether a non-citizen's household size makes him more likely to utilize the listed benefits. Large families are thus more suspect. *Id.*

*Assets, Resources, and Financial Status*. Adjudicators are to consider whether the non-citizen's household has a gross income above 125% of FPG or has significant assets, whether the household assets and resources would cover any reasonably foreseeable medical costs, any outstanding financial liabilities, and whether the non-citizen has ever in the past applied for or received any of the

21

enumerated public benefits. *Id.* at 41,502-03. Non-citizens are to evidence this factor by submitting, *inter alia*, their tax returns, bank statements, credit history and score, and proof of private health insurance. *Id.* at 41,503.

*Education and Skills.* Adjudicators are to consider whether the non-citizen has adequate education and skills to obtain lawful employment with an income sufficient to avoid becoming a public charge. *Id.* Non-citizens are directed to evidence this factor by submitting, *inter alia*, their employment history, tax returns, proof of degrees or licenses, and proof of proficiency in English or any other languages. *Id.* at 41,503-04.

*Affidavit of Support.* For those non-citizens who must obtain an affidavit of support, the Rule directs adjudicators to consider "the likelihood that the sponsor would actually provide the statutorily-required amount of financial support," which is to be evidenced by proof of the sponsor's income and assets, the relationship between the non-citizen and sponsor, and the number of other non-citizens for whom the sponsor has executed affidavits of support. *Id.* at 41,504.

*Desired Immigration Status.* The Rule newly requires adjudicators to consider the immigration status sought by the non-citizen, "as it relates to the

22

alien's ability to financially support[ ] himself or herself during the duration of the alien's stay." *Id.* After the publication of the Rule, USCIS updated its policy manual to clarify that it would generally treat seeking LPR status as a negative factor, given that LPRs are eligible for public benefits after the five-year waiting period has elapsed. *See* USCIS, POLICY MANUAL vol. 8, pt. G, ch. 12 (2020). We note that the vast majority of non-citizens who are subject to the Rule are being assessed precisely *because* they are seeking LPR status; this provision therefore would appear to automatically assign a negative factor to any applicant for lawful immigration to the United States.

After addressing these factors, the Rule concludes by identifying a number of heavily weighted negative and positive circumstances that adjudicators should consider in deciding a case. While cautioning that no single factor is dispositive, the Rule directs adjudicators to give particular emphasis to four heavily weighted negative factors: (1) lacking a current or recent employment history, (2) receiving a relevant public benefit for more than twelve months in the preceding three years, (3) lacking health insurance while having a diagnosed medical condition likely to require extensive treatment or institutionalization, and (4) having been

found inadmissible or removable on public charge grounds in the past. 84 Fed. Reg. at 41,504. In contrast, the Rule also identifies the following heavily weighted positive factors: (1) having a household income that exceeds 250% of FPG, (2) being employed with an income exceeding 250% of FPG, and (3) having private health insurance that was not purchased using Affordable Care Act premium tax credits. *Id.*

### III. Procedural Posture

Shortly after DHS issued the Final Rule in August 2019, the two cases at issue in these appeals were filed in the Southern District of New York. New York, Vermont, Connecticut, and New York City (collectively "the States") filed suit first, followed a few days later by Make the Road New York, African Services Committee, Asian American Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc. (collectively, "the Organizations"). The two groups of plaintiffs (collectively, "the Plaintiffs") raise largely similar challenges to the Rule, arguing that it is invalid under the Administrative Procedure Act ("APA") as well as the Fifth Amendment's due process clause. The Organizations also challenge the Rule

24

under the Fifth Amendment's guarantee of equal protection. Both the States and the Organizations moved for a preliminary injunction, and the district court heard combined oral argument.

On October 11, 2019, four days before the Rule was scheduled to take effect, the district court granted both motions for preliminary injunctions in largely identical decisions and orders. After concluding that both the States and the Organizations had standing to challenge the Rule, the district court found that they had demonstrated a likelihood of success on the merits of their claims that the Rule was contrary to law as well as arbitrary and capricious, and that the other preliminary injunction factors supported injunctive relief. The district court thus enjoined DHS from enforcing the Rule nationwide.[14]

DHS timely appealed the district court's grant of the preliminary injunctions and moved for a stay pending appeal. A motions panel of this Court denied DHS's motion to stay. DHS then filed an application for a stay with the Supreme Court, requesting that the preliminary injunctions be stayed through the resolution of the merits of this appeal and the disposition of any petition for a

_____

[14] The district court also ordered that the effective date of the Rule be stayed pursuant to 5 U.S.C. § 705.

writ of certiorari. The Supreme Court granted the application in January 2020.

*DHS v. New York*, 140 S. Ct. 599 (2020). With the district court's preliminary

injunctions thus stayed, the Rule went into effect nationwide on February 24,

2020.[15]

## DISCUSSION

We review a district court's decision to grant a preliminary injunction for

abuse of discretion, examining the legal conclusions underpinning the decision

---

[15] Five similar cases challenging the Rule were brought in the District of Maryland, the Northern District of Illinois, the Northern District of California, and the Eastern District of Washington. *See CASA de Maryland, Inc. v. Trump*, No. 19-cv-2715 (D. Md.); *Cook Cty. v. Wolf*, No. 19-cv-6334 (N.D. Ill.); *City and Cty. of San Francisco v. USCIS*, No. 19-cv-4717 (N.D. Cal.); *California v. DHS*, No. 19-cv-4975 (N.D. Cal.); *Washington v. DHS*, No. 19-cv-5210 (E.D. Wash.). All five district courts granted plaintiffs' motions for preliminary injunctions. DHS appealed in all cases and, as here, requested that the Fourth, Seventh, and Ninth Circuits stay the district courts' preliminary injunctions pending appeal. The Fourth and a divided panel of the Ninth Circuit granted DHS's motions to stay, the Ninth Circuit doing so in a lengthy published opinion. *See City & Cty. of San Francisco v. USCIS*, 944 F.3d 773 (9th Cir. 2019). The Seventh Circuit denied DHS's motion to stay, but DHS successfully sought a stay from the Supreme Court for the preliminary injunction at issue in that case, which was limited in scope to the state of Illinois. *See Wolf v. Cook Cty.*, 140 S. Ct. 681 (2020). The Seventh Circuit has since decided the merits of the case before it, holding that plaintiffs were likely to succeed on the merits of their challenge to the Rule and affirming the preliminary injunction entered by the Northern District of Illinois. *See Cook Cty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020).

de novo and the factual conclusions for clear error. *Cty. of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008). The scope of the injunctive relief ordered by the district court is evaluated for abuse of discretion. *Id.*

These appeals fall under the preliminary injunction framework laid out in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *Winter* instructs that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where, as here, the government is a party to the suit, the final two factors merge. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009); *see California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Before we turn to the merits of these appeals, however, we address two threshold arguments raised by DHS.

## I.    Threshold Arguments

DHS first argues that neither the States nor the Organizations meet the "irreducible constitutional minimum of standing" and thus cannot be permitted to challenge the Rule. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). DHS

further argues that the Plaintiffs may not bring suit because they do not fall within the zone of interests protected by the public charge statute. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). We disagree with DHS on both counts.

### A.    Standing

At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment. Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts" that establish the "three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and citation omitted). Here, DHS argues that the States and Organizations have failed to establish injury in fact, which requires the Plaintiffs to show they have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

28

The States allege that they are injured because the Rule will cause many of their residents to forgo use of public benefits programs**,** thereby decreasing federal transfer payments to the states, reducing Medicaid revenue, increasing overall healthcare costs, and causing general economic harm. DHS argues that these projected harms do not suffice to show injury in fact because the facts asserted by the States at most establish a possible, rather than imminent, future injury, and because any economic losses will be offset by the money saved by not providing public benefits to those who disenroll. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

We are satisfied that the States have sufficiently established actual imminent harms. DHS itself anticipates that a significant number of non-citizens will disenroll from public benefits as a result of the Rule's enactment, including many who are not in fact subject to the Rule but who would be fearful of its consequences nonetheless. *See* 84 Fed. Reg. at 41,300-01, 41,463. When an agency action has a "predictable effect . . . on the decisions of third parties," the consequences of those third party decisions may suffice to establish standing, even when the decisions are illogical or unnecessary. *See Dep't of Commerce v. New*

*York*, 139 S. Ct. 2551, 2566 (2019). Contrary to its disparagement before us of the likelihood of harm to the States from disenrollment, DHS acknowledged in its own explication of the costs and benefits considered in adopting the Rule that expected disenrollment will result in decreased federal funding to states, 84 Fed. Reg. at 41,485, decreased revenue for healthcare providers, *id*. at 41,486, and an increase in uncompensated care, *id*. at 41,384.

DHS's own predictions thus align with declarations submitted by the States documenting the Rule's chilling effect on non-citizen use of public benefits – which began even prior to the Rule taking effect – and its anticipated economic impacts.[16] Where the agency itself forecasts the injuries claimed by the States, we

---

[16] For example, the Commissioner of Health of the State of New York stated that "even before the Final Rule has gone into effect, consumers have been calling . . . [and] inquiring about canceling their Medicaid or other health insurance coverage because of the Final Rule." New York ("N.Y.") J. App. 512. The Commissioner further notes that "[i]ndividuals without coverage will still need and receive care" but without insurance "those costs will be borne by the healthcare delivery system." *Id.* The President and CEO of New York City Health and Hospitals Corporation provided specific examples of patients refusing care or requesting disenrollment because of the Rule, and estimated that in the best-case scenario, the Rule could result in a loss of $50 million in the first year for the municipal hospital system. *See* N.Y. J. App. 266-69; *see also* N.Y. J. App. 183 (Commissioner of the New York City Department of Social Services providing statistics evidencing a "striking and dramatic drop in non-citizen SNAP cases" since the public charge rule began to get media coverage); N.Y. J. App. 227, 233-34

agree with the Ninth Circuit that it is "disingenuous" for DHS to claim that the injury is not sufficiently imminent. *San Francisco*, 944 F.3d at 787 (finding state and local governments had standing to challenge the Rule).

We are also unpersuaded by DHS's argument that the States cannot establish injury in fact because any losses in funding will be offset by the savings accrued as fewer people seek public assistance. "[T]he fact that an injury may be outweighed by other benefits . . . does not negate standing."[17] *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006). In any event, this simplistic argument fails to account for the fact that the States allege injuries that extend well beyond reduced Medicaid revenue and federal funding to the States, including an overall

---

(Commissioner-Designate of Connecticut Department of Social Services estimating economic harms and increased healthcare costs); N.Y. J. App. 385-86 (Acting Secretary of the Agency of Human Services in Vermont predicting increased use of state-funded services).

[17] For largely the same reason, we are not persuaded by DHS's argument that the States' losses will be offset by their continued receipt of Emergency Medicaid funds, a benefit not impacted by the Rule. We further note that Emergency Medicaid is limited to care provided after a "sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity" if immediate medical care is necessary to prevent serious health consequences. 42 C.F.R. § 440.255(b)(1), (c). That narrow definition is far from a blanket assurance that all or even most services rendered in an emergency-room setting will be covered.

increase in healthcare costs that will be borne by public hospitals and general economic harms. *See, e.g.*, N.Y. J. App. 185 (explaining that "the SNAP program has a direct economic multiplier effect: for every one dollar in SNAP benefits received, there is an approximate $1.79 in increased economic activity"); N.Y. J. App. 512-13. Again, DHS itself identified these same broader harms as likely outcomes of the Rule. *See, e.g.*, REGULATORY IMPACT ANALYSIS, INADMISSIBILITY ON PUBLIC CHARGE GROUNDS, RIN 1615-AA22, at 105-06 (2019) (calculating that reduced use of SNAP caused by the Rule will result in an estimated annual decrease of approximately $550 million in economic activity). We are satisfied that the States' alleged economic harms are sufficiently concrete and imminent to constitute injury in fact.

The Organizations allege injury on the grounds that the Rule has necessitated significant and costly changes in their programmatic work and caused increased demand on their social service programs. DHS contends that the Organizations have only shown harm to their "abstract social interests" and that increased costs of representing clients after the Rule is not sufficient to

32

confer standing. Appellants' Br. at 23 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

An organization need only show a "perceptible impairment" of its activities in order to establish injury in fact. *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993). Contrary to DHS's assertion that the Organizations have merely altered the subject matter of their existing outreach work, the declarations submitted by the Organizations make clear that the Rule has required significant diversion of resources. For example, over the course of three months Make the Road New York conducted almost forty workshops for community members devoted exclusively to the Rule, necessitating the hiring of two part-time staff members. *See* Make the Road ("M.T.R.") J. App. 319-20, 323. The complexities of the Rule required Catholic Charities to change its educational outreach from group sessions to time-intensive individual meetings and to institute a series of evening phone banks. *See* M.T.R. J. App. 344, 349-51. The African Services Committee is funding a campaign of radio-based public service announcements to disseminate information about the Rule and has documented an increased demand on its social service programs, as clients turn away from

33

public benefits programs.[18] *See* M.T.R. J. App. 466-67, 470.

