## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF CONNECTICUT, and STATE OF VERMONT, <br><br>             Plaintiffs, <br><br>      v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF,[1] *in his official capacity as Acting Secretary of the United States Department of Homeland Security*; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; KENNETH T. CUCCINELLI II, *in his official capacity as Senior Official Performing the Duties of Director of the United States Citizenship and Immigration Services and Senior Official Performing the Duties of Deputy Secretary of United States Department of Homeland Security*; and UNITED STATES OF AMERICA, <br><br>             Defendants. | CIVIL ACTION NO. 19-CV-7777 (GBD) (OTW) <br><br><br> FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.     For generations, the United States has been a haven for immigrants seeking opportunity and upward mobility.  *See, e.g.*, John F. Kennedy, *Nation of Immigrants* (1958); Emma Lazarus, *The New Colossus* (1883) (welcoming "your tired, your poor, your huddled

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the caption has been updated to reflect the officials currently occupying these offices.

masses").  Our federal immigration law reflects this history, permitting exclusion of immigrants as a "public charge" only in very narrow circumstances where the immigrants are unwilling or unable to work and have no other source of support, and therefore likely to be primarily dependent on the federal government in the long term.

2.      The Final Rule, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pt. 103, 212, 213, 214, 245, 248) ("Final Rule") turns this history on its head.  The Final Rule upends Defendants' circumscribed authority to exclude an individual as a "public charge," exploding this narrow classification to radically realign national immigration policy in a manner both proscribed by Congress and unauthorized by law. In so doing, the Final Rule implements this Administration's explicit animus against immigrants of color; it is the means by which immigrants from what this Administration has described as "shithole countries" will be excluded to the benefit of white, wealthy Europeans.[2]

3.      The Final Rule weaponizes the public charge inquiry to target legal immigrants who are lawfully present in this country, who have close ties to our communities, and who Congress has expressly decided should be entitled to certain federal benefits.  The Rule penalizes immigrants for their use of vital, non-cash benefit programs—such as food stamps, Medicaid, and housing assistance—that are designed to encourage upward mobility and promote self-sufficiency.   As a result, the Rule will disproportionately harm immigrants of color, immigrants with disabilities, and immigrants with limited resources at the time of their visa or green card applications.

---

[2] Ali Vitali et al., *Trump referred to Haiti and African nations as 'shithole' countries*, NBC News (Jan. 11, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

4.      The Department of Homeland Security's new definition of "public charge"
unlawfully and unreasonably assumes that *any* recipient of certain federal benefits above a *de
minimis* threshold of use will become a drain on public resources.  But the history and purpose of
the benefits programs that the Rule targets do not support such an assumption.  Rather, Congress
intended to provide temporary, supplemental benefits to working families to enable them to
continue to be productive members of our society.  Defendants thus contort the meaning of
"public charge" beyond recognition by radically expanding its definition to include individuals
who receive benefits—however nominal—and by viewing the receipt of such benefits as
evidence of long-term dependency rather than, as Congress intended, a means of empowering
individuals to continue contributing to their communities.

5.      The Final Rule will cause immediate and irreparable injury to the Plaintiffs and
their residents.  Immigrants, forced to choose between feeding their children and losing their
pathway to citizenship, or believing they face such a forced choice due to confusion and fear
about the Final Rule, will withdraw from programs that Congress designed to promote stability
and upward mobility.  And this chilling effect, and the concomitant increase in homelessness,
food insecurity, and undiagnosed and untreated medical issues, will force state and local
governments to bear severe financial and public health consequences.  State and local
governments will be forced to expend their own resources to assist low- and middle-class
workers and their families, including citizen children, and to cover the public health and other
severe consequences that will result from immigrants forgoing non-cash supplemental benefits.

6.      As Defendants themselves acknowledge, the Rule will not only drive families
away from using the food supplements, health care, and housing assistance programs expressly
covered by the Rule, but will also deter households from availing themselves of other benefits to

which they are lawfully entitled and which are not directly subject to the Rule.  The result will be less preventative health care, less nutritious food, and less stable housing, with enormous financial and public harms to Plaintiffs and their residents.  Additionally, immigrants who choose to continue receiving public benefits stand to lose adjustments in their status critical to their stability and success.

7.     The Final Rule directly and irreparably interferes with Plaintiff States' and City's sovereign interests in the governance of their jurisdictions.  The Rule would upend Plaintiffs' statutes and policies designed to combat homelessness and improve children's health outcomes. It would undermine Plaintiffs' systems designed to promote public health, well-being, and civil rights of their residents.  And the Rule will also inflict irreparable harm on Plaintiffs' economies, increasing poverty and housing instability, and reducing economic productivity and educational attainment within the Plaintiffs' jurisdictions.

8.     Defendants' radical reversal of longstanding practice and policy violates the Administrative Procedure Act and the Constitution.  First, Defendants' effort to overhaul federal immigration policy by redefining the long-established meaning of the term "public charge" exceeds their statutory authority.  Second, the Final Rule discriminates against persons with disabilities, in direct contravention of Section 504 of the Rehabilitation Act of 1973.  The Final Rule also is arbitrary and capricious in a host of ways, including Defendants' failure to reasonably justify their departure from decades of settled practice and to adequately consider the Rule's varied and extensive harms.  And Defendants failed to give the public adequate notice of these changes through the notice and rulemaking process.  Finally, the Rule intentionally discriminates against Latino immigrants and immigrants of color, in keeping with Defendants'

broader scheme designed to instill fear in those communities and deter and decrease immigration from these communities.

9.      Additionally, the Final Rule was promulgated by Defendant Kevin K. McAleenan in his capacity as purported Acting Secretary of Homeland Security. Because McAleenan was improperly serving in the role of Acting Secretary of Homeland Security in violation of the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3341 *et seq.*, and the Homeland Security Act of 2002 ("HSA"), 6 U.S.C. § 111 *et seq.*, he lacked the authority to promulgate the Rule. Accordingly, the Rule is an *ultra vires* agency action that was void *ab initio*.

10.      Plaintiffs the State of New York, the City of New York, the State of Connecticut, and the State of Vermont bring this action to vacate the Final Rule and enjoin its implementation because it exceeds and is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C); is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A); was promulgated by an official appointed in contravention of the FVRA and the HSA; and violates the equal protection guarantee of the Fifth Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE

11.      This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and the FVRA, 5 U.S.C. § 3341 *et seq.*

12.      This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705 and 706.

13.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (e)(1) because Defendants are United States agencies or officers sued in their

official capacities, Plaintiffs the State of New York and the City of New York are residents of this judicial district, and a substantial part of the events or omissions giving rise to this action occurred and are continuing to occur in this district.

## PARTIES

14.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

15.     Plaintiff the City of New York is a municipal corporation organized pursuant to the laws of the State of New York.  New York City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter.  New York City is the largest city in the United States by population.

16.     Plaintiff the State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America.  The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 et seq.

17.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state of the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

18.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Final Rule harms their sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated.

19.     Defendant United States Department of Homeland Security ("DHS" or "the Department") is a cabinet agency within the executive branch of the United States government, and is an agency within the meaning of 5 U.S.C. § 552(f).  DHS promulgated the Final Rule and is responsible for its enforcement.

20.     Defendant Chad F. Wolf (the "Acting Secretary") is the Acting Secretary of Homeland Security and Under Secretary for Strategy, Policy, and Plans at DHS.  He assumed the title of Acting Secretary in November 2019 following the resignation of his predecessor, Kevin K. McAleenan, who at the time was Acting Secretary of Homeland Security and Commissioner of U.S. Customs and Border Protection.  McAleenan, in turn, inherited the role of Acting Secretary in April 2019 after the resignation of his predecessor, Kirstjen Nielsen, who is the last person to have been confirmed by the Senate as Secretary of Homeland Security.  Defendant Wolf is sued in his official capacity.[3]

21.     Defendant United States Citizenship and Immigration Services ("USCIS") is an agency of DHS and is an agency within the meaning of 5 U.S.C. § 552(f).  USCIS has primary authority to make public charge determinations for adjustment of status applications

22.     Defendant Kenneth T. Cuccinelli II is the Senior Official Performing the Duties of the Director of USCIS and of the Deputy Secretary of Homeland Security and is sued in his official capacity.

23.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

---

[3]     Plaintiffs refer to Wolf and McAleenan as "Acting Secretaries" without conceding that either of them was ever lawfully appointed to that position or has lawfully exercised the powers of that position, as set forth below.

## ALLEGATIONS

24.     The Immigration and Nationality Act ("INA") provides that the federal government may deem a non-citizen applying either to enter or to reside permanently in the United States likely to become a public charge, and thus inadmissible for entry or adjustment of status.  8 U.S.C. § 1182(a)(4)(A).  In assessing whether an applicant is likely to fall within the public charge definition, DHS is required to evaluate a range of factors in a totality of circumstances determination.  8 U.S.C. § 1182(a)(4)(B).  The Final Rule drastically changes this process, far beyond statutory limits, to exclude from admissibility working individuals and families, their children, the disabled, people of color, and other residents of Plaintiffs' jurisdictions who are not likely to depend primarily and permanently on government support.

**A.     Federal Immigration Statutes Incorporated the Common Law Interpretation of Public Charge.**

25.     Since the 19th century, the term "public charge" has been understood to mean solely those individuals who depend permanently and primarily on government resources.  The term has never been understood to include individuals who earn moderate or low incomes, or who receive temporary or moderate amounts of public benefits that are designed to assist them in maintaining stable and healthy lives.  For more than a century, federal immigration statutes have incorporated this established and narrow common law meaning of "public charge."  And over subsequent decades, Congress has repeatedly rejected numerous attempts to expand public charge beyond the common law definition.

**1.     Common Law Defines Public Charge as an Individual Primarily Dependent on Governmental Assistance.**

26.     For more than 130 years, courts, Congress, and federal agencies have consistently interpreted the term "public charge" to mean an individual who has become or is likely to become primarily or completely dependent on the government in the long term.

27.     The first federal immigration statute, enacted in 1882, adopted the concept of "public charge" that had been used by several local and state statutes enacted in the first half of the 19th century.[4]  Like those early state and local statutes, the federal statute excluded those who could not work on a sustained basis, including "convicts, lunatics, idiots, and any person unable to take care of himself without becoming a public charge."  Immigration Act of 1882, ch. 376, 22 Stat. 214, 47th Cong. (1882).  And like the early state and local statutes on which it was based, the federal statute did not exclude as public charges individuals who were able to work.

28.     In 1907, Congress passed a second immigration statute, which it amended in 1910.  Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899 (1907); amended by Act of Mar. 26, 1910, ch. 128, § 1, 36 Stat. 263, 263 (1910).  Both the 1907 law and the amendment retained the public charge exclusion for paupers, professional beggars, those with contagious illnesses, and those with permanent "defects," and therefore, had to look to the government indefinitely for support.  These federal statutes thus continued the preexisting meaning of public charge as including solely those individuals who needed to rely primarily on the government to live, and not those who did or could work.

29.     Courts and the Board of Immigration Appeals ("BIA")[5] have consistently interpreted "public charge" to refer to individuals who depend completely or nearly completely upon government support.  In 1915, the Supreme Court has affirmed this understanding.  In *Gegiow v. Uhl,*[6] the Court held that the public charge exclusion did not cover the poor or the

---

[4] Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1850 (1993) (citing Act of Feb. 26, 1794, ch. 32, §§ 15, 1794 Mass. Acts & Laws 375, 385.).

[5] The BIA is a department within the Department of Justice ("DOJ") that is the highest administrative body for interpreting and applying immigration laws. The BIA has nationwide jurisdiction to hear appeals from certain decisions rendered by immigration judges and by district directors of DHS.

[6] 239 U.S. 3 (1915).

temporarily unemployed, but was intended to reach individuals permanently unable to support themselves through work.[7]  Justice Holmes, writing for the Court, explained that temporary factors such as local labor conditions were irrelevant to a public charge finding and that such a determination should be based solely on "permanent personal objections."[8]  A "likely public charge" determination under the common law thus required a permanent and unalterable condition of dependence, rather than a condition of temporary hardship or low-income status.

30.     In the decades following *Uhl*, courts rejected a "latitudinarian construction" of public charge and held that it encompassed only "those persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future."[9]  From the 1940s to the present, the BIA and circuit courts have continued to adhere to this narrow definition, overturning public charge exclusions of employable immigrants found inadmissible for having low incomes or using some public benefits.  Interpreting decades of common law on public charge, the BIA found that the INA "requires more than a showing of a possibility that the alien will require public support."[10]

31.     For applicants who arrived in the United States without financial resources but were willing and able to work in the long term, the public charge exclusion did not apply; public charge determination was thus the exception, rather than the rule.

---

[7] *Id.* at 9-10.

[8] These permanent personal objections included: long-term poverty ("paupers and professional beggars"), disability ("idiots" and those with "a mental or physical defect"), a history of criminality ("convicted felons, prostitutes"), or "persons dangerously diseased." *Id.* at 10.

[9] *Ex parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919); *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917); *U.S. ex rel. Mantler v. Comm'r of Immigration*, 3 F.2d 234, 235 (2d Cir. 1924).

[10] *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962); *see also, e.g.*, *Matter of A-*, 19 I. & N. Dec. 867, 869 (Comm. 1988).

2.     **The Immigration and Nationality Act of 1952 Incorporated the Common Law Definition of Public Charge.**

32.     In 1952, Congress passed the INA, which included a provision establishing public charge as a ground of both inadmissibility and removal.  The INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."  8 U.S.C. § 1182(a)(4).

33.     The statute requires a public charge determination for applicants seeking to adjust their status to become permanent residents (i.e. green card holders).  Defendant USCIS is a component of DHS and has authority to make public charge determinations for adjustment of status applications.  8 U.S.C. § 1201(a).  Prior to March 1, 2003, this function was performed by the Immigration and Naturalization Service ("INS"), under the purview of the United States Department of Justice ("DOJ").  After 2003, this authority was delegated to DHS.

34.     The statute also requires a public charge determination for applicants seeking entry to the United States via a visa application—such as people applying for family- or employment-based visas.  The Department of State has jurisdiction to make such public charge determinations for visa applicants.  *See* Department of State, 9 Foreign Affairs Manual 302.8.

35.     Additionally, the INA provides that any individual who becomes a public charge "within five years after the date of entry from causes not affirmatively shown to have arisen since entry" is subject to removal.  8 U.S.C. § 1227(a)(5).  DOJ is responsible for initiating and adjudicating removal proceedings.  8 U.S.C. § 1103(g).

36.     The term "public charge" is used in both the admissibility and removal sections of the INA, and applies in the admissibility context, to individuals seeking entry to the United

States and those seeking to adjust their status to become permanent residents, and in the deportation context.

37.     Congress incorporated the common law definition of public charge into both the admission and removal provisions of the INA.  Congress enacted the INA's public charge provision against the backdrop of decades of clear and consistent court and agency decisions defining a public charge as an individual primarily and permanently dependent on governmental assistance and gave no indication that it intended to change that prevailing common law interpretation.

> **3.     Congress Repeatedly Rejected Efforts to Expand Public Charge Beyond the Common Law Definition.**

38.     Since the passage of the INA, Congress has consistently resisted expansion of the public charge definition to reach immigrant applicants who receive basic, non-cash benefits.

39.     With welfare and immigration reform in the 1990s, the scope of the public charge exclusion became a sharply contested issue.  While the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the Personal Responsibility and Work Opportunity Reconciliation Act (the "Welfare Reform Act") imposed restrictions on immigration, the bills also set baseline protections for immigrants' use of public benefits that DHS now seeks to ignore.  In these laws, and in subsequent statutory enactments, Congress made clear that the public charge provisions of the INA are not triggered by the use of benefits like Medicaid, nutritional supplements, and housing subsidies.

40.     In early 1996, Congress considered the Immigration Control and Financial Responsibility Act ("ICFRA"), which—much like the Final Rule—would have expressly altered the well-established meaning of "public charge" to encompass a non-citizen who used almost

any public benefit program for more than one year,[11] with limited exceptions for certain emergency medical and childhood nutrition services.[12]  H.R. Rep. 104-469, at 266-67 (1996). After months of debates and amendments, the Senate rejected the bill.  Discussing the proposed change, Senator Leahy objected that "the definition of public charge goes too far in including a vast array of programs none of us think of as welfare. . . .  The bill would affect the working poor who are striving against difficult odds to become self-sufficient. . . .  The bill is unnecessarily uncertain and will yield harsh and idiosyncratic results that no one should intend."  S. Rep. No. 104-249, at 64 (1996).

41.     In 1996, Congress passed IIRIRA, which modified certain aspects of the public charge analysis, but did not change the settled meaning of "public charge" as including solely individuals who are not currently or likely to become primarily and permanently dependent on the government.  Instead, IIRIRA amended the INA to include, for the first time, a list of mandatory factors to consider when determining which applicants were likely to become a public charge, including the applicant's age, health, family status, financial status, and education and skills.  Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674-75 (1996).  As part of the

---

[11] The ICFRA would have defined "public charge" to encompass "any alien who receives benefits . . . for an aggregate period of more than 12 months" from: (i) the aid to families with dependent children program, (ii) Medicaid, (iii) the food stamp program, (iv) the supplemental security income ("SSI") program, (v) any state general assistance program, or (vi) "any other program of assistance funded, in whole or in part, by the Federal Government or any State or local government entity, for which eligibility for benefits is based on need."  H.R. 2202 § 202(a)(5)(D).

[12] The Act would have excluded the following services from public charge determinations: (i) emergency medical services under title XIX of the Social Security Act; (ii) prenatal and postpartum services under title XIX of the Social Security Act; (iii) short-term emergency disaster relief; (iv) assistance or benefits under (I) the National School Lunch Act (42 U.S.C. 1751 et seq.), (II) the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.), (III) section 4 of the Agriculture and Consumer Protection Act of 1973 (Public Law 93-86; 7 U.S.C. 612c note), (IV) the Emergency Food Assistance Act of 1983 (Public Law 98-8; 7 U.S.C. 612c note), (V) section 110 of the Hunger Prevention Act of 1988 (Public Law 100-435; 7 U.S.C. 612c note), and (VI) the food distribution program on Indian reservations established under section 4(b) of Public Law 88-525 (7 U.S.C. 2013(b)); or (v) any student assistance received or approved for receipt under title IV, V, IX, or X of the Higher Education Act of 1965 in an academic year which ends or begins in the calendar year in which the Act is enacted until the matriculation of their education.  H.R. 2202 §§ 201-02.

public charge determination, IIRIRA also permitted INS officials to take into account "a[n]

affidavit of support," *i.e.*, an agreement by a sponsor to provide financial support to an applicant

who would otherwise be likely to become a public charge.  *Id.*

42.     During the drafting of IIRIRA, Congress specifically rejected a provision that—

much like the Final Rule—would have redefined public charge to include individuals who

received "federal public benefits for an aggregate of 12 months over a period of 7 years."  142

Cong. Rec. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl).  Senate Republicans

removed the controversial provision in response to President Clinton's "threat of shutting down

the Federal Government unless Congress ma[d]e changes in the immigration bill."  142 Cong.