"[A] nonprofit organization establishes an injury-in-fact if, as here, it establishes that it spent money to combat activity that harms its . . . core activities." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) (internal quotation marks omitted). The Organizations are dedicated to providing an array of legal and social services to non-citizens and they have expended significant resources to mitigate the Rule's impact on those they serve. In so doing, they have diverted resources that would otherwise have been available for other programming, a "perceptible opportunity cost" that suffices to confer standing. *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011).

The Rule will also impede the Organizations' abilities to carry out their responsibilities in a variety of ways. *Oyster Bay*, 868 F.3d at 110 (finding standing

---

[18] Similarly, the Asian American Federation has devoted resources to a press conference and media-based outreach campaign and plans to reallocate staff to implement new programmatic priorities in light of the Rule. *See* M.T.R. J. App. 487, 490-91. And the Catholic Legal Immigration Network has seen a three-fold increase in the volume of inquiries related to the public charge ground and anticipates redirecting staff currently assigned to other projects to respond to the Rule. *See* M.T.R. J. App. 502-04.

where an organization "face[d] increased difficulty in meeting with and organizing [day] laborers"). For example, the Asian American Federation, which "support[s] culturally appropriate health and human services for Asian American immigrants[,]" is preparing to establish a network of social service providers that will not ask for immigration status information in order to provide alternatives for non-citizens who will not access public benefits because of the Rule. M.T.R. J. App. 485-86, 490.  And while Catholic Charities was previously able to assign adjustment of status cases to paralegals working under the supervision of accredited representatives or attorneys, it anticipates that most of the adjustment cases for its predominantly low-income clients will now need to be handled by an attorney and require in-person representation at adjustment interviews. M.T.R. J. App. 346-48.

These injuries constitute "far more than simply a setback to the [Organizations'] abstract social interests." *Havens Realty*, 455 U.S. at 379. Even before its entry into force, the Rule has caused a "perceptible impairment" of the Organizations' activities and further harms are imminent. *Oyster Bay*, 868 F.3d at

35

110 (internal quotation marks omitted). As with the States, we conclude that the injuries alleged by the Organizations suffice to confer Article III standing.

**B**.    **Zone of Interests**

DHS also argues that neither group of Plaintiffs falls within the zone of interests of the public charge statute. The zone-of-interests test restricts the ability to bring suit to those plaintiffs whose interests are "arguably within the zone of interests to be protected or regulated by the statute that [they] say[] was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted). Because Congress intended to make agency action presumptively reviewable under the APA, that test is not especially demanding in the context of APA claims and may be satisfied even if there is no "indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). A plaintiff is precluded from bringing suit only where its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. at 399. Here, DHS argues that the Plaintiffs' interests fall outside the zone of

interests of the statute because the Plaintiffs seek to facilitate greater use of public benefits by non-citizens, which it views as inconsistent with the purpose of the public charge ground.

This argument mischaracterizes both the purpose of the public charge statute and the Plaintiffs' interests. DHS assumes the merits of its own argument when it identifies the purpose of the public charge ground as ensuring that non-citizens do not use public benefits. As we conclude *infra* in Section II.B.6, Congress enacted the public charge ground to refuse admission to non-citizens who will likely be unable to support themselves in the United States, which is not tantamount to ensuring that non-citizens do not access any public benefits.

Moreover, when we consider the role of the public charge ground within the broader context of the INA, a fuller picture of the interests implicated in the statute emerges. *See Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 529 (1991) (explaining the Supreme Court's reasoning in *Clarke* that, in the context of the National Bank Act "the zone-of-interests test was to be applied not merely in the light of § 36, which was the basis of the plaintiffs' claim on the merits, but also in the light of § 81, to which § 36 was an exception"). The public

37

charge statute delineates a category of persons who are to be denied adjustment of status (or another form of admission) to which they would otherwise have a claim. *See, e.g.*, 8 U.S.C. § 1255 (detailing requirements for adjustment of status). The grounds of inadmissibility are the fulcrum on which Congress balances its interest in allowing admission where it advances goals of family unity and economic competitiveness against its interest in preventing certain categories of persons from entering the country. *See* 84 Fed. Reg. at 41,306. DHS suggests that only those parties advocating increasingly harsher interpretations of the grounds of inadmissibility could fall within the zone of interests protected by the statute. That is too narrow a read of both the zone-of-interests test itself and the interests protected by the public charge ground. Understood in context, its purpose is to exclude where appropriate and to not exclude where exclusion would be inappropriate. *See Patchak*, 567 U.S. at 225-26.

As with the interests protected by the statute, DHS mischaracterizes the Plaintiffs' interests when it claims they seek only increased non-citizen enrollment in public benefits. The States actually seek to protect the economic benefits that result from healthy, productive, and engaged immigrant

38

communities. And the Organizations' interests stem from their assorted missions to increase non-citizen well-being and status, which they express in their work to provide legal and social services to non-citizens. An overbroad interpretation of the public charge ground, tipping the balance too far in the direction of exclusion at the expense of admission in the interest of family unity and economic vitality, imperils both these interests. *See Clarke*, 479 U.S. at 399 n.14 (finding zone of interests could apply to "those whose interests are directly affected by a broad or narrow interpretation of the [statute]" (internal quotation marks omitted)).

The Plaintiffs are among "those who in practice can be expected to police the interests that the statute protects[,]" namely, the admission of non-citizens who will be self-sufficient and the exclusion of those who will not. *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 131 (2d Cir. 2020) (internal quotation marks omitted); *see Bank of Am. Corp. v. City of Miami,* 137 S. Ct. 1296, 1304 (2017). We conclude that the States and the Organizations have Article III standing to challenge the Rule and that they fall within the zone of interests of the public charge statute. We thus turn to the merits of these appeals.

## II.    Likelihood of Success on the Merits

We begin by considering whether the Plaintiffs are likely to succeed on the merits of their claims, the first preliminary injunction factor. *See Winter*, 555 U.S. at 20. The Plaintiffs challenge the Rule under the APA, which declares unlawful any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Though the Plaintiffs contend that the Rule violates the APA for several reasons, we focus on the arguments that the Rule is unlawful because it is contrary to the INA and because it is arbitrary and capricious.

## A.     Legal Framework

"We evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* deference framework." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017). At the first step of *Chevron*, we consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Accordingly, we start our analysis

40

below by considering whether Congress has spoken to its intended meaning of the statutory term "public charge" and conclude that it has done so. Because the intent of Congress is clear, "*Chevron* leaves the stage" and we proceed to the central question of whether DHS's interpretation of "public charge" is consistent with this intent. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (internal quotation marks omitted). We conclude that the Rule is contrary to the INA and that the Plaintiffs have thus demonstrated a likelihood of success on the merits of this claim. *See* 5 U.S.C. § 706(2)(A).

We then move to the Plaintiffs' second argument, that the Rule is unlawful for the further reason that it is procedurally arbitrary and capricious. *See id*. We consider this argument under the familiar rubric laid out in *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), which asks whether the agency has "articulate[d] a satisfactory explanation for its action."[19] *Id.* at 43. We conclude

---

[19] As we noted in *Catskill Mountains*, there has been "[m]uch confusion" about the relationship between *Chevron* and the *State Farm* frameworks. 846 F.3d at 522. We distinguished the two, however, on the grounds that "*State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process" while *Chevron* "is generally used to evaluate whether the conclusion reached as a result of that process . . . is reasonable." *Id.* at

41

that DHS failed to provide a reasoned explanation for its changed definition and

the expanded list of relevant public benefits and that the Plaintiffs are thus also

likely to succeed on the merits of their claim that the Rule is arbitrary and

capricious under 5 U.S.C. § 706(2)(A).[20]

Accordingly, because the Plaintiffs have shown a likelihood of success on

these two arguments, they have established the first preliminary injunction factor

in their favor.

### B.     The Rule is Contrary to the INA.

"In a statutory construction case, the beginning point must be the language

of the statute[.]" *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992). "If

the statutory text is ambiguous, we also examine canons of statutory

construction" to identify congressional intent. *Catskill Mountains*, 846 F.3d at 512;

*see Chevron*, 467 U.S. at 843 n.9. Here, the Plaintiffs do not argue that "public

---

521. On appeal, the Plaintiffs primarily raise procedural challenges to the Rule.
We thus consider these arguments under the *State Farm* framework. *See also Nat.
Res. Def. Council, Inc. v. U.S. EPA*, 961 F.3d 160, 170-71 (2d Cir. 2020).

[20] Because we find the Plaintiffs are likely to succeed on the merits of their two
primary arguments, we need not address their additional argument that the Rule
is contrary to the Rehabilitation Act or the Organizations' argument that the Rule
violates equal protection.

charge" is unambiguous on its face, relying instead on the ratification canon to ascertain the clear intent of Congress.

The ratification canon provides that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). The Plaintiffs argue that Congress ratified the settled judicial and administrative interpretations of "public charge" as it repeatedly reenacted the public charge ground over the course of more than a century – most recently in 1996 – such that the current public charge statute unambiguously forecloses the Rule's new interpretation of the term. In response, DHS argues that its interpretation is not precluded by the historical interpretations of "public charge" and that other provisions of the INA show that the Rule is consistent with Congress's intended meaning of "public charge." Proper application of the ratification canon requires a thorough understanding of the evolution of the public charge statute, from its inception in 1882 to its enactment in its current form in 1996, as well as the accompanying body of administrative and judicial decisions interpreting the term. Accordingly, we begin with a historical review.

### 1. Origins of the Public Charge Ground

The public charge ground has its roots in concerns that arose in the late nineteenth century that foreign nations were addressing poverty within their own borders by funding passage to the United States for their poorer citizens. *See* 13 CONG. REC. 5,109 (1882). As one of the primary immigrant-receiving states, New York in particular was concerned that, upon arrival, these non-citizens "bec[a]me at once a public charge . . . get[ting] into our poor-houses and alms-houses." *Id.* In response to the costs of supporting new arrivals and other expenditures associated with its role overseeing the immigration process, New York attempted to impose various taxes and bonds on arriving immigrants, as well as the shipping companies providing their transport. *See id*. at 5,107. The Supreme Court, however, repeatedly struck down these state statutes as unconstitutional, on the grounds that the Constitution vested the power to "regulate commerce with foreign nations," U.S. CONST. art. I, § 8, cl. 3, in Congress. *See, e.g.*, *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875).

New York thus turned to Congress for assistance, lobbying for the enactment of two provisions that ultimately became law with the Immigration Act of 1882: the public charge ground of exclusion and the immigrant fund. The

inaugural public charge statute directs immigration inspectors to board arriving ships and refuse permission to land to any passenger who is "unable to take care of himself or herself without becoming a public charge[.]" Immigration Act of 1882, Pub. L. No. 47-376, § 2, 22 Stat. 214, 214. While denying entry to those who could not care for themselves, the Act simultaneously established an "immigrant fund," which was to be used, *inter alia*, "for the care of immigrants arriving in the United States, [and] for the relief of such as are in distress." *Id.* § 1. By these provisions, the Act established a scheme that distinguished between those arriving immigrants who were "unable to take care of [themselves]" and those who were merely "in distress." *Id.* §§ 1, 2. The former were to be excluded; the latter provided with financial support. Representatives from New York spoke in favor of this two-part design, applauding the effort to exclude those who would depend on public assistance while offering words of praise for the immigrants who may arrive in need of some aid but ultimately go on to "learn our language, adapt themselves readily to our institutions, and become a valuable component part of the body-politic."13 CONG. REC. 5,108 (statement of Rep. Van Voorhis).

45

Early interpretations of the term "public charge" from this era come principally from state courts and treat the term as somewhat interchangeable with "pauper," distinguishable from those who were simply poor by the permanence of the condition. For example, the Massachusetts Supreme Court explained that a bond could be required for arriving immigrants who had "been paupers in a foreign land; that is, for those who have been a public charge in another country; and not merely destitute persons, who, on their arrival here, have no visible means of support[.]" *City of Boston v. Capen*, 61 Mass. 116, 121 (Mass. 1851). The court affirmed that the bond was necessary only from "those who, by reason of some permanent disability, are unable to maintain themselves" and who "might become a heavy and long continued charge to the city, town, or state, in this country[.]" *Id.* at 122; *see also State v. The S.S. Constitution*, 42 Cal. 578, 582 (Cal. 1872); *City of Alton v. Cty. of Madison*, 21 Ill. 115, 116 (Ill. 1859).