Rec. S11612 (daily ed. Sept. 28, 1996) (statement of Sen. Simpson).

43.     In 2013, Congress rejected yet another attempt to broaden the definition of public

charge in a proposed amendment to the Border Security, Economic Opportunity, and

Immigration Modernization Act of 2013, S. 744, 113th Cong. (2013) ("2013 Border Security

Bill").  The amendment would have altered the meaning of public charge by including applicants

for admission, who sought either to remain in the United States or to adjust their status, likely "to

qualify even for non-cash employment supports" such as Medicaid and SNAP.  S. Rep. No. 113-

40, at 42 (2013).  The report of the Judiciary Committee noted that the senators opposing the

amendment "cited the strict benefit restrictions and requirements."  *Id.*

**4.     Congress Has Repeatedly Protected Immigrant Access to Non-Cash Public Benefits.**

44.     Over the past two decades, Congress has repeatedly affirmed its commitment to

ensuring that immigrants may enroll in certain non-cash benefits programs.  While non-citizens

remain ineligible for a number of public programs, Congress preserved access to benefits like

SNAP, housing assistance, and Medicaid for several categories of legally residing non-citizens.

14

These non-cash benefits are designed to help working and employable individuals, promote self-sufficiency, and allow individuals who temporarily fall on hard times to avoid poverty. Increased enrollment in food, health care, housing programs also supports better public health outcomes and strengthens the labor force and economic productivity within Plaintiff States.

45.     In 1996, Congress passed the Welfare Reform Act, Pub. L. No. 104–193, 110 Stat. 2105 (1996).  While it again left the definition of "public charge" intact, the Welfare Reform Act excluded non-citizens from many federal and state cash public benefits programs.  8 U.S.C. §§ 1611(a), 1621(a).  Under the Welfare Reform Act, only "qualified aliens," such as green card holders, refugees, recipients of temporary parole for humanitarian reasons, residents whose deportation is being withheld, and entrants from certain enumerated countries, could enroll in means-tested benefits programs.  8 U.S.C. §§ 1611, 1641.  Of these "qualified aliens," most categories of individuals were only eligible for benefits after five years from their date of entry.  8 U.S.C. § 1613.  The House Budget Committee report stated that, as a result of these provisions, the "welfare reform strategy end[ed] the role of welfare as an immigration magnet." H.R. Rep. 104-651, at 6 (1996).  While Congress sought, through the Act, to promote self-sufficiency and eliminate the role of benefits as an incentive to immigrate to the United States, Congress chose not to expand the definition of public charge, instead addressing such goals through other means.

46.     At the same time, however, the Welfare Reform Act also ensured that non-citizens would remain eligible for numerous non-cash benefits, including emergency medical assistance, disaster relief, immunization services, and public housing.  8 U.S.C. §§ 1611(b), 1621(b).  Despite promoting concepts of self-sufficiency and personal responsibility, the Act also recognized the need for a safety net.  142 Cong. Rec. S9387 (Aug. 1, 1996) (Statements of Sen.

Pressler) ("The bill before us would change the welfare system and the lives of many Americans for the better. Welfare was meant to be a safety net, not a way of life. This bill would restore the values of personal responsibility and self-sufficiency by making work, not Government benefits, the centerpiece of public welfare policy.").

47.     In 2002, Congress passed the Farm Bill, which rolled back the Welfare Reform Act's restrictions to restore access to supplemental nutrition benefits for many non-citizen children and non-citizens receiving disability benefits. Farm Security and Rural Investment Act of 2002, Pub. L. No. 107–171, § 4401, 116 Stat. 134 (2002). The Bill also provided that non-citizens who had been present in the country for more than five years would be eligible for supplemental nutrition benefits. *Id.*

48.     In support of the 2002 Farm Bill's increased access to food stamps, Senator Robert Graham specifically recognized the importance of the food supplement programs to moving people off welfare to work: "I am also acutely aware of the role the Food Stamp Program plays in helping families leave welfare for work. . . .  I supported the 1996 welfare reform law. Some of my original interest in the Food Stamp Program grew out of my desire to see welfare reform succeed. . . .  I would call particular attention to [accomplishing] the following: restor[ing] benefits to legal immigrant children—most of whom are members of working families. . . .  This important legislation would improve basic benefits for senior citizens, people with disabilities, and working citizen and legal immigrant families with children." 147 Cong. Rec. S13245-07, S13270 (Dec. 14, 2001). He also noted that ensuring immigrants' access to food stamps was consistent with the goals of the Welfare Reform Act: "A provision of the 1996 law also cut off food stamps to legal immigrants. This was unnecessary to achieve the goals of the law, since over 90 percent of legal immigrants are working." *Id.*

49.    The 2009 Child Health Insurance Program ("CHIP") Reauthorization Bill further expanded access to benefits for non-citizens, allowing states to provide Medicaid and CHIP coverage to lawfully residing non-citizen children and pregnant women during their first five years in the country.  CHIP Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8 (2009).

50.    Recent efforts to limit immigrant access to non-cash benefits have failed.  The RAISE Act of 2017 proposed sweeping changes to the INA, including a point-based visa system. S. 1720, 115th Cong. (2017).  A substantially identical bill of the same title was introduced in 2019.  S. 1103, 116th Cong. (2019).  Both bills would have restricted parents of citizen children to obtaining only temporary immigrant visas and barred them from receiving any federal, state, or local public benefits.  S. 1720 § 4(d)(2)(s)(2)(b); S. 1103 § 4(d)(2)(s)(2)(b).  Congress has not acted on either bill.

**B.     Regulatory Guidance on Public Charge Codified the Primarily Dependent Standard.**

51.    In 1999, INS published guidance on the definition of public charge, which reflected the well-established common law meaning of "public charge" adopted by courts, agencies, and Congress: an individual primarily dependent on cash-based governmental assistance over the long term.  *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689-93 (Mar. 26, 1999) ("1999 Field Guidance").

52.    The 1999 Field Guidance defined a public charge as "an alien who has become (for deportation purposes) or who is likely to become (for admission/adjustment purposes) primarily dependent on the government assistance, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."  *Id.*  Immigrant applicants who received non-cash benefits or who

received less than 50 percent of their income from the government were not considered to fall within the definition of public charge. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114, 51,163-64 (Oct. 10, 2018) (the "Proposed Rule").

53. Before issuing the 1999 Field Guidance, the INS consulted with agencies that administer public benefit programs and thus have expertise in the nature and use of public benefits, including the Social Security Administration ("SSA"), the Department of Health and Human Services ("HHS"), and the Department of Agriculture ("USDA"). Those agencies opined that cash benefits, rather than non-cash benefits like SNAP, Medicaid, or housing assistance, and long-term institutionalization, were the best indicators of whether an individual is relying primarily on the government. After that consultation, INS determined in the 1999 Field Guidance that cash benefits, rather than non-cash benefits, are relevant to assessing the likelihood that an individual would become a public charge. *See* 84 Fed. Reg. 41,351.

54. The 1999 Field Guidance applied in both the admission and removal contexts. 64 Fed. Reg. at 28,690.

55. The INS explained that guidance was necessary to clarify, in the wake of the Welfare Reform Act, "the relationship between the receipt of public benefits and the concept of 'public charge'" because the Welfare Reform Act "deterred eligible aliens and their families, including citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive." *Id.* at 28,692.

56. The 1999 Field Guidance acknowledged the well-documented benefits of access to public benefits and recognized that receipt of non-cash benefits did not correlate with a likelihood of long-term dependence on the government assistance. The Department noted that

"[t]his reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare." *Id.*

57.    The 1999 Field Guidance also concluded that the "nature of the public program" is critical to determining whether a particular public benefit is relevant to the public charge determination.  As the INS explained, "non-cash benefits (other than institutionalization for long-term care) are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family."  Such non-cash benefits are also often "available to families with incomes far above the poverty level," the INS explained, reflecting broad public policy decisions about improving general public health and nutrition rather than any indication that a recipient is primarily depend on the government. *Id.*  By contrast, substantial cash benefits for income maintenance may provide enough resources to primarily support an individual or family.

58.    In addition to expressly codifying which circumstances and public benefits gave rise to a public charge determination, the 1999 Field Guidance explained in more detail the application of the INA's public charge considerations, including "age, health, family status, assets, resources, and financial status, and education and skills."  8 U.S.C. § 1182(a)(4)(B)(i).  Consistent with BIA decisions in the 1960s and 70s,[13] the 1999 Field Guidance required INS officials to evaluate each factor as a part of a totality of circumstances test to assess whether an applicant would become primarily dependent on governmental assistance in the future.  64 Fed. Reg. at 28690.  The 1999 Field Guidance provided that "[s]ervice officers should assess the

---

[13] *See Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421-22 (AG 1964) (finding that a determination of public charge "requires more than a showing of a possibility that the alien will require public support" and "[s]ome specific circumstance . . . tending to show that the burden of supporting the alien is likely to be cast on the public, must be present"); *Matter of Harutunian*, 14 I. & N. Dec. 583 (BIA 1974) (determining applicant was a public charge after considering the totality of the applicant's circumstances, including age, inability to earn a living, and lack of family or other support).

financial responsibility of the alien by examining the totality of the alien's circumstances at the time of his or her application . . . .  The existence or absence of a particular factor should never be the sole criterion for determining if an alien is likely to become a public charge." *Id* (emphasis omitted).

59.     The 1999 Field Guidance further specified that the public determination for visa and green card applicants was forward-looking and that "past receipt of non-cash benefits" and even "past receipt of special-purpose cash benefits" should be not taken into account.  64 Fed. Reg. at 28,690.

60.     The 1999 Field Guidance is currently in effect.  There is no indication that the 1999 Field Guidance has failed to screen out applicants who were likely to become primarily or permanently dependent on the government.  Nor is there evidence that immigrants who utilized the non-cash benefits excluded from consideration by the 1999 Field Guidance ultimately became primarily dependent on the government.

61.     Based on the 1999 Field Guidance, DOJ, the agency responsible for applying the public charge determination in the removal context, issued a fact sheet acknowledging that the public charge doctrine "ha[d] been part of U.S. immigration law for more than 100 years" and clarifying that benefits like food supplements, public health benefits, and housing assistance were "not intended for income maintenance" and "are not subject to public charge consideration."  U.S. Dep't of Justice, Public Charge Fact Sheet, 2009 WL 3453730 (Oct. 29, 2011).

## C.     Congress Has Expressly Prohibited Discrimination on the Basis of Disability.

62.     In addition to protecting access to public benefits, Congress has also evinced its intent to eliminate barriers to admissibility faced by individuals with disabilities.  The 19th century definition of public charge encompassed individuals who were mentally or physically

disabled, based on the outdated assumption that disabled persons would not be able to work or otherwise support themselves.  But Congress has since expressly prohibited discrimination based on an applicant's disability.

63.     In 1973, Congress enacted the Rehabilitation Act, which authorizes federal grants to states for vocational rehabilitation services to individuals with disabilities and prohibits disability discrimination in federally funded programs.  29 U.S.C. § 794.  The Rehabilitation Act extended this prohibition on disability discrimination to the federal government itself in 1978. Pub. L. No. 95-602, § 119, 92 Stat. 2955 (1978).

64.     Section 504 of the Rehabilitation Act prohibits discrimination because of disability in any program or activity conducted by any federal executive branch agency. Specifically, the statute provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]"  29 U.S.C. § 794(a). The DOJ's Office of Legal Counsel has determined that Section 504's prohibitions on discrimination apply to all INS—and now DHS—activities and programs, which would include public charge determinations.[14]

65.     In 1990, Congress passed the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The ADA prohibits disability discrimination in private employment, state and local government, and public accommodations.

---

[14] *See* April 1997 Opinion at 1; Memorandum for Maurice C. Inman, Jr., General Counsel, Immigration and Naturalization Service, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Section 504 of the Rehabilitation Act of 1973* (Feb. 2, 1983).

Shortly after the ADA's passage, and consistent with the policies embodied by the ADA, Congress also amended the INA to eliminate exclusions based on "mental retard[ation]," "insanity," "psychopathic personality," "sexual deviation," or "mental defect."  Immigration Act of 1990, Pub. L. No. 101-649, §§ 601-603, 104 Stat. 4978 (1990).

66.    Most recently, in 2008, Congress removed HIV and AIDS from the list of infectious diseases that would prevent an individual from immigrating to or visiting the United States, which broadened further protections for disabled immigrants.  Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008, Pub. L. No. 110-293, 122 Stat. 2918 (2008); 42 C.F.R. § 34.2(b) (2008).

**D.    Public Benefits Enable Immigrants to Maintain Healthy Lives and Stable Employment.**

67.    The long-standing definition of "public charge," which the Final Rule would upend, ensures that immigrants are able to participate in essential federal, state, and local benefits programs that provide supplemental assistance to further public health, nutrition, housing-stability, and other public policy goals.

68.    Receipt of limited governmental assistance, particularly in the form of food, housing, and health insurance subsidies, enables immigrants and their children to maintain employment, continue healthy and stable lives, and to contribute fully to the federal and state economies.  Rather than inhibiting self-sufficiency, these benefits help immigrants achieve their full economic potential.

**1.    Food Supplement Programs Prevent Health Problems and Promote Healthy Eating Habits.**

69.    By providing supplemental nutrition benefits, state and local governments promote positive health outcomes and prevent conditions like obesity, diabetes, and malnutrition,

which can limit an individual's ability to work.  These benefits offer targeted and crucial assistance to working families, particularly those that support children, individuals with disabilities, and seniors.

70.     SNAP is a federal nutritional supplement program that is overseen by USDA but administered in large part at the state level.  SNAP benefits are available to low-income residents to purchase nutritional staples, such as bread and cereals, fruit and vegetables, meats, and dairy products.[15]

71.     New York State distributes SNAP benefits through its Office of Temporary and Disability Assistance ("NYOTDA").  In 2018, an average of 2.7 million New York residents, including approximately 265,000 non-citizens, each month received a total of almost $4.5 billion in SNAP benefits.[16]

72.     New York City administers SNAP benefits through its Department of Social Services' Human Resources Administration ("NYCDSS") under the oversight of NYOTDA.

73.     Connecticut distributes SNAP through its Department of Social Services ("CTDSS").[17]  In calendar year ("CY") 2018, a total of 493,600 Connecticut residents—nearly 14 percent of the state population—received SNAP benefits, including 168,489 children under the age of 18.[18]

---

[15] *See Supplemental Nutrition Assistance Program (SNAP)*, Off. of Temp. & Disability Assistance, Frequently Asked Questions, http://otda.ny.gov/programs/snap/qanda.asp#noncitizen.

[16] *Annual Report (2018)*, Off. of Temp. & Disability Assistance, 4 (2019), http://otda.ny.gov/news/attachments/OTDA-Annual-Report-2018.pdf.

[17] *Supplemental Nutrition Assistance Program - SNAP*, Ct. St. Dep't of Housing, https://portal.ct.gov/dss/SNAP/Supplemental-Nutrition-Assistance-Program---SNAP.

[18] *People Served –CY 2012-2018*, Ct. Dep't of Soc. Serv., 56 (2019), https://data.ct.gov/Health-and-Human-Services/Connecticut-Department-of-Social-Services-People-S/928m-memi p.56.

74.     Vermont distributes SNAP benefits through a program called 3SquaresVT.  The

Department for Children and Families, which is a division of the Agency of Human Services,

administers the program.  In fiscal year ("FY") 2018, 74,038 Vermont residents received SNAP

benefits.  Approximately one third of SNAP recipients in Vermont are children under the age of

18.

75.     Nationally, approximately two-thirds of SNAP beneficiaries are under 18, over

60, or living with disabilities.[19]  The SNAP program has consistently reduced poverty among its

participants, especially in non-metropolitan areas.  In 2015, SNAP lifted approximately 17

percent of its beneficiaries—over 8 million people—above the poverty line.  Among children,

SNAP decreased the poverty rate by approximately 28 percent.[20]  The vast majority of SNAP

beneficiaries—over 90 percent—do not receive cash welfare benefits.[21]

### 2.     Health Insurance Programs Increase Access to Preventative Care and Treatment for Disabilities and Diseases.

76.     Health insurance programs, like Medicaid, expand coverage to low-income

individuals and families who may otherwise be uninsured.  Having access to health insurance

increases the likelihood that individuals will seek medical care regularly and receive preventative

and potentially life-saving treatment.

---

[19] U.S. Dep't of Agric., Characteristics of USDA Supplemental Nutrition Assistance Program Households: Fiscal Year 2017 (Summary) (Feb. 2019), https://fns-prod.azureedge.net/sites/default/files/resource-files/Characteristics2017-Summary.pdf; U.S. Dep't of Agric., Characteristics of USDA Supplemental Nutrition Assistance Program Households: Fiscal Year 2016 (Summary) (Nov. 2017), https://fns-prod.azureedge.net/sites/default/files/ops/Characteristics2016-Summary.pdf.

[20]  Laura Wheaton & Victoria Tran, *The Antipoverty Effects of SNAP*, Urb. Inst., https://www.urban.org/sites/default/files/the_antipoverty_effects_of_snap.pdf.

[21] U.S. Dep't of Agric., Characteristics of USDA Supplemental Nutrition Assistance Program Households: Fiscal Year 2017 (Summary) (Feb. 2019), https://fns-prod.azureedge.net/sites/default/files/resource-files/Characteristics2017-Summary.pdf.

77.     Medicaid offers coverage to those with income and assets below a certain threshold, generally those earning 138 percent of, or less than, the Federal Poverty Guideline ("FPG").

78.     New York State Department of Health ("NYSDOH") manages the Medicaid program for New York and administers NY State of Health, New York State's Insurance Marketplace ("NYS Marketplace").  NYS Marketplace includes health insurance options for New Yorkers, including Medicaid, Child Health Plus (New York's version of CHIP), and other insurance plans for low-income New Yorkers.

79.     During FY 2019, Medicaid provided comprehensive insurance coverage to over 6 million New Yorkers, including children, pregnant women, single individuals, families, and individuals certified blind or disabled.  More than one third of Medicaid enrollees statewide are children.

80.     In FY 2019, Child Health Plus covered 396,351 children in New York.

81.     In New York City, the NYC Department of Health and Mental Hygiene ("DOHMH") and NYC Health + Hospitals ("Health + Hospitals") receive reimbursements from Medicaid for administrative costs and as medical services providers.  Health + Hospitals, DOHMH, and NYC DSS assist potential beneficiaries with applying for Medicaid and CHIP.

82.     According to state enrollment data published in March 2019, 3.5 million New York City residents—approximately 40 percent of the City's population—are enrolled in Medicaid.