Congress amended the immigration laws in 1891, making slight revisions to the public charge ground of exclusion while adding for the first time a public charge ground of deportation. *See* Immigration Act of 1891, Pub. L. No. 51-551, §§ 1, 11, 26 Stat. 1084, 1084, 1086. Under the terms of the 1891 Act, "[a]ll idiots,

46

insane persons, [and] paupers or persons likely to become a public charge" were

to be excluded from admission, *id.* § 1, while a non-citizen who became "a public

charge within one year after his arrival in the United States" could be deported,

*id.* § 11.

In 1907, Congress again made modest revisions to the public charge

ground, amending the law to exclude "paupers; persons likely to become a public

charge; [and] professional beggars[.]" Immigration Act of 1907, Pub. L. No. 59-96,

§ 2, 34 Stat. 898, 899. A few years after the 1907 Act, the Supreme Court weighed

in on the meaning of "public charge" in its first and (as of yet) only interpretation

of the term. In *Gegiow v. Uhl*, 239 U.S. 3 (1915), the Court considered the case of

two Russian immigrants who had been found likely to become public charges

because they arrived with little money; were bound for Portland, Oregon, where

work was scarce; and had no one legally obligated to support them. *Id.* at 8. In its

analysis, the Court emphasized that "public charge" was listed alongside

"paupers" and "professional beggars" in the statute, reasoning that the term

should "be read as generically similar to the others mentioned before and after."

*Id.* at 10. Accordingly, the Court concluded that a "public charge," like the other

categories of persons mentioned, must be defined by some kind of "permanent personal objections." *Id.* Because the Russian immigrants had been deemed likely public charges based on the Portland labor market, rather than on any intrinsic and problematic characteristics of their own, the Court reversed the determination.

Citing *Gegiow*, we declared ourselves "convinced" in a subsequent decision that "Congress meant [public charge] to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future." *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917). The Ninth Circuit adopted our interpretation in *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920), *rev'd in part on other grounds,* 259 U.S. 276, 285 (1922). Other circuits adopted a somewhat broader interpretation of the term as encompassing "not only those persons who through misfortune cannot be self-supporting, but also those who will not undertake honest pursuits, and who are likely to become periodically the inmates of prisons[,]" *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (internal quotation marks omitted); *see United States ex rel. Medich v. Burmaster*, 24 F.2d 57, 59 (8th Cir. 1928). But those interpretations as

48

well emphasized the habitual and persistent nature of the dependency that would render one a public charge.

### 2. The Immigration Act of 1917

In the wake of *Gegiow*, Congress sought to "overcome" the line of cases that "limit[] the meaning of [public charge] because of its position between other descriptions conceived to be of the same general and generical nature." S. COMM. ON IMMIGRATION, 64TH CONG., REP. ON H.R. 10384, at 5 (1916). Thus, in the Immigration Act of 1917, Congress relocated the public charge ground within the list of excludable persons so that it no longer appeared between paupers and professional beggars, but rather between contract laborers and people who had been deported previously. *See* Pub. L. No. 64-301, § 3, 39 Stat. 874, 876.

Notwithstanding Congress's efforts, "[s]everal courts promptly questioned the efficacy of the [1917] amendment and affirmed the interpretation that a 'person who is likely to become a public charge' is one who for some cause is about to be supported at public expense[.]" *Matter of Harutunian*, 14 I. & N. Dec. 583, 587 (B.I.A. 1974). The Ninth Circuit was the first to hold that "this change of location of the words does not change the meaning that should be given them,

49

and that it is still to be held that a person 'likely to become a public charge' is one who, by reason of poverty, insanity, or disease or disability, will probably become a charge on the public." *Ex parte Hosaye Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922). A few years later, the Fifth Circuit affirmed that the public charge ground still "intended to refer to . . . a condition of dependence on the public for support." *Coykendall v. Skrmetta*, 22 F.2d 120, 121 (5th Cir. 1927). And in *United States ex rel. Iorio v. Day*, 34 F.2d 920 (2d Cir. 1929), we agreed that the change did not require overruling the interpretation we had previously adopted in *Howe*, noting that "[t]he language itself, 'public charge,' suggests . . . dependency." *Id.* at 922.

As the courts of appeals applied the public charge ground in this era, the inquiry usually turned on whether the non-citizen could earn a living, frequently out of a concern that a health condition might prevent the person from working.[21]

---

[21] *See, e.g., Tod v. Waldman*, 266 U.S. 113, 120 (1924) (remanding based on "the absence from the record of any finding by the department on appeal as to the issue [of] whether the lameness of Zenia, one of the children, affected her ability to earn a living or made her likely to become a public charge"); *United States ex rel. Minuto v. Reimer*, 83 F.2d 166, 168 (2d Cir. 1936) (affirming public charge determination where non-citizen "was a woman seventy years old with an increasing chance of becoming dependent, disabled, and sick [and] [n]o one was under any obligation to support her"); *Tullman v. Tod*, 294 F. 87, 88 (2d Cir. 1923) (affirming public charge determination where the non-citizen "was found to be affected with deaf mutism, which, as was certified, might affect his ability to earn

Conversely, courts routinely found a non-citizen's ability and willingness to work

sufficient to defeat a public charge finding.[22] Administrative interpretations

---

a living"); *Wallis v. United States ex rel. Mannara*, 273 F. 509, 511 (2d Cir. 1921) ("A person likely to become a public charge is one whom it may be necessary to support at public expense by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty. We think that the finding by the administrative authorities, showing a physical defect of a nature that may affect the ability of the relator and appellee to earn a living, is sufficient ground for exclusion [as a likely public charge]" (internal citation omitted)); *see also "Italia" Societa Anonima Di Navigazione v. Durning*, 115 F.2d 711, 713 (2d Cir. 1940).

[22] *See, e.g., Ex parte Sturgess*, 13 F.2d 624, 625 (6th Cir. 1926) (reversing public charge determination where non-citizen was "39 years of age, in good health, a skilled carpenter, and had in his possession about $75 in money"); *Nocchi v. Johnson*, 6 F.2d 1, 1 (1st Cir. 1925) (reversing public charge determination where there was "no clear showing that the boy is so feeble-minded that he is not able to earn his own living" and his parents were wealthy); *United States ex rel. Mantler v. Comm'r of Immigration*, 3 F.2d 234, 236 (2d Cir. 1924) (reversing public charge determination where non-citizen "is 23 years of age, has been in the country now for 4 years, is in good physical condition, and by industry and frugality has saved a substantial portion of her earnings"); *Sakaguchi*, 277 F. at 916 (reversing public charge determination where there was no evidence "of mental or physical disability or any fact tending to show that the burden of supporting the appellant is likely to be cast upon the public" and the non-citizen was "an able-bodied woman of the age of 25 years, with a fair education . . . [and] a disposition to work and support herself"); *see also Thack v. Zurbrick*, 51 F.2d 634, 635 (6th Cir. 1931)*; United States ex rel. De Sousa v. Day*, 22 F.2d 472, 473-74 (2d Cir. 1927); *Lisotta v. United States*, 3 F.2d 108, 111 (5th Cir. 1924).

51

issued in the early days of the Board of Immigration Appeals ("BIA") also focused on non-citizens' abilities to work and sustain themselves.[23]

In the context of the public charge ground of deportation, this era also saw growing consensus among the courts that non-citizens who had been institutionalized were deportable as public charges.[24] The BIA weighed in on the matter in one of its first published decisions to address either of the public charge grounds. In *Matter of B-*, 3 I. & N. Dec. 323 (B.I.A. 1948), the BIA considered the case of a non-citizen who was institutionalized in a psychiatric hospital run by the state of Illinois. The BIA held that a non-citizen who had become a public charge could not be deported on that basis unless the state had a law imposing a charge for the services rendered, a demand for repayment had been made, and

---

[23] *See, e.g.*, *Matter of C-*, 3 I. & N. Dec. 96, 97 (B.I.A. 1947) ("In this case there is no likelihood that the beneficiary will become a public charge. . . . [H]e is in good health and is able and willing to go to work."); *Matter of V-*, 2 I. & N. Dec. 78, 81 (B.I.A. 1944) (reversing public charge determination where the respondent was employed and "has always been self-supporting" other than during a period of hospitalization).

[24] *See, e.g.*, *Canciamilla v. Haff*, 64 F.2d 875, 876 (9th Cir. 1933); *Fernandez v. Nagle*, 58 F.2d 950, 950 (9th Cir. 1932); *United States ex rel. Casimano v. Comm'r of Immigration*, 15 F.2d 555, 556 (2d Cir. 1926); *United States ex rel. La Reddola v. Tod*, 299 F. 592, 593 (2d Cir. 1924).

52

the non-citizen had failed to reimburse the state. *Id.* at 326. These procedural safeguards persist to this day in the public charge ground of deportation, which considers benefits received, but are not applied in the predictive public charge ground of inadmissibility. *See Harutunian*, 14 I. & N. Dec. at 589.

### 3.  The Immigration and Nationality Act of 1952

Shortly after the *Matter of B-* decision, the Senate initiated "a full and complete investigation of [the] entire immigration system[,]" the results of which were released in a Senate Judiciary Committee Report published in 1950. SENATE JUDICIARY COMM., THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES, S. REP. NO. 81-1515, at 1 (1950). The investigation and report resulted in a proposed omnibus bill to overhaul the "patchwork" of the then-existing immigration and naturalization systems. *Id.* at 4. Thus was enacted the Immigration and Nationality Act of 1952, the foundation of our current immigration system.

The Judiciary Committee report devotes several pages to a review of the public charge ground. The report notes that "courts have given varied definitions of the phrase 'likely to become a public charge,'" but summarizes the caselaw as

53

focusing on four characteristics that indicate non-citizens are likely to become public charges: (1) impending or current imprisonment in a federal prison; (2) limited finances; (3) a weakened physical condition "as it relate[s] to his ability and capacity for employment[;]" and (4) traveling to the United States on a ticket paid for by someone else. *Id.* at 347-48. The Judiciary Committee recommended that the public charge ground be re-enacted in the forthcoming INA and further recommended that the term not be defined in the statute since "the elements constituting likelihood of becoming a public charge are varied." *Id.* at 349.

Congress took both recommendations, listing "[a]liens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges" as one of the INA's grounds of inadmissibility. *See* Pub. L. No. 82-414, § 212(a)(15), 66 Stat. 163, 183 (1952). The INA also retained the corresponding ground of deportation for any non-citizen who "in the opinion of the Attorney General, has within five years after entry become a public charge from causes not affirmatively shown to have arisen after entry." *Id.* § 241(a)(8).

Administrative interpretations of "public charge" after the enactment of the INA largely align with the pre-1952 interpretations. In 1964, the Attorney General noted that the term had been the subject of "extensive judicial interpretation" and that the "general tenor" of the caselaw understood "public charge" to require "[s]ome specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public[.]" *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1964).

The BIA subsequently affirmed that "while economic factors should be taken into account, the alien's physical and mental condition, as it affects ability to earn a living, is of major significance." *Harutunian*, 14 I. & N. Dec. at 588. The BIA concluded that "[e]verything in the statutes, the legislative comments and the decisions points to one conclusion[:]" that Congress intended to exclude as a likely public charge a non-citizen who was not self-supporting. *Id.* at 589; *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (B.I.A. 1977).

As the BIA applied this interpretation in subsequent decisions, it focused on the non-citizen's capacity for work, reversing decisions that put too much

55

weight on temporary setbacks and affirming those where a non-citizen had no

prospects for employment by virtue of age or disability.[25] And in *Matter of Perez*,

15 I. & N. Dec. 136, 137 (B.I.A. 1974), the BIA explicitly held that "[t]he fact that

an alien has been on welfare does not, by itself, establish that he or she is likely to

become a public charge."

### 4. The Current Public Charge Ground

It was against this backdrop of judicial and administrative interpretations

that Congress enacted PRWORA and IIRIRA in 1996, creating the public charge

ground as it exists today. While leaving the principal statutory language intact –

rendering inadmissible any non-citizen who is "likely at any time to become a

public charge" – IIRIRA amended the ground to require consideration of the non-

citizen's age, health, family status, financial status, and education. *See* IIRIRA

---

[25] *See, e.g., Matter of A-*, 19 I. & N. Dec. 867, 870 (B.I.A. 1988) ("There may be circumstances beyond the control of the alien which temporarily prevent an alien from joining the work force. . . . [T]he director placed undue weight on [the family's financial circumstances], thereby overshadowing the more important factors; namely, that the applicant has now joined the work force, that she is young, and that she has no physical or mental defects which might affect her earning capacity."); *Vindman*, 16 I. & N. Dec. at 132 (affirming public charge finding where respondents were older adults and had no employment prospects); *cf. Matter of Kowalski*, 10 I. & N. Dec. 159, 160 (B.I.A. 1963).

§ 531(a). IIRIRA also required certain non-citizens to obtain affidavits of support, *id*. § 551(a), building on PRWORA's requirement that such affidavits of support be legally enforceable against the sponsor, *see* PRWORA § 423.