83.     According to state enrollment data published in July 2019, in New York City nearly 159,000 children are covered by CHIP, or approximately 39 percent of the total CHIP enrollees in New York State.

84.     In Connecticut, the state's Department of Social Services administers Medicaid (known as HUSKY A) and CHIP (known as Husky B).[22]  During 2018, 566,045 Connecticut residents participated in Medicaid/HUSKY A and 31,672 Connecticut residents participated in CHIP/Husky B.[23]

85.     The Department of Vermont Health Access (DVHA) administers Medicaid and CHIP in Vermont.[24]

86.     During FY 2017, 5841 Vermont children participated in CHIP (known as Dr. Dynasaur).[25]  In December 2018, Medicaid for children and adults (including CHIP) covered 67,237 adults and 63,886 children.[26]

87.     Medicaid's role is particularly important for vulnerable populations and populations with specialized health care needs—for instance, Medicaid provides prenatal and postpartum care and covers almost half of all births.  Studies have shown that expanded Medicaid access is associated with improvement in public health, and in particular with lower mortality rates, better pregnancy and birth outcomes, and higher cancer detection rates.

88.     CHIP covers services such as check-ups, vaccinations, blood tests, and X-rays for infants and children, which help to prevent them from developing a lifetime of serious diseases and medical conditions.

---

[22] Connecticut's Health Care for Children & Adults, https://www.ct.gov/hh/site/default.asp.

[23] *People Served – CY 2012-2018*, Ct. Dep't of Soc. Serv., 10, 36 (2019), https://data.ct.gov/Health-and-Human-Services/Connecticut-Department-of-Social-Services-People-S/928m-memi.

[24] State of Vermont Green Mountain Care, https://www.greenmountaincare.org/.

[25] *Framework for the Annual Report of the Children's Health Insurance Plans Under Title XXI of the Social Security Act*, 10 (2017), https://www.medicaid.gov/chip/downloads/annual-reports/vt-chipannualreport.pdf.

[26] *Global Commitment to Health 11-W-00194/1 Annual Report for Demonstration Year 2018*, State of Vt. Agency of Hum. Serv., 8 (2019), https://dvha.vermont.gov/global-commitment-to-health/2018-vt-gc-annual-report-final-with-attachments.pdf.

89.     Health insurance coverage contributes to the financial security and stability of many low- and middle-income workers.  Not only are insured workers less likely to miss work for health-related reasons, they are also less likely face exorbitant medical debt when they do seek medical care.

### 3.     Housing Assistance Programs Decrease Displacement and Homelessness.

90.     Affordable housing programs decrease housing displacement and homelessness and allow recipients to live in a stable physical environment.

91.     New York State Homes and Community Renewal ("NYHCR") administers funding from the U.S. Department of Housing and Urban Development ("HUD"), including for the Section 8 Housing Choice Voucher Program ("HCV"), and Veterans Affairs Supportive Housing ("HUD-VASH").  HCV provides rent subsidies to very low-income families, the elderly, individuals with disabilities, and those in shelters or at the risk of becoming homeless, including survivors of domestic violence, to afford safe and sanitary housing in the private market.  The HUD-VASH programs offer both Housing Vouchers and Project-Based Rental Assistance units to homeless veterans.

92.     In total, NYSHCR currently administers 44,332 vouchers (including HCVs and HUD-VASH vouchers) on behalf of participating families throughout New York State.  Of these families, 73 percent are female-headed, 39 percent have children under 18, 23 percent have a person with a disability, 31 percent are elderly, 27 percent are African American/Black, and 14 percent identify as Hispanic.

93.     NYSHCR also administers Project-Based Rental Assistance to private owners of multifamily housing to lower rental costs.  In 2018, NYSHCR administered this assistance to over 92,000 apartments in 986 buildings for approximately 150,000 people statewide.  Of this population, 58 percent are elderly, 23 percent are families with children, and 12 percent have a

27

family member who is disabled.  In addition, 25 percent identify as African-American/Black, and 34 percent as Hispanic.

94.     In New York City, the New York City Department of Housing Preservation and Development ("HPD") and New York City Public Housing Authority ("NYCHA") administer the Section 8 Choice Vouchers Program and Section 8 Project-Based Rental Assistance.

95.     In Connecticut, public housing assistance is administered at the state level by the Department of Housing ("CTDOH").[27]  Like its New York equivalent, CTDOH administers HUD grants, including the Section 8 Housing Vouchers Program and Section 8 Project-Based Rental Assistance.

96.     CTDOH also administers special types of Section 8 vouchers targeted at specific vulnerable populations.  These include the Family Unification Program, a collaboration with the state's Department of Children and Families that provides housing vouchers to families for whom the lack of adequate housing is a primary factor in the placement of the family's child or children in out-of-home care; Mainstream Housing Opportunities Program for Persons with Disabilities, which creates a pipeline to housing for persons with disabilities; and Nursing Facility Transition Preference, which supplies vouchers for persons  with disabilities transitioning from licensed nursing facilities into a private rental unit.[28]

97.     In FY 2017 to 2018, CTDOH directly administered $80,488,781 worth of Section 8 vouchers to 7,524 families.  Across the state of Connecticut, in CY 2018, federal rental assistance programs provided low-income residents with $850 million in housing assistance, supporting 37,200 households through the portable Section 8 voucher program; 22,800

---

[27] *Programs and Initiatives*, Ct. St. Dep't of Housing, https://portal.ct.gov/DOH/DOH-Gold-Bar/Programs.

[28] *Section 8 Housing Choice Voucher (HCV) Program*, Ct. St. Dep't of Housing, https://portal.ct.gov/DOH/DOH/Programs/Housing-Assistance---Section-8.

households with project-based vouchers; and 13,300 in government-owned public housing developments.  In all, 162,700 people in 83,000 Connecticut households benefitted from federal housing assistance in CY 2018, including 92,800 people in families with children.

98.    CTDOH also administers a range of exclusively state-funded housing assistance programs for low-income people, including the Rental Assistance Program ("RAP"), which awards vouchers to assist very-low-income families in affording decent, safe, and sanitary housing in the private market,[29] and the Elderly Rental Assistance Program, which provides rental assistance to low-income persons residing in state-assisted rental housing for the elderly.[30] In FY 2017 to 2018, CTDOH administered 6,486 RAP vouchers.

99.    In Vermont, the Office of Economic Opportunity ("OEO"), which is within the Department for Children and Families, administers some housing assistance programs, including the Family Supportive Housing program and the Housing Opportunity Grant Program.  The Family Supportive Housing program provides intensive case management and service coordination to homeless families with children.  This program is funded through Medicaid and uses roughly $700,000 annually, of which approximately 40 percent is federal and 60 percent is state funding.  In FY 2018, the program served 187 families, including 462 people, of which 225 were children under six.[31]  The Housing Opportunity Grant Program provides a blend of state and federal funding to support operations, homelessness prevention, and rapid re-housing assistance at approximately 39 non-profit emergency shelter, transitional housing, and prevention

---

[29] *Rental Assistance Program (RAP)*, Ct. St. Dep't of Housing, https://portal.ct.gov/DOH/DOH/Programs/Housing-Assistance--Rental-Assistance-Program-RAP.

[30]  *Elderly Rental Assistance Program*, Ct. St. Dep't of Housing,  https://portal.ct.gov/DOH/DOH/Programs/Elderly-Rental-Assistance.

[31] St. of Vt. Dep't. for Child. & Fam. Off. of Econ. Opportunity, Family Supportive Housing Program Annual Report: State Fiscal Year 2018, 4, https://dcf.vermont.gov/sites/dcf/files/OEO/Docs/FSH-AR-SFY2018.pdf.

programs across Vermont.  The program provides approximately $7.4 million annually in core funding to these homeless shelters and services.  Approximately 14 percent of the funding is federal, largely through the HUD Homeless Assistance fund, and the remainder of the program is funded by the state.  In FY 2018, Vermont's publicly funded emergency shelters, domestic violence shelters, and youth shelters served 3872 persons, including 2770 adults and 1102 children.  Of those persons, 58 percent were single adults and 42 percent were in families with children.  The average length of stay was approximately 50 days.[32]  The Economic Services Division, also within the Department for Children and Families, also provides some emergency temporary housing assistance through a state general assistance fund. And the Agency of Human Services funds a number of temporary rental assistance programs intended to provide "bridge" funding as participants wait for Section 8 funding to become available.

100.   The Vermont State Housing Authority ("VSHA"), a quasi-governmental body, administers many of the Section 8-funded housing assistance programs statewide in Vermont. Vt. Stat. Ann. tit. 24, § 4005.[33] These programs include Vermont's Section 8 Existing Housing Choice Voucher program.  That program provides subsidy payments to owners of private housing on behalf of a very-low income individual or family.  With a voucher, individuals and families pay approximately 30 percent of their adjusted income for rent.  Tenants may select their own housing, subject to certain conditions.  Participants in this program also benefit from access to the Family Self-Sufficiency program, which provides social services to help families achieve greater financial independence.  Section 8 vouchers may also be used to allow first-time

---

[32] State of Vt. Dep't for Child. & Fam., Housing Opportunity Grant Program (HOP) Annual Report - State Fiscal Year 2018, https://dcf.vermont.gov/sites/dcf/files/OEO/Docs/HOP-AR-2018.pdf.

[33] Other Section 8 programs in Vermont are administered via local, municipal housing authorities, such as the Burlington Housing Authority. https://burlingtonhousing.org/; see Vt. Stat. Ann. tit. 24, § 4003.

homebuyers to pay for a mortgage under certain conditions of the Homeownership program. VSHA also runs the HUD-VASH initiative and Housing for Persons with AIDS program as well as the Project Based Voucher and Moderate Rehabilitation programs, which help landlords and developers improve and expand housing stock in return for making their housing available for use by low-income families.  VSHA also administers the Shelter Plus Care program, which provides rental assistance to homeless people with disabilities, and the Mainstream Housing program, which funds rental assistance for non-elderly disabled families.  It also administers the Family Unification program, which provides rental assistance to families for whom lack of adequate housing is a primary factor in the separation of children from their families.  This program is a collaboration with the Agency of Human Services, VHSA's direct housing services reach approximately 8,000 Vermont families.[34]

101.     Housing programs that Plaintiffs administer are essential to reducing homelessness and promoting stability, safety, and health by ensuring housing accommodations that families can afford.  For example, in New York State, where even middle class families struggle to find affordable housing options, programs like Section 8 and public housing offer tools to correct the effects of skewed market forces.

102.     Recipients of public housing benefits often work and do not necessarily receive other governmental assistance.

103.     Affordable housing programs also promote employment by installing beneficiaries in stable accommodations, which often provide access to reliable transportation.

---

[34] *Rental Assistance Program*, Vermont State Housing Authority, https://www.vsha.org/vsha-programs/rental-assistance-program/.

Individuals who receive housing assistance are less likely to face chronic tardiness or absenteeism at work or school.

**E.      The 2018 Proposed Rulemaking.**

104.     On October 10, 2018, DHS published in the Federal Register a Notice of Proposed Rulemaking regarding the public charge ground for inadmissibility.  83 Fed. Reg. at 51,114-51,296.

105.     The Proposed Rule re-defined the meaning of public charge and significantly changed the process by which DHS decides whether an applicant would likely become a public charge and thus be inadmissible.

106.     First, the Proposed Rule drastically expanded the established common law definition of public charge incorporated into the INA and abandoned the long-standing understanding of a public charge as a person who was and would remain primarily dependent on the government over the long term.  Instead, the Proposed Rule set a monetary threshold and considered any applicants who received public benefits valued at 15 percent of the FPG (approximately $5 per day) for a period of 12 consecutive months to be a public charge.  83 Fed. Reg. at 51,290.

107.     Second, the Proposed Rule radically expanded the benefits within the public charge definition, adding supplemental non-cash benefits, like food supplements, public health insurance, and housing assistance.  *Id.* at 51,289-90.  The Proposed Rule classified subsidies like SNAP and Section 8 as monetary benefits and services like Medicaid as non-monetary benefits.  If an applicant received both monetary and non-monetary benefits simultaneously, then use of the non-monetary benefits for only nine months within a 36-month period would render the applicant a public charge.  *Id.* at 51,158, 51,290.

108.    Finally, the Proposed Rule sought to replace the public charge's case-by-case totality of circumstances test, which DHS used to determine whether applicants were likely to become a public charge, with a formulaic test that would assign positive, negative, heavily positive, and heavily negative weights to enumerated factors.  This weighted circumstances scheme stacked the odds of admissibility against disabled, non-white, and low-income applicants.  *Id.* at 51,291-92.

109.    The Proposed Rule received over 200,000 comments, "the vast majority of which opposed the rule."  84 Fed. Reg. at 41,297.  Many commenters strenuously opposed both the changes to the definition of public charge and the changes to the totality of circumstances test.  Commenters expressed concern for the substantial negative public health outcomes and economic consequences that would result from a decrease of enrollment in subsidized nutrition, health insurance, and housing programs.

110.    Commenters cautioned also that these proposed changes, taken together, would target some of the country's most vulnerable residents, including persons with disabilities, the elderly, women, children, and racial minorities.

**F.      The Final Rule.**

111.    On August 14, 2019, DHS published the Final Rule in the Federal Register.  The Final Rule changes both the public charge definition and the process by which DHS determines whether an applicant is likely to meet this definition in the future.  84 Fed. Reg. at 41,292-508.

112.    Specifically, the Final Rule eliminates the primarily dependent standard; includes receipt of non-cash benefits in the public charge definition; and establishes a weighted circumstances test that relies heavily on factors that bear no reasonable relationship to whether an individual will become a drain on the public fisc.  *Id.* at 41,294-95.

113.    Despite the longstanding exclusion of supplemental, non-cash benefits from the public charge analysis, the Final Rule creates a new standard of total self-sufficiency, a concept nowhere found in the relevant portions of INA itself, and requires individuals to satisfy this requirement to avoid a public charge determination.[35]

114.    DHS's total self-sufficiency standard contravenes Congressional intent and decades of case law and legislative history.  Moreover, the predictable consequences of the Final Rule—resulting in immigrant communities becoming less healthy, less educated, and less equipped for the workforce—significantly undermine immigrants' ability to attain self-sufficiency through reliance on programs that Congress created and extended to immigrants for that very purpose.

115.    The Final Rule also fails to acknowledge that the DHS concluded in 1999, three years after Congress passed IIRIRA and the Welfare Reform Act, that immigrants' use of supplemental, non-cash benefits did not raise apprehensions about improper incentives.  Nor does the Final Rule provide evidence that immigrants are motivated by participation in non-cash benefits programs to come or to stay in the United States.

116.    Likewise, the Final Rule does not provide support for the conclusion that immigrants who utilized the benefits excluded from consideration under the 1999 Field Guidance typically became primarily dependent on the government, rather than using those benefits to become upwardly mobile and more self-sufficient.

---

[35] On August 13, 2019, just one day after announcing the Final Rule, Cuccinelli publicly rewrote the iconic Emma Lazarus poem inscribed on the Statue of Liberty: "Give me your tired and your poor who can stand on their own two feet and who will not become a public charge."  Jason Silverstein, *Trump's top immigration official reworks the words on the Statue of Liberty*, CBS News (Aug. 14, 2019), https://cbsnews.com/news/statue-of-liberty-poem-emma-lazarus-quote-changed-trump-immigration-official-ken-cuccinelli-after-public-charge-law/.

117.     Finally, while the Final Rule projects certain savings for federal and state budgets, it does not account for a wide range of public health, economic, and administrative harms to Plaintiffs.

**1.     The Rule Arbitrarily and Unlawfully Departs from the Well-Established Meaning of Public Charge**

**a.     The Rule Abandons the Permanently and Primarily Dependent Standard.**

118.     The Final Rule drastically changes the scope of the public charge determination, which for more than 130 years has applied only to individuals primarily dependent on the government for support over the long term.  The Rule would expand the public charge definition far beyond its historical and statutory boundaries to exclude from admissibility the majority of low-income immigrants, many of whom are on their way to building stable and more prosperous lives.  By penalizing even temporary and minimal use of public benefits, the Rule would place significant obstacles along the path of upward mobility.

119.     The Final Rule defines "public charge" to include an immigrant "who receives one or more public benefit," without regard to whether the benefits received suggest long-term dependence upon the government, rather than temporary, short-term help to overcome specific hardships.  The Rule deems a public charge any person who has (i) received any amount of certain non-monetary public benefits—including, for example, food stamps, Medicaid, certain types of housing assistance or cash subsidies—for more than 12 months in the aggregate within any 36-month period.  84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a)).  Whereas the Proposed Rule set a value threshold for evaluating whether an applicant's use of benefits fell within the public charge definition, the Final Rule dispenses with the threshold altogether, and replaces it with a pure durational requirement that looks only to the *fact* of receiving benefits over some period of time rather than the *amount* of such benefits.

35

120.     In a further departure from the Proposed Rule, the Final Rule provides that when an individual receives two or more benefits simultaneously, DHS would count each benefit separately in calculating the duration of use.  *Id*. at 41,295-97; *see also id.* at 41,501 (to be codified at 8 C.F.R. § 212.21(a)).  For example, under this stacking scheme, an applicant who suffered a temporary health setback and who received both Medicaid and SNAP during a six-month period would be considered a public charge because the applicant used six months of Medicaid and six months of SNAP.  The Final Rule provides no limit on the magnitude of the stacking effect; an applicant who experienced an unexpected job loss and enrolled, for a limited time, in three benefits programs would fall within the public charge definition after just four months.  Nor does the Rule provide guidance for how receipt of public benefits during only *part* of a month will count; this ambiguity may result in immigrants being excluded as public charges for receiving benefits for even shorter durations than 12 full months.

121.     This change impermissibly expands the INA's—and Congress's—definition of public charge, which understood a public charge to be an individual primarily and permanently dependent on government assistance.  Consistent with this understanding, DHS has historically interpreted the INA's public charge provision to apply to applicants who receive more than 50 percent of their income from public cash benefits.  *See* 83 Fed. Reg. at 51,164.  By ignoring the amount of public benefits received by an immigrant, and treating *any* receipt of benefits as evidence that somebody will become a public charge, DHS exceeds its rulemaking authority.

122.     Egregiously, the Rule's interpretation of public charge encompasses all applicants receiving any amount of almost any public benefits for one year in the aggregate (less if the applicant is receiving more than one benefit at the same time).  This radical re-definition of public charge would reach, for example, an immigrant who received less than $1 per day in food

stamps.  The Department does not articulate any reasoned basis for the new durational threshold nor attempt to justify exclusion of applicants who receive minimal governmental assistance.

123.    As support for its conclusion that an applicant who received any amount government assistance is excludable as a public charge, DHS repeatedly cites BIA decisions in *Matter of Vindman* and *Matter of Harutunian.*  Both cases, however, involved immigrant applicants who relied almost exclusively on the government for income; these cases only reinforce the permanently and primarily dependent standard set forth in the history, case law, and agency interpretations, including the 1999 Field Guidance.  DHS's flawed legal analysis is irrational.