Congress considered, and nearly enacted, a more sweeping set of changes to the public charge ground with IIRIRA. The conference report of the bill included a statutory definition of public charge, which would have defined the term to cover "any alien who receives [means-tested public benefits] for an aggregate period of at least 12 months[.]" CONFERENCE REPORT, H.R. REP. 104-828, at 138 (1996). While the House passed the conference report containing this language, it was ultimately dropped under threat of presidential veto. *See* 142 CONG. REC. S11,882 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl); *cf.* Statement on Senate Action on the "Immigration Control and Financial Responsibility Act of 1996," 32 WEEKLY COMP. PRES. DOC. 783 (May 2, 1996) (President Clinton critiquing prior version of the bill for "go[ing] too far in denying legal immigrants access to vital safety net programs which could jeopardize public health and safety").

We end our historical review back where we started this opinion, with INS's release of the 1999 Guidance to counteract public confusion after IIRIRA and PRWORA. We have already explored in some detail INS's 1999 interpretation, which defines "public charge" as one who is "primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." 64 Fed. Reg. at 28,677. We simply note here that INS concluded that its interpretation was warranted by "the plain meaning of the word 'charge,' the historical context of public dependency when the public charge immigration provisions were first enacted more than a century ago, . . . the expertise of the benefit-granting agencies that deal with subsistence issues[, and the] factual situations presented in the public charge case law." *Id.*

### 5. The Settled Meaning of "Public Charge"

With this understanding of the history of the public charge ground, we turn to the applicability of the ratification canon. We first examine whether Congress changed the statutory language as it amended the ground over the years, so as to render the canon inapposite. *See Holder v. Martinez Gutierrez*, 566

58

U.S. 583, 593 (2012). We then determine whether the caselaw interpretations of

the term produced a sufficiently consistent and settled meaning of the term, such

that we may presume Congress ratified that understanding when it created the

current public charge statute in 1996. *See Commodity Futures Trading Comm'n v.*

*Schor*, 478 U.S. 833, 846 (1986).

We quickly dispose of the first question. There can be no dispute that, since

its origins in the Immigration Act of 1882, Congress reenacted the public charge

ground without pertinent change in 1891, 1907, 1917, 1952, and 1996. We note

that Congress made minor alterations to the ground over the course of its history.

For example, the 1882 public charge ground excluded anyone who was "unable to

take care of himself or herself without becoming a public charge" at their time of

arrival in the United States while subsequent acts established the forward-

looking likelihood standard. *Compare* Immigration Act of 1882 § 2 *with*

Immigration Act of 1891 § 1. And with IIRIRA, Congress added the list of

mandatory factors to consider when applying the ground. *See* IIRIRA § 531(a). But

Congress has unwaveringly described the fundamental characteristic at issue as

being a "public charge" since 1882. We easily conclude that Congress "adopt[ed]

59

the language used in [its] earlier act[s]" in its most recent reenactment of the public charge ground in 1996. *See Hecht v. Malley*, 265 U.S. 144, 153 (1924).

With respect to the second question, our review of the historical administrative and judicial interpretations of the ground over the years leaves us convinced that there was a settled meaning of "public charge" well before Congress enacted IIRIRA. The absolute bulk of the caselaw, from the Supreme Court, the circuit courts, and the BIA interprets "public charge" to mean a person who is unable to support herself, either through work, savings, or family ties. *See, e.g., Day*, 34 F.2d at 922; *Harutunian*, 14 I. & N. Dec. at 588-89. Indeed, we think this interpretation was established early enough that it was ratified by Congress in the INA of 1952. But the subsequent and consistent administrative interpretations of the term from the 1960s and 1970s remove any doubt that it was adopted by Congress in IIRIRA. *See United Airlines, Inc. v. Brien*, 588 F.3d 158, 173 (2d Cir. 2009) (noting that "Congress's repeated amendment of the relevant provisions of the statute without expressing any disapproval" of the BIA's interpretation is "persuasive evidence that the [Agency's] interpretation is the one intended by Congress" (internal quotation marks omitted)).

60

We find particularly significant the Attorney General's decision from 1962, which summarizes the "extensive judicial interpretation" of the term as requiring a particular circumstance, like disability or age, that shows that "the burden of supporting the alien is likely to be cast on the public[.]" *Martinez-Lopez*, 10 I. & N. Dec. at 421. Accordingly, the Attorney General held that "[a] healthy person in the prime of life cannot ordinarily be considered likely to become a public charge[.]" *Id.* The BIA came to a similar conclusion after its own review of the public charge caselaw and legislative history, holding that "any alien who is incapable of earning a livelihood, who does not have sufficient funds in the United States for his support, and [who] has no person in the United States willing and able to assure that he will not need public support is excludable as likely to become a public charge[.]" *Harutunian*, 14 I. & N. Dec. at 589-90. Subsequent administrative decisions affirmed that the public charge determination must be made based on the totality of the circumstances and rejected the notion that receipt of public benefits categorically renders one a public charge. *See Perez*, 15 I. & N. Dec. at 137; *Vindman*, 16 I. & N. Dec. at 132; *A-*, 19 I. & N. Dec. at 870.

61

The scope and consistency of these administrative decisions warrants the application of the ratification canon. These published decisions are nationally binding, issued under the agency's mandate to "provide clear and uniform guidance to [other components of the government] and the general public on the proper interpretation and administration of the [INA]." 8 C.F.R. § 1003.1(d)(1). The broad principles articulated in the decisions are grounded in comprehensive reviews of public charge history and offer a consistent understanding of the term as they carry that history forward. While we may not derive a settled rule from isolated or contradictory decisions, *see Jama v. Immigration and Customs Enf't*, 543 U.S. 335, 350-52 (2005), that is not the case here. For more than twenty years prior to IIRIRA, the agency interpreted "public charge" to mean a person not capable of supporting himself. In the face of this consistent agency interpretation – which itself aligns with the earlier judicial interpretations – we conclude that when Congress reenacted the public charge ground in 1996 it ratified this settled construction of the term. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 157 (2000) (concluding that Congress ratified agency interpretation that had been

its "unwavering position since its inception" and that was consistent "with the position that its predecessor agency had first taken").

Our conclusion finds further support in the legislative history of IIRIRA. "Although we are generally reluctant to employ legislative history at step one of *Chevron*" it may be helpful "when the interpretive clues speak almost unanimously, making Congress's intent clear beyond reasonable doubt." *Catskill Mountains*, 846 F.3d at 515 (internal quotation marks and alterations omitted). We thus look to the legislative history only to confirm what we have already concluded.

As noted above, Congress very nearly included a statutory definition of "public charge" in IIRIRA that would have redefined the term to mean receipt of any form of means-tested public benefits for more than twelve months. *See* CONFERENCE REPORT, H.R. REP. NO. 104-828, at 138. That proposed definition was intended to overcome the BIA's *Matter of B-* decision, which interpreted the public charge ground of deportation, but it was deleted from the final enactment under threat of presidential veto.[26] *See* 142 CONG. REC. S4,408-09 (daily ed. April

_____

[26] The definition was proposed as part of the public charge ground of deportation. CONFERENCE REPORT, H.R. REP. NO. 104-828, at 138. We nevertheless think it

30, 1996) (statement of Sen. Simpson); 142 CONG. REC. S11,882 (statement of Sen.

Kyl). In effect, an effort was made to *change* the prior administrative and judicial

consensus as to the meaning of public charge, but that effort failed.

While we agree with DHS that failed legislative proposals are, as a general

matter, unreliable sources of legislative history because bills may fail for any

number of reasons, here we know exactly why the definition was removed from

IIRIRA and find it directly relevant to our analysis. *See Solid Waste Agency of N.

Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169-70 (2001). We read this

legislative history as further evidence that Congress was aware of prevailing

administrative interpretations of "public charge" when it enacted IIRIRA. *See

Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 782-83 (1985) (applying ratification

canon where legislative history demonstrated Congress was aware of

interpretation). Congress's abandonment of its efforts to change the meaning of

---

reasonable to look to this language as we interpret the public charge ground of
inadmissibility on the principle that a term appearing in multiple places within a
statute is "generally read the same way each time it appears." *Ratzlaf v. United
States*, 510 U.S. 135, 143 (1994). And while the definition was proposed to
overcome *Matter of B-*'s procedural safeguards for public charge deportation, the
definition is confined to identifying the relevant benefits and time period of use
that made one a "public charge" and could have easily been transposed to the
inadmissibility context. *Cf. Harutunian*, 14 I. & N. Dec. at 589.

the term further suggests that it ratified the existing interpretation of "public

charge" in 1996. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600-01 (1983).

DHS urges us to conclude that Congress did not ratify any interpretation of

"public charge" because the term has never had a fixed definition. To support its

contention, DHS points to the 1950 Senate Judiciary Committee report, which

observed that "the elements constituting likelihood of becoming a public charge

are varied[.]" S. REP. NO. 81-1515, at 349. Consequently, the report recommends

that the term not be defined in the statute and that the determination of whether

a given non-citizen is likely to become a public charge should "rest[] within the

discretion of the [agency]." *Id.*; *see id.* at 347 (noting the term has been given

"varied definitions" by the courts).

Rather than suggesting that the core meaning of "public charge" is unclear,

the language on which DHS relies refers to the fact there are a variety of personal

circumstances that may be relied on to show the *likelihood* that a would-be

immigrant would fall within that category. As described above, the report distills

from the caselaw four circumstances that indicate a non-citizen is likely to

become a public charge. *Id.* at 348. It thereby recognizes that there are many paths

to dependency, and that administrative flexibility in determining whether a non-citizen is likely to be dependent is desirable. But the fact that many and varied circumstances may show that one is *likely* to become a public charge does not mean that the underlying term is undefined or lacks a core meaning. And while DHS makes much of the fact that it retains discretion to decide whether the ground applies in a given case, the allowance of discretion in individual cases does not mean that the term itself is standardless or without a core, established meaning.

We recognize that our conclusion that Congress ratified the settled meaning of "public charge" in 1996 conflicts with decisions from the only two circuits to have addressed this argument to date. *See City and Cty. of San Francisco v. USCIS*, 944 F.3d 773, 798 (9th Cir. 2019); *Cook Cty. v. Wolf*, 962 F.3d 208, 226 (7th Cir. 2020). In the context of granting DHS's motion to stay the injunctions against the enforcement of the Rule entered by district courts in California and Washington, the Ninth Circuit decided that "public charge" had been subjected to "varying historical interpretations" by 1996, such that the ratification canon

66

did not apply. *San Francisco*, 944 F.3d at 797. The Ninth Circuit reasoned that there was no consistent interpretation because

> [i]nitially, the likelihood of being housed in a government or charitable institution was most important. Then, the focus shifted in 1948 to whether public benefits received by an immigrant could be monetized, and the immigrant refused to pay for them. In 1974, it shifted again to whether the immigrant was employable and self-sufficient. That was subsequently narrowed in 1987 to whether the immigrant had received public cash assistance, which excluded in-kind benefits.[27]

*Id.* at 796. We think the Ninth Circuit goes astray in pinning the definition of "public charge" on the *form* of public care provided to the dependent non-citizen. That the face of our welfare system has changed over time does not mean that the fundamental inquiry of the public charge ground – whether the non-citizen is likely to depend on that system – has also changed. The settled meaning of "public charge," as the plain meaning of the term already suggests, is dependency: being a persistent "charge" on the public purse. And as we explain

---

[27] We explain below our further disagreement with these characterizations of the 1948 *Matter of B-* decision and the 1987 public charge provision established in the Immigration Reform and Control Act of 1986, which only applied to those non-citizens participating in an ad hoc legalization program.

further below, the mere receipt of benefits from the government does not constitute such dependency.

We are similarly unpersuaded by the Seventh Circuit's "admittedly incomplete" historical review and its conclusion that plaintiffs in that case had failed to establish that Congress ratified the settled meaning of the term. *See Cook Cty.*, 962 F.3d at 226. The Seventh Circuit focuses almost exclusively on the state of the law prior to 1927 and enactments post-dating Congress's 1996 amendment to the public charge ground, the point at which any existing interpretation would have been ratified. *Id.* at 222-26. Critically, this limited analysis omits the administrative interpretations of the 1960s and 1970s that established uniform and nationally binding interpretations of the public charge ground, a key component of our determination that Congress ratified the prevailing interpretation of the term in 1996. *See id.* at 225.

In light of the judicial, administrative, and legislative treatments of the public charge ground from 1882 to 1996, we hold that Congress ratified the settled meaning of "public charge" when it enacted IIRIRA. Congress intended the public charge ground of inadmissibility to apply to those non-citizens who

were likely to be unable to support themselves in the future and to rely on the

government for subsistence. "[D]eference is not due unless a court, employing

traditional tools of statutory construction, is left with an unresolved ambiguity."