124.    The Final Rule's changes to the dependence standard are also not a logical outgrowth of the Proposed Rule.

125.    First, while the Proposed Rule contemplated lowering the dependence threshold to include individuals who received smaller amounts of public benefits, the Proposed Rule did not contemplate or suggest that Defendants were considering eliminating the quantity threshold altogether and instead counting the receipt of *any* amount of certain public benefits as relevant to the public charge determination.  *See* 83 Fed. Reg. at 51,290.

126.    Second, in determining whether an applicant meets the 12-month durational threshold for benefits-use, the Final Rule allows DHS to stack the number of months when the applicant uses more than one benefit at a time.  DHS did not provide the public notice of this stacking scheme.  The Department deprived the public of the opportunity to comment on how often and when individuals use benefits in conjunction with one another and how these patterns would affect the public charge analysis.

###### b. The Rule Dramatically Expands the Types of Benefits Considered As Part of the Public Charge Definition.

127.   The Final Rule also expands the benefits that give rise to a public charge

determination.  In sweeping these supplemental benefits, which currently support approximately

one third of all citizens born in the United States, into the public charge definition,[36] DHS seeks

to evade the legislative decision-making process and alter immigration law in ways that

Congress never authorized and has, in fact, explicitly rejected.

128.   Consistent with statutory directive, the 1999 Field Guidance provides that income

replacement programs, such as TANF and SSI, or long-term institutionalization, are the only

benefits relevant to the public charge determination.  The current guidance prohibits DHS from

taking into account most non-cash benefits because "non-cash benefits (other than

institutionalization for long-term care) are by their nature supplemental and do not, alone or in

combination, provide sufficient resources to support an individual or family."  64 Fed. Reg. at

28,692.

129.   The Final Rule, by contrast, requires consideration of an applicant's use of almost

any public benefit, regardless of whether the benefit is supplemental in nature.  The Rule defines

"public benefit" to include all Federal, State, local or tribal cash assistance programs; SNAP;

various forms of housing assistance, including Section 8, Section 8 Project-Based Rental

Assistance, and public housing; and most non-emergency Medicaid benefits (the "enumerated

benefits").  84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(b)(1)(i)).[37]

---

[36] Danilo Trisi, *One-Third of U.S.-Born Citizens Would Struggle to Meet Standard of Extreme Trump Rule for Immigrants*, Ctr. for Budget and Pol'y Priorities, (Sept. 27, 2018), https://www.cbpp.org/blog/one-third-of-us-born-citizens-would-struggle-to-meet-standard-of-extreme-trump-rule-for.

[37] Recognizing that Proposed Rule would have potentially devastating impacts on women and children, the Final Rule makes limited exceptions for pregnant women and children on Medicaid.  84 Fed. Reg. at 41,476.  Women and children would still be penalized, however, for enrolling in SNAP, and women would have to enroll and disenroll in Medicaid depending on their pregnancy status.  The Final Rule also purports to allow consideration for "primary

130.     DHS exceeds its rulemaking authority by including non-cash supplemental benefits like SNAP, Medicaid, Section 8 subsidies, and public housing in the public charge determination.  As the relevant statutory language, history, case law, and long-standing agency practice demonstrate, Congress never intended that an immigrant's lawful receipt of non-cash supplemental benefits be used to render a public charge determination.

131.     On three occasions—while debating ICFRA, IIRIRA, and the Border Security Bill—Congress considered and rejected proposals to alter the well-settled meaning of public charge to reach non-cash benefits like food stamps, health insurance, and housing assistance programs.  Opponents of these provisions expressly resisted including non-cash benefits in the public charge inquiry.  The Final Rule ignores this statutory history and directly contradicts clear Congressional intent.

132.     DHS also interferes with Plaintiffs' discretion under the Welfare Reform Act to administer federal benefits programs.  The Welfare Reform Act provides that "a State is authorized to determine the eligibility of an alien . . . for any designated Federal program."  8 U.S.C. § 1612(b)(1).  The Final Rule is inconsistent with congressional intent to place in State hands determinations of who should be eligible for benefits by deterring non-citizens from enrolling in benefits for which Plaintiff states deemed them eligible.

133.     Finally, the proposed changes irrationally penalize low-income applicants from using benefits that Congress expressly allowed them to receive, and that are designed to assist beneficiaries and enable them to participate in the workforce.

---

caregiver" role as part of the totality of circumstances test.  84 Fed. Reg. at 41,438, 41,504, 41,438, 41,502 (to be codified at 8 C.F.R. 212.21(f)).

### c.      The Rule Impermissibly Extends the Public Charge Determination to Non-Immigrant Visas.

134.    The INA subjects only applicants for visas or adjustment of status to a public charge determination.  *See* 8 U.S.C. § 1182(4)(a).

135.    The INA does not require that individuals seeking to extend or change the status of non-immigrant visas, including students, tourists, and certain types of temporary workers, undergo a public charge determination. *See* 8 U.S.C. § 1184; 8 U.S.C. § 1101(a)(15)(defining classes of non-immigrant visas).

136.    Without statutory authority, the Final Rule would subject an applicant requesting to extend a non-immigrant visa or to change the status of a current visa to a public charge inquiry and require denial of the application if, at any point in the prior 36 months, the applicant received benefits for 12 months in the aggregate.  84 Fed. Reg. at 41,507 (to be codified at 8 C.F.R. § 214.1).  For example, individuals studying in the United States and seeking to extend their student visas in order to complete their education will, for the first time and without any statutory basis, be subject to a public charge inquiry.  For these individuals, the Final Rule imposes an even more draconian test that looks only to the receipt of public benefits and does not take into any other factors, much less the totality of circumstances.

137.    As with the changes to the public charge definition, DHS ignores the statutory limits on its authority.

138.    Furthermore, the Final Rule unlawfully removes discretion from DHS officials to determine whether these applicants are likely to become a public charge.  Under the INA, DHS must weigh a minimum of six statutory factors in a totality of circumstances test to determine whether an applicant is likely to become a public charge.  *See* 8 U.S.C. § 1182(a)(4)(b).  By automatically denying visa extensions for every applicant who has received 12 months of public

benefits within the past 36 months, without considering any other factors, the Final Rule violates this statutory mandate.

> ### 2. The Rule Arbitrarily and Unlawfully Transforms the Totality of Circumstances Test to Stack the Odds Against Disabled, Non-White, and Poor Immigrant Applicants.

139.    The Final Rule arbitrarily and unlawfully overhauls the public charge "totality of circumstances" test to stack the odds against immigrants with disabilities, immigrants of color, and low-income immigrants.  The Rule does so by arbitrarily and unlawfully relying on a collection of "negative" factors that both individually and collectively bear little reasonable relationship to whether an individual immigrant will become a public charge.  The Rule's reliance on these irrational factors skews the inquiry against immigrants who are not wealthy, who receive small amounts of non-cash supplemental benefits, who speak languages other than English, or who are disabled.  And the Rule places a heavy thumb on the scale in favor of immigrants from predominately wealthy, white, and English-speaking countries.

140.    To determine the likelihood that a particular applicant would become a public charge, the INA specifies that DHS must take into account a range of factors, including, at a minimum, an immigrant's age, health, family status, assets, resources, financial status, education, and skills, in determining whether the applicant is inadmissible.  *See* 8 U.S.C. § 1182(a)(4). While DHS must assess each factor in the totality of circumstances test, the statute neither prioritizes nor permits the prioritization of any given factor.  *Id.*  Both courts and DHS itself have interpreted the statutory mandate to require a case-by-case determination based on the facts of each application.  *See* 64 Fed. Reg. at 28,690, 28,692.

141.    The Final Rule transforms the statutorily-mandated totality of circumstances test by adding a host of secondary factors to each of the statutory factors and assigning mandatory weights to each factor considered.  The Rule divides the factors into four weights: negative,

heavily negative, positive, and heavily positive.  84 Fed. Reg. at 41,397; *id.* at 41,502-04 (to be codified at 8 C.F.R. § 212.22(b)).

142.    The Final Rule's negative factors include an applicant's (i) age, if he or she is under 18 or over 62; (ii) health, if he or she is diagnosed with a medical condition that could interfere with the immigrant's educational or work opportunities; (iii) income, if he or she earns less than 125 percent of the FPG and does not have other significant assets; (iv) financial status, if he or she has a poor credit score, has applied or been certified for, or received, benefits in the past, or has future foreseeable medical costs that he or she cannot cover without Medicaid; (v) skills, if he or she is non-proficient in English; (vi) education if he or she lacks a high school diploma; and (vii) family status, if the applicant has a large family or family members that are financially interdependent.  *Id.* at 41,502-04 (to be codified at 8 C.F.R. § 212.22(b)(1)-(5)).

143.    The heavily negative factors include an applicant's (i) lack of employability; (ii) receipt or authorization to receive benefits for 12 months within 36 months of filing application (for a visa, admission, adjustment of status, extension of stay, change of status); (iii) diagnosis of a medical condition that is likely to require extensive medical treatment or institutionalization or interfere with the applicant's ability to attend work or school where the applicant lacks private insurance; and (iv) previous findings of inadmissibility.  *Id.* at 41,504 (to be codified at 8 C.F.R. § 212.22(c)(1)).

144.    The only heavily positive factors are an applicant's financial assets, resources, support, or annual income of at least 250 percent of the FPG, and enrollment in a private insurance plan.  *Id.* at 41,504 (to be codified at 8 C.F.R. § 212.22(c)(2)).  However, enrolling in a private insurance plan using tax credits to offset health care premium costs under the Patient

Protection and Affordable Care Act (ACA) does not count as a heavily weighted positive factor. *Id.* at 41,504.

145.    The Final Rule instructs DHS officials to weigh the factors and find in favor of admissibility only if the positive factors outweigh the negative factors. *Id.* at 41,397-98.  When a heavily weighted negative factor is present, the applicant can only overcome a public charge determination by showing two or more countervailing positive factors or one heavily weighted positive factor. *Id.*

146.    While contending that agency officials would retain discretion to balance all factors in deciding whether an applicant would more likely than not become a public charge, the Rule guides DHS officials to enter public charge findings for applicants with disabilities, non-white applicants, and applicants who do not arrive in the United States with significant resources. The Final Rule reshapes the public charge exception, which has until now applied only to applicants who likely to become primarily and permanently dependent on the government, into an effective presumption against admissibility for these groups.

        **a.**    **The Weighted Circumstances Test Discriminates Against Individuals with Disabilities and Irrationally Presumes that Their Disabilities will Render them Public Charges.**

147.    The Final Rule resurrects the legacy barriers to admissibility for the mentally and physically disabled that Congress has dismantled over time.  By heavily weighting medical diagnoses, the costs of government subsidized treatments and care, and the lack of private health insurance against applicants, DHS unlawfully discriminates against individuals with disabilities in violation of Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a).

148.    The Final Rule intentionally discriminates against individuals with disabilities by requiring DHS officials to consider an applicant's "disability diagnosis that, in the context of the

alien's individual circumstances, [when it] affects his or her ability to work, attend school, or otherwise care for him or herself."  84 Fed. Reg. at 41,408.

149.     Under the weighted circumstances test, which penalizes applicants who are diagnosed with or in treatment for a disability, most persons with disabilities, even those not primarily depending on government assistance, would be found inadmissible.  For example, the Final Rule would heavily weigh as a negative factor a disabled applicant's receipt of Medicaid. *Id.* at 41,504 (to be codified at 8 C.F.R. § 212.22(c)(1)(iii)).  Many persons with disabilities, even working professionals with advanced degrees, retain Medicaid coverage because Medicaid is the only insurer that sufficiently covers some forms of personalized care and medical equipment. Yet the Rule does nothing to reasonably accommodate that reality for individuals with disabilities.  Accordingly, the Final Rule would penalize individuals who, based solely on their disabilities, chose Medicaid coverage, the only appropriate insurance to meet their needs.

150.     Additionally, the Final Rule provides that DHS would consider whether an applicant has been diagnosed with a medical condition "that will interfere with [the applicant's] ability to provide and care for him- or herself, to attend school, or to work upon admission or adjustment of status."  *Id.* at 41,316.  A significant proportion of disabilities affect, in some way, an individual's ability to work or learn.  The Final Rule would thus disproportionately assign a negative weight to individuals with disabilities, including to an applicant requiring a reasonable accommodation at work or an Individualized Education Program at school.

151.     The weighted circumstances would also count the same factors multiple times against a disabled applicant of limited means.  For example, an applicant in a wheelchair who needs an accommodation at work would presumptively be deemed a public charge.  Because the individual has been diagnosed with a medical condition that interferes with work and likely does

not have private insurance, the applicant would start the test with a heavily weighted negative

factor.  If he had used Medicaid for more than 12 months at any point in the past three years, he

would have two heavily weighted negative factors.  He would then receive additional negative

marks in (i) health, for his disability and (ii) financial status, for his use of and application for

Medicaid.  The applicant would further be disqualified from the heavily positive factor of having

private health insurance.  In substance, the Final Rule counts the same underlying facts against

an individual in multiple ways, stacking the results towards inadmissibility.

       **b.**    **The Weighted Circumstances Test Would Have A Discriminatory Impact on Immigrants of Color.**

152.    The weighted circumstances test disproportionately places applicants from

countries with predominately non-white populations at a disadvantage, regardless of their ability

to find employment and achieve self-sufficiency in the future.  Sixty percent of applicants from

Mexico and Central America and 41 percent from Asia would have two or more negative factors,

compared to only 27 percent of immigrants from Europe, Canada, and Oceania.[38]  Applicants

from countries with non-white majorities are also less likely to have assets in excess of 250

percent of the FPG.  DHS fails to adequately address this discriminatory impact and,

accordingly, ensures that immigrants of color would be significantly more likely to be found

inadmissible.

153.    DHS also does not sufficiently address the specific effects of the Rule's language-

based discrimination.  The new test assigns a negative weight to an applicant's limited English

proficiency ("LEP") without specifying how DHS officials should determine whether an

applicant's English is proficient.

---

[38] Randy Capps, Mark Greenberg, Michael Fix & Jie Zong, *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration*, Migration Pol'y Inst., 9 (Nov. 2018), https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration.

154.    Nor does the Final Rule make a reasonable connection between LEP status and the likelihood of becoming a public charge. Immigrants from Central and South American as well as Asian countries are more likely to have limited English skills, but are almost equally likely to find gainful employment as are non-LEP immigrants from Europe.[39]

155.    This change lacks a rational relationship to the determination of whether an applicant will depend on governmental resources, since immigrants who speak limited English can readily find employment in industries that do not require frequent employee communication as well as within non-English speaking communities.  Furthermore, this factor also runs afoul the federal government's obligation not to discriminate on the basis of national origin.

156.    Moreover, the Rule's mandatory consideration of household size irrationally disfavors families that live together and pool resources, and will further disfavor immigrants of color who tend to reside in larger households comprised of multiple generations.  *See* 84 Fed. Reg. 41,501-41,502; 8 C.F.R. §212.21(d).

157.    DHS acknowledges the Rule's impact on immigrants of color and recognizes the possibility that the Rule would have discriminatory effects, but does nothing to meaningfully address or ameliorate the disproportionate harms to non-white immigrant communities.  *Id.* at 41,322.

c.      **The Weighted Circumstances Test Unlawfully and Arbitrarily Targets Immigrants Who Are Not Likely to Become Public Charges.**

158.    The weighted circumstances test targets immigrants who Congress never intended to consider public charges.  Under the INA, a public charge is an applicant who is likely to become permanently and primarily dependent on the government for support.

---

[39] Jie Zong & Jeanne Batalova, *The Limited English Proficient Population in the United States*, Migration Pol'y Inst. (July 8, 2018), https://www.migrationpolicy.org/article/limited-english-proficient-population-united-states.

159.     But the weighted circumstances test targets applicants who are not remotely likely to become permanently and primarily dependent on the government for support.  For example, without reasoned analysis, the Final Rule counts a large family as a negative factor, even though more family members may be able to contribute to the family's shared finances.  The weighted circumstances test also undervalues the significance of affidavits of support, which have traditionally allowed and encouraged family members to take financial responsibility for one another.

160.     Under the Rule, applicants who work (or are employable) are likely to be deemed public charges simply because, among other things, they earn (or are likely to earn) moderate or low incomes, obtain health insurance using premium tax subsidies designed to assist moderate- or low-income working individuals and families, or use small amounts of non-cash supplemental public benefits.  The weighted circumstances test thus goes far beyond Congress's intent in enacting the public charge inquiry, and far beyond DHS's authority.

### d.     The Weighted Circumstances Test Arbitrarily Deters Immigrants from Accepting Benefits to Which They Are Legally Entitled.

161.     The weighted circumstances test deters immigrant applicants from enrolling in benefits programs to which they are legally entitled in contravention of Congressional intent.  In the decades since the Welfare Reform Act, Congress expressed an intent to provide non-citizens with access to basic food, health care, and housing needs.

162.     Additionally, Congress has specified, in particular, that SNAP may not be considered against recipients as income or resources under any federal, state, or local law.  *See* 7 U.S.C. § 2017(b).

163.     Despite this, the new test heavily weighs as a negative factor any use of the enumerated public benefits for an aggregate of 12 months within the last 36 months of the

immigrant's application.  Under the Final Rule, the statutory protections for these benefits become illusory; a non-citizen could not enroll in benefits programs without being heavily penalized for exercising that right.

164.    As in the disability context, the weighted circumstances test double counts use of legally protected benefits against applicants.  For example, a single working mother who received food stamps for the previous year starts the test with a heavily weighted negative factor because she used benefits for an aggregate of 12 months within the 36 months.  Because, in order to qualify for SNAP benefits, she must make below 125 percent of the FPG, she receives an additional negative factor for her income and is disqualified from the countervailing heavily positive factor of making 250 percent of the FPG.  She also receives a negative financial status rating for her use of public benefits.  The Final Rule's calculus imposes multiple, separate demerits based on a single factual predicate.

> **e.    The Weighted Circumstances Test Arbitrarily Penalizes Immigrants with Limited Resources at the Time of Application.**

165.    The Final Rule's changes to the totality of circumstances test ensure that immigrants with limited resources at the time of their application will face a nearly insurmountable burden to escape a public charge finding—even if they are hardworking and productive members of Plaintiffs' communities.

166.    The Rule counts a household income of less than 125 percent of the FPG as a negative factor even if the applicant has not received any of the enumerated public benefits.  The Rule arbitrarily targets hardworking immigrants simply because they work in moderate- or low-paying jobs.  For example, the annual income of applicants who hold steady jobs that are important to Plaintiffs' economies—including childcare and early education providers, food-service workers, and farm workers—are often at or below the Rule's 125 percent income cutoff.