*Epic Sys.*, 138 S. Ct. at 1630 (internal quotation marks omitted). Here, because the

ratification canon reveals the intent of Congress "on the precise question at issue,

that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

We thus owe no deference to the Rule and consider only whether it comports

with congressional intent.

### 6.  The Rule's Inconsistency with the Settled Meaning

"No matter how it is framed, the question a court faces when confronted

with an agency's interpretation of a statute it administers is always, simply,

whether the agency has stayed within the bounds of its statutory authority." *City*

*of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted). Having marked

out the interpretive boundaries of "public charge," we now consider whether the

Rule's interpretation falls within the ambit of congressional intent. DHS

repeatedly claims that the Rule aligns with the intent of Congress because it

excludes those non-citizens who lack "self-sufficiency and . . . need to rely on the

government for support." 84 Fed. Reg. at 41,317; *see, e.g., id.* at 41,295, 41,306,

41,318, 41,320, 41,348. As we have just concluded, Congress did indeed ratify a

consistent and long-standing judicial and administrative understanding of

"public charge" as focused on non-citizens' abilities to support themselves. But

DHS's generalized assurance that it shares Congress's interest in self-sufficiency

is belied by the Rule's actual definition of "public charge," which reveals that

DHS and Congress have dramatically different notions of the term.

The prevailing administrative and judicial interpretation of "public charge"

ratified by Congress understood the term to mean a non-citizen who cannot

support himself, in the sense that he "is incapable of earning a livelihood, . . .

does not have sufficient funds in the United States for his support, and has no

person in the United States willing and able to assure that he will not need public

support[.]" *Harutunian*, 14 I. & N. Dec. at 589. Moreover, under that interpretation

the "determination of whether an alien is likely to become a public charge . . . is a

prediction based upon the totality of the alien's circumstances . . . . The fact that

an alien has been on welfare does not, by itself, establish that he or she is likely to

become a public charge." *Perez*, 15 I. & N. Dec. at 137. In contrast, the Rule

70

categorically renders non-citizens public charges – i.e., not self-sufficient – if they are likely to access any quantity of the enumerated benefits for a limited number of months. *See* 84 Fed. Reg. at 41,349. We think it plain on the face of these different interpretations that the Rule falls outside the statutory bounds marked out by Congress. Our conclusion is bolstered by the fact that many of the benefits newly considered by the Rule have relatively generous eligibility criteria and are designed to provide supplemental assistance to those living well above the poverty level, as we discuss in greater detail below.[28] *See infra* Section II.C.2.

To be sure, we do not find the intent of Congress evidenced by the ratification canon to be so precise as to support only one interpretation. On the contrary, the principles at issue are broad enough that they may support a variety of agency interpretations. But while an agency may "give authoritative meaning to the statute within the bounds of th[e] uncertainty" implicit in congressional

---

[28] DHS assumes that receipt of SNAP, Medicaid, or housing assistance shows that a non-citizen is per se unable to meet basic needs. *See, e.g.*, 84 Fed. Reg. at 41,349. Because DHS primarily invokes this assumption as a justification for its changed interpretation, we address (and reject) it in our analysis of the Plaintiffs' arbitrary and capricious challenge. We note it here because the fact that the Rule incorporates public benefits with broader programmatic aims than basic subsistence evidences the Rule's inconsistency with congressional intent.

71

intent, "the presence of some uncertainty" does not prevent us from "discern[ing]
the outer limits of [a statutory] term[.]" *Cuomo v. Clearing House Ass'n, LLC*, 557
U.S. 519, 525 (2009). When the meaning of a statutory term is unclear, federal
agencies specialized in the area receive deference from courts in assigning
meaning to the uncertain language. But the deference is not unlimited. If
Congress passed a statute leaving it unclear whether a term of the statute means
A, B, or C, an appropriate federal agency will receive deference in
concluding that the proper meaning is any one of A, B, or C. But it does not
follow that, because the statutory term could mean either A, B, or C, the
agency will receive deference in interpreting it to mean X or Y or Z, because
such an interpretation would be inconsistent with the meaning of the
statute.

Whatever gray area may exist at the margins, we need only decide today
whether Congress "has unambiguously foreclosed the [specific] statutory
interpretation" at issue. *Catawba Cty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009). And
we conclude that Congress's intended meaning of "public charge"

72

unambiguously forecloses the Rule's expansive interpretation. We are not persuaded by DHS's efforts to argue otherwise.

DHS first attempts to argue that its definition of "public charge" is consistent with the historical caselaw interpretations of the term. DHS points to two district court cases from the 1920s to claim that Congress ratified a definition of "public charge" that encompasses minimal and temporary public benefits usage. The first, *Guimond v. Howes*, 9 F.2d 412 (D. Me. 1925), held that members of an immigrant family were likely to become public charges when the husband was a bootlegger who had been incarcerated for two periods of sixty and ninety days, respectively. *Id.* at 413. Because the family had been "supported" by the town while he was imprisoned, and because the husband's occupation made it likely he would return to jail in the future, the district court found the family likely public charges. *Id.* at 413-14. The second case, *Ex parte Turner*, 10 F.2d 816, 817 (S.D. Cal. 1926), also found that members of a family were likely public charges because the husband was "predisposed to physical infirmity" and would "likely be incapacitated from performing any work or earning support for himself and [his] family" when his ailments flared up in the future. Because his wife and

73

children had received charitable aid during his previous two-month hospitalization, the court anticipated they would do so again when he became sick in the future and found the family to be likely public charges. *Id*.

In both cases, the district court did look at previous, short-term receipt of public benefits in making the public charge determination. But neither case suggests that this receipt alone rendered the immigrant a public charge. Rather, the district courts found it significant that the families were likely to repeatedly become dependent on the public in the future, as the breadwinners of the families were unlikely to stop bootlegging or to overcome physical infirmity. *Guimond*, 9 F.2d at 414; *Turner*, 10 F.2d at 817. These cases thus do not suggest that courts have historically considered the temporary receipt of benefits as sufficient to enter a public charge finding. To the contrary, both *Guimond* and *Turner* rest on the finding that the benefits usage was *not* merely temporary but was likely to regularly reoccur.[29]

---

[29] In any event, even if these cases could be read to support DHS's proposition, they would not outweigh the prior or subsequent caselaw – particularly the agency decisions from the 1960s and 1970s setting out nationally binding public charge standards – endorsing a different interpretation of "public charge."

The only other case on which DHS relies is *Matter of B-*, 3 I. & N. Dec. at

323. DHS argues that *Matter of B-* shows that a non-citizen is deportable as a

public charge if she fails to reimburse the government for the benefits used, even

if the non-citizen was not primarily dependent on the benefits. DHS reads far too

much into the case. In *Matter of B-*, the non-citizen was institutionalized, the

paradigmatic example of a public charge. *Id.* at 324. The only issue in the case was

whether she could escape deportation by reimbursing the state for the services

received. *Id.* at 326. The BIA held that a non-citizen is not deportable as a public

charge unless the state has asked for reimbursement and the non-citizen or her

relatives have failed to pay. *Id.* at 325. Rather than broadening the definition of

the public charge ground of inadmissibility – or saying *anything* that casts doubt

on other cases suggesting that a "public charge" must be persistently and

primarily dependent on the government – *Matter of B-* held that even an

immigrant who had been institutionalized at public expense because she *was*

unable to care for herself and *was* likely to require permanent hospitalization, *still*

was not categorically a public charge if the state had not sought payment and

been unable to collect.

75

*Matter of B-* thus offers a procedural escape hatch to those who need government services but have money to pay. While the decision alters the mechanics of deportation as a public charge, it hardly presents a new interpretation of the term "public charge" itself.[30] It seems particularly odd to cite this somewhat unusual case, with its generous treatment of a non-citizen who might well seem to fall within the established meaning of "public charge," in support of a sweeping *expansion* of that category.

DHS next argues that a series of policy statements enacted as part of PRWORA show that the Rule's interpretation is consistent with congressional intent regarding the meaning of "public charge." *See* 8 U.S.C. § 1601 (describing the "national policy with respect to welfare and immigration"). In the policy statements, which lay out the rationale for enacting restrictions on non-citizen eligibility for public benefits, Congress emphasized that "[s]elf-sufficiency has

---

[30] Moreover, in *Matter of Harutunian*, the BIA held that the *Matter of B-* test is limited to the public charge ground of deportation and should not be read into the public charge ground of inadmissibility. 14 I. & N. Dec. at 589-90. This distinction between the public charge grounds of inadmissibility and deportation was affirmed by INS in its 1999 Guidance, where it explained that while "the definition of public charge is the same for both admission/adjustment and deportation, the standards applied to public charge adjudications in each context are significantly different." 64 Fed. Reg. at 28,689.

been a basic principle of United States immigration law since this country's

earliest immigration statutes" and affirmed that

> [i]t continues to be the immigration policy of the United
> States that (A) aliens within the Nation's borders not
> depend on public resources to meet their needs, but rather
> rely on their own capabilities and the resources of their
> families, their sponsors, and private organizations, and (B)
> the availability of public benefits not constitute an
> incentive for immigration to the United States.

*Id.* § 1601(1), (2). The policy statements further explain that PRWORA creates

"new rules for eligibility and sponsorship agreements in order to assure that

aliens be self-reliant in accordance with national immigration policy." *Id.*

§ 1601(5). The policy statements conclude by noting that any state adopting the

federal benefits eligibility scheme laid out in PRWORA "shall be considered to

have chosen the least restrictive means available for achieving the compelling

governmental interest of assuring that aliens be self-reliant in accordance with

national immigration policy." *Id.* § 1601(7).

DHS reads these policy statements to mean that "Congress expressly

equated a lack of 'self-sufficiency' with the receipt of 'public benefits'" and that

Congress intended "public charge" to mean "individuals who rely on taxpayer-

funded benefits to meet their basic needs." Appellants' Br. at 30-31. We are

thoroughly unpersuaded by this argument. PRWORA implemented Congress's

goal of self-sufficiency by *restricting* non-citizen eligibility for benefits, including

the establishment of the five-year waiting period for LPRs. PRWORA did not

*eliminate* non-citizen eligibility for benefits nor does it suggest that such drastic

action is necessary. Still less does it indicate any congressional intention that

non-citizens who receive the benefits for which Congress did *not* render them

ineligible risk being considered "public charges." On the contrary, the policy

statements specifically proclaim that the new eligibility restrictions sufficiently

"*achiev[ed]* the compelling governmental interest of assuring that aliens be self-

reliant in accordance with national immigration policy." *Id.* § 1601(7) (emphasis

added). Clearly, Congress decided that the benefits it preserved for non-citizens

after PRWORA did not interfere with its interest in assuring non-citizen self-

sufficiency. Rather than supporting DHS's expanded interpretation, both the

policy statements, taken as a whole, and the actual implementation of those

policy goals in the substantive provisions of PRWORA, are in considerable

tension with the Rule's new interpretation of "public charge," which penalizes

78

non-citizens for the possibility that they will access the very benefits PRWORA

preserved for them.[31]

DHS attempts to salvage this argument by pointing out that the 1999

Guidance made various cash benefits relevant to the public charge analysis,

notwithstanding that PRWORA also preserved non-citizen eligibility for those

benefits. DHS argues that this shows that Congress did not intend to preclude

the agency from considering the receipt of PRWORA-approved benefits in the

public charge determination. DHS is correct that the 1999 Guidance makes

"receipt of public cash assistance for income maintenance" one of two ways

"primary dependence" on the government could be shown. 64 Fed. Reg. at 28,689.

But the Guidance was also clear that receipt of such benefits alone was

insufficient to establish dependency, and that any such receipt needed to be

weighed in the context of the non-citizen's overall circumstances. The Guidance

explicitly noted that "an alien receiving a small amount of cash for income

_____

[31] We note that in its decision on DHS's motion to stay the preliminary
injunctions, the Ninth Circuit accepted DHS's argument on this point. *San
Francisco*, 944 F.3d at 799. The Ninth Circuit based its analysis on the first two
policy statements but did not consider the impact of the subsequent statements in
which Congress explained that the PRWORA eligibility scheme satisfied its
notions of self-sufficiency. *Id.*

maintenance purposes could be determined not likely to become a public charge due to other positive factors under the totality of the circumstances test." 64 Fed. Reg. at 28,690. While the 1999 Guidance permissibly looked at receipt of cash benefits as one *factor* indicating dependence on the government, the Rule elevates receipt of any quantity of a broad list of benefits to be the very *definition* of "public charge." *See* 84 Fed. Reg. at 41,295.

The question under consideration is whether the Rule's understanding of the term "public charge" goes beyond the bounds of the settled meaning of the term. The Plaintiffs do not argue, and we do not hold, that the receipt of various kinds of public benefits is irrelevant to the determination of whether a non-citizen is likely to become a public charge. But *defining* public charge to mean the receipt, even for a limited period, of any of a wide range of public benefits – particularly, as we discuss below, ones that are designed to supplement an individual's or family's efforts to support themselves, rather than to deal with their likely permanent inability to do so – is inconsistent with the traditional understanding of what it means to be a "public charge," which was well-established by 1996.