167.    DHS fails to offer any rationale for why the Rule counts a household income of less than 125 percent of the FPG as a negative factor.  84 Fed. Reg. at 41,413-16.  DHS states only that the 125 threshold is an appropriate measure for sponsors who provide affidavits to support otherwise inadmissible applicants.  Yet the threshold for sponsors, who undertake the obligation to support themselves as well as the immigrant applicant, has no bearing on appropriate income threshold for the applicant herself.  DHS does not justify the departure from the current standard, which requires an income threshold sufficient to keep applicants from becoming primarily dependent on government income-replacement programs.

168.    The weighted circumstance test's consideration of an applicant's credit score is similarly without rational explanation.  DHS does not provide any support for the conclusion that an individual's credit score is indicative of whether he or she is likely to become dependent on government assistance in the future.  *Id.* at 41,425-28.

### 3.    DHS Underestimates and Fails to Quantify Widespread Harms.

169.    The Final Rule's Regulatory Impact Analysis simply declines to quantify or assess many of the very real harms that Defendants admit will arise from the Final Rule.

170.    While DHS concludes that federal and state governments will reduce their direct benefits payments to immigrants by approximately $2 billion annually, DHS fails to even attempt to quantify the bulk of the countervailing costs attributable to the Rule.  84 Fed. Reg. at 41,485.  For example, this estimate does not account for downstream indirect costs on state and local economies, *see id.* at 41,489-90, nor does it consider many of the longer-term costs on a population that will, as a result of the Rule, become sicker, poorer, and less educated.

171.    First, DHS severely underestimates the Final Rule's chilling effect.  The Department acknowledges that experts predict that 24 to 25 million people will forgo or disenroll

in benefits, but then estimates without basis that the Rule will only affect approximately 700,000 people. *Id.* at 41,463.

172.     The Final Rule also acknowledges that DHS did not attempt to quantify many significant costs, including effects on "potential lost productivity, [a]dverse health effects, [a]dditional medical expenses due to delayed health care treatment, and [i]ncreased disability insurance claims, [and] a]dministrative changes to business processes such as reprogramming computer software and redesigning application forms and processing." *Id.* at 41,489.

173.     Specifically, the Final Rule recognizes but refuses to quantify "increases in uncompensated health care or greater reliance on food banks or other charities," *id.* at 41,485, and "reduced revenues for health care providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing program." *Id.* at 41,486.

174.     The Final Rule also did not include a federalism analysis nor did it account for the Rule's effect on state tax revenue and economic activity, which likely decrease due to the rise in illness and poverty. *Id.* at 41,492.

**G.     Defendants Were Motivated by Animus toward Immigrants and Latino Communities When Adopting the Final Rule.**

175.     Defendants were fully aware of the disparate impact that Final Rule will have on Latino communities and other immigrants of color. Indeed, Defendants proposed the Rule specifically to prevent members of those communities from residing permanently or obtaining citizenship in the United States, a result desired by Defendants. The Final Rule is of a piece with the Administration's rhetoric and policies, which have long reflected a deep animus toward immigrants of color and Latino communities.

176.    President Trump has long engaged in rhetoric that disparages Latinos and immigrants of color.  In statements stretching back to the beginning of his campaign, President Trump has repeatedly dehumanized, devalued, and vilified immigrants in general, and specifically immigrants from Latin America.  For instance:

    a.   During his campaign launch in June 2015, President Trump claimed that "[w]hen Mexico sends its people. . . .  They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists. . . .  It's coming from more than Mexico.  It's coming from all over South and Latin America."[40]

    b.   In December 2015, President Trump called for a "total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on."[41]

    c.   In December 2016, in an interview with TIME magazine, President Trump stated in reference to a supposed crime wave on Long Island, "They come from Central America.  They're tougher than any people you've ever met.  They're killing and raping everybody out there.  They're illegal.  And they are finished."[42]

    d.   During a meeting regarding a proposed immigration reform package in the Oval Office in June 2017, President Trump stated that 15,000 immigrants from Haiti

---

[40] *Full text: Donald Trump announces a presidential bid*, Wash. Post, (June 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?noredirect=on&utm_term=.0a30b7ba1f8a).

[41] Donald J. Trump Campaign, *Donald J. Trump Statement on Preventing Mulsim Immigration* (Dec. 7, 2015), https://web.archive.org/web/20170508054010/https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.

[42] Michael Scherer, *2016 Person of the Year: Donald Trump*, Time, https://time.com/time-person-of-the-year-2016-donald-trump/.

"all have AIDS" and that 40,000 immigrants from Nigeria would never "go back

to their huts" in Africa after seeing the United States.[43]

e.  On June 28, 2017, speaking of immigrants, President Trump stated, "They are bad

   people.  And we've gotten many of them out already . . . . We're actually

   liberating towns, if you can believe that we have to do that in the United States.

   But we're doing it and we're doing it fast."[44]

f.  During a January 2018 meeting with lawmakers, while discussing protections for

   immigrants from Haiti, El Salvador and other African countries, President Trump

   asked why the United States is "having all these people from shithole countries

   come here" and suggested that the United States should have more immigrants

   from countries like Norway.[45]

g.  In a May 16, 2018 speech, President Trump stated that "[w]e have people coming

   into the country, or trying to come in . . . You wouldn't believe how bad these

   people are.  These aren't people, these are animals."[46]

h.  At an event on April 7, 2019, President Trump claimed that the asylum program

   in the United States was a "scam," claiming beneficiaries were "some of the

   roughest people you've ever seen," and that they "carry[] the flag of Honduras or

   Guatemala or El Salvador, only to say [they are] petrified to be in [their]

---

[43] Michael Shear and Julie Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html

[44] Alana Abramson, *'I Can Be More Presidential Than Any President.' Read Trump's Ohio Rally Speech*, Time (July 26, 2017), https://time.com/4874161/donald-trump-transcript-youngstown-ohio/.

[45] Vitali et al, *supra* note 2.

[46] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

country."[47]

    i.    Speaking on the topic of migrant groups travelling to the United States from Central America at a rally on May 8, 2019, President Trump, stated, "[W]hen you see these caravans starting out with 20,000 people, that's an invasion."[48]

    j.    On July 14, 2019, President Trump tweeted that four non-white Members of Congress (Representatives Alexandria Ocasio-Cortez, Rashida Tlaib, Ilhan Omar, and Ayanna Pressley) should "go back" to the "totally broken and crime infested places from which they came."[49]  One day later the President accused the four Representatives of hating the United States and stated that "they are free to leave" the country.[50]

177.    Indeed, several senior level officials at the DHS, including the official responsible for implementing the public charge rule, have similarly expressed their animus towards immigrants of color.

    a.    On August 13, 2019, just a day after announcing the Final Rule, Defendant Cuccinelli stated that the famous inscription on the Statue of Liberty, welcoming "huddled masses" of immigrants to the United States, only referred to "people coming from Europe."[51]

---

[47] *President Trump Mocks Asylum Seekers, Calls Program a "Scam,"* C-SPAN (April 6, 2019), https://www.c-span.org/video/?c4790668/president-trump-mocks-asylum-seekers-calls-program-scam.

[48] *Road to the White House 2020 President Trump Holds Rally in Panama City,* C-SPAN (May 9, 2019), https://archive.org/details/CSPAN_20190509_065700_Road_to_the_White_House_2020_President_Trump_Holds_Rally_in_Panama_City.

[49] Donald J. Trump (@realDonaldTrump), Twitter (July 14, 2019, 5:27 AM), https://twitter.com/realDonaldTrump/status/1150381394234941448.

[50] Brian Naylor, *Lawmakers Respond To Trump's Racist Comments: We Are Here To Stay*, NPR (July 15, 2019), https://www.npr.org/2019/07/15/741771445/trump-continues-twitter-assault-on-4-minority-congresswomen.

[51] Zeke Miller and Ashley Thomas, *Trump Official: Statue of Liberty's Poem is about Europeans*, Associated Press (Aug. 14, 2019), https://www.apnews.com/290fe000b4584ddca46a6eb36a74a703.

b.   During an October 23, 2018 interview, Cuccinelli repeating President Trump's characterization, called immigrants crossing the southern border of the United States an "invasion."[52]

c.   On June 13, 2017, then Acting Director of U.S. Immigration and Customs Enforcement, and current "border czar", Thomas Homan, testified before Congress that "every immigrant in the country without papers . . . should be uncomfortable.  You should look over your shoulder.  And you need to be worried."[53]

d.   Homan repeated the threat on June 22, 2017, stating that "[f]or those who get by the Border Patrol they need to understand there's no safe haven in the United States . . . if you happen to get by the Border Patrol, ICE is looking for you." Later he clarified that while the enforcement priorities were those who committed crimes, "[n]ow the message is clear: If you're in the United States illegally . . . someone is looking for you.  And that message is clear."[54]

e.   In January 2019, Mark Morgan, the current Acting Director of ICE, speaking of children detained in border facilities stated, "I've been to detention facilities where I've walked up to these individuals that are so-called minors, 17 or under. I've looked at them I've looked at their eyes . . . and I've said that is a soon-to-be

---

[52] John Binder, *Exclusive-Ken Cuccinelli: States Can Stop Migrant Caravan "Invasion" With Constitutional War Powers*, Brietbart (Oct. 23, 2018), https://www.breitbart.com/politics/2018/10/23/exclusive-ken-cuccinelli-states-can-stop-migrant-caravan-invasion-with-constitutional-war-powers/.

[53] *Immigration and Customs Enforcement and Customs and Border Patrol Fiscal Year 2018 Budget Request: Hearing Before the Subcomm. on Homeland Sec. of the H. Comm. on Appropriations*, 115th Cong. 279 (2017) (statement of Thomas D. Homan, Acting Dir., Immigration and Customs Enf't).

[54] Press Release, The White House Office of the Press Secretary, Press Gaggle by Director of Immigration and Customs Enforcement Tom Homan et al. (June 28, 2017).

MS-13 gang member.  It's unequivocal."[55]

178.   Defendants have acted on this rhetoric by adopting policies that seek to isolate and exclude Latino immigrants and other immigrants of color.  For instance, the Trump Administration has:

a.   Rescinded the Deferred Action for Childhood Arrivals program, which protected 800,000 individuals, 90 percent of which were Latino and 80 percent of which were Mexican-American;

b.   Banned travel from several majority-Muslim countries;

c.   Suspended refugee admissions to the United States;

d.   Terminated special protections from removal for migrants from nations experiencing war and natural disasters, including Nicaragua, Honduras, Haiti and El Salvador;

e.   Increased actual and threatened raids and deportations of undocumented migrants, including, as recently as June 17, 2019, when President Trump tweeted a threat that "[n]ext week ICE will begin the process of removing the millions of illegal aliens who have illicitly found their way into the United States.  They will be removed as fast as they come in;"[56]

f.   Attempted to suspend or terminate federal funding to localities that elect to limit their participation in federal immigration enforcement efforts;

---

[55] Ted Hesson, *Trump's pick for ICE director: I can tell which migrant children will become gang members by looking into their eyes*, Politico (May 16, 2019), https://www.politico.com/story/2019/05/16/mark-morgan-eyes-ice-director-1449570.

[56] Nick Miroff & Maria Sacchetti, *Trump vows mass immigration arrests, removals of "millions of illegal aliens" starting next week*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/immigration/trump-vows-mass-immigration-arrests-removals-of-millions-of-illegal-aliens-starting-next-week/2019/06/17/4e366f5e-916d-11e9-aadb-74e6b2b46f6a_story.html.

g.  Attempted to build a physical wall along the Mexico-U.S. border;

h.  Adopted policies of separating children from their families when entering the
United States from Mexico, and detaining children separate from their parents and
families thereafter; and

i.  Maintained children and other migrants across the border between Mexico and the
United States in detention facilities that the United Nations Children's Fund has
described as "dire" and as causing "irreparable harm" to children housed in
them.[57]

179.  Further, President Trump and Defendants, including and senior officials in the
DHS have explicitly sought to disparage immigrant use of public benefits.  These comments
often contain false and misleading assertions that generically characterize immigrants, and
especially immigrants of color, as poor, a drain on the United States, and taking advantage of
United States citizens:

a.  On July 18, 2015, President Trump tweeted: "It's a national embarrassment that
an illegal immigrant can walk across the border and receive free health care."[58]

b.  On June 21, 2017, during a rally, President Trump demanded "new immigration
rules which say those seeking admission into our country must be able to support
themselves financially and should not use welfare for a period of at least five
years."[59]  However, immigrants are already held to this standard.

---

[57] UN News, *After Rio Grande tragedy, UNICEF chief highlights "dire" detention centers on US-Mexico border*
(June 27, 2019), https://news.un.org/en/story/2019/06/1041421.

[58] Donald J. Trump (@realDonaldTrump), Twitter (July 18, 2015),
https://twitter.com/realDonaldTrump/status/622469994220273664.

[59] Michelle Mark, *Trump called for legislation blocking immigrants from receiving welfare for 5 years – but it
already exists*, Business Insider (June 22, 2017),  https://www.businessinsider.com/trump-called-for-legislation-
blocking-immigrants-from-receiving-welfare-for-5-years-but-it-already-exists-2017-6.

c.  In August 2017, while announcing his support of the RAISE Act, a bill designed
    to decrease the population of Latino immigrants and immigrants of color in the
    United States by restricting family-based visas, President Trump stated that the
    bill would ensure that immigrants were "not going to come in and just
    immediately go and collect welfare."[60]

d.  During a press conference on August 2, 2017, Stephen Miller, a senior advisor to
    President Trump, misleadingly claimed that "roughly half of immigrant head of
    households in the United States receive some type of welfare benefit."[61]  But
    researchers have shown that poor immigrant households use less welfare than
    poor non-immigrant households.[62]

e.  At the same press conference, Stephen Miller went on to falsely state that the
    United States "issue[s] a million green cards to foreign nationals from all the
    countries of the world" without regard to "whether they can pay their own way or
    be reliant on welfare."[63]

f.  On March 11, 2019, during an interview, President Trump said: "I don't want to
    have anyone coming in that's on welfare."  He continued "I don't like the idea of
    people coming in and going on welfare for 50 years, and that's what they want to

---

[60] Alexia Fernandez Campbell, *Poor immigrants are the least likely group to use welfare, despite Trump's claims*,
Vox.com (Aug. 4, 2017), https://www.vox.com/policy-and-politics/2017/8/4/16094684/trump-immigrants-
welfare.com.

[61] White House Press Briefing, Press Briefing by Press Secretary Sarah Sanders and Senior Policy Advisor Stephen
Miller (Aug. 2, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-
sanders-senior-policy-advisor-stephen-miller-080217/.

[62] Alex Nowrasteh, *CIS Exaggerates the Cost of Immigrant Welfare Use*, CATO Inst. (May 10, 2016),
https://www.cato.org/blog/cis-exaggerates-cost-immigrant-welfare-use.

[63] Press Briefing, *supra* note 61.

be able to do—and it's no good."[64]

g.  On April 17, 2019, after the Trump Administration announced a proposed rule
that would block households with undocumented members from obtaining public
housing assistance, an administration official stated that "as illegal aliens attempt
to swarm our borders, we're sending the message that you can't live off of
American welfare on the taxpayers' dime."[65]

## H.  Defendant McAleenan Lacked the Authority to Promulgate the Rule.

180.  Article II of the Constitution requires that the President obtain the "Advice and
Consent" of the Senate for Cabinet officials.

181.  The FVRA establishes a default framework for authorizing acting officials to fill
Senate-confirmed roles, with three options for who may serve as an acting official. 5 U.S.C.
§ 3345. Under this framework, (1) the "first assistant to the office" of the vacant officer generally
becomes the acting official, *id.* § 3345(a)(1), unless (2) the President authorizes "an officer or
employee" of the relevant agency above the GS-15 pay rate for 90 days or more within the
preceding year, *id.* § 3345(a)(3).

182.  The FVRA further provides that a position may be occupied by an acting official
for a maximum of 210 days. *Id.* § 3346. This framework is the "exclusive means" for authorizing
acting officials unless a specific statute authorizes "the President, a court, or the head of an
Executive department" to designate one. *Id.* § 3347.

---

[64] Alexander Marlow et al., *President Donald Trump On Immigration: "I Don't Want To Have Anyone Coming In That's On Welfare"*, Breitbart (Mar. 11, 2019), https://www.breitbart.com/politics/2019/03/11/exclusive-president-donald-trump-on-immigration-i-dont-want-to-have-anyone-coming-in-thats-on-welfare/.

[65] Stephen Dinan, *HUD moves to cancel illegal immigrants' public housing access*, Wash. Times (April 17, 2019) https://www.washingtontimes.com/news/2019/apr/17/hud-moves-cancel-illegal-immigrants-public-housing/.

183.    DHS has such a statute –the HSA– which establishes an order of succession for
the Acting Secretary, expressly superseding the FVRA's default options. 6 U.S.C. § 113(g). First
in line under the HSA is the Deputy Secretary, and then the Under Secretary for Management.
*Id.* §§ 113(a)(1)(A), 113(g)(1). After these two offices, the order of succession is set by the
Secretary of Homeland Security. *Id.* § 113(g)(2).

184.    Under the FVRA, official actions taken by unlawfully serving acting officials
"shall have no force or effect" and "may not be ratified" after the fact by the official who
lawfully should have assumed the Acting Secretary role. 5 U.S.C. § 3348(d)(1), (2).

185.    Secretary Kirstjen Nielsen was the most recent Senate-confirmed Secretary of
Homeland Security. On February 15, 2019, she exercised her power under the HSA to set an
order of succession for the position of Acting Secretary should the Deputy Secretary and Under
Secretary of Management positions become vacant. She did so by amending the existing order of
succession that had been issued by then-Secretary Jeh Johnson in 2016 (Delegation 00106).

186.    Nielsen's February Delegation provided two grounds for accession of an Acting
Secretary: (1) in the event of the Secretary's death, resignation, or inability to perform the
functions of the office, Executive Order 13753 (the most recent prior amendment to the order of
succession in the Department) would govern the order of succession; and (2) if the Secretary
were unavailable to act during a disaster or catastrophic emergency, the order of succession
would be governed by Annex A to the February Delegation.

187.    At the time of the February Delegation, the orders of succession found in E.O.
13753 and Annex A were identical.  The first four positions in the order of succession for both
were as follows: (1) Deputy Secretary; (2) Under Secretary for Management, (3) Administrator
of the Federal Emergency Management Agency (FEMA) and (4) Director of the Cybersecurity

and Infrastructure Security Agency (CISA). The February Delegation further provided that officials who were only acting in the listed positions (rather than appointed to those positions) were ineligible to serve as Acting DHS Secretary, such that the position of Acting Secretary would pass to the next Senate-confirmed official.

188.     Nielsen originally announced her resignation from the Secretary position effective April 7, 2019. Under the order of succession in effect at that time, and in view of the vacancy in the Deputy Secretary position, the Acting Secretary position would have been assumed by Claire Grady, the Under Secretary for Management. *See* 6 U.S.C. §§ 113(a)(1)(A), 113(g)(1). But Nielsen then purported to remain in office until April 10, and Grady resigned on April 9.