Finally, DHS points to three other statutory provisions to support its argument that the Rule is consistent with the intent of Congress. First, DHS points to 8 U.S.C. § 1182(s), which exempts from the public charge analysis "any benefits" received by a non-citizen who qualified for such benefits as a survivor of domestic violence. *See* 8 U.S.C. § 1641(c). DHS argues that because § 1182(s) excuses *any* benefits received, Congress understood that past receipt of even non-cash benefits would otherwise generally be relevant to a public charge determination. But 8 U.S.C. § 1182(s) was added in 2000, shortly after INS issued its 1999 Guidance in which it clarified that benefits like TANF and SSI would be relevant for the public charge determination. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1505(f), 114 Stat. 1464, 1526. Without § 1182(s), survivors of domestic violence could thus have had their receipt of cash benefits used against them. By far the most natural reading of § 1182(s) is that Congress was preventing domestic violence victims from being penalized under the then-existing framework. In any event, the statute concerns what is *relevant* to the determination, and gives no indication that Congress somehow understood that the receipt of the benefits covered by the 1999

Guidance, let alone a broader set of benefits, could categorically render non-citizens who were not domestic violence survivors "public charges." Once again, what is impermissible in DHS's interpretation is not that it renders receipt of supplemental non-cash benefits relevant to a non-citizen's classification as a public charge, but rather that it makes the receipt of such benefits determinative.

Second, DHS argues that the provisions requiring affidavits of support for family-based immigrants and allowing the government to seek reimbursement from the sponsor for any means-tested public benefit used by the non-citizen support its interpretation. DHS contends that these provisions show that Congress considered any non-citizen who might receive an unreimbursed public benefit in the future a likely public charge. *See* 8 U.S.C. §§ 1182(a)(4)(c)(ii), 1183a(b)(1)(A). We are not convinced that the affidavit reimbursement mechanism shows congressional intent to broaden the meaning of "public charge." For one thing, not all immigrants have to provide affidavits of support; the requirement is limited to family-based immigrants and we see no reason it should be taken to alter the underlying terms that apply to all non-citizens.[32] We

---

[32] The affidavit of support requirement is also applied to a small subset of employment-based immigrants, where the non-citizen's prospective employer is

also note that the statute includes a corollary, allowing the non-citizen herself to take the sponsor to court if the sponsor fails to support the non-citizen as promised. *See id.* § 1183a(a)(1)(B). The reimbursement provision thus serves primarily as a mechanism to get sponsors to take their commitments seriously by making them legally enforceable, a longstanding point of concern. *See* S. REP. NO. 81-1515, at 347 *(*Senate Judiciary Committee Report from 1950 critiquing the affidavit of support as an unenforceable document that "at most, appears to be merely a moral obligation upon the affiant").

Third and last, DHS looks to the 1986 Immigration Reform and Control Act ("IRCA") to support its claim that the Rule is consistent with congressional intent. IRCA established an ad hoc legalization program for undocumented immigrants. *See* 8 U.S.C. § 1255a. To qualify for legalization, applicants needed to prove that most of the grounds of inadmissibility did not apply to them, including the public charge ground. *See id.* § 1255a(a)(4), (d)(2). However, IRCA established a "special rule" with respect to the public charge inquiry, under which a non-citizen would not be deemed a likely public charge "if the alien

---

a relative or an entity owned in large part by a relative. 8 U.S.C. § 1182(a)(4)(D).

demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." *Id.* § 1255a(d)(2)(B)(iii). DHS argues that because the IRCA special rule specifically incorporates only cash assistance, the generic ground in § 1182(a)(4) must necessarily have a broader reach.

The implementing regulations of IRCA, however, suggest that, rather than refining the benefits relevant to the public charge inquiry, the special rule allowed a non-citizen who may otherwise be deemed a likely public charge because of his limited financial resources an additional manner of showing self-sufficiency. The relevant regulations provide that a non-citizen "who has a consistent employment history which shows the ability to support himself or herself even though his or her income may be below the poverty level, may be admissible." 8 C.F.R. § 245a.2(k)(4). Accordingly, even if an applicant was "determined likely to become a public charge[,]" adjudicators were to find a non-citizen inadmissible on this ground only if he was "unable to overcome this determination after application of the special rule" and consideration of his employment history. *Id.* § 245a.2(d)(4). The BIA applied the IRCA special rule in

84

*Matter of A-*, reversing a public charge finding that put too much weight on the applicant's "financial circumstances" in the face of "the more important factors; namely, that the applicant has now joined the work force, . . . is young, and . . . has no physical or mental defects which might affect her earning capacity." 19 I. & N. Dec. at 870. In other words, the BIA read the IRCA special rule as fully consistent with the long-standing view that the ultimate issue in defining a "public charge" is the non-citizen's anticipated ability, over a protracted period, to be able to work to support himself or herself. IRCA and its implementing regulations thus show that Congress continued to emphasize capacity for work as a core element of the public charge ground.

All three of these statutory arguments share a common flaw. DHS attempts to justify a sweeping redefinition of "public charge" by pointing to tangential details within the extensive patchwork that makes up American immigration law – none of which express any intention by Congress to revise or depart from the settled meaning of the term "public charge." DHS's argument that these statutory provisions are "consistent" with its interpretation is of no relevance. The question is whether, by passing these statutes, Congress undertook to change the

85

long-established meaning of public charge. While the statutes to which DHS

points may be "consistent" with the meaning DHS has assigned to public charge,

they are no less consistent with the long established meaning of public charge

that DHS seeks to overturn. These enactments do nothing to demonstrate that

Congress changed the meaning of public charge. The arguments thus "run[ ]

afoul of the usual rule that Congress does not alter the fundamental details of a

regulatory scheme in vague terms or ancillary provisions – it does not, one might

say, hide elephants in mouseholes." *Epic Sys.*, 138 S. Ct. at 1626-27 (internal

quotation marks omitted).

We conclude that the Plaintiffs have demonstrated a likelihood of success

on the merits of their argument that the Rule is contrary to the INA. In reenacting

the public charge ground in 1996, Congress endorsed the settled administrative

and judicial interpretation of that ground as requiring a holistic examination of a

non-citizen's self-sufficiency focused on ability to work and eschewing any idea

that simply receiving welfare benefits made one a public charge. The Rule makes

receipt of a broad range of public benefits on even a short-term basis the very

86

definition of "public charge." That exceedingly broad definition is not in accordance with the law. *See* 5 U.S.C. § 706(2)(A).

## C.     The Rule is Arbitrary and Capricious.

We next consider whether the Plaintiffs are likely to succeed on the merits of their argument that the Rule is arbitrary and capricious. *See id*. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. But "[t]his is not to suggest that judicial review of agency action is merely perfunctory. To the contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful." *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008) (internal quotation marks omitted).

"When an administrative agency sets policy, it must provide a reasoned explanation for its action. This is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). The Plaintiffs argue that the Rule is arbitrary and capricious because DHS has not provided a reasoned explanation for its changed definition of "public charge" or the Rule's expanded list of

relevant benefits. DHS contends that it has adequately explained its action, stating that it adopted its new public charge definition to "improve upon" the 1999 Guidance by "aligning public charge policy with the self-sufficiency principles set forth in [PRWORA]." 83 Fed. Reg. at 51,123; *see also* 84 Fed. Reg. at 41,319-20. DHS further explains that it expanded the list of relevant benefits because the 1999 Guidance relied on an "artificial distinction between cash and non-cash benefits" that is not warranted under DHS's new definition. 83 Fed. Reg. at 51,123; *see* 64 Fed. Reg. at 28,689. For the reasons laid out below, we agree with the district court that the Plaintiffs are likely to succeed on the merits of their claim that the Rule is arbitrary and capricious because neither rationale is a "satisfactory explanation" for DHS's actions.[33] *State Farm*, 463 U.S. at 43.

### 1. Explanation for Changed Definition

DHS justifies its revised definition of "public charge" – one who uses a relevant public benefit for more than twelve months in the aggregate – as a "superior interpretation of the statute to the 1999 Interim Field Guidance"

---

[33] Because we find the Plaintiffs likely to succeed on this basis, we do not address the Plaintiffs' additional contentions that we could find the Rule arbitrary and capricious based on its aggregation principle, selection of factors indicative of future benefits use, or cost-benefit analysis.

because it "furthers congressional intent behind both the public charge

inadmissibility statute and PRWORA in ensuring that aliens . . . be self-sufficient

and not reliant on public resources." 84 Fed. Reg. at 41,319. "In fact, DHS believes

it would be contrary to congressional intent to promulgate regulations that . . .

ignore the[] receipt" of the benefits listed in the Rule "as this would be contrary

to Congress's intent in ensuring that aliens within the United States are self-

sufficient." *Id.* at 41,318 (citing the PRWORA policy statements at 8 U.S.C.

§ 1601(2)(A)); *see, e.g., id.* at 41,295, 41,305, 41,308. In short, DHS justifies its

changed interpretation as necessary to implement Congress's view that "the

receipt of any public benefits, including noncash benefits, [is] indicative of a lack

of self-sufficiency." Appellants' Br. at 43.

      This explanation fails for the same reasons as DHS's related argument that

the PRWORA policy statements show that the Rule is consistent with Congress's

intended meaning of "public charge." *See supra* Section II.B.6. As we discussed

above, the PRWORA policy statements do show a congressional interest in

ensuring non-citizen self-sufficiency. *See* 8 U.S.C. § 1601(1), (2). But the

statements also show that, contrary to DHS's belief, Congress's vision of self-

89

sufficiency does *not* anticipate abstention from all benefits use. *See Cook Cty.*, 962

F.3d at 232 (rejecting DHS's "absolutist sense of self-sufficiency that no person in

a modern society could satisfy"). Rather, Congress realized its notion of self-

sufficiency with a new benefits eligibility scheme that greatly reduced – but did

not eliminate – non-citizen eligibility for public benefits. *See* 8 U.S.C. § 1601(7)

(describing the PRWORA eligibility scheme as "achieving the compelling

governmental interest of assuring that aliens be self-reliant in accordance with

national immigration policy"). "The Supreme Court and [other] court[s] have

consistently reminded agencies that they are bound, not only by the ultimate

purposes Congress has selected, but by the means it has deemed appropriate, and

prescribed, for the pursuit of those purposes." *Gresham v. Azar*, 950 F.3d 93, 101

(D.C. Cir. 2020) (internal quotation marks omitted).

Had Congress thought that any benefits use was incompatible with self-

sufficiency, it could have said so, either by making non-citizens ineligible for all

such benefits or by making those who did receive them inadmissible. But it did

not. We are thus left with an agency justification that is unmoored from the

nuanced views of Congress. *See Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 85-

86 (2d Cir. 2006) (finding agency failed to provide reasoned explanation as to "how adoption of a *per se* coverage standard comports with congressional purposes in enacting the Medicare Act," which prioritized individualized care determinations). As the Supreme Court has explained,

> no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice – and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (emphasis omitted).

DHS's misconception of the PRWORA policy statements and Congress's intended notion of self-sufficiency is its principal justification for its revised definition; it identifies no other "deficienc[y]" in the 1999 Guidance, apart from its limited list of relevant benefits, discussed below. *See* 84 Fed. Reg. at 41,319; *see also id.* at 41,349 (describing the Guidance's interpretation as "suboptimal when considered in relation to the goals of the INA and PRWORA").

To be sure, we do not suggest that DHS must, as a general matter, show that the Guidance was deficient or that the Rule is necessarily a better interpretation than the prior policy reflected in the Guidance to avoid being

91

found arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (clarifying that agencies are not required to show "that the reasons for the new policy are *better* than the reasons for the old one"). Nor do we suggest that, when an agency offers a statutory interpretation as part of its reason for adopting a policy, and a reviewing court later rejects the agency's statutory interpretation, that the policy is per se arbitrary and capricious. But where, as here, DHS anchors its decision to change its interpretation in the perceived shortcomings of the prior interpretation, and then fails to identify any actual defect, it has not provided a "reasoned explanation" for its actions – particularly when it bases its changed position on its reading of a statute, and it is the new Rule, rather than the old Guidance, that strays from congressional intent. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

## 2. Explanation for Expanded List of Benefits

This brings us to DHS's rationale for expanding the list of benefits relevant to the public charge determination. DHS explains that it included a broader group of benefits in the Rule because the distinction made in the 1999 Guidance between cash and non-cash benefits was no longer appropriate in light of the

92

more restrictive notions of self-sufficiency DHS enacted with the changed definition. *See* 84 Fed. Reg. at 41,356; *see also id.* at 41,349, 41,351, 41,375; 83 Fed. Reg. at 51,123. Though this explanation is in some ways subsidiary to DHS's explanation for the changed definition, DHS argues this as an additional justification and we thus address its additional shortcomings. *See* Appellants' Br. at 43.