189.     Before leaving office on April 10, 2019, Nielsen made a partial amendment to DHS's order of succession. In this April Delegation, Nielsen retained the two separate grounds for accession to the role of Acting Secretary: vacancies arising from Secretary's death, resignation, or inability to perform the functions of office were still governed by E.O. 13753, and vacancies arising from the Secretary's unavailability to act during a disaster or catastrophic emergency were still governed by Annex A to the Delegation. Nielsen also did not amend E.O. 13753, which continued to govern the order of succession in the event of a vacancy created by the Secretary's death, resignation or inability to perform the functions of the office. Secretary Nielsen did, however, amend Annex A, which set forth the order of succession for when the Secretary is unavailable to act during a disaster or catastrophic emergency; the new order of succession was as follows: (1) Deputy Secretary; (2) Under Secretary for Management; (3) Commissioner of U.S. Customs and Border Protection (CBP), and (4) Administrator of FEMA.

190.     Defendant McAleenan, who was at the time serving as Commissioner of CBP, then assumed the role of Acting Secretary, purportedly pursuant to Annex A. However, E.O.

13753 and not Annex A governed the relevant order of succession because the vacancy in the position of Secretary was created by Nielsen's resignation, not through the Secretary's unavailability during a disaster or catastrophic emergency.

191.    On August 14, 2019, DHS published the Final Rule in the Federal Register. The Rule was issued pursued to Acting Secretary McAleenan's authority, *see* 84 Fed. Reg. at 41,295-96, and under his signature, *id.* 41,508.

192.    Nearly three months later, on November 8, 2019, McAleenan substituted Annex A for E.O. 13753 to govern the order of succession when the Secretary dies, resigns, or is unable to perform the functions of office. McAleenan then directed the order of succession in Annex A to be: (1) Deputy Secretary, (2) Under Secretary for Management; (3) Commissioner of CBP; and (4) Under Secretary for Strategy, Policy, and Plans. On November 13, 2019, McAleenan resigned as both Acting Secretary and Commissioner of CBP. Because the first three positions in the line of succession were vacant, the Senate-confirmed Under Secretary for Strategy, Policy, and Plans—Chad Wolf—assumed the role of Acting Secretary.

193.    On November 13, 2019—the day he became Acting Secretary—defendant Wolf amended the order of succession for Deputy Secretary, so as to remove the CISA Director from the order of succession, and install the Principal Deputy Director of USCIS next in the order. Subsequently, defendant Cuccinelli assumed the title of the Senior Official Performing the Duties of Deputy Secretary, as he was at the time Principal Deputy Director of USCIS. Defendant Cuccinelli currently serves as the Senior Official Performing the Duties of both the Deputy Secretary and the Director of USCIS.

194.    On November 15, 2019, two days after Wolf assumed the Acting Secretary role, the Chairman of the House of Representatives Committee on Homeland Security and the Acting

Chairwoman of the House Committee on Oversight and Reform wrote a letter to the head of

GAO "to express serious concerns with the legality of the appointment" of Chad Wolf as Acting

Secretary and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary.

195.    In particular, the Chairman and Acting Chairwoman expressed concern that Wolf

was serving in violation of the FVRA and HSA because former Acting Secretary McAleenan did

not lawfully assume the Acting Secretary position, and so McAleenan had no authority to make

the changes to DHS's order of succession that formed the basis for Wolf's accession to Acting

Secretary.

196.    On August 14, 2020, GAO issued a report responding to the Chairman and Acting

Chairwoman's request, and assessing the legality of the appointment of Chad Wolf as Acting

Secretary of DHS and Ken Cuccinelli as Senior Official Performing the Duties of Deputy

Secretary.

197.    In the report, GAO explained that "[i]n the case of vacancy in the positions of

Secretary, Deputy Secretary, and Under Secretary of Management, the HSA provides a means

for an official to assume the title of Acting Secretary pursuant to a designation of further order of

succession by the Secretary." *Id.* at 11. Based on the amendments Secretary Nielsen made to the

order of succession in April 2019, GAO concluded that the Senate-confirmed CBP

Commissioner (McAleenan) "would have been the appropriate official" to serve as Acting

Secretary only if Secretary Nielsen had been "unavailable to act during a disaster or catastrophic

emergency." *Id.* at 7.

198.    However, because Secretary Nielsen had *resigned*, GAO concluded that E.O.

13753 controlled under "the plain language of the April Delegation." *Id.* Thus, after Secretary

Nielsen's resignation, then-Director of CISA, Christopher Krebs, should have assumed the

position of Acting Secretary because he was the first Senate-confirmed official in the E.O. 13753

order of succession. *Id.* at 8 & n.11. Although "McAleenan assumed the title of Acting Secretary

upon the resignation of Secretary Nielsen," "the express terms of the existing [succession]

required [Krebs] to assume that title" and thus "McAleenan did not have authority to amend the

Secretary's existing designation." *Id.* at 11. GAO concluded that Wolf and Cuccinelli were

improperly serving in their acting roles because they assumed those acting roles under the

"invalid order of succession" established by McAleenan in November 2019. *Id.*

     199.    GAO recognized that Secretary Nielsen's conduct may have suggested that she

intended McAleenan to become Acting Secretary upon her resignation, but GAO noted that "it

would be inappropriate, in light of the clear express directive of the April Delegation" – which

provided that McAleenan would only take over if Nielsen were unavailable to act during a

disaster or a catastrophic emergency – "to interpret the order of succession based on post-hoc

actions." *Id.* at 9. GAO concluded that because the April Delegation "was the only existing

exercise of the Secretary's authority to designate a successor . . . McAleenan was not the

designated acting Secretary because, at the time, the director of the CISA was designated the

Acting Secretary under the April Delegation." *Id.*

     200.    Furthermore, the GAO concluded in the report that because McAleenan and

defendant Wolf were unlawfully appointed, that defendant Wolf's alterations to the order of

succession for Deputy Secretary were issue without authority. *Id.* at 10–11. Because the prior

order of succession for Deputy Secretary did not include defendant Cuccinelli's position, the

GAO concluded that his succession to the role of Senior Official Performing the Duties of

Deputy Secretary was invalid. *Id.*

201.     Because Defendant McAleenan unlawfully assumed the position of Acting Secretary of Homeland Security in violation of the FVRA and HSA, under the plain terms of the FVRA, his official actions in issuing the Rule as Acting Secretary is therefore invalid.

202.     Following the release of the GAO report, at least one district court found that Defendant Wolf was not lawfully serving as Acting Secretary.  *See Casa de Md.*, 2020 WL 5500165, at *20–23.

203.     As a result, on September 10, 2020, FEMA Administrator Peter Gaynor—who purportedly would have become Acting Secretary upon McAleenan's resignation based on the order of succession laid out in Executive Order 13753—"exercised any authority that he had to designate an order of succession," and in doing so re-issued the same order of succession that McAleenan had promulgated.[66]  This action tacitly acknowledges that Wolf and McAleenan previously had not been lawfully appointed, and that their actions as Acting Secretary were in excess of their authority.

204.     Defendant Wolf then purported to "affirm and ratify any and all actions involving delegable duties that [he] ha[d] taken from November 13, 2019, through September 10, 2020."[67]  This purported ratification flies in the face of the clear language of 5 U.S.C. § 3348(d)(2), which provides that actions taken by officials serving in violation of the FVRA "may not be ratified."  Moreover, even Wolf could ratify prior unlawful actions, he did not purport to ratify the Rule, which was issued on August 14, 2019.

---

[66]     Chad F. Wolf, Ratification of Actions Taken by the Acting Secretary of Homeland Security, Doc. No. 2020-21055 (Sept. 17, 2020), available at https://www.federalregister.gov/documents/2020/09/23/2020-21055/ratification-of-department-actions (to be published in the Federal Register on Sept. 23, 2020).

[67]     *Id.*

I.     **Defendant Cuccinelli Was Unlawfully Appointed as Senior Official Performing the Duties of Director of USCIS and Senior Official Performing the Duties of Deputy Secretary.**

205.    On April 25, 2017, Lee Francis Cissna was nominated by President Trump to serve as USCIS Director.  He was confirmed by the Senate on October 5, 2017 and took office on October 8, 2017.

206.    On May 13, 2019, Mark Koumans was named Deputy Director of USCIS. At the time, the Deputy Director was designated as the first assistant to the office of the USCIS Director.

207.    On May 24, 2019, Director Cissna informed his employees via email that he would be resigning from the agency effective June 1.  Mr. Cissna stated that he had submitted his resignation "at the request of the president."[68]  In fact, the President's chief immigration adviser, Stephen Miller, had "been publicly agitating for weeks for Trump to fire Cissna."[69]  The President reportedly "forced the resignation of … Cissna" because he believed that Mr. Cissna "wasn't doing enough" to pursue the President's immigration agenda.[70]

208.    Under the FVRA, Deputy Director Koumans—the first assistant to the Director—automatically became Acting Director of USCIS upon Cissna's resignation.

209.    However, on June 10, 2019, DHS announced that defendant Cuccinelli would serve as Acting Director of USCIS, effective that same day.[71]

---

[68]     Dara Lind, *Trump Pushes Out Head of Largest Immigration Agency—and Wants Ken Cuccinelli Instead*, Vox (May 25, 2019), https://www.vox.com/2019/5/25/18639156/trumpcuccinelli-cissna-uscis-director.

[69]     *Id.*

[70]     *Staunch Anti-Immigration Supporter Ken Cuccinelli Named to Top Immigration Post*, CBS News (June 10, 2019), https://www.cbsnews.com/news/staunch-anti-immigration-supporter-ken-cuccinelli-named-to-top-immigration-post/.

[71]     *Cuccinelli Named Acting Director of USCIS*, USCIS (June 10, 2019), https://www.uscis.gov/news/news-releases/cuccinelli-named-acting-director-uscis.

210.    The President has long sought to appoint defendant Cuccinelli as an executive branch official, and initially planned to appoint defendant. Cuccinelli as a so-called "czar" with comprehensive authority over federal immigration policy.[72]  However, multiple Senators had indicated that they would not confirm defendant Cuccinelli were he to be nominated to be Director of USCIS.[73]

211.    To appoint Mr. Cuccinelli as Acting Director of USCIS, the Administration created a new office of "Principal Deputy Director," designated the Principal Deputy Director as the first assistant to the USCIS Director for purposes of the FVRA, and appointed Cuccinelli as the Principal Deputy Director of USCIS.  The Administration did so because it believed that these steps "would allow Cuccinelli to become acting director under a provision of the [FVRA]."[74]

212.    Mr. Cuccinelli had never served in USCIS, any other component of DHS, nor any other federal agency, as either an elected or appointed official or as an employee.

213.    The President has neither named a nominee for USCIS Director, nor announced any intent or timetable to nominate someone.

214.    On November 13, 2019, defendant Wolf—as Acting Secretary of Homeland Security—designated defendant Cuccinelli the Senior Official Performing the Duties of Deputy

---

[72]    Maggie Haberman & Zolan Kanno-Youngs, *Trump Expected to Pick Ken Cuccinelli for Immigration Policy Role*, N.Y. Times (May 21, 2019), https://www.nytimes.com/2019/05/21/us/politics/trump-ken-cuccinelli-immigration.html.

[73]    *See* Jordain Carney, *Republicans Warn Cuccinelli Won't Get Confirmed by GOP Senate*, The Hill (June 10, 2019), https://thehill.com/homenews/senate/447804-republicans-warn-cuccinelli-wont-get-confirmed-by-gop-senate.

[74]    Ted Hesson, *Cuccinelli Starts as Acting Immigration Official Despite GOP Opposition*, Politico (June 10, 2019), https://www.politico.com/story/2019/06/10/cuccinelli-acting-uscis-director-1520304.

Secretary of Homeland Security.  Defendant Cuccinelli continues to serve as Acting Director of USCIS to this day.[75]

215.    At least one federal district court has concluded that Cuccinelli was appointed Acting Director of USCIS in violation of the FVRA.  *See L.M.-M.* v. *Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020).  Thus, any actions purportedly taken by him in that purported capacity are also *ultra vires* and void *ab initio* under the FVRA, and were done "in excess of . . . authority" and not "in accordance with law" under the APA.

**J.    The Final Rule Harms the Plaintiffs.**

216.    The Final Rule's destructive and far-reaching consequences significantly frustrate Plaintiffs' obligations to provide for the social and economic well-being of their residents, harms Plaintiffs' economies, and inflicts substantial and burdensome administrative costs on Plaintiffs' institutions.

**1.    The Final Rule Will Have a Broad Chilling Effect on Public Benefits Enrollment.**

217.    The Final Rule will result in non-citizens withdrawing from or forgoing enrollment in public benefit programs that their tax dollars support, and to which they are legally entitled. The Final Rule may also result in harm to American citizens who share a case with a non-citizen household member.

218.    With respect to those individuals directly affected by the Final Rule, DHS absurdly "expects that [non-citizens] . . . will make purposeful and well-informed decisions commensurate with the immigration status they are seeking."  84 Fed. Reg. at 41,312.  But the only decision for which the Final Rule's weighted test effectively allows is for immigrants to

---

[75] Cuccinelli's official title within USCIS has since been amended to Senior Official Performing the Duties of Director of USCIS. *See* Leadership, United States Department of Homeland Security, *available at* https://www.dhs.gov/leadership.

make the impossible choice of either forgoing critical public benefits, or risking being found likely to become a public charge, resulting in denial of admission or adjustment of status.

219.    Moreover, millions of immigrants—including many of Plaintiffs' residents—will be frightened and confused about the potential consequences of applying for benefits and will forgo public assistance altogether, even if the Final Rule does not implicate their immigration status or include a particular benefit in the public charge analysis.

220.    Nonprofit research and education entities estimate that Plaintiff States will experience disenrollment from public benefits at rates between 15 to 35 percent.[76]

221.    Indeed, this chilling effect has already begun.  Families, responding to rumors and news reports that use of public benefits would have adverse immigration consequences,[77] began disenrolling from multiple public benefit programs even before the publication of the Proposed Rule.  The Final Rule will exacerbate the chilling effect and the number of immigrants forgoing critical and sometimes life-saving public benefits will increase.

222.    For example, a web and phone survey of citizens and non-citizens in the community commissioned by the City of New York in December 2018 and January 2019 confirmed that many fear the impact of changes to the public charge rule.  The survey showed that, because of concern over public charge, three-quarters of the non-citizens surveyed (76 percent) would consider withdrawing from or not applying for services, even if the survey respondent felt he or she needed the services.

---

[76] *"Only Wealthy Immigrants Need Apply": How a Trump Rule's Chilling Effect Will Harm the U.S.*, Fiscal Pol'y Inst. (Oct. 10, 2018), http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf; Samantha Artiga et al., *Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid*, The Henry J. Kaiser Fam. Found. (Oct. 18, 2018), https://www.kff.org/report-section/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and-medicaid-appendices/.

[77] Helena Evich, *Immigrants, Fearing Trump Crackdown, Drop Out of Nutrition Programs*, Politico (Sept. 3, 2018), https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292.

223.     Additionally, frontline staff members from Health + Hospitals and DOHMH have observed and reported that clients have disenrolled from or expressed reluctance to enroll in public benefits and services due to fear of changes in the public charge definition and determination.

224.     Vermont's multiple refugee resettlement communities face similar concerns. Refugees are exempt from the Final Rule and may continue to receive public benefits without jeopardizing their immigration status.  However, many refugees have families with mixed immigration statuses.  Fear and confusion surrounding the Final Rule will likely result in refugees, as well as their non-refugee family members, disenrolling in critical benefits that help them successfully integrate.

225.     Vermont's Refugee Health Program, which is managed through the Department of Health at the Agency of Human Services, works to protect and promote the health of refugees from the time they arrive in Vermont.  The Program collaborates with community partners to help refugees integrate into the health care system.  Among other things, all eligible refugees are immediately enrolled in Medicaid, SNAP, and TANF when they arrive in Vermont. Reenrollment after the initial resettlement period is challenging and can cause substantial confusion.  Immigrants and refugees in Vermont have already demonstrated anxiety and fear surrounding the changes to the public charge rule.

226.     The Final Rule will harm children with at least one non-citizen parent, regardless of the child's citizenship status.  Approximately 9.2 million of the 10.5 million children with at least one immigrant parent in the United States are American citizens by birth.[78]

---

[78] Jeanne Batalova et al., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Pol'y Inst. (June 2018), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families.

227.     Children thrive when their families thrive.  When the immigrant parents of citizen children disenroll or decline to enroll in public benefits, their children will suffer too.  Tragically, experts estimate that up to 2 million citizen children will disenroll from medical insurance and up to 3 million will disenroll from food supplement programs as a result of the Final Rule.[79]

228.     DHS is aware of the devastating impact of the Final Rule on residents who depend on the enumerated public benefits and on residents who depend on benefits that are not directly subject to the Rule.  After enactment of the Welfare Reform Act in the mid-1990s, there was a sharp decline in the usage of benefits, even among groups whose eligibility remained unchanged.  This trend prompted the INS to publish the 1999 Field Guidance to "reduce negative public health and nutrition consequences generated by the confusion."  83 Fed. Reg. at 51,133.

229.     Defendants acknowledge that the Final Rule would affect Plaintiffs' residents regardless of whether the Final Rule directly applies to their immigration status.  84 Fed. Reg. at 41,312.

230.     Additionally, DHS concedes that the chilling effect will have far-reaching consequences with respect to food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers, and increased costs to states and localities.  *Id.* at 41,313.

**2.     The Final Rule Will Result in Negative Public Health Outcomes.**

**a.     The Final Rule will Harm Public Health.**

231.     The Final Rule will endanger health insurance coverage for a substantial number of Plaintiffs' residents and cause significant harms to the public health.

---

[79] Artiga et al., *supra* note 76.

232.     In New York, up to 2 million non-citizens and their citizen children enrolled in Medicaid, Child Health Plus (New York's version of CHIP), and other health care options available through the State may choose to disenroll from these programs because of the Final Rule.

233.     New York City's Health + Hospitals estimates that over 200,000 of its patients could be either directly affected by the Final Rule or change their behavior out of concern about the Final Rule even if they are not directly impacted by the Final Rule itself.  Health + Hospitals expects that patients will respond to the Final Rule in three ways if they believe their use of public benefits could endanger their ability to attain immigration relief in the future, or if they believe it may impact the ability of a household member to attain immigration relief in the future: First, patients may disenroll.  Second, patients may use fewer preventative services resulting in a downstream increase of high-severity and inpatient services.  Third, patients may make it more difficult for healthcare providers to collect identifying information, and thus adversely affect Health + Hospitals' ability to collect payment for services.  Each of these potential responses has detrimental consequences for the City.