In the 1999 Guidance, INS explained that "[a]fter extensive consultation with benefit-granting agencies" it "determined that the best evidence of whether an alien is primarily dependent on the government for subsistence is . . . the receipt of public cash assistance for income maintenance." 64 Fed. Reg. at 28,692; *see* 83 Fed. Reg. 51,133. The Guidance consequently excluded non-cash benefits (e.g., SNAP, housing assistance, and Medicaid) from consideration because those benefits were "increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition." 64 Fed. Reg. at 28,692. In other words, "participation in [those] programs [was] not evidence of poverty or dependence" because they are "by their nature supplemental and do not, alone or in

93

combination, provide sufficient resources to support an individual or family." *Id.*;

*see id.* at 28,678.

In justifying its decision to include these non-cash benefits in the Rule,

DHS explains that they are relevant to its revamped public charge definition

because they "bear directly on self-sufficiency." 84 Fed. Reg. at 41,366. DHS

reasons that because "[f]ood, shelter, and necessary medical treatment are basic

necessities of life[, a] person who needs the public's assistance to provide for

these basic necessities is not self-sufficient." 83 Fed. Reg. at 51,159. Thus, the Rule

includes these benefits as relevant to the public charge determination to ensure

that all benefits bearing on self-sufficiency are considered. *Id.*; *see* 84 Fed. Reg. at

41,356.

The fundamental flaw of this justification is that while DHS repeatedly

contends that the non-citizens using these programs would be unable to provide

for their basic necessities without governmental support, it does not provide *any*

factual basis for this belief. *See, e.g.,* 83 Fed. Reg. at 51,159; 84 Fed. Reg. at 41,354,

41,366, 41,375, 41,381, 41,389. While the 1999 Guidance was developed in

consultation with the benefits-granting agencies, DHS does not claim that their

94

expertise again informed its decision that people who use non-cash benefits would be otherwise unable to meet their basic needs.[34] Of course, DHS is free to change its interpretation and we do not suggest it is under any obligation to consult with its sister agencies in so doing. But what DHS may not do is rest its changed interpretation on unsupported speculation, particularly when its categorical assumptions run counter to the realities of the non-cash benefits at issue. The goals and eligibility criteria of these benefits programs belie DHS's assumption and show that these programs are designed to provide supplemental support, rather than subsistence, to a broad swath of the population – as INS recognized in 1999.

Take, for example, SNAP – the *Supplemental* Nutrition Assistance Program – which was born of a desire to "raise levels of nutrition among low-income households." Food Stamp Act of 1964, Pub. L. No. 88-525, § 2, 78 Stat. 703, 703. SNAP benefits are intended for all those whose "financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a *more nutritious* diet." Food and Agriculture Act of 1977, Pub. L. No. 95-113, § 1301, 91

---

[34] In response to a comment directly asking whether any such consultation took place, DHS invoked the deliberative process privilege. 84 Fed. Reg. at 41,460.

Stat. 913, 962 (emphasis added); *see* 7 C.F.R. § 273.9(a). Because SNAP is not

intended only for those who might otherwise face starvation, the program is open

to households with incomes exceeding the federal poverty guideline, 7 C.F.R.

§ 273.9(a)(1), and its supplemental nature is underscored by the fact that the

average SNAP recipient receives only $127 a month in benefits, *see* House of

Representatives Amicus Br. at 19 (citing 2018 statistics). Large numbers of SNAP

recipients, far from being incapable of productive employment, work for some of

America's largest corporations.[35]

The housing benefits included in the Rule have a similar aim, intended to

ensure "a decent home and a suitable living environment for all persons, but

principally those of low *and moderate* income." Housing and Community

Development Act of 1974, Pub. L. No. 93-383, § 101(c)(3), 88 Stat. 633, 634

(emphasis added). Indeed, while the majority of those using housing programs

are low-income families, benefits remain available to those earning up to 80% of

---

[35] *See* Public Justice Center Amicus Br. at 12 (citing Senate report concluding that SNAP beneficiaries are "'far more' likely to be employed than to rely on cash assistance" (quoting S. Rep. No. 11-220, at 8 (2007)); *see also* Dennis Green, *Data From States Shows Thousands of Amazon Employees Are on Food Stamps*, BUSINESS INSIDER (Aug. 25, 2018) (discussing SNAP usage by Amazon, Walmart, and McDonald's employees).

the area median income – $85,350 for a family of four in New York City in 2019.

M.T.R. J. App. 164; *see* 42 U.S.C. § 1437a(b)(2)(A). It makes little sense to treat the

mere receipt of housing benefits as proof of inability to survive by one's own

efforts when the program is intended for, among others, people who can and do

earn moderate incomes. In contrast, TANF – one of the three benefits listed in the

1999 Guidance – is generally only available to families with incomes well below

the federal poverty guideline.[36]

 While the Rule declares non-citizens dependent for using Medicaid instead

of private health insurance, it cannot be ignored that in this country, access to

private healthcare depends for many people on whether an employer offers

coverage. *See* National Housing Law Project Amicus Br. at 22 (noting that roughly

40% of employed Medicaid beneficiaries work for small businesses, many of

which are not legally required to provide health insurance). Considering that

---

[36] The TANF earnings thresholds for new applicants vary by state and range from approximately 16% of FPG in Alabama to 91% of FPG in Nevada. *See* CONG. RESEARCH SERV., TANF: ELIGIBILITY AND BENEFIT AMOUNTS IN STATE TANF CASH ASSISTANCE PROGRAMS at 3 (2014). In the majority of states, however, TANF was only available to those earning less than 50% of FPG, which means an annual income of less than $13,100 for a family of four in 2020. *Id.*; *see* Annual Update of the HHS Poverty Guidelines, 85 Fed. Reg. 3,060, 30,060 (Jan. 17, 2020).

97

access to insurance is often determined by factors beyond an individual's control, we are dubious of DHS's unsupported claim that using public health insurance shows a lack of self-sufficiency.[37] To the contrary, studies show that more than 60% of Medicaid beneficiaries who are not children, older adults, or people with disabilities are *employed*. *See* Public Justice Center Amicus Br. at 20 (citing RACHEL GARFIELD ET AL., KAISER FAMILY FOUND., UNDERSTANDING THE INTERSECTION OF MEDICAID AND WORK: WHAT DOES THE DATA SAY? 2 (2019)). To be sure, it is easier for individuals to purchase private coverage in the wake of the Affordable Care Act ("ACA"), but the Rule implies that even using ACA tax credits to purchase

---

[37] DHS also suggests that Medicaid is included because "the total Federal expenditure for the Medicaid program overall is by far larger than any other program for low-income people," 84 Fed. Reg. at 41,379, which DHS takes as evidence that it is "a more significant form of public support" for individuals than other benefits, Appellants' Br. at 43; *see* 83 Fed. Reg. at 51,160. We are not persuaded that the difference in dollars expended is an appropriate indicator of a non-citizen's level of self-sufficiency; rather, it seems plain to us that the difference is due to the high cost of providing healthcare in the United States. *Cf. Public Citizen, Inc. v. Mineta*, 340 F.3d 39, 58 (2d Cir. 2003) ("The notion that 'cheapest is best' is contrary to *State Farm*."). The size of the government expenditure on Medicaid may be relevant to a policy debate about the costs and benefits of the program, but it has little bearing on whether Medicaid recipients should be considered "public charges."

98

health insurance evidences an inability to meet one's needs without government support. 84 Fed. Reg. at 41,299.

Of course, SNAP and housing benefits may very well be all that stands between some non-citizens and hunger or homelessness. Some families *may* actually fail to meet these basic needs without government support. But these programs sweep more broadly than just families on the margin, encompassing those who would no doubt keep their families fed and housed without government support but are able to do so in a healthier and safer way because they receive supplemental assistance. *See Cook Cty.*, 962 F.3d at 232 (noting that the benefits covered by the Rule "are largely supplemental" and that "[m]any recipients could get by without them" (emphasis omitted)). Accepting help that is offered to elevate one to a higher standard of living, *help that was created by Congress for that precise purpose*, does not mean a person is not self-sufficient – particularly when such programs are available not just to persons living in abject poverty but to a broad swath of low- and moderate-income Americans, including those who are productively employed. DHS goes too far in assuming that all those who participate in non-cash benefits programs would be otherwise unable

to meet their needs and that they can thus be categorically considered "public charges." Its unsupported and conclusory claim that receipt of such benefits indicates an inability to support oneself does not satisfy DHS's obligation to explain its actions. *See Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (rejecting agency's "conclusory" explanation and noting that "[s]uch intuitional forms of decisionmaking . . . fall somewhere on the distant side of arbitrary" (internal quotation marks omitted)); *see also State Farm*, 463 U.S. at 51.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. But the agency must at least . . . show that there are good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2125-26 (internal quotation marks and citations omitted). DHS has failed to do so here. Accordingly, the Plaintiffs have shown they are likely to succeed on the merits of their claim that DHS's failure to provide a reasoned explanation renders the Rule arbitrary and capricious.

## III.    Irreparable Harm to the Plaintiffs

The second preliminary injunction factor under *Winter* requires the Plaintiffs to show they are likely to suffer irreparable harm in the absence of injunctive relief. 555 U.S. at 20. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted). We have already discussed the Plaintiffs' claimed injuries in evaluating their standing to challenge the Rule and both the States and Organizations point to largely similar harms to establish this injunctive factor. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (looking to same injuries to establish standing and irreparable harm).

The States contend that the implementation of the Rule will result in reduced Medicaid revenue and federal funding and a greater number of uninsured patients seeking care, putting public hospitals that are already insufficiently funded at risk of closure. *See, e.g.*, N.Y. J. App. 512-13. Additionally, as the administrators of the benefits programs at issue, the States allege that they will be required to undertake costly revisions to their eligibility systems to ensure

that non-citizens are not automatically made eligible for or enrolled in benefits

they may no longer wish to receive after the Rule's implementation. *See, e.g.*, N.Y.

J. App. 236, 381-82. The Organizations point to the economic harms of expending

funds to mitigate the impact of the Rule on the communities they serve. *See, e.g.*,

M.T.R. J. App. 466-67. As noted, DHS predicted that the Rule would have

economic harms, and the Rule has already had a chilling effect on non-citizen use

of public benefits. See *supra* Section I.A. These injuries claimed by the States and

the Organizations are actual and imminent. Moreover, because money damages

are prohibited in APA actions, they are irreparable. *See* 5 U.S.C. § 702; *Ward v.*

*Brown*, 22 F.3d 516, 520 (2d Cir. 1994). We thus conclude that the Plaintiffs have

established the second factor of the preliminary injunction standard.[38]

## IV. Balance of Equities and the Public Interest

The final inquiry in our preliminary injunction analysis requires us to

consider whether the balance of equities tips in favor of granting the injunction

---

[38] We note that our precedents suggest that the Plaintiffs may be able to show that a preliminary injunction is warranted on the strength of these first two factors alone. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 636, 640-41 (2d Cir. 2019), *rev'd on other grounds,* – U.S. – 2020 WL 3848061 (July 9, 2020). Notwithstanding this possibility, we consider the balance of equities and the public interest, as discussed in *Winter*.

and whether that injunction is in the public interest, the third and fourth *Winter*

factors. *Winter*, 555 U.S. at 20; *Azar*, 911 F.3d at 575 (considering the final two

factors together where the government is a party). DHS argues that it would be

harmed by a preliminary injunction because an injunction would force the agency

to retain its prior policy, which grants status to some non-citizens that DHS

believes should be denied under a proper interpretation of the public charge

ground. Because there is no apparent means by which DHS could revisit

adjustment determinations made while the Rule is enjoined, this harm is

irreparable.

     While DHS has a valid interest in applying its preferred immigration

policy, we think the balance of equities clearly tips in favor of the Plaintiffs. For

one, DHS's claimed harm is, to some extent, inevitable in the preliminary

injunction context. Any time the government is subject to a preliminary

injunction, it necessarily suffers the injury of being prevented from enacting its

preferred policy. Without additional considerations at play – for example,

national security implications, *Winter,* 555 U.S. at 26, or the need to correct a

previous policy that had been deemed unlawful – we do not think DHS's

inability to implement a standard that is as strict as it would like outweighs the wide-ranging economic harms that await the States and Organizations upon the implementation of the Rule.

The public interest also favors a preliminary injunction. DHS itself acknowledges that the Rule will likely result in "[w]orse health outcomes, including increased prevalence of obesity and malnutrition, . . . [i]ncreased prevalence of communicable diseases, . . . [i]ncreased rates of poverty and housing instability[,] and [r]educed productivity and educational attainment." 83 Fed. Reg. at 51,270. To say the least, the public interest does not favor the immediate implementation of the Rule.