234.     In Connecticut, an estimated 45,000 children with non-citizen parents participate in Medicaid or CHIP, known in Connecticut as HUSKY A and HUSKY B.[80]  Based on the projected disenrollment rates from nonprofit institutes, between 6,750 to 15,750 children in Connecticut may lose health care coverage because of the Final Rule.

235.     By deterring participation in Medicaid, CHIP, and other health insurance programs Plaintiff States administer, the Final Rule undermines Plaintiffs' interest in improving

---

[80] Samantha Artiga et al., *Potential Effects of Public Charge Changes on Health Coverage for Citizen Children*, The Henry J. Kaiser Fam. Found. (May 18, 2018), https://www.kff.org/report-section/potential-effects-of-public-charge-changes-on-health-coverage-for-citizen-children-appendix/.

both short- and long-term health and advancing public health interests for both immigrants and citizens.

236.    An increase in uninsured residents will have significant adverse effects on individuals' well-being and the public health of Plaintiff States and of New York City. Immigrants will delay care, avoid seeking treatment, and fall back on financially strained public and nonprofit clinics and hospitals for emergency care.  Children are at significant risk: because uninsured children will not have access to routine well-child visits and primary care, they will be at greater risk for potentially serious health issues and will be more likely to rely on emergency room visits for treatments.

237.    Lack of access to primary care not only puts the health and well-being of non-citizens at risk but also jeopardizes Plaintiffs' ability to provide for the well-being of all their residents.  For example, because uninsured persons are less likely to receive immunizations, there is an increased risk of vaccine-preventable diseases to the entire community.  Additionally, New York City agencies are concerned that patients will fail to seek testing and treatment for communicable diseases, leading to poor health outcomes and increasing the risk of disease transmission.

238.    The Final Rule will also imperil New York's significant progress in combatting the spread of the HIV/AIDS epidemic by reducing enrollment in Medicaid and thus decreasing access to HIV prophylaxis, testing, and care; chilling participation in federal, State, and City programs and services for people with HIV; and discouraging HIV testing.  New York's Medicaid Program for Persons with HIV assists nearly 67,000 New Yorkers by providing health care and other supportive services.  New York State's AIDS Drug Assistance Program helps ensure access to HIV medication for uninsured and underinsured persons; and federal programs,

such as Ryan White, help ensure access to primary medical care, essential support services, and medications for people living with HIV.

239.    Treating persons with HIV and persons at risk for HIV helps prevents the transmission and acquisition of HIV.  By deterring HIV-positive individuals and those at risk for HIV from enrolling in Medicaid and other health insurance programs, non-citizens will not receive life-saving health care and the risk for disease transmission will increase within Plaintiffs' jurisdictions.

**b.    The Final Rule Will Increase Food Insecurity.**

240.    By penalizing immigrant participation in SNAP, the Final Rule undermines Plaintiffs' interest in combatting food insecurity.  While WIC is not an enumerated benefit under the Final Rule, the Rule's chilling effect extends to the WIC program, which works in tandem with other benefits, such as SNAP and Medicaid.

241.    Food-insecure individuals are disproportionately more likely to experience poor physical health.  Food insecurity has particularly harmful direct and indirect impacts on the health, development, and overall well-being of children.  For example, children in food-insecure households are more likely to be sick and experience increased behavioral and emotional issues, and are less likely to perform well in school.[81]

242.    In an effort to stretch their food budget, food-insecure immigrants will be more likely to engage in cost-saving strategies that harm their health.  For example, individuals will

---

[81] *The Impact of Poverty, Food Insecurity, and Poor Nutrition on Health and Well-Being*, Food Res. & Action Ctr. 1 (Dec. 2017), http://frac.org/wp-content/uploads/hunger-health-impact-poverty-food-insecurity-health-well-being.pdf.

purchase inexpensive and nutrient-poor food; underuse or skip medication; and choose between having food and having adequate housing, transportation, health care, and utilities.[82]

243.    Additionally, because fewer non-citizen mothers and their children will participate in WIC, both will be at risk of birth complications, malnutrition, and even death. Moreover, non-citizen mothers will not receive other health supports that WIC provides, like breastfeeding support services.  By deterring non-citizen mothers from accessing these services, the Final Rule will put children at greater risk of short- and long-term adverse health effects that are correlated with reductions in breastfeeding, including diabetes, obesity, and chronic disease, as well as reduced cognitive development.

### c.    The Final Rule Will Increase Housing Insecurity.

244.    The Final Rule's inclusion of housing assistance programs and its overall chilling effect on seeking public assistance will discourage individuals and families from participating in affordable housing programs.  Individuals deterred from participating in housing programs because of the Final Rule will face substantial challenges in finding affordable housing and avoiding homelessness.  For example, the New York State housing market is plagued by low vacancy rates and high rents.  Specifically, the vacancy rate in New York State for non-rural areas is 4.3 percent compared to 6.1 percent nationally.  Nearly 80 percent of New Yorkers living in non-rural areas confront a rental housing market that has less than a 5 percent vacancy rate.  Extremely low vacancy rates can be found throughout New York, including in Albany, Buffalo, New Rochelle, Troy, White Plains, and New York City.  Additionally, the median rent in New York State is $1,075, hundreds of dollars higher than the national median rent of $827.

---

[82] Eleanor Goldberg, *8 Impossible Choices People Who Can't Afford Food Make Every Day*, HuffPost (Oct. 23, 2014), https://www.huffpost.com/entry/hunger-statistics-us_n_6029332.

The disparity is even wider for many municipalities throughout New York, including New York City and Hempstead.

245.    Non-citizens will also incur substantial and potentially prohibitive costs, including thousands of dollars for deposits, brokers' fees, up-front rental payments, and storage and moving fees.

246.    Once an individual forgoes housing because of the Final Rule, it will be very difficult for such an individual to reenroll in housing programs to receive the benefits they once had.  For example, all federal housing programs in New York State have waiting lists, and once individuals terminate their housing benefit, they will not be able to return to their old apartment or neighborhood.

247.    Further, housing insecurity has negative health impacts.  Scarce affordable housing can cause families to cohabitate in crowded, multi-family households, which can have negative health effects from overcrowding and stress.

248.    Housing instability and homelessness further contribute to severe stress and mental health issues, including depression and anxiety—health issues that may follow children into adulthood.  Additionally, children who experience housing instability are less likely to perform well in school and are more likely to experience economic insecurity in adulthood.

### 3.    The Final Rule Will Harm State Economic Interests.

249.    If adopted, the Final Rule will cause Plaintiff States to suffer massive federal funding cuts, significant economic ripple effects, and thousands of lost jobs.  Specifically, even estimating that only 15 percent of households containing at least one non-citizen would disenroll in SNAP and Medicaid—enumerated benefits under the Final Rule—the Final Rule's chilling effect will collectively cost Plaintiff States approximately $1.1 billion in federal funding; $2.3 billion in economic ripple effects; and 15,816 lost jobs.  If benefits disenrollment reaches 35

percent, Plaintiff States collectively stand to lose $2.7 billion in federal funding; $5.5 billion in ripple effects and the loss of tens of thousands of jobs.[83]

### a. The Final Rule Will Increase State Medical and Hospital Costs.

250.    The Final Rule will shift the costs of health care to hospitals and state and local governments.  Moreover, the health care costs state and local governments will bear will increase overall and cause significant financial strain on these institutions.  Because individuals without health insurance wait longer to seek care, the care they eventually receive from emergency rooms is more costly.

251.    Because Medicaid and other health insurance programs offered through the NYS Marketplace have made health insurance more affordable, the number of uninsured New Yorkers has decreased.  In 2013, the uninsured rate was 10 percent—it is now 4.7 percent because of increased health insurance coverage, including through Medicaid.  The Final Rule will reverse this progress.

252.    NYC Health + Hospitals estimates that if 20 percent of potentially affected Medicaid enrollees were to drop their health insurance, over 15,000 insured patients would become uninsured and Health + Hospitals would face a significant financial loss as a result in the first year of the Final Rule being in effect.

253.    DOHMH may face increased costs for clinic services resulting from uncompensated care due to its obligation to provide certain types of care that it must provide regardless of a patient's ability to pay; this may be compounded by an influx of uninsured patients.

---

[83] *Economic and Fiscal Impacts of Reduced Food and Medical Assistance*," Fiscal Pol'y Inst. (2018), http://fiscalpolicy.org/wp-content/uploads/2018/11/50-states-economic-impact-of-public-charge-1.pdf.

254.    In Connecticut—again, because of improved Medicaid access—the uninsured rate for low-income people making less than 200 percent of the Federal Poverty Level fell from 27 percent in 2013 to 15 percent in 2017, while the overall uninsured rate fell from 9 percent to 6 percent.

255.    In Vermont, the overall uninsured rate fell from 7 percent to 4 percent during the same time frame.[84]

256.    Plaintiffs will be also responsible for the substantial financial burden of increased health care costs associated with the decline in SNAP and WIC usage.  Children who grow up with resulting higher rates of disease and malnutrition will likely need to rely on health care provided by state governments to treat these long-term issues.

### b.    The Final Rule Will Shift Costs to Plaintiffs' Benefit Programs.

257.    The Final Rule will shift the costs of providing non-cash, supplemental benefits to state and local governments.  Like Congress, many state and local governments provide non-cash supplemental benefits to their residents to further critical public policy goals—such as improving general public health and nutrition, promoting education and child health, and assisting working families to maintain or achieve economic stability.

258.    The Final Rule will transfer costs to these and other similar programs, forcing Plaintiffs to bear costs that Congress intended the federal government to share.  As many immigrants disenroll or forgo the use of supplemental benefits enumerated in the Final Rule, Plaintiffs will need to try to cover the costs of providing such supplemental benefits to promote the health, nutrition, education, and housing security of their residents.

---

[84] *Health Insurance Coverage of the Total Population*, The Henry J. Kaiser Fam. Found., https://www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

### c.    The Final Rule Will Negatively Affect the Labor Force.

259.    Deterring non-citizens from enrolling in Medicaid and other health insurance programs will negatively affect the workforce.  Without routine, preventive health care, employees will be more likely to miss work because of their own illnesses or because they have to care for sick family members.  This instability in the workforce will diminish economic productivity.

260.    The increase in uninsured workers will significantly affect the health care industry, which disproportionately employs immigrants in lower-skilled positions such as nursing and home-health aides.  In New York, 59 percent of employees in these fields are immigrants—the highest share nationally.  Harms to this workforce will have cascading impacts in the fields and markets where these workers are employed.

261.    Because home health agencies and nursing homes are less likely to provide employer-sponsored insurance, their employees are more likely to be enrolled in Medicaid.  A sicker health-care workforce may result in a labor shortage, harming the workers and the individuals cared for by the workers.

262.    In Vermont, the increase in uninsured workers will affect the farming, fishing, and forestry industry, in which 13.4 percent of all workers are immigrants.[85]  Like lower-skilled health care workers, agricultural workers are unlikely to receive employer-sponsored insurance and therefore more likely to be enrolled in Medicaid.

---

[85] *Immigrants in Vermont*, Am. Immigr. Council, 3 (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_vermont.pdf.

263.     The decrease in Medicaid, SNAP, and WIC enrollment for children, which will worsen health outcomes, will also impede their academic success, and thus limit their economic contributions in the future.

264.     Additionally, the decrease in safe and stable housing interferes with children's educational and financial prospects.

### d.     The Final Rule Will Decrease Economic Productivity.

265.     Research has shown that SNAP helps to stimulate state and local economies.  The SNAP program has a direct economic multiplier effect: for every one dollar in SNAP benefits received, there is an approximate $1.79 in increased economic activity.[86]

266.     In 2017, New York had one of the highest number of SNAP benefit redemptions in the United States, along with California, Texas, and Florida.  More than $4.7 billion federal SNAP dollars were spent in New York State at the more than 18,600 authorized retailers, including supermarkets, grocery stores, and convenience stores.[87]

267.     In 2017, Connecticut SNAP recipients spent $653.08 million at some 2,600 approved authorized retail locations, buoying the state's economy. [88]

268.     In 2017, Vermont SNAP recipients spent $112.95 million at 700 authorized locations in the State.[89]

---

[86] Kenneth Hanson, *The Food Assistance National Input-Output Multiplier (FANIOM) Model and Stimulus Effects of SNAP*, U.S. Dep't of Agric., iv (Oct. 2010), https://www.ers.usda.gov/webdocs/publications/44748/7996_err103_1_.pdf?v=0.

[87] U.S. Dep't of Agric., Fiscal Year 2017 At a Glance, 3 (Jan. 16, 2018), https://fns-prod.azureedge.net/sites/default/files/snap/2017-SNAP-Retailer-Management-Year-End-Summary.pdf.

[88] Catlin Nchako & Lexin Cai, *A Closer Look at Who Benefits from SNAP: State-by-State Fact Sheets*, Ctr. for Budget and Pol'y Priorities (Dec. 3, 2018), https://www.cbpp.org/research/food-assistance/a-closer-look-at-who-benefits-from-snap-state-by-state-fact-sheets#Connecticut

[89] Catlin Nchako & Lexin Cai, *A Closer Look at Who Benefits from SNAP: State-by-State Fact Sheets*, Ctr. for Budget and Pol'y Priorities (Dec. 3, 2018), https://www.cbpp.org/research/food-assistance/a-closer-look-at-who-benefits-from-snap-state-by-state-fact-sheets#Vermont.

269.    SNAP also benefits local farms in New York.  In 2017, approximately 60,000 New York households spent $3.4 million federal SNAP dollars at authorized farmers' markets throughout the State.[90]

270.    Vermont SNAP recipients are eligible for "crop cash," a program funded by the USDA that incentivizes spending SNAP benefits at local farmer's markets.[91]  In 2018, recipients spent $62,533 in crop cash in Vermont.

       **e.     The Final Rule Will Increase the Cost of Providing Shelter.**

271.    The lack of participation in affordable housing programs will increase emergency shelter use, which will place a substantial financial strain on states and municipalities.  It is significantly more expensive to house a family in an emergency shelter than to provide long-term housing through either public housing or Section 8.  In 2016, it cost Connecticut an average of over $91 per night – or $33,360 per year – to shelter a homeless person, as against an average of $15,198 annually to rent a HUD-subsidy-eligible two-bedroom apartment at the average statewide HUD-determined fair market rent.[92]  In Vermont, the average cost for emergency housing from the state general assistance fund was $74 per night.

       **4.     The Final Rule Interferes With Obligations Under State Law.**

272.    The Final Rule will significantly impede the ability of Plaintiffs, their agencies, and their institutions to provide critical care and services to their residents, including those as

---

[90]  Press Release, N.Y.S. Governor Andrew M. Cuomo, Governor Cuomo Announces Plan to Protect SNAP Recipients' Access to Farmers' Markets (July 27, 2018), https://www.governor.ny.gov/news/governor-cuomo-announces-plan-protect-snap-recipients-access-farmers-markets.

[91]  NOFA-VT, https://nofavt.org/cropcash.

[92]  *CECHI: Connecticut Estimating Costs of Child Homelessness Initiative* (Apr. 26, 2016), http://www.pschousing.org/files/CECHI_4_21_16-2final.pdf.

mandated by state law.  The Rule's chilling effect prevents Plaintiffs and their agencies from fulfilling their mandate to provide aid to their residents.

273.    For example, Article XVII of the New York State Constitution provides that "the aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions."  N.Y. Const., art. XVII, § 1.  It also provides that "the protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefore shall be made by the state and by such of its subdivisions."  *Id*.

274.    In accordance with this constitutional mandate, the New York State Legislature created OTDA, and charged it with providing for the health and well-being of New York residents.  The New York Legislature has made clear that this includes providing "family assistance," "safety net assistance," and "medical assistance" to non-citizens.  *See* N.Y. Social Services Law § 122.  Because the Final Rule deters non-citizens from accessing benefits that and other New York State agencies administer, the Final Rule would significantly frustrate OTDA's constitutional and statutory responsibilities.

275.    Similarly, in New York State, the Office for New Americans ("ONA")—a statutorily-created state-level immigrant services office—is charged with helping immigrants fully and successfully integrate into their communities through, among other things, English language instruction and job training.  Because the Final Rule would cause immigrants to forgo services necessary to their health and well-being, the Final Rule would impede ONA's ability to provide its core services, and will instead force ONA to divert resources to deal with the effects of unmet basic needs, and the burdens that the Final Rule imposes.  For example, attorneys that ONA's resources support may need to divert significant staff time to assisting immigrants complete the forms that the Final Rule requires.

5.     **The Final Rule Imposes Programmatic and Administrative Burdens on Plaintiffs and Their Institutions.**

276.     The Final Rule will impose significant additional programmatic and administrative burdens on the state and local agencies that administer many of the programs that are included in the public charge analysis, or will be implicated by the Final Rule's chilling effect.

277.     Plaintiffs will no longer be able to consistently rely on current systems they have invested in to streamline benefits enrollment, and will need to instead employ costly and time-consuming processes that will strain their budgets.

278.     For example, New York, Connecticut, and Vermont commonly determine whether individuals are income-eligible for WIC based on their participation in programs like Medicaid and SNAP.  Because the Final Rule will result in a decrease in participation in Medicaid and SNAP among WIC families, WIC staff will no longer be able to rely on such participation to determine income-eligibility for many individuals.

279.     Accordingly, state agency staff will need to spend additional time conducting income assessments for WIC applicants, which is one of the most burdensome elements of the process.

280.     Plaintiffs will also need to undertake significant efforts to educate agency staff and the public on the Final Rule.  Indeed, although DHS significantly underestimates the costs of familiarizing individuals with the Final Rule, it acknowledges these costs exist, and will burden a wide variety of Plaintiffs' entities.  84 Fed. Reg. at 41,467, 41,488.

281.     NYC Health + Hospitals will incur significant costs to implement the Final Rule, which will include costs for staff training, outreach, preparation of materials, and additional financial counseling and legal services to support its patients.  MetroPlus, the managed care plan

owned by Health + Hospitals, would also experience a negative financial impact related to decreased enrollment and the cost of implementation.

282.    NYSDOH expects to expend approximately $8.3 million because of the Final Rule.  These costs include training the NYS Marketplace customer service center representatives and approximately 7,000 in-person assistors who help residents apply for health insurance programs; developing policies and procedures for these representatives to refer non-citizens and citizens with non-citizen family members to other state agencies, like ONA for more information with respect to the Final Rule; and increased call time for customer service center representatives responding to questions about the Rule.

283.    Additionally, state agencies will have to divert staff resources to educate vulnerable communities, and address increased call volume and traffic from concerned residents.[93]  In New York, for example, ONA has already expended considerable efforts in responding to the Proposed Rule.  For instance, in response to a significant increase in telephone calls and individuals seeking guidance from ONA's community partners, ONA hosted a two-day phone bank on public charge in early October 2018, which drew over 800 callers, and resulted in over 1,000 referrals to other services.  ONA anticipates that because of the Final Rule it will need to continue and intensify these efforts.