Thus, the Plaintiffs have met their burden of showing that a preliminary injunction is warranted in these cases. Accordingly, we affirm the district court orders granting such relief in these cases.

## V.     Scope of Injunction

While we hold that the district court properly granted the Plaintiffs' preliminary injunction motions, there remains one final issue for our consideration: whether the district court abused its discretion by entering a nationwide injunction, rather than a geographically limited measure. DHS argues

104

that a national injunction is insufficiently tailored to the Plaintiffs' particular

injuries and allows the decision of a single district court to override contrary

decisions of other courts, an outcome not warranted by the need for uniform

application of immigration law. The Plaintiffs respond that the scope of relief is

determined by the extent of the violation and that the APA authorizes the broad

relief issued here.

The issuance of nationwide injunctions has been the subject of increasing

scrutiny in recent years, a topic that has already touched these cases on their brief

foray to the Supreme Court. *See New York*, 140 S. Ct. at 599-601 (Gorsuch, J.,

concurring in the grant of stay); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2424-29

(2018) (Thomas, J., concurring). The difficult questions implicated in this debate

are evidenced by the fact that both DHS and the Plaintiffs marshal persuasive

points to support their arguments. As the Plaintiffs point out, courts have long

held that when an agency action is found unlawful under the APA, "the ordinary

result is that the rules are vacated – not that their application to the individual

petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145

F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks omitted). This aligns

105

with the general principle that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Moreover, courts have recognized that nationwide injunctions may be particularly appropriate in the immigration context, given the interest in a uniform immigration policy. *See Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015); *see also Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds,* 138 S. Ct. 2392 (2018).

On the other hand, we share DHS's concern that a district judge issuing a nationwide injunction may in effect override contrary decisions from co-equal and appellate courts, imposing its view of the law within the geographic jurisdiction of courts that have reached contrary conclusions. That result may well be more unseemly than the application of inconsistent interpretations of immigration law across the circuits – a situation that is hardly unusual, and may well persist without injustice or intolerable disruption. *See, e.g.*, *Orellana-Monson v. Holder*, 685 F.3d 511, 520 (5th Cir. 2012) (discussing circuit variance in a substantive asylum standard).

We have no doubt that the law, as it stands today, permits district courts to enter nationwide injunctions, and agree that such injunctions may be an appropriate remedy in certain circumstances – for example, where only a single case challenges the action or where multiple courts have spoken unanimously on the issue. The issuance of unqualified nationwide injunctions is a less desirable practice where, as here, numerous challenges to the same agency action are being litigated simultaneously in district and circuit courts across the country. It is not clear to us that, where contrary views could be or have been taken by courts of parallel or superior authority, entitled to determine the law within their own geographical jurisdictions, the court that imposes the most sweeping injunction should control the nationwide legal landscape.

When confronted with such a volatile litigation landscape, we encourage district courts to consider crafting preliminary injunctions that anticipate the possibility of conflict with other courts and provide for such a contingency. Such approaches could take the form of limiting language providing that the injunction would not supersede contrary rulings of other courts, an invitation to the parties to return and request modification as the situation changes, or the limitation of

the injunction to the situation of particular plaintiffs or to similarly situated persons within the geographic jurisdiction of the court.

We need not decide whether the able district judge in these cases abused his discretion in entering nationwide injunctions. Instead, we exercise our own discretion, in light of the divergent decisions that have emerged in our sister circuits since the district court entered its orders, to modify the injunction, limiting it to the states of New York, Connecticut, and Vermont. *Cf. Smith v. Woosley*, 399 F.3d 428, 436 (2d Cir. 2005). As modified, the injunction covers the State plaintiffs and the vast majority of the Organizations' operations. We see no need for a broader injunction at this point, particularly in light of the somewhat unusual posture of this case, namely that the preliminary injunction has already been stayed by the Supreme Court, not only through our disposition of the case, but also through the disposition of DHS's petition for a writ of certiorari, should DHS seek review of this decision. *See New York*, 140 S. Ct. at 599.

## CONCLUSION

For the reasons stated above, we agree with the district court that a preliminary injunction is warranted in these cases but modify the scope of the

108

injunctions to cover only the states of New York, Connecticut, and Vermont. The

orders of the district court are therefore **AFFIRMED AS MODIFIED**.

## Appendix A

**Amici Curiae in *New York v. DHS* and *Make the Road v. Cuccinelli***

Maureen P. Alger, Priyamvada Arora, Cooley LLP, Palo Alto, CA, *for Amici Curiae* American Academy of Pediatrics, American Medical Association, American College of Physicians, American College of Obstetricians and Gynecologists, New York State American Academy of Pediatrics, American Academy of Pediatrics – Vermont Chapter, and Medical Society of the State of New York, *in support of Plaintiffs-Appellees*.

Emily Tomoko Kuwahara, Crowell & Moring LLP, Los Angeles, CA, Austin Sutta, Crowell & Moring LLP, San Francisco, CA, *for Amici Curiae* Asian Americans Advancing Justice | AAJC, Asian American Legal Defense and Education Fund, National Women's Law Center, and 40 Other Organizations, *in support of Plaintiffs-Appellees*.

Hillary Schneller, Center for Reproductive Rights, New York, NY, *for Amicus Curiae* Center for Reproductive Rights, *in support of Plaintiffs-Appellees*.

Elizabeth B. Wydra, Brianne J. Gorod, Dayna J. Zolle, Constitutional Accountability Center, Washington, DC, *for Amici Curiae* Immigration History Scholars, *in support of Plaintiffs-Appellees*.

Johanna Dennehy, Steptoe & Johnson LLP, Washington, DC, *for Amici Curiae* Immigration Law Professors, *in support of Plaintiffs-Appellees*.

Richard L. Revesz, Jack Lienke, Max Sarinsky, Institute for Policy Integrity at New York University School of Law, New York, NY, *for Amicus Curiae* Institute for Policy Integrity at New York University School of Law, *in support of Plaintiffs-Appellees*.

Russell L. Hirschhorn, Proskauer Rose LLP, New York, NY, *for Amici Curiae* Justice in Aging, American Society on Aging, Caring Across Generations, Jewish Family Service of Los Angeles, Jewish Federations of North America, National Asian Pacific Center on Aging, National Council on Aging, National Hispanic Council on Aging, MAZON, PHI, and Center for Medicare Advocacy, *in support of Plaintiffs-Appellees*.

110

Nilda Isidro, Goodwin Procter LLP, New York, NY, *for Amici Curiae* Members of Congressional Black Caucus, Congressional Hispanic Caucus, and Congressional Asian Pacific American Caucus, *in support of Plaintiffs-Appellees.*

Stuart Rossman, National Consumer Law Center, Boston, MA, *for Amici Curiae* National Consumer Law Center, Legal Aid Justice Center, Public Citizen, Inc., Consumer Action, Equal Justice Society, Impact Fund, Secure Justice, Media Alliance, Americans for Financial Reform Education Fund, and New Economy Project, *in support of Plaintiffs-Appellees.*

Paul J. Lawrence, Alanna E. Peterson, Pacifica Law Group LLP, Seattle, WA, *for Amici Curiae* Nonprofit Anti-Domestic Violence and Sexual Assault Organizations, *in support of Plaintiffs-Appellees.*

Debra Gardner, Public Justice Center, Baltimore, MD, *for Amicus Curiae* Public Justice Center, *in support of Plaintiffs-Appellees.*

Paul W. Hughes, Michael B. Kimberly, Matthew A. Waring, McDermott Will & Emery LLP, Washington, DC, *for Amici Curiae* 105 Businesses and Organizations, *in support of Plaintiffs-Appellees.*

111

**Amici Curiae in** *New York v. DHS*

Sarah M. Ray, Kyle A. Virgien, Diana A. Aguilar, Charles F. Sprague, Latham & Watkins LLP, San Francisco, CA, Tyce R. Walters, Latham & Watkins LLP, Washington, DC, *for Amici Curiae* American Civil Liberties Union, Center for Public Representation, American Association of People with Disabilities, Association of University Centers on Disabilities, Autistic Self Advocacy Network, Civil Rights Education and Enforcement Center, Coelho Center for Disability Law, Policy, and Innovation, Disability Rights Advocates, Disability Rights Education and Defense Fund, Disability Rights New York, Judge David L. Bazelon Center for Mental Health Law, Little Lobbyists, Mental Health America, National Association of Councils on Developmental Disabilities, National Council on Independent Living, National Disability Rights Network, National Federation of the Blind, New York Civil Liberties Union, The Arc of the United States, and United Spinal Association, *in support of Plaintiffs-Appellees*.

Lisa C. Wood, Kristyn DeFilipp, Andrew London, Emily Nash, E. Jacqueline Chávez, Foley Hoag LLP, Boston, MA, Justin Lowe, Wendy Parmet, Health Law Advocates, Inc., Boston, MA, *for Amici Curiae* Health Law Advocates, Inc. and Other Organizations Interested in Public Health, *in support of Plaintiffs-Appellees*.

R. Adam Lauridsen, Chessie Thacher, Victor H. Yu, Nicholas R. Green, Keker, Van Nest & Peters LLP, San Francisco, CA, *for Amici Curiae* National Housing Law Project, Food Research & Action Center, Center for Law & Social Policy, National Education Association, Service Employees International Union, California League of United Latin American Citizens, California Food Policy Advocates, Center for the Study of Social Policy, Children's HealthWatch, Comunidades Unidas/Communities United, First Focus on Children, Los Angeles Regional Food Bank, Mississippi Center for Justice, National WIC Association, National Low Income Housing Coalition, Prevention Institute, Sant La Haitian Neighborhood Center, South Carolina Appleseed Legal Justice

Center, Virginia Poverty Law Center, *in support of Plaintiffs-Appellees.*

Matthew S. Freedus, Edward T. Waters, Phillip A. Escoriaza, Amanda N. Pervine, Feldesman Tucker Leifer Fidell LLP, Washington, DC, *for Amici Curiae* Public Health, Health Policy, Medicine, and Nursing Deans, Chairs, and Scholars, American Public Health Association, American Academy of Nursing, and Public Health Solutions, *in support of Plaintiffs-Appellees.*

Danielle L. Goldstein, Michael Dundas, Office of the Los Angeles City Attorney, Barbara J. Parker, Erin Bernstein, Office of the Oakland City Attorney, Margaret L. Carter, Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, CA, Vince Ryan, Robert Hazeltine-Shedd, Harris County, TX, Donna R. Ziegler, Alameda County, CA, Esteban A. Aguilar, Jr., City of Albuquerque, NM, Anne L. Morgan, City of Austin, TX, Andre M. Davis, City of Baltimore, MD, Mark A. Flessner, Benna Ruth Solomon, City of Chicago, IL, Christopher J. Caso, City of Dallas, TX, Kristin M. Bronson, City and County of Denver, CO, Lawrence Garcia, Eli Savit, City

of Detroit, MI, Rodney Pol, Jr., City of Gary, IN, Crystal Barnes, City of Holyoke, MA, Ronald C. Lewis, Judith L. Ramsey, Collyn Peddie, City of Houston, TX, Howard Phillip Schneiderman, King County, WA, Michael P. May, City of Madison, WI, Brian E. Washington, Marin County, CA, Erik Nilsson, City of Minneapolis, MN, Leslie J. Girard, William M. Litt, Anne K. Brereton, Marina S. Pantchenko, Monterey County, CA, Kathryn E. Doi, Rachael E. Blucher, Natalie M. Smith, Hanson Bridgett LLP, Sacramento, CA, Susana Alcala Wood, City of Sacramento, CA, John C. Beiers, David A. Silberman, Ilana Parmer Mandelbaum, San Mateo County, CA, Peter S. Holmes, City of Seattle, WA, Francis X. Wright, Jr., City of Somerville, MA, Michael Rankin, City of Tucson, AZ, Michael Jenkins, City of West Hollywood, CA, *for Amici Curiae* 26 Cities and Counties, *in support of Plaintiffs-Appellees.*

**Amici Curiae in** *Make the Road v. Cuccinelli*

Sadik Huseny, Brittany N. Lovejoy, Joseph C. Hansen, Tess L. Curet, Alexandra B. Plutshack, Latham & Watkins LLP, San Francisco, CA, *for Amici Curiae* Fiscal Policy Institute, Presidents' Alliance on Higher Education and Immigration, National Center for Law and Economic Justice, American Federation of State, County and Municipal Employees, California Immigrant Policy Center, Child Care Law Center, Colorado Fiscal Institute, Community Action Marin, Kids Forward, Michigan Immigrant Rights Center, Oasis Legal Services, Economic Progress Institute, United African Organization, and Virginia Interfaith Center for Public Policy, *in support of Plaintiffs-Appellees.*

Lawrence J. Joseph, Law Office of Lawrence J. Joseph, Washington, DC, *for Amicus Curiae* Immigration Reform Law Institute, *in support of Defendants-Appellants.*

114