284.    Likewise, the City of New York has expended and will continue to expend substantial resources in connection with the new regulation.  The City's efforts include creating and implementing a comprehensive media and community outreach and education campaign, developing a script for 311 operators to field calls from New Yorkers concerned about how the

---

[93] The Office for New Americans, a New York State immigration service, has reported triple the staff time necessary to answer questions on public charge and enrollment in public benefits since the Proposed Rule was published.

rule will affect them, participating in over 150 public meetings, developing a City-wide strategy with consistent messaging for use by all affected City Agencies, expanding the scope of the City's immigration telephone hotline in order to better address New Yorkers' questions and concerns about the public charge regulation, and connecting New Yorkers who may be impacted—or who fear that they may be impacted—by the regulation with referrals to City-funded, free legal services.

285.   Moreover, state agencies will have to expend time to process disenrollment requests and applications to re-enroll ("churn").   Churn is associated with fear-based disenrollment followed by subsequent re-enrollment.   Re-enrollment may happen when individuals learn they are not subject to a public charge determination or when medical or nutritional problems advance such that re-enrollment is necessary despite the potential negative impact on the family's immigration status.

286.   In some contexts, the effects of disenrollment and re-enrollment will be particularly costly.   For example, NYSHCR currently has no policies or procedures in place to assist individuals in reentering federal housing programs after termination because re-enrollment is rare.   If the Final Rule were to go into effect, NYSHCR may need to devise policies and procedures to address how to assist families that may relinquish their housing because of fear, but then may subsequently seek housing because of a change in circumstances.

287.   The Final Rule also obligates state and local agencies to provide information to USCIS to determine whether a "public charge bond has been breached."   Gathering, storing, and transmitting this information will require Plaintiffs either to expend additional resources or to divert resources from other areas to comply.

6.      **The Final Rule Harms Plaintiffs' Interest in Civil Rights.**

288.    Plaintiffs have an interest in promoting and protecting the civil rights of their

citizens, which the Final Rule dramatically undermines.  The Final Rule would impose

devastating and disproportionate burdens on Plaintiffs' most vulnerable populations, including

individuals with disabilities, women, and people of color.

a.      **The Final Rule Disproportionately Impacts Individuals with Disabilities.**

289.    The Final Rule targets and penalizes individuals with disabilities; the Rule will

have a direct and disproportionate impact on immigrants with disabilities.

290.    Individuals with disabilities disproportionately rely on public benefit programs—

often because of their disability—to be self-sufficient.  Approximately 33 percent of Medicaid

enrollees between the ages of 18 and 65 have a disability, as compared with approximately 12

percent of adults under the age of 65 in the general United States population.  Additionally, non-

elderly individuals with disabilities are significantly less likely to have private health

insurance—often because of their disability—because of decreased access to employer-provided

health insurance and increased health care needs.[94]  Medicaid provides preventative and primary

care and medical treatment for chronic conditions.  It also provides access to medical devices,

and home- and community-based services, which are not covered by private insurance.

291.    Although the Final Rule exempts services funded through Medicaid but instituted

through the Individuals with Disabilities Education Act ("IDEA") and exempts Medicaid

benefits received by children themselves, as detailed above, the Final Rule will cause families to

---

[94] MaryBeth Musumeci & Julia Foutz, *Medicaid Restructuring Under the American Health Care Act and Nonelderly Adults with Disabilities*, The Henry J. Kaiser Fam. Found. (Mar. 2017), http://files.kff.org/attachment/Issue-Brief-Medicaid-Restructuring-Under-the-American-Health-Care-Act-and-Nonelderly-Adults-with-Disabilities.

disenroll even from benefits that are not technically within the scope of the Final Rule and will likely deter families from enrolling or maintaining their special needs children in Medicaid. Public health insurance programs like Medicaid provide specialized care and services that help children with special needs stay healthy, manage their activities of daily living, attend school, and, for some, to stay alive.[95]

### b.      The Final Rule Disproportionately Impacts Women.

292.    The Final Rule disproportionately harms women because non-citizen women, particularly women of color, are at a higher risk for economic insecurity than non-citizen men are and therefore are more likely to participate in and benefit from the supplemental public programs that the Final Rule targets.  This heightened risk of economic insecurity is due in part to pay disparities, discrimination, overrepresentation of immigrant women and especially immigrant women of color in low-wage work, which all inhibit the ability of immigrant women to have private health care coverage and food security.  For example, in 2017, 47 percent of non-citizen recipients of Medicaid were women (as compared to 40 percent men and 13 percent children).  Similarly, 48 percent of non-citizen recipients of SNAP were women (as compared to 40 percent men and 12 percent children).[96]

293.    Moreover, the Final Rule harms women by including employment history in the public charge analysis.  *See* 84 Fed. Reg. at 41,503.  Women have a disproportionate responsibility for caregiving duties and immigrant women often forgo careers in the formal

---

[95] MaryBeth Musumeci & Julia Foutz, *Medicaid's Role for Children with Special Health Care Needs: A Look at Eligibility, Services, and Spending*, The Henry J. Kaiser Fam. Found. (Feb. 22, 2018), https://www.kff.org/medicaid/issue-brief/medicaids-role-for-children-with-special-health-care-needs-a-look-at-eligibility-services-and-spending/.

[96] National Women's Law Center calculations based on U.S. Census Bureau, 2017 Current Population Survey, using Sarah Flood, Miriam King, Renae Rodgers, Steven Ruggles, and J. Robert Warren. Integrated Public Use Microdata Series, Current Population Survey: Version 6.0 [dataset]. Minneapolis, MN: IPUMS, 2018, at https://doi.org/10.18128/D030.V6.0.

economy to focus on childcare and other familial needs.  In the Final Rule, DHS pays lip service to this reality by including a provision that permits DHS to consider whether the applicant is a "primary caregiver" for an individual presently residing in the applicant's home.  However, the Final Rule's primary caregiver consideration applies only to current caregivers, and will not help immigrants whose employment history is limited by their former caregiver role.  *See id.* at 41,438, 41,504, 41,438, 41,502 (to be codified at 8 C.F.R. 212.21(f)).  Moreover, when determining whether an applicant is a "primary caregiver," USCIS will consider evidence of whether the individual is residing in the alien's home, the individual's age and medical condition, including disability.  *See id.* at 41,504.

294.    The Final Rule further disproportionately affects women by considering lack of high school diploma and LEP as indicators of likelihood that an immigrant may become a public charge.  *See* 83 Fed. Reg. at 51,190, 51,195.  Women receive less formal education in many regions.  This is even more likely to harm women when compounded with the above focus on employment history.

### c.    The Final Rule Disproportionately Impacts People of Color.

295.    The Final Rule will overwhelmingly harm non-white immigrants.  Of the 25.9 million immigrants who will be affected by the Rule, 23.3 million are non-white.[97]

296.    Immigrant applicants of color will be disproportionately harmed by the inclusion of LEP as a negative factor.  In 2015, individuals with LEP represented 9 percent[98] of the United States population ages five and older.  New York is home to one of the highest concentrations of

---

[97] Custom Tabulation by Manatt Phelps & Philips LLP, *Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard*, (Oct. 11,  (2018), https://www.manatt.com/Insights/Articles/2018/Public- Charge-Rule-Potentially-Chilled-Population (using 2012-2016 5-Year American Community Survey Public Use Microdata Sample (ACS/PUMS); 201220162012-201620122016 5-Year American Community Survey (ACS) estimates accessed via American FactFinder; Missouri Census Data Center (MCDC) MABLE PUMA-County Crosswalk).

[98] Zong & Batalova, *supra* note 39.

individuals with LEP—approximately 10 percent of the United States individuals with LEP call

New York home.  In New York, 2,518,700 people—more than 13 percent of New York's

population—had limited English proficiency.

297.    In 2015, 278,700 people—more than 8 percent of Connecticut's population—had

limited English proficiency.[99] In Vermont, this number was 9,000, or roughly 1.5 percent of

Vermont's population.[100]

298.    Latino and Asian immigrants have the lowest rates of English proficiency, as

compared to European and Canadian immigrants who have the highest rates.[101]

299.    The Final Rule's weighted circumstances test favors white immigrants.  Sixty

percent of green card applicants from Mexico and Central America and 41 percent from Asia had

two or more negative factors, whereas only 27 percent of immigrants from Europe, Canada, and

Oceania have two or more negative factors.[102]  Immigrants from Europe and Canada, and

Oceania (primarily Australia and New Zealand) are the least likely to be affected by the Final

Rule's changes to public charge because they are generally wealthier, more educated, and more

likely to speak English.  In fact, immigrants from these regions with predominantly white

populations have the highest proportion of recent lawful permanent residents with family income

above 250 percent FPG.[103]

---

[99] *Id.*

[100] *Id.*

[101] Jynnah Radford, *Key Findings about U.S. Immigrants*, Pew Res. Ctr. (June 17, 2019), https://www.pewresearch.org/fact-tank/2019/06/17/key-findings-about-u-s-immigrants/; *Language Spoken at Home and English-speaking Ability, by Age, Nativity and Region of Birth: 2016*, Pew Res. Ctr., http://assets.pewresearch.org/wp-content/uploads/sites/7/2018/09/06132759/PH_2016-Foreign-Born-Statistical-Portraits_Current-Data_7_Language-by-age-nativity-and-birth-region.png.

[102] Capps et al., *supra* note 38.

[103] *Id.* at 19-26.

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act—Exceeds Statutory Authority under INA)

300.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

301.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

302.    Defendants may only exercise authority conferred by statute.  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

303.    The Final Rule exceeds Defendants' statutory authority because the Final Rule imposes a novel meaning of "public charge" that is contrary to the well-settled meaning of that term.  The Final Rule disregards the long-standing meaning of primary and permanent dependence incorporated into the definition of public charge, and considers receipt of *any* public benefits for 12 months in the aggregate within any 36-month period sufficient to render an applicant a public charge.  This change is not authorized by the relevant federal statutes.

304.    The Final Rule also exceeds Defendants' statutory authority because the Final Rule, contrary to Congressional intent, would permit Defendants to consider applicants' use of non-cash benefits, such as food supplements, public health insurance, and housing assistance in a public charge determination.

305.    The Final Rule also exceeds Defendants' statutory authority because the weighted circumstances test targets applicants who Congress never intended to consider public charges.

306.    The Final Rule further exceeds Defendants' statutory authority because the Final Rule would permit Defendants to apply the public charge determination to applicants seeking to adjust non-immigrant visas and deprive them of a totality of circumstances inquiry.

307.    The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA.  5 U.S.C. § 706(2)(C).

308.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act—Exceeds Statutory Authority under FVRA)

309.    The Final Rule further exceeds Defendants' statutory authority because Defendants lacked authority under the FVRA to issue the Rule.

310.    The HSA establishes an order of succession for the position of Acting Secretary of Homeland Security. 6 U.S.C. §§ 113(a)(1)(A), 113(g)(1), 113(g)(2).  After the first two offices, the order of succession is set by the Secretary of Homeland Security.  *Id.* § 113(g)(2).

311.    Before leaving office on April 10, 2019, former Secretary Nielsen amended the order of succession.  Under the express terms of the order of succession she created, upon her resignation, the Director of CISA was the lawful successor to assume the position of Acting Secretary.

312.    Kevin McAleenan, who was at the time Commissioner of CBP, nevertheless unlawfully assumed the title of Acting Secretary of Homeland Security.  Because McAleenan was not the lawful successor to former Secretary Nielsen, he therefore lacked the authority to issue the Final Rule.

313.    Under the FVRA, 5 U.S.C. § 3348(d)(1), McAleenan's issuance of the Rule was performed without authority, in violation of the FVRA.  As a result, the Rule is not in accordance with law and was issued in excess of statutory jurisdiction, authority, or limitations, in violation of the APA.

314.    The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA.  5 U.S.C. § 706(2)(C).

90

315.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act—Not in Accordance with Law)

316.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

317.     Under the APA, a court must set "aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

318.     The Final Rule conflicts with Section 504 of the Rehabilitation Act, which provides that no individual with a disability "shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]"  29 U.S.C. § 794(a).

319.     The Final Rule also conflicts with the SNAP statute, which provides that "[t]he value of benefits that may be provided under this chapter shall not be considered income or resources for any purpose under any Federal, State, or local laws, including, but not limited to, laws relating to taxation, welfare, and public assistance program."  7 U.S.C. § 2017(b).

320.     Finally, the Final Rule conflicts with the Welfare Reform Act, which provides that "a State is authorized to determine the eligibility of an alien . . . for any designated Federal program."  8 U.S.C. § 1612(b)(1).

321.     The Final Rule is therefore "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

322.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**FOURTH CLAIM FOR RELIEF**

**(Administrative Procedure Act—Arbitrary and Capricious)**

323.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

324.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

325.     The Final Rule is arbitrary and capricious because DHS's justification for its decision runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence.

326.     The Final Rule is arbitrary and capricious because Defendants have failed to reasonably justify their departure from decades of settled practice with respect to the scope and definition of a "public charge" and their expansion of the public charge determination to include factors that are not rationally related to whether an individual will become primarily and permanently dependent on governmental assistance.

327.     The Final Rule is arbitrary and capricious because it arbitrarily discriminates against individuals with disabilities and does not address the Rule's conflict with Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

328.     The Final Rule is arbitrary and capricious because its replaces the statutory totality of the circumstances test with a test that is vague, arbitrary, and unsupported by the evidence.

329.     The Final Rule is arbitrary and capricious because it is pretextual.  While the Final Rule purports to identify individuals who will be public charges, its adoption of factors that bear no reasonable relationship to that inquiry demonstrates that defendants were instead seeking to reduce immigration by immigrants of color.

330.     The Final Rule is arbitrary and capricious because DHS fails to adequately address the Final Rule's discriminatory impact. The Final Rule is arbitrary and capricious because it does not adequately quantify or consider the harms that will result.

331.     The Final Rule is arbitrary and capricious because it relies on incorrect legal interpretations of *Matter of Vindman*, 16 I &N Dec. 131 (Reg'l Comm'r 1977), and *Matter of Harutunian*, 14 I&N Dec. 583 (Reg'l Comm'r 1974).

332.     The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

333.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## FIFTH CLAIM FOR RELIEF

### (Administrative Procedure Act—Without Observance of Procedure Required by Law)

334.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

335.     The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

336.     The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  5 U.S.C. § 553(c); *see also id.* § 553(b).

337.     The Final Rule failed to quantify harm to public health, state economies, and other administrative burdens.

338.     In addition, the Final Rule entirely eliminates the benefits value threshold of 15 percent of the FPG in the public charge definition and allows DHS offices to stack the number of months when counting how long an applicant has used benefits.  Neither of these policies was discussed in the Proposed Rule, and they are not a logical outgrowth of the Proposed Rule.

Accordingly, these provisions were adopted without conforming to procedure required by law in violation of 5 U.S.C. § 706(2)(D).

339.    The regulations as drafted must be set aside as in violation of 5 U.S.C. § 706(2)(D).

## SIXTH CLAIM FOR RELIEF

### (U.S. Constitution, Fifth Amendment—Due Process Clause Equal Protection Guarantee)

340.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

341.    Under the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution, the federal government cannot deny to any person the equal protection of its laws.  The Due Process Clause prohibits the federal government from discriminating against individuals on the basis of race, ethnicity, and national origin.  U.S. Constitution Amend. V.

342.    Defendants were motivated by discriminatory animus toward Latinos and immigrant communities of color when they promulgated the Final Rule.

343.    Defendants intend to target Latino immigrants and immigrants of color with the Final Rule, as part of their broader effort to reduce the population of permanent residents of color in the United States.

344.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SEVENTH CLAIM FOR RELIEF

### (Federal Vacancies Reform Act and Homeland Security Act)

345.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

346. Pursuant to the FVRA, an agency action taken by an unlawfully serving acting official "shall have no force and effect" and "may not be ratified" after the fact. 5 U.S.C. § 3348(d)(1), (2).

347. The HSA establishes an order of succession for the position of Acting Secretary of Homeland Security. 6 U.S.C. §§ 113(a)(1)(A), 113(g)(1), 113(g)(2).

348. Defendant Kevin McAleenan was not the lawful successor to former Secretary Nielsen, and therefore lacked the authority to issue the Final Rule.

349. Under the FVRA, 5 U.S.C. § 3348(d)(1), McAleenan's issuance of the Final Rule was performed without authority and accordingly, has "no force and effect."

350. Because Defendant McAleenan was unlawfully serving as Acting Secretary, the official actions he took in that role, including issuing the Final Rule, were *ultra vires* actions that are void *ab initio* under the plain terms of the FVRA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1. Declare that the Final Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2. Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3. Declare that the Final Rule is without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

4. Declare that the Final Rule is unconstitutional;

5. Vacate and set aside the Final Rule;

6.      Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

7.      Postpone the effective date of the Final Rule pursuant to 5 U.S.C. § 705;

8.      Declare that Defendant McAleenan's service as Acting Secretary of Homeland Security was unlawful under the Federal Vacancies Reform Act and Homeland Security Act;

9.      Declare that the Final Rule is invalid under the Federal Vacancies Reform Act and Homeland Security Act;

10.     Grant other such relief as this Court may deem proper.

DATED:  October 2, 2020                    Respectfully submitted,

                                           LETITIA JAMES
                                           *Attorney General of the State of New York*

                                           By: */s/ Elena Goldstein*
                                           Elena Goldstein
                                             *Deputy Chief, Civil Rights Bureau*
                                           Matthew Colangelo
                                             *Chief Counsel for Federal Initiatives*
                                           Ming-Qi Chu, *Section Chief, Labor Bureau*
                                           Amanda Meyer, *Assistant Attorney General*
                                           Abigail Rosner, *Assistant Attorney General*

                                           Office of the New York State Attorney
                                           General
                                           28 Liberty Street
                                           New York, NY 10005
                                           Phone: (212) 416-6021
                                           Elena.goldstein@ag.ny.gov

                                           *Attorneys for the State of New York*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: /s/ *Tonya Jenerette*
Tonya Jenerette
  *Deputy Chief, Impact Litigation Unit*
Cynthia Weaver, *Senior Counsel*
Hope Lu, *Senior Counsel*
Doris Bernhardt, *Senior Counsel*
Melanie Ash, *Senior Counsel*
100 Church Street, 20th Floor
New York, NY 10007
Phone: (212) 356-4055
tjeneret@law.nyc.gov

*Attorneys for the City of New York*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: /s/ *Benjamin Battles*
Benjamin Battles, *Solicitor General*
Eleanor Spottswood, *Assistant Attorney General*
Julio Thompson, *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*

WILLIAM TONG
*Attorney General of Connecticut*

By: /s/ *Joshua Perry*
Joshua Perry
  *Special Counsel for Civil Rights*
55 Elm Street
Hartford, CT 06106-0120
(860) 808-5318
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